**Pages 1 - 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

SINCO TECHNOLOGIES PTE, LTD,    )
                                )
            Plaintiff,          )
                                )
   VS.                          )      **NO. C 17-05517 EMC**
                                )
SINCO ELECTRONICS (DONGGUAN)    )
CO., LTD.; XINGKE ELECTRONICS   )
(DONGGUAN) CO., LTD; NG CHER    )
YONG aka CY NG; and LIEW YEW    )
SOON aka MARK LIEW,             )
                                )
            Defendants.         )
_____)

San Francisco, California
Thursday, October 25, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

    ROPERS, MAJESKI, KOHN & BENTLEY
    1001 Marshall Street
    Redwood City, California  94063
    BY:  **LAEL D. ANDARA, ATTORNEY AT LAW**
        **MICHELLE G. TREVIÑO, ATTORNEY AT LAW**

For Defendants:

    DEHENG LAW OFFICES
    7901 Stoneridge Drive - Suite 208
    Pleasanton, California  94588
    BY:  **CHRISTOPHER J. HOGAN, ATTORNEY AT LAW**
        **YI YAO, ATTORNEY AT LAW**

Reported By:       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   Official Reporter

**Thursday - October 25, 2018**                          **1:46 p.m.**

                          **P R O C E E D I N G S**

                                ---000---

THE CLERK:  Calling Civil Action 17-5517, SinCo Technologies versus Sinco Electronics.

Counsel, please approach the podium and state your appearances for the record.

MR. ANDARA:  Good afternoon, Your Honor.  Lael Andara and Michelle Treviño and our paralegal Manali Shah for the plaintiff SinCo Technologies.

THE COURT:  All right.  Thank you.

MR. HOGAN:  Good afternoon, Your Honor.  Christopher Hogan for defendant CY Ng, and my colleague Yi Yao is here.

THE COURT:  All right.  We're on for defendant -- or plaintiff's motion for preliminary injunction.

Let me ask, who has been served and who can properly be subject to any preliminary injunction besides Mr. Ng?

MR. ANDARA:  So we received -- the clerk entered a default on August 24th against Electronics DG, the corporation.  The other entities are related if not the same as that corporation, but the time has not run under Article 15 of the Hague Convention except for Electronics DG.

On approximately October 20th of this month, Mark Liew was substitute serviced in Malaysia, as was M.L. Tjoa I believe on October 10th in Singapore, both by substitute service.

**THE COURT:** By substitute service.  And have they -- they've not made any appearance?

**MR. ANDARA:** They have not.

**THE COURT:** And do we know whether that sub service is compliant with whether it's the Hague Convention or any other --

**MR. ANDARA:** Well, the Hague Convention wouldn't apply for Malaysia and Singapore.  It would apply for China, but in Singapore and in Malaysia you're allowed to do personal service.  You're allowed to send it by registered mail, and we've also sent it by e-mail.

**THE COURT:** So the other -- so Mark Liew is located where?

**MR. ANDARA:** Malaysia.

**THE COURT:** And Mr. -- is it Ms. or Mr. Tjoa?

**MR. ANDARA:** Mr. Tjoa.

And the declarations for the process service for both of those individuals have been filed with the court on ECF.

**THE COURT:** And have these individuals been served with a copy of the preliminary injunction motion?

**MR. ANDARA:** So we e-mailed -- so while this is going on, after the state action was brought on related matters, they filed no less than 15 trademark applications with the U.S. PTO based on --

**THE COURT:** "They" being?

**MR. ANDARA:**  Electronics DG --

**THE COURT:**  Okay.

**MR. ANDARA:**  -- and Xingke, which are the same company, and I'm happy to illustrate why.

So we used the e-mails that were provided to us, and we provided them not only the motion but the reply, and I've got copies of that I can show the Court if you're so inclined.

**THE COURT:**  So sum up who's been served.  And also what about Electronics DG or Xingke?  Have they been -- has that entity -- even though they're in default, have they been served with this motion?

**MR. ANDARA:**  Well, Electronics DG is the same as -- they're the ones we got a default -- or that the clerk entered a default on the 24th.

**THE COURT:**  Right.

**MR. ANDARA:**  That's also who we believe those e-mails are related to because that's whose name is on the trademark application pending in the U.S. PTO.  So they would have received that by e-mail, as I referenced, and actually this motion and the reply.

**THE COURT:**  This motion by e-mail?

**MR. ANDARA:**  Correct.

**THE COURT:**  Do you have any reason to believe otherwise?

**MR. HOGAN:**  I have no reason to believe what was done

or was not done.  It's really not something I'm aware of.

I am aware that there was some service of process recently by substitute services attempted.  You know, I can't go too far out the bounds of the fellow that I represent; but you also have to have jurisdiction over the defendants, and I did address that briefly in my papers, before we get to even the merits of the injunction.

So obviously I think it's very shaky and I did address it, but I don't know what Mr. Andara did.  I don't know what these folks received, and I can't say they're all the same either. The relationship between the companies is complicated and when they're in the case, they can sort it out.

THE COURT:  All right.  Well, let me ask another question.  What is the status of the state court proceeding? There's a preliminary injunction there?

MR. ANDARA:  We have a preliminary injunction.  I guess Mr. Hogan's client -- and Mr. Hogan's client was the superior for Mark Liew, who is also in the state court action. He also has a preliminary injunction against him.  So all the parties who have shown up in state court have preliminary injunctions against them related to the trade secret aspects of this case.

THE COURT:  And those would be Mr. Ng and Mr. Liew?

MR. ANDARA:  Correct.

THE COURT:  And tell me more about what that

injunction does.

MR. ANDARA: Sure. So specifically Exhibit A of our motion is the preliminary injunction as it relates to Mark Liew; and for purposes of this hearing, like I mentioned, 1 through 3 tend to be focused on the trade secret aspect. Section 4 says defendant is prohibited from passing himself off as a current employee of SinCo Technologies PTE Limited. I believe defendants are arguing that that stands in the same footprint as the relief we're seeking before this Court, and we articulated in the reply why a passing-off claim is an unfair competition claim separate and apart from a trademark infringement claim.

And then Exhibit B is the preliminary injunction against Mr. Hogan's client CY Ng, and it references Section 3 -- or paragraph 3 about midway down. It says, "Defendant shall cease to use plaintiff's trademarks registered in the United States," but the preliminary injunction clearly states throughout that it's limited to the state of California.

And then in a later order it indicates that it's not even sure that it has -- it believes it may be preempted by this case, and specifically acknowledges that this case is where he believes this issue should be decided as to the trademark infringement.

And, more importantly, this injunction also says "Nothing in this preliminary injunction shall prevent defendant from

identifying his employer as Xingke Electronics," and we're asserting that "Xingke" is also a form of infringement.

**THE COURT:**  All right.  So with respect to the injunction that is sought in this court, let me ask, there is some indication that there's use of Sincoo with two Os; is that right?

**MR. ANDARA:**  Can we get the screen up so I can actually --

**THE COURT:**  Yeah.

**MR. ANDARA:**  So if you could go to page 704, which is ECF 55, page 2 of 70.  This is a letter that I sent on February 16th, 2018.  If you see on the business card there, the Sinco trademark and logo has exact same colors, same font, same logo with the ying and the yang symbol in the background. All that's been added is an extra O.  So instead of Sinco it says Sincoo.

**THE COURT:**  So I understand that that could be problematic in terms of confusion.

What about the spelling X-I-N-G-K-E, Xingke --

**MR. ANDARA:**  Sure.  So --

**THE COURT:**  -- to a U.S. audience?

**MR. ANDARA:**  To a U.S. audience, and that's actually critical because if we look at Exhibit K, page 340, which is ECF 54-13, page 103 of 127, this is the deposition of CY Ng of February 12th, 2018, and I asked him (reading):

"As far as you know, so are the characters -- it's your understanding the characters that are used in China to designate the company Electronics DG, are those characters the same under" --

**THE COURT:**  No, I understand the Chinese characters are the same.  That's why I said "for this audience," the U.S.

**MR. ANDARA:**  Correct.  So what they did is they sent -- took our ex-employees, came in and said they were Sinco.  They transferred the business.  They got agreements.

And then six months, nine months later in March of 2017, they announced that they were doing a name change to Xingke. The problem with that, though, if we go to Exhibit BBB, which is the Xingke website at 670, they continually treat these as the same company.

If we look at 672, their description of the company talks about Xingke was established in 2000 after 10 years of steady development.  Well, Xingke didn't exist until 2017.  They say at 2007, Dongguan Humen XINGKE Industrial Park was completed and put into operation.  Again, 10 years later was the first time that that was used.

And throughout this website, they reference Sinco.  For example, 675 from their website is a picture of their building. You can see clearly that is the logo of SinCo, which was removed and replaced, according to CY Ng's deposition testimony, in 2018 to be Xingke but it's still green and red.

The point being is the consumers still assume that SinCo and Xingke are the same.  They've been presented in that manner.

**THE COURT:**  Because of the substance what's on the site, not just changing the title --

**MR. ANDARA:**  Right.

**THE COURT:**  -- and the wording but the pictures and the description of the entity.

**MR. ANDARA:**  And it's the same people.  They met with CY and Mark as SinCo employees, they changed the contract, and now they understand the company -- and what's important is Sinco and Xingke are phonetic translations of those characters. So if you say "Xingke" on the phone to a Chinese speaker, they hear the same thing.

So for purposes of somebody in -- there they're at the same address.  They're the same Chinese characters.  It's the same people operating these companies.  They basically are still taking the benefit of SinCo's trademark.

**THE COURT:**  Well, who are -- the U.S. customers --

**MR. ANDARA:**  Yes.

**THE COURT:**  -- who are they?

**MR. ANDARA:**  Well, this is under seal.

**THE COURT:**  The ones that would be -- I don't need to know their names.

**MR. ANDARA:**  Right.

**THE COURT:**  The ones that would be subject to the confusion.

**MR. ANDARA:**  So we --

**THE COURT:**  Are they Chinese speaking?  Who are they?

**MR. ANDARA:**  Well, it's a mix.  Some of the engineers are and some are not.  For example, we have --

**THE COURT:**  The customers; right?

**MR. ANDARA:**  Correct.  Because a lot of the customers, you know, travel and go back and visit the factory, and so some of them will speak Chinese to engage with the engineers.

But our issue with the trademark is really the English side of it.  For example, our complaint and the request for preliminary injunction is for their use of Sinco and Xingke on their English translation.

We don't request or require them to do anything to their translations on the Chinese aspects of their website.  It's the issue is that Sinco and Xingke have become synonymous based on the use and how the U.S. customers understood that change occurred and also the phonetic equivalent.  You know, it's the same exact company with a different phonetic translation of the same characters.

**THE COURT:**  That's why I'm asking you.  If you're focusing on the English and you say the phonetics are exactly the same, if you didn't know Chinese and you just looked at the Romanization, you wouldn't necessarily know -- you wouldn't as

an American -- as an English speaker, you wouldn't necessarily pronounce those the same.

**MR. ANDARA:**  Correct, and that's why it's -- right, but you can't divorce the context.  In other words, this wasn't a situation where Sinco was in the market and then Xingke came out on the market separate and apart.

**THE COURT:**  So you're saying in context --

**MR. ANDARA:**  Correct.

**THE COURT:**  -- it is confusing; but the name itself, if it weren't -- if they had changed completely the website and said "We just started" and didn't use a photo and all of that, that would be less of a problem.

**MR. ANDARA:**  Correct.  Exactly.  There would be no reason for the consumer to be confused.

**THE COURT:**  And so what you're asking for is to enjoin the use of both, I assume, Sincoo, which is very close in English, as well as the Xingke even though it's spelled differently because contextually it engenders confusion?

**MR. ANDARA:**  Well, it's not even contextually.  They use the same colors.  They use the same types of fonts depending on which iteration you're talking about.  It's intended to be confusing to the consumer.  It's intended to relay that Sinco is just basically recreated under Xingke, a different equivalent of the same company.

**THE COURT:**  All right.  What's your response to that?

What's wrong with that?

MR. HOGAN:  Your Honor, we've covered a bunch of ground here.  I'll try to touch the cases -- points made.

One of my arguments, and Mr. Andara read it, is that the state court did issue a very limited injunction against CY.  It expires in four months, and Judge Kuhnle was very careful about not affecting his ability to make a living.  And as Mr. Andara read, defendant shall cease to use plaintiff's trademarks registered in the United States.

So that's why I argued issue preclusion or *res judicata* because Judge Kuhnle already ruled on it.  The name SinCo can't possibly be a trade secret.  That's their company name.  They send it out into the world.  It would be kind of comical to claim it's a trade secret.

What they're saying is it's a trademark.  And as you can see in Judge Kuhnle's order, CY Ng was already told, "Don't use the name SinCo.  It's a trademark.  But you can use Xingke."

And, again, both Mr. Andara and I attached the injunction motion -- excuse me -- the injunction order to our respective motions to give this Court a chance to see how the state court had ruled on what are, in fact, both trade secret and trademark issues.

As for the Sinco name, we're going pretty far downstream.  If you were to read my answer to the complaint -- now, of course, I represent CY Ng, an engineer.  He's just a cog in the

machine, but you saw the photo of the name Sinco on the side of the building.  Under American law, it's called laches or a naked license.  If someone else is using your name Sinco and you don't think they should be, you have to move extremely promptly.  It doesn't matter who holds the trademark.  It's a question of having a license to use the name.

One of the defenses in this lawsuit that Lael Andara's client needs to prove is it says it right there on the building and it has year after year after year.  There's no license agreement to use the name.  I know they're trying to cobble one together.  So why -- I don't know what happens under Chinese law and I don't care.  Why does SinCo Singapore think he alone gets to use the name?

That's always puzzled me about this case.  And if you can't get past that, there can't really be an injunction, but I have to mention it.

THE COURT:  Well, are you saying because for laches purposes, because it was permitted without a license?

MR. HOGAN:  There are cases where you are using somebody else's name and you don't act within six months to stop the person you feel is infringing on your mark, you waive the right to enforce that mark.

THE COURT:  Right.

MR. HOGAN:  This has been --

THE COURT:  But obviously if it was done pursuant to a

license, that's not a problem.

**MR. HOGAN:** I'd love to see the license. That would make the case a lot easier.

**THE COURT:** All right. And if it was done with permission, maybe there wasn't a formal licensing agreement but an implied license or something of the sort, that might be different too than a competitor doing it totally without authorization, without any business relationship at all.

I mean, that is a different situation. If you know that a competitor without any relationship to you is using your trademark and you let it go for 10 years, yeah, I think there's a laches problem. But if it's done pursuant to some kind of an agreement, representation agreement, even if there's not a formal license, and then something breaks down, they get bought by a competitor and suddenly they're not with you, they're against you, et cetera, I'm not sure the clock doesn't start running until that point of adversarial competitiveness comes into play.

**MR. HOGAN:** Well, there are issues of fact there. One of my things is these two founders, you know, they do what a lot of business partners did. They set up these companies. They never thought -- and I've written this in my paperwork. It's apparent they never thought the divorce was coming, otherwise all the paperwork would be sorted out and Mr. Andara's job would be a lot easier.

But they have used -- Sinco Singapore and the China factory have gone back and forth, people who work Singapore work in China.  They've used the Sinco name.  They use it on e-mails.

One of my arguments is, yeah, Mr. Andara's client should have purchased the shares that were for sale and bought the rights that they're suing over now.  They did not purchase the shares.  It was purchased by a company they thought that was a competitor, and now they're going, "Uh-oh.  Oh, no.  Wait.  This is our name."  Well, there's going to be an issue of fact if they don't both have the right to use the Sinco name.

The China factory has a lot of employees.  They have a business to run, and you don't automatically get to go up and go, "Uh-oh.  That's my name.  I win," where you've let the other side use it for a long time even if it's through some applied procedure.

THE COURT:  So is the key, then, the lack of an express licensing agreement?  Because, as I say, if it was an express licensing agreement and then it expired or terminated for cause or something and they continued to use it, then they have a trademark claim.

MR. HOGAN:  I agree.

THE COURT:  So what's missing here is a formal or -- recognized or at least a formal licensing agreement.

MR. HOGAN:  Correct.

**THE COURT:**  So let me get the response, then, from Mr. Andara.

What about that?

**MR. ANDARA:**  Well, I mean, if we divorce context, then maybe you can make that argument except the context doesn't support that.  It's exactly the example you just gave.  Keep in mind who the defendants are in this case.

Mr. Liew and Mr. Ng were SinCo's employees.  We hired them in Singapore.  We stationed them at the contract manufacturer to oversee the products and meet with U.S. customers, and they were two of six to ten that were stationed at that location to represent SinCo's interests.  They were our employees.  Their use of the mark was allowed within the scope of their employment.

Our issue is Mr. Liew and Mr. Ng had never traveled to the United States.  Mr. Ng worked for us from 2003 until 2017. Mr. Liew worked for us from 2005 until 2017.  He'd never been to the United States.  He'd never traveled here.  Never met with a customer because we have separate staff that does that that are located here.

So this argument that they were allowed to use the SinCo mark beyond the scope of employment is just -- it's not supported.

Furthermore, Electronics DG and the entities associated here were our contract manufacturer.  We had a purchase -- we

had purchase order terms.  We had a supply agreement.  We had written documents between each other that indicated the context, which is you're manufacturing our products.  Our clients are coming and visiting.  We want to put the SinCo trademark on the side so that it shows uniformity so when they show up, they know that they're dealing with SinCo, and they were.  They were dealing with Mark Liew, our employee, and CY Ng.  Those are the individuals that they met.

But the scope of their use was limited to contract manufacturing in China.  They never --

**THE COURT:**  And I take it that is what Judge Kuhnle prohibits Mr. Ng from using the word Sinco notwithstanding the fact that it had been used for a long time, so there wasn't a laches problem there.  There wasn't a problem there.

But it does go on to say that the injunction will not prevent the defendant from identifying his employer as Xingke Electronics.  So why shouldn't this Court follow the same route?

**MR. ANDARA:**  Okay.  First of all, let me just finish this one last point because I think this can kind of put this to bed, so to speak.

As I mentioned, Electronics DG after the state action filed no less than 15 patent -- or trademark applications, each of which have been abandoned or suspended based on our opposition to date; but, more importantly, they had sought to

obtain a trademark for Sinco in China.

Can you go to page 87?

And at page 87 is a declaration from Guong Li Zhang (phonetic), which is the attorney that represents SinCo in China, and he was able to show that they perjured themselves in this action because defendant Electronics DG in that case said they had the Sinco mark since 1995, but yet the document they used to submit that they were the owners was dated July 1st, 2005.

And as a result -- can you go to the next page?

**MR. HOGAN:**  Your Honor, I have to object to this line of testimony.  I mean, he's raising issues that lack foundation, applying legal standards in China that we have no idea what they are here.

**THE COURT:**  Well, I question what's -- I grant you that you may be entitled to an injunction to prohibit the defendants from using the name Sinco.  So we don't have to go over that.

**MR. ANDARA:**  Okay.

**THE COURT:**  I'm asking why should we also extend the injunction, if there is one, to the use of Xingke Electronics?

**MR. ANDARA:**  Consumer confusion.  One of the primary factors in *Sleekcraft* is, especially here, we have tier-one manufacturers.

**THE COURT:**  That's the issue.  We're back to where we

started.

**MR. ANDARA:**  Yes.

**THE COURT:**  Sincoo with two Os, I can see that engenders confusion.

**MR. ANDARA:**  Yes.

**THE COURT:**  Your argument here, notwithstanding the different spelling and at least English phonetization --

**MR. ANDARA:**  Yes.

**THE COURT:**  -- back to in context it is confusing --

**MR. ANDARA:**  Correct.

**THE COURT:**  -- but that's an interesting question.

So do I issue an injunction based on a trademark claim use of a term that can or cannot be confusing based on context?

**MR. ANDARA:**  At the very least.  For example, there's a way to narrow this to address your concerns, is -- it's important to understand that when they came to the U.S. and used our trademarks, they only met with our existing customers at the time, our U.S. customers who had existing projects.

So if you wanted to limit this to the context of the unfair use, the reality is we can say "Based on the projects at Company A, B, and C, you're not allowed to use Xingke."  If they want to use it on other projects, then maybe there wouldn't be any confusion.

I mean, the burden is on us to show that later on; but for purposes of the preliminary injunction, it's patently unfair

for them to continue to maintain and steal away the business that we created on the very projects that they stole from us using our trademarks.

THE COURT:  Well, what if they were required to disclaim, make it an express disclaimer, that Xingke Electronics is not SinCo, this is a newly formed entity?  That happens a lot in trademark.

MR. ANDARA:  Sure.

THE COURT:  It's another way of requiring a disclaimer so there is no confusion, even though if one were to read the text, one would think, "Oh, they were founded around the same year," et cetera, et cetera.

MR. ANDARA:  Well, I know my client would be very frustrated with that because of the color and the phonetic equivalent, but I can see how that could be a reasonable result to at least deal with until we get to the merits.

THE COURT:  Right.

So what's wrong with that?

MR. HOGAN:  I'm thinking about that.  It's interesting.

There are a number of problems with the defendants not being here.  I'm just CY Ng, and he's an engineer worker and he's sending e-mails.  He's working for the company Xingke, Z-I-N-K-E [sic].  So what one engineer -- an injunction on one engineer is not going to really solve anything.

As I stated before, I think that the state court already was very careful not to put Cy Ng in a position where he couldn't do his job, and I'm not sure how to filter that through Cy Ng's ability to work.  And Cy Ng is just one guy there, of course.

THE COURT:  The injunction, presumably, if I find there was sufficient notice given to Electronics DG, that they would be bound by the preliminary injunction.  The whole idea is that that entity could not use -- or if they use the name "Xingke," there would have to be a disclaimer attached to it.

MR. HOGAN:  Yeah.  I must say I don't think -- and Lael might be able to comment on this -- I don't think Sinco Electronics DG operates anymore.  I think they went over to the Xingke.  I know all the e-mail extensions have changed.

Both Lael's client and the China factory for years used Sinco, S-I-N-C-O, in the e-mail addresses.  Then I suspect because of this lawsuit, the China factory went over to Xingke, X-I-N-G-K-E, so I had no objection to any block on the Sinco name because nobody's using it anymore on the Chinese side, if that makes sense.

If I understand -- putting aside the issue of all the other defendants who are not here, I think what I'm hearing is that Cy Ng is supposed to put on his e-mails or his correspondence a disclaimer that Sinco Electronics -- or Xingke Electronics is not Sinco Electronics Singapore, something to

that effect.

It's a bit unusual because he's only one employee in a big company; but since he's here before this court, I think that can work.  I don't know how effective it would be, but I'm open to ideas.

THE COURT:  All right.  What's your response?

MR. ANDARA:  Under F.R.C.B. 665(d)(2)(C), Mr. Ng and Mr. Liew are both employees of Electronics DG or Xingke, whatever you want to call them.  They're in active concert or participation, and they're subject to this injunction.  They know full well what's going on in this action.  They're paying the legal fees.  I mean, that's been established at deposition in documents they have produced.

So essentially they're waiting -- they've been hiding behind the Hague Convention to delay appearing, but they will be appearing.  The default that we sought in state court was filed on -- basically over a year ago.  It just so happens the federal courts act a lot quicker than state so we were able to get the default sooner.

But they shouldn't be -- they shouldn't be rewarded when they have full notice and they know what's going on in this case to, you know, continue to take over the market by the delay.

THE COURT:  All right.  You've also asked for almost a freeze on assets in San Jose.

**MR. ANDARA:**  There's a Sinco asset.

**THE COURT:**  And isn't the problem there that Mr. Ng is not the owner of that, that this new owner KOTL --

**MR. ANDARA:**  Well, it's Electronics D -- so the way that the witnesses described KOTL and Electronics DG is KOTL came in and now is Electronics DG.

So assuming what the witnesses are saying is correct, Electronics DG, who we got a default against on August 24th, that's who owns the property at Varner Court here in San Jose.

And it's important to understand that because, for example, page 106, which is Exhibit G, Mark Liew specifically calls out on his LinkedIn that he's located in San Jose, and he's able to do that by --

**THE COURT:**  Well, who's the owner of record of this San Jose property?

**MR. ANDARA:**  KOTL, the entity there.  But when we attempted to serve them at their location in Tracy, there was nobody there and the materials were turned back.

**THE COURT:**  You essentially want the Court to sort of pierce the corporate veil and reach through and reach this entity.

**MR. ANDARA:**  Well, we just don't want the asset to be transferred.

**THE COURT:**  I understand that, but to issue an order against an entity that's not named in this lawsuit for

injunctive relief creates a potential problem, and it's not clear to me that there's been a showing of a likelihood of dissipation to warrant that.  So on those two fronts I am leery about that remedy absent some further showing.

MR. ANDARA:  I understand.

We did show that the witnesses used that property when they came to visit our U.S. customers.  We've referenced the testimony of the witnesses that make reference to the fact that KOTL is Electronics DG or now Xingke.

But given the fact that they've stonewalled us, both defendant employees, Mr. Ng and Mr. Liew have basically taken the position "We can't give you any more documents in discovery because they belong to the company, and since they're not a party, we don't have to give them to you," so there's no other way -- there's no way for us -- our hands are tied.  We can only show what's in the public record and what testimony of the witnesses were.

THE COURT:  Well, I suspect more will be uncovered in one way or another as discovery proceeds.

I'm going to take the motion for preliminary injunction under submission.  I am inclined to issue, probably without little doubt, an injunction against the use of Sinco or Sincoo with a double O.

With respect to the Xingke, I am going to look at the option of perhaps a disclaimer as a way of at least

preliminarily safeguarding against consumer confusion.

I think the bigger question is sort of who can be bound by this injunction, and I guess I'm going to have to look more closely at the service process.

And there is in the record an indication that this motion was communicated to those who were served?  Is that in the record?

**MR. ANDARA:**  It's not in the record because we just -- I think that occurred -- obviously it occurred after we filed the order, but it's 889 is the e-mail that my associate sent on September 28th, which is the motion.

**THE COURT:**  Well, why don't you submit -- I'll let you submit a supplemental declaration --

**MR. ANDARA:**  Okay.  Fair enough.

**THE COURT:**  -- with the documentation that the entities you feel have been adequately served have also been served with notice of this motion.

**MR. ANDARA:**  Yes.

**THE COURT:**  All right.  So let's talk about where we go from here case management-wise.

So who remains to be served, then, in your view?

**MR. ANDARA:**  Xingke Electronics (Dongguan) Company Limited, Xingke Electronics Technology Company Limited, Sincoo Electronics Company Limited.  They are -- we're still waiting for the six months to run for Article 15 of the

Hague Convention --

THE COURT: So those --

MR. ANDARA: -- because they were in the amended complaint that was last done.

THE COURT: Those are the three entities that --

MR. ANDARA: Is that right?

(Pause in proceedings.)

THE COURT: So I'm looking at the second amended complaint.

MR. ANDARA: Yes.

THE COURT: So Sinco Electronics (Dongguan) Company has been served. They're the ones that --

MR. ANDARA: Well, they're the ones that we got -- under the Hague Convention, Article 15, we moved to get a default from the clerk, which was granted.

THE COURT: Right. And you're going to move for default judgment on that?

MR. ANDARA: Correct. That's right.

THE COURT: Okay. And then Xingke Electronics has -- what's the status of service?

MR. ANDARA: I think we're still a couple months out because of the second amended -- you have the date of the second amended complaint, but it was basically like a week after that it was submitted to the civil authority.

THE COURT: So it's under the Hague.

**MR. ANDARA:**  Yes.

**THE COURT:**  And then Xingke Electronics Technology Limited, same thing?

**MR. ANDARA:**  Same thing as with Sincoo Electronics.

**THE COURT:**  Okay.  And Mui Lang Tjoa has been sub served --

**MR. ANDARA:**  Correct.

**THE COURT:**  -- you believe?

**MR. ANDARA:**  In Singapore, correct.

**THE COURT:**  And Mr. Ng has been served and Liew, Liew Yew Soon, Mark Liew.

**MR. ANDARA:**  He was the most recent one, correct.

**THE COURT:**  That was also sub served?

**MR. ANDARA:**  Correct.  Three different ways.

**THE COURT:**  So there are three entities outstanding?

**MR. ANDARA:**  Correct.

**THE COURT:**  All right.

**MR. ANDARA:**  But essentially they're the same. They're at the exact same address, same facility, same people operating them.

**THE COURT:**  All right.  So then that raises the question, there was some talk about a possible settlement conference in terms of the ADR process with a magistrate judge, but there was a question about having other defendants appear first.

And now that you've named -- it looks like at least you believe you have now served -- effectuated service on just about everybody but these three entities, and the three entities have notice and we're waiting for the clock to run. You think a couple more months.

MR. ANDARA:  Correct.

THE COURT:  Is there some reason why we should not refer this case for settlement talks before a magistrate judge let's say 90 days, 120 days hence to allow for the fruition of completed service, allow for whatever discovery you might want prior to that, and see if this can be resolved?

MR. ANDARA:  Well, so, from a practical standpoint, just so the Court is aware, we moved for an Order to Show Cause for contempt based on violation of Mr. Liew of the first preliminary injunction.  The Court set a hearing date I believe of January 7th in state court for those contempt proceedings.

I suspect that he's not going to ever enter this country again, so -- and Mr. Ng may very well be in the same boat.  And since we have the default against DG, I'm just not sure who would be at the settlement conference.

THE COURT:  Well, maybe it can be done -- I mean, that's something that the magistrate judge would have to arrange.

MR. ANDARA:  Yeah.  And we --

THE COURT:  It might be able to be done by

videoconference or something else.  I mean, not ideal but --

**MR. ANDARA:**  Sure.

**THE COURT:**  My main question is, without getting into the logistics, whether it appears within the next 120 days you will have everybody one way or another within the stadium here and whether we ought to take that opportunity to try to see if there can be an ADR process.

**MR. ANDARA:**  I like the idea and I'm open to it.  I think basically what I anticipate is we're going to file for the default judgment.  They're going to suddenly appear; and I think once they appear and we've actually got a person to talk to, that might be the time to actually schedule that.

**THE COURT:**  Well, don't you think that will all happen within 120 days?

**MR. ANDARA:**  I hope so.  Yeah, I guess we're in federal court.  Yeah.  Potentially.

**THE COURT:**  Because you're going to move for default judgment soon; right?

**MR. ANDARA:**  Right.

**THE COURT:**  Why don't I refer this to a magistrate judge to be -- for a settlement conference to be held within 120 days.  That's four months.  Meanwhile, if you want to bring your motion for entry of default judgment, you can do that. The service presumably will be effectuated on all entities.

So lets talk about discovery.  What needs to happen, then,

over the next, let's say, 120 days?

MR. ANDARA:  Well, unless the companies are in the case, we're getting nothing.  The spigot turned off because we're being told "It's that shell, not this shell."

THE COURT:  Yeah.

MR. HOGAN:  Your Honor, I've let him say that twice. I have no idea what he's talking about.  I have not failed to produce a single document because I said, "Gee, Electronics DG has it."  I am clueless.  Everything we had to produce, we produced.  So I've got to take issue with that.

THE COURT:  Well, all right.

MR. ANDARA:  There's a Microsoft laptop specifically his witness testified to that exists that he says he can't produce because --

THE COURT:  Do you want to bring a discovery motion in that regard?

MR. ANDARA:  Yeah.  We've sent out discovery in federal.  We've met and conferred.  I guess that would be the next step.

THE COURT:  Well --

MR. ANDARA:  And specifically --

THE COURT:  -- my main goal is if we're going to set this before a magistrate judge for a settlement conference, hopefully we'll have people at least reachable, whether it's by way of satellite or something else, to participate.

I want to make sure that there has been enough exchange of information here to make this a fruitful effort and you don't go into a settlement conference with nothing in hand with which to base your assessment of this case and the risks, et cetera.

So whatever you need to do, if you think you're not getting anything, you're not getting cooperation and you think there's a remedy, you should bring that consistent with my standing order.  You know how to bring discovery matters before this Court's attention.

**MR. ANDARA:**  Will do.

**THE COURT:**  And then let's set a further status conference 150 days out after you've met with a magistrate judge.

So, Angie?

**THE CLERK:**  Okay.  It looks like March 28th, Your Honor.

**THE COURT:**  Okay.  March 28th, 2019, at 10:30.

All right.

**MR. ANDARA:**  Yeah.

**MR. HOGAN:**  Thank you, Your Honor.

**THE COURT:**  Great.  Thank you.

**MR. ANDARA:**  Thank you, Your Honor.

(Proceedings adjourned at 2:25 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, December 12, 2018




_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter