**Pages 1 - 24**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

SINCO TECHNOLOGIES PTE LTD.,    )
                                )
          Plaintiff,            )
                                )
   VS.                          )        **NO. C 17-05517 EMC**
                                )
SINCO ELECTRONICS (DONGGUAN)    )
CO. LTD.; et al.,               )
                                )
          Defendants.           )
_____ )

                        San Francisco, California
                        Thursday, February 13, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:

                    ROPERS, MAJESKI, KOHN & BENTLEY
                    1001 Marshall Street - Suite 500
                    Redwood City, California  94063
          **BY:  LAEL D. ANDARA, ATTORNEY AT LAW
                MARIO A. ISKANDER, ATTORNEY AT LAW
                DANIEL E. GAITAN, ATTORNEY AT LAW**

For Defendants:

                    WHGCL, PLC
                    1301 Dove Street - Suite 1050
                    Newport Beach, California  92660
          **BY:  JOHN E. GIUST, ATTORNEY AT LAW
                JEFFREY C.P. WANG, ATTORNEY AT LAW**

                    PRATHER LAW OFFICES
                    245 Fifth Street - Suite 103
                    San Francisco, California  94103
          **BY:  EDWIN K. PRATHER, ATTORNEY AT LAW**


Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**Thursday - February 13, 2020**                          **1:49 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Calling Civil action 17-5517, SinCo Technologies PTE Limited vs. SinCo Electronics.

Counsel, please approach the podium and state your appearances for the record.

**MR. ANDARA:**  Good afternoon, Your Honor.  Lael Andara for the plaintiff.

**THE COURT:**  All right.  Thank you, Mr. Andara.

**MR. GIUST:**  Good afternoon, Your Honor.  John Giust for defendant XingKe and the individual defendants.

**THE COURT:**  All right.  Good afternoon, Mr. Giust.

**MR. PRATHER:**  Good afternoon, Your Honor.  Edwin Prather also on behalf of defendants.

**THE COURT:**  All right.  Thank you, Mr. Prather.

**MR. WANG:**  Good afternoon, Your Honor.  Jeffrey Wang, XingKe defendants.

**THE COURT:**  All right.  Mr. Wang.

**MR. ANDARA:**  And I have my associates Mario Iskander and Manali Shah.

**THE COURT:**  All right.  So we've got various cross-motions here.  Let me first -- actually, there's a fact that I want to make sure I understand correctly just for basic context.

And I understand that XingKe and its predecessor was essentially the manufacturer for goods that were sold, for instance, in the United States by SinCo; correct?

**MR. ANDARA:**  They were one of the manufacturers, yes.

**THE COURT:**  One of the manufacturers.

**MR. ANDARA:**  Yes.

**THE COURT:**  That most of its products, at least at one time, were -- most of its business was with SinCo?

**MR. ANDARA:**  That's right.

**MR. GIUST:**  Most but not all.

**THE COURT:**  Yeah.  And that -- and it was -- was it a common practice for XingKe to sort of drop ship?  When things were ordered by SinCo for third-party buyers, for instance, and they were manufactured, would the goods go through SinCo and then out, or were they drop shipped directly from XingKe, or what was the typical --

**MR. ANDARA:**  Well, these were not finished goods. These were parts that were designed and helped implement.  We created the tooling for these parts because they hadn't existed until we became involved.  Once the engineering was done, we would send the specs to make the tooling at the factory and then the factory would make these parts and then the parts would be shipped to where the company had directed them to be assembled into the overall consumer --

**THE COURT:**  Customers being customers of SinCo?

**MR. ANDARA:**  Correct.

**THE COURT:**  So they were essentially shipped directly from XingKe?  In other words, they weren't sent to SinCo and SinCo had a warehouse and they would in turn send it out?

**MR. ANDARA:**  I think there -- I believe there is a warehouse in Singapore; but I think for the most part, when they went to mass production, that they would be going, you know, directly to those assemblers or companies that put all the devices together used by the end customer.

**THE COURT:**  All right.  So in terms of sort of direct competition between SinCo and XingKe, the allegation is either -- at some point XingKe started selling directly to some of the common customers.  That's where some of the dispute is.

**MR. ANDARA:**  That's about 99 percent of the dispute, is the projects they had previously been working on, they cut us out of the equation and went directly to those customers.

**THE COURT:**  And during the period when there was an amicable relationship, am I right about, I don't know, 85 percent or more of XingKe's business was with and through SinCo?

**MR. ANDARA:**  That's right.

**MR. GIUST:**  And, Your Honor, I don't recall that being part of the record so --

**THE COURT:**  Well, I thought I saw somewhere that Mr. Chee admitted at a deposition that SinCo accounted for

about 85 percent of the sales.

**MR. GIUST:** Right. So that's page 12 of Document Number 299-2. Mr. Chee says about 85 percent of the goods shipped came from SinCo, but Bryan Lim had some testimony on that same page where he sells -- where he testifies that SinCo China -- at that time it was called SinCo -- could sell on their own. So he doesn't give a limit. He just --

**THE COURT:** Right. But the majority but not all, some of it.

**MR. GIUST:** Right.

**THE COURT:** So one of the questions is -- and, frankly, I mean, I'll cut to the chase. I think it's very hard to grant summary judgment in either direction here because there are so many facts and characterizations. I mean, when you look at the characterizations of the relationship and the role of various people and whether there was an oral license, what was the scope of that oral license, was it contradicted by further purchase orders, it just seems to me all of this is rife with facts and factual disputes.

So the question, for instance, about the scope of the license to use the mark, I mean, first of all, there's no written license; right? It was an oral license.

**MR. ANDARA:** Well, that's not exactly accurate. As Mr. Chee testified, the supply agreement and the terms and conditions of those related purchase orders that you spoke of

were consistent with the order.

THE COURT: Consistent with but they didn't constitute by any means the entirety of the agreement.

MR. ANDARA: Well, you can look at the terms and conditions of the supply agreement and assuming there's no oral agreement, they specifically say anything that SinCo provides to the contract manufacturer is still SinCo's property. In other words, you can't use this -- what we're giving you, whatever materials, whatever designs, you can't use this outside of creating goods for SinCo. That was part of the terms and conditions as consistent with what was understood between the parties.

THE COURT: Well, consistent with but not necessarily dispositive of. It doesn't say that you can't use the trademark in other situations. I mean, this would be a lot simpler case if there was a simple license agreement, and we don't have one. And to the extent that there is varying testimonies now that -- and it may be you'll prevail on the facts; but to say as a matter of judgment, as a matter of law, that I have to find that the scope of the license is X, that it was limited to X, Y, and Z, I find that tough.

And so I just don't see how I can grant summary judgment on that. On the other hand, the idea that SinCo abandoned the mark, lost the license because it gave a naked license, I don't find that very persuasive. Even though there's not much

evidence of actual formal control and the lack of a license that had terms of control, this is one of those cases where, at least as alleged by XingKe, there was almost, they call it, a joint venture, I mean, a close working relationship for many years.  It was the main supplier and SinCo was the main purchaser.

And it allegedly, and I know this is in dispute, planted or embedded to employees.  You know, we can dispute, and you do dispute, you know, who was the employee and who was the employer, what did they do.

But, again, with all those facts, even though there was no formal indicia of control, the cases suggest that if there is a close relationship and somewhat long-standing, extended over years, the degree of control in order to maintain the validity of a trademark need not be that high.  So the idea that there's been an abandonment and this is a naked license, it's an argument and it's an argument that can be made to the jury, but I don't see how I can rule on that as a matter of law at this point given all the facts that go in both directions.

MR. ANDARA:  Well, and also the case that defendants cited, they cited the *NAACP* case, and if we look at 753 F.2d 136, that court was talking about the use of the mark, but it was -- it made it very clear in that opinion that it was measuring the abandonment from the time that those parties ceased to work with each other.

In this case the parties ceased to work with each other when SinCo proceeded with litigation to enforce its rights. So there was no time period where we were not asserting our rights. Every time that the trademark was used, we immediately spoke up. That's why we're here.

**THE COURT:** Well, yeah. The counterargument is that part of it when you license a licensee, implicit in the naked license doctrine, in the abandonment doctrine, is that you've got to have some degree of control to make sure that not just the mark is not misused but the product is not so inferior that it dilutes or it sort of ruins the value of the mark.

And, you know, there's some -- one could argue there wasn't a whole lot of -- there wasn't, like, annual inspections. There wasn't quality control tests. There wasn't, you know -- so, like I said, the factors kind of go in both directions.

On the other hand, there is a long-standing relationship unlike the *da Vinci Wine* case where, you know, they licensed to sell wine and a guy went once to taste the wine and that was it.

**MR. GIUST:** You know, Your Honor, in terms of the long-standing relationship, and they do rely on that relationship in their opposition brief, but if they're going to rely on that long-standing relationship from 2003 until when the dispute arose sometime in 2016, that long-standing

relationship also applies to our claim of equitable *estoppel* because we relied on that long-standing relationship as well, that we were using the marks under their direction and control that whole time.

THE COURT:  But there's some dispute as to what was said and exactly what -- you know, you can have a long-standing relationship; but if it was pursuant to an agreement that said but you can only use the mark, you know, for China, you can only use it for these purposes, and, you know --

MR. GIUST:  To address that, Your Honor, that agreement was in the year 2000.  We have attached to our opposition to their motion for summary judgment Exhibit 1, Attachment J, is an e-mail sent from the SinCo Singapore people to defendant CY Ng, which provides a copy of the mark, says "Use this as your standard template," with no restrictions.  It says "standard template."  So whatever oral agreements existed previously would have been undone by that command from SinCo Singapore.

THE COURT:  Well, I don't know.  It's not necessarily inconsistent.  If you were acting under an oral agreement and the understanding is, "Yeah, here is the deal, here's your scope," and you say, "Oh, okay.  Here's some new logos, here's some new colors," but implicit in that is, "Yeah, we're not changing the scope.  You can still use it."

I mean, I understand your argument, but to say that a jury

must find one way or the other, that's the problem I'm having.

**MR. GIUST:**  Okay.  I understand your position.

**THE COURT:**  It seems to me, you know, you both have arguments but these are classically arguments that are going to be argued to the jury, both equitable *estoppel*, the abandonment, scope of the license.  I mean, what normally would be a simple case of trademark, you-all have turned this into a -- well, I won't say mountain but a big hill here; but there are a lot of facts, which is exactly why it seems to me that summary judgment is not appropriate in either direction.

**MR. GIUST:**  Thank you, Your Honor.

**MR. ANDARA:**  Well, Your Honor, I think it's important, again, we have a context here and reading that e-mail out of context, you're right, Your Honor, that's inappropriate.  But to say that there was no oversight and we didn't control the mark is simply disingenuous.

We provided Exhibit Z, which was several performance evaluations that were done by our employees -- if you could bring that up -- and our employees, as you can see here, we had the professor was CY Ng, and the signature of the employee he was evaluating was Liew Yew Soon.  If you go through these exhibits, they talk about the specific projects they were doing for the plaintiff.  And there's multiple performance evaluations that we've done on their work to make sure they're providing the oversight on the production of those parts to

make sure they're consistent with SinCo's quality measures.

Furthermore, the supply agreement specifically had a clause on this issue.  The terms and conditions that were attached to every purchase order had the same quality assurances.

And the most important fact, which is being overlooked here, is --

**THE COURT:**  What was done, though, to follow-up on those purchase orders at Section 5?  Are you talking about the inspection?

**MR. ANDARA:**  Correct.  So what was done was we hired employees in Singapore.  So, for example, CY Ng, he was head of our Engineering Department.  We hired him in Singapore, had him stationed at the plant to oversee the products.  For example, Exhibit G that we submitted to the Court, he submitted a declaration to the High Court of Singapore where he admitted that he was an employee of Singapore.

And I know defendants are going to say, "Oh, he was an employee of Silicon Rubber," which is somewhat of a red herring given the fact that that company ceased to exist on May 23rd, 2006, according to their own documents; and the statements he made, this is 2011, indicated under penalty of perjury that he was an employee, the testimony he gave at HHH, for example.

**MR. GIUST:**  It's a hotly contested issue of fact.

**THE COURT:**  These are arguments and a nice

presentation.  You're going to present that to the jury, but to say there's no disputed issue of fact here and no inference -- remember, whoever is moving for summary judgment, all inferences, not just facts but all reasonable inferences that can be drawn to the contrary are drawn in favor of the opposing party.  That's a tough argument.

I understand your arguments.  You've got some facts, but to say that one could not draw a reasonable inference to the contrary when there's some contested issue about who's in whose employ and what exactly Mr. Ng did...

**MR. ANDARA:**  But does that actually rise to a level that a reasonable jury looking at that evidence could find that they were not an employee?  We cited a case specifically that said creating evidence after the litigation starts, the benefits use, is not a way to circumvent your objective evidence and your sworn affidavits under penalty of perjury.

Mr. Lew likewise entered into an employment agreement with SinCo.  He filed with the U.S. State Department under penalty of perjury a visa application in 2006 where he admitted he was our employee.  It simply can't be enough that all you have to do is say "You know what?  I didn't believe I was an employee" to create an issue of fact.

**THE COURT:**  Well, there's an assertion in here that XingKe supervised and paid their salary; is that right?

**MR. GIUST:**  That's right.

**MR. ANDARA:** Correct. And Mr. Chee specifically addressed that issue in Exhibit EEEE. He specifically testified to how that worked, that it was related to the fixed costs; and he gave the example that just like McDonald's would have oversight as to how their franchises were running, the agreement was that part of the fixed fees for getting the manufacturing opportunities to work for the plaintiff was that we were allowed to have our employees stationed and overseeing the projects, and that was a cost that we'd be reimbursed for in order for them to get work from us.

**MR. GIUST:** And we have Exhibit 1 to our opposition which says the opposite, that our company was paying their salaries. So it's a question of fact.

**THE COURT:** It's a question of fact. I mean, again, all inferences are drawn against the moving party; and in light of those circumstances, I'm going to deny summary judgment, both motions, cross-motions for summary judgment. This case is heading for trial and that's where we're going.

**MR. GIUST:** Okay. Thank you.

**MR. ANDARA:** All three motions? Because there was our motion and then two motions coming back.

**THE COURT:** Yeah, all motions.

**MR. ANDARA:** Okay.

**THE COURT:** My only question -- I do have a case management question, that is what is -- frankly, when I looked

at your case management statement, I was getting confused and I didn't know whether there was something that's pending that needs to be resolved as we move towards trial or not.  Is there a pending discovery dispute or something going on?

**MR. ANDARA:**  Discovery is closed.  Fact discovery is closed.

**THE COURT:**  Is there something -- yeah, I didn't --

**MR. ANDARA:**  They did indicate they were going to bring a motion for summary judgment on behalf of defendant Tjoa, and in their reply it sounds like they're attempting to -- their theory of the case is that Mr. Tjoa is the one that did the infringement, which creates an interesting issue since they represent him and the other defendants, but we never received a motion for summary judgment as to Mr. Tjoa.  And according to the scheduling order, the last day to file a motion for summary judgment --

**THE COURT:**  There's no more.  This is it.  There's no more summary judgment motions.

**MR. GIUST:**  There's not going to be a motion on Tjoa.

**THE COURT:**  Okay.  All right.

**MR. PRATHER:**  Your Honor, if I could, in regards to the scheduling of this case.

**THE COURT:**  Yes.

**MR. PRATHER:**  Obviously I think the Court's aware that I'm new to this case.  I've just been brought into the case.

**THE COURT:** I know you are able. Everybody knows that Mr. Prather was a law clerk of mine 17 years ago or something like that.

**MR. ANDARA:** Yes. My client has brought it up several times.

**THE COURT:** I can understand. You can speak very quickly.

**MR. PRATHER:** I'm certainly not going to argue that fact, Your Honor.

**THE COURT:** Good.

**MR. ANDARA:** And this is the fifth counsel we've had in this case.

**MR. PRATHER:** We have -- there is one issue I just want to bring to the Court's attention.

**THE COURT:** Yes.

**MR. PRATHER:** And that is, and it's sort of a world crisis, as the Court does also know, I have a lot of Asian clients, and it's affecting me and many other cases. We represent a Chinese entity and we represent Chinese nationals as clients, and our clients weren't planning on being here today but if they wanted to, they could not be here today. They cannot exit the country.

**THE COURT:** Because of the current crisis.

**MR. PRATHER:** Because of the coronavirus, we're having significant issues. There is a deposition planned. I'm not

sure, in fact I think it's doubtful that that deposition can go forward in person.

THE COURT:  Where is that supposed to take place?

MR. ANDARA:  Here.  It's supposed to be here in the States.  We can work that out.  That's not a problem.

MR. PRATHER:  I don't think that that -- I don't have a specific request, Your Honor, in regards to this issue; and I only raise it because, frankly, I met Mr. Andara for the first time today and I'm appearing in this matter before Your Honor for the first time today, but I think the trial date here could potentially be in jeopardy.

And I'm not asking for a continuance nor do I want one; but as of today, our clients can't travel here, at least through the end of April, and that may have some potential impact on our mediation in front of Judge Beeler.  It may have impact on other issues.

As I mentioned, I don't have a specific request today; but to the extent that a travel ban continues that doesn't allow our clients to travel outside of Mainland China, that is going to be --

THE COURT:  Is that a complete bar at this point for not just those in particular provinces?

MR. PRATHER:  Well, Your Honor, my understanding is that -- and I think, as we're all aware, there are no flights between Mainland -- as of today -- or is it tomorrow? -- there

are no flights between Mainland China and the United States except for emergencies and the return of U.S. citizens.

The border between Russia and China, Mainland China, is closed.  Flights between Mainland China and Hong Kong also nonexistent.  The world has cut off China from the rest of the world.  We can argue whether that's appropriate or not, but the fact of the matter is our clients can't come here and that's a --

**MR. ANDARA:**  Well, Your Honor --

**MR. PRATHER:**  If I could just finish, please.

**THE COURT:**  Let him finish and then I'll let you speak.

**MR. ANDARA:**  Sure.

**MR. PRATHER:**  And so what I'm -- all I'm doing today, Your Honor, is putting everyone on notice so we can have a discussion about it.  I don't have an ask.  I don't have an ask at all.

**THE COURT:**  Okay.

**MR. PRATHER:**  But I think that this creates logistical issues for us going forward, and I didn't want us to file something or bring it to the Court's attention at a later date and have anyone say, "Well, you didn't mention it the last time you were before the Court."

So that being said, all we know as of today is through the end of April there is no travel to be had between Mainland

China and the United States.

I do want to mention one other thing, which is at our client's place of business, there has been a coronavirus detected in at least one employee.  So that is affecting both our company's operations as well as just it's thrown everything sort of awry, Your Honor.  And so how that proceeds, what happens, whether we are -- whether the client is able to isolate that or not, I don't know, but that's in the future.

But at least as of today, this is what I know and as an officer of the court, I wanted to bring that to the Court's attention because I do think it does affect some things.  Obviously we as lawyers can continue to litigate and do what we do here; but from a future-client-coming-here standpoint, I think it does affect that so that I wanted to raise.

**THE COURT:**  All right.

**MR. ANDARA:**  And I'm not opposed to that, but I think we need to be actually very clear on this.  The defendants that are represented by Mr. Prather and Mr. Wang, Mark Liew is a citizen from Malaysia.  He was on Chinese New Year when it was shut down.  From my understanding, if you hadn't gotten back to the factory, you were permitted from going back to the factory.  So there's every reason to believe he's in Malaysia.  CY Ng, he's a Singaporean, also a defendant.  ML Tjoa, also a defendant, he's a Singaporean.

These are not Chinese residents.  The majority of the

people that we have been dealing with have not been from China. I understand from the factory they may want to have a representative, but I don't think there's any reason, for example, to put off the settlement agreement -- or the settlement meeting *per se*, and I think it can be worked out that we can do that via videoconference or some other means.

And as for the purposes of trial, I agree, if there's still a ban at that point, absolutely we should move it so that everyone that needs to be here can be here.

**MR. PRATHER:**  And if I could just respond, Your Honor. While I appreciate Mr. Andara's comments about my client's citizenship, they are, as I understand, as of yesterday when I checked, they are in Mainland China.  So regardless of their citizenship, they are in China.

**THE COURT:**  All right.  Well, let's take it one step at a time.

With respect to the settlement conference, that's going to be Judge Beeler's prerogative what to do about that and whether she needs their presence or not or whether there's a workaround.

I and everybody else wants to see these discussions go forward because already, I mean, you can tell this is going to be a messy case.  It's going to be -- it's an expensive proposition; and this case, like everything else, the parties would be better off trying to get this thing resolved, but I'm

going to leave that to Judge Beeler to figure out whether she can go forward and what the logistics are.

With respect to the trial, at this point the trial is on. If there is a motion to continue trial because of unavailability of witnesses, obviously I will entertain that, but I will want some real evidence.  You know, I don't want to hear "I understand so and so is over here."  "No, he's not there."  I want declarations.  I want real evidence about who is where and why they can't get here.

I know there are direct flights that are stopped.  From the news it appears that the border between Hong Kong and China are not completely closed.  There's a big protest about wanting to close it all and the administrator there decided to keep two ports open.

So I don't know what the situation is, and I don't know that you can't get out.  It may be that every country is now isolated from those who are in China, but I don't know whether that's true.

But those are the kinds of things I'll be looking for.  If there's going to be any request to continue, I will want to know facts; and if it looks like there's some witnesses and rights of the client can't be represented, we have no choice. I mean, I have every intent in following through.  There was a request earlier about continuing the trial date, but this case has been pending long enough.  I'm not inclined to continue

anything unless absolutely necessary.  So that's -- but I'm open to the facts.

MR. ANDARA:  We have one issue.  I think both parties are intending on bringing *Daubert* motions, and I think we probably would like to hear how you would like us to present those.  Or just follow your standing order?  We can do that.

THE COURT:  Well, you know, there's also going to be a limit.  How many *Daubert* -- how many experts are there?  How many *Daubert* motions are you expecting?

MR. ANDARA:  Well, there's one damage expert by the plaintiff.  We're arguing that there's two by the defendants as part of our *Daubert* motion.

THE COURT:  So there's how many *Daubert* motions?

MR. GIUST:  So there's been two expert reports submitted, Your Honor, and I think each side will bring one *Daubert* motion on the other side's expert report.

THE COURT:  Okay.

MR. GIUST:  So there will be two *Daubert* motions.

THE COURT:  Well, that's -- I mean, that's --

MR. ANDARA:  That's right.

THE COURT:  That's fine.  What I don't want to see is, you know, 10 *Daubert* motions.

MR. ANDARA:  Oh, no, no.  We don't want to see that either.

THE COURT:  And you better think about trial.  I

forget how many days we've set for this.

Did we -- Angie, did we, in our pretrial order?

**THE CLERK:** Four days, Your Honor.

**THE COURT:** So you might start thinking about your witness lists and how you're going to get -- you know, when you do four days, you're down to about -- I don't know, I forget whether that includes jury selection or not, but that's not a lot of hours.

**THE CLERK:** It does.

**THE COURT:** So you might want to think about, you know, where you want to emphasize and what you want to do with that time frame.

**MR. ANDARA:** Okay.

**THE COURT:** Okay.  So do we have a further status? Maybe we should in this.  Our pretrial conference is --

**THE CLERK:** May 26th.

**THE COURT:** Maybe beginning of April we should check in and see how things are going.

**MR. ANDARA:** Yeah.  I think our meeting with Beeler is towards the end of March.  I'm actually -- I think I'm out of the country the first week or -- first and second week of April just for scheduling.

**THE CLERK:** April 9th, Your Honor.

**THE COURT:** Are you here the 9th?

**MR. ANDARA:** I think I'm out at that point in time.

**THE COURT:**  What's the date with Judge Beeler?

**MR. ANDARA:**  My phone's off.  Sorry.

**THE CLERK:**  March 13th before her.

**MR. ANDARA:**  I can do it in March.  I know we're leaving, like, the 2nd.

**THE COURT:**  Okay.  Why don't we do it end of March.

**THE CLERK:**  March 26th, Your Honor.

**THE COURT:**  Okay.  How's the 26th?

**MR. ANDARA:**  That's agreeable.

**MR. PRATHER:**  Your Honor, I'm unavailable.  Was that April date not good for you?

**THE COURT:**  Yeah, because Mr. Andara is out the first two weeks he said.

Can we move it up --

**THE CLERK:**  March 19th.

**THE COURT:**  19th?  How about March 19th?

**MR. PRATHER:**  That would be fine.

**THE COURT:**  Okay.

**MR. ANDARA:**  That's fine.

**THE COURT:**  Let's do March 19th and that will be shortly after the settlement conference, and we can kind of take stock where we are at that point.

**MR. ANDARA:**  Great.

**THE COURT:**  And we'll know more hopefully about the situation in China.

**MR. ANDARA:**  Great.  Thank you, Your Honor.

**THE COURT:**  Great.  Thank you.

**MR. WANG:**  Thank you, Your Honor.

(Proceedings adjourned at 2:16 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, February 21, 2020

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter