| | |
|---|---|
| TODD A. ROBERTS (SBN 129722)<br>LAEL D. ANDARA (SBN 215416)<br>JENNIFER E. ACHESON (SBN 130833)<br>MARIO A. ISKANDER (SBN 327025)<br>DANIEL E. GAITAN (SBN 326413)<br>ROPERS MAJESKI PC<br>1001 Marshall Street, 5th Floor<br>Redwood City, CA 94063<br>Telephone: 650.364.8200<br>Facsimile: 650.780.1701<br>Email: todd.roberts@ropers.com<br>lael.andara@ropers.com<br>jennifer.acheson@ropers.com<br>mario.iskander@ropers.com<br><br>Attorneys for Plaintiff<br>SINCO TECHNOLOGIES PTE LTD | **WHGC, P.L.C.**<br>JEFFREY C.P. WANG<br>JeffreyWang@WHGCLaw.com<br>JOHN E. GIUST<br>JohnGiust@WHGCLaw.com<br>KATHLEEN E. ALPARCE<br>KathleenAlparce@WHGCLaw.com<br>JESSICA A. CRABBE (SBN 263668)<br>JessicaCrabbe@WHGCLaw.com<br>130 l Dove Street, Suite 1050<br>Newport Beach, CA 92660<br>Telephone: (949) 833-8483<br>Facsimile: (866) 881-5007<br><br>EDWIN K. PRATHER (CABN 190536)<br>edwin@pratherlawoffices.com<br>**PRATHER LAW OFFICES**<br>245 Fifth Street, Suite 103<br>San Francisco, California 94103<br>Telephone: (415) 881-7774<br><br>*Attorneys for Defendants*<br>XINGKE ELECTRONICS (DONGGUAN) CO., LTD. formerly known as SINCO ELECTRONICS (DONGGUAN) CO. LTD., MUI LIANG TJOA aka ML TJOA, NG CHER YONG aka CY NG, and LIEW YEW SOON aka MARK LIEW |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SINCO TECHNOLOGIES PTE LTD,<br><br>Plaintiff,<br><br>v.<br><br>SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGLE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual),<br><br>Defendants. | Case No. 3:17CV5517<br><br>**JOINT STATUS CONFERENCE STATEMENT**<br><br>Date: August 7, 2020<br>Time: 10:30 AM<br>Judge: Edward M. Chen<br><br>Trial Date: Not Set<br>Date Action Filed: 9/22/2017 |

Plaintiff SINCO TECHNOLOGIES PTE, LTD. ("SinCo") and Defendants Ng Cher Yong AKA Cy Ng ("Mr. Ng"), Mui Liang Tjoa ("Mr. Tjoa"), Liew Yew Soon, AKA Mark Liew ("Mr. Liew") and XingKe Electronics (Dongguan) Co., Ltd. ("Xingke")[1] (collectively, "Parties") jointly submit this Joint Status Conference Statement in accordance with the Clerk's Minute Entry of **May 28, 2020** [ECF 361.] The parties had a Settlement Conference scheduled with Magistrate Beeler on **July 23, 2020**, which Judge Beeler reset to **November, 4, 2020**. [ECF 363.]

The above-referenced case concerns trademark infringement and related federal. The plaintiff is SinCo Technologies Pte, Ltd., a Singaporean company. It initiated this lawsuit on **September 22, 2017**, a year after filing a related lawsuit in State Court. [ECF 1.] The following entities and persons were sued:

**Sinco Electronics (Dongguan) Co., Ltd.,** a Chinese company, now known as XingKe Electronics (Dongguan) Co., Ltd. ("XingKe").  A default was entered by the Clerk in the Action on **August 24, 2018**, and later set aside by stipulation on **December 19, 2018** [ECF 111] followed by an Answer and Counterclaims to the Second Amended Complaint filed by DG on **January 29, 2019** [ECF 135];

**Mr. Ng**, an employee of DG and a former employee of SinCo (disputed by Defendants) appeared in this Action on **March 16, 2018** [ECF 33]; and

**Mr. Liew**, an employee of DG and a former employee of SinCo (disputed by Defendants) who filed an answer with counterclaims against SinCo on **November 16, 2019** [ECF 99.]

In its Second Amended Complaint, filed on **February 23, 2018**, SinCo added the following defendants to this case [ECF 23.]:

**XingKe Electronics Technology Ltd.,** a Chinese company;

**Sincoo Electronics Technology Co., Ltd.**, (also alleged by SinCo to be affiliated with XingKe, which XingKe has denied) thereafter a default was entered by the Clerk on **December 17, 2018 [ECF 110]**; and

**Mr. Tjoa** (a former executive of XingKe and former President and CEO of Jinlong

---

[1] Sinco Electronics (Dongguan) Co. Ltd. changed its name to Xingke Electronics (Dongguan) Co. Ltd. in March of 2017.

4814-2085-5494.1 - 1 - STATUS CONFERENCE STATEMENT
3:17CV5517

Machinery and Electronics Co., Ltd.) who filed an answer on **November 1, 2018** [ECF 87].

## I.     JURISDICTION, VENUE, AND SERVICE.

This Court has subject matter jurisdiction over SinCo's Lanham Act claims under 15 U.S.C. §1051, et seq. This Court has jurisdiction over the subject matter of this action under the Judicial Code, 28 U.S.C. §§1331 (a federal question) and 1338(a) and (b) (Acts of Congress relating to trademarks), the Lanham Act, 15 U.S.C. §1121, et seq., and principles of supplemental jurisdiction. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2), (c) and §1400(a). The nucleus of facts giving rise to Plaintiff's claims occurred in this jurisdiction and the United States ("U.S."). This is the second action brought by SinCo; the first action was brought on **October 28, 2016** in the Superior Court of California, County of Santa Clara, Case No. 16-cv-301867 (the "State Action").

On **February 19, 2019** Plaintiff filed Motion for Leave to File Third Amended Complaint. [ECF 143.] On the hearing of said motion on **April 18, 2019**, Judge Chen directed the parties to limit the scope of this litigation to the trademark claims, directing that the employment and trade secret issues be litigated in the Santa Clara Superior action. To facilitate that end, XingKe and Mr. Liew filed a motion to dismiss the non-trademark counterclaims, which was granted on **May 19, 2020** [ECF 358].

SinCo completed the depositions of several XingKe employees and Defendant Tjoa in Singapore, from **May 28, 2019** to **June 3, 2019**. [ECF 188.] Defendants retained new counsel in May, so the deposition of the SinCo Singapore employees ordered by the Court, were delayed until new counsel becomes more familiar with the case. Plaintiff's 30(b)(6) deposition was taken on **September 16, 2019**. SinCo further took the deposition of Mr. Deqiang Liu on **November 1, 2019** however because of delay of the interpreter and the objections of opposing counsel, the Defendants have agreed to allow SinCo to complete Mr. Liu's deposition **on a mutually agreeable date and time after the July 23, 2020 settlement conference** by stipulation of the parties as it falls outside of the Fact discovery cutoff date.

SinCo filed a motion for partial summary judgment and Defendants filed two motions for partial summary judgment. On February 25, 2020, all of the motions for partial summary judgments were denied [ECF 348].

Trademark Application No. 87658544 and No. 87658552 filed by XingKe on **October 24, 2017** is pending in Trademark Trial and Appeal Board and will be "on hold" until this action is heard and a final judgment is submitted in Federal Court.

There is a settlement conference with Judge Beeler in this Action set for November 4, 2020.

*SINCO'S STATEMENT*:

This is case arising out of Defendant Cher Yong Ng ("Mr. Ng"), Defendant Mark Liew ("Mr. Liew"), Defendant Mui Liang Tjoa ("Mr. Tjoa") and defendants entities SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS (DONGGUAN) CO., LTD; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD. (collectively "DG")[2] conspiring to steal Plaintiff SINCO TECHNOLOGIES PTE LTD.'s ("SinCo") United States ("U.S.") customers by falsely and deceptively using SinCo's U.S. trademarks, trade secrets and employees to divert business while in the U.S.

**TRADEMARK USE**. SinCo began operations in Singapore in 1995 and began using the SinCo word mark and logo within a year. SinCo contracted with the factory that later became Electronics DG to do the manufacturing of electronic components and parts it helped develop and design for U.S. customers. SinCo provided DG a limited license to use of its trademark on packaging and for other uses in the scope of the work being done for SinCo, for example, to facilitate drop shipping and other logistical issues (as is common in the industry). SinCo obtained U.S. trademarks beginning in 2006, Trademark Registration 3188537.

**LICENSE.** As the years progressed SinCo's founder and owner, recognizing that DG did the majority of SinCo's manufacturing, personally invested as a minority owner in the entity. Thereafter, in 2000-2003 SinCo decided the volume of production at DG and the frequency of

---

[2] Cy Ng defined SINCO ELECTRONICS (DONGGUAN) CO., LTD. as "Electronics DG," in his declaration of **March 22, 2017,** in the state action.

ROPERS MAJESKI — A Professional Corporation, Redwood City

1  U.S. customers' requests to visit the facility required on-site oversight and interface capabilities
2  by SinCo. Stationing SinCo engineers on site at the contract manufacturer, SinCo could more
3  readily make changes and address customers concerns, as SinCo maintained the relationship. To
4  help facilitate and capitalize on this on-sight presence, in approximately 2009, SinCo expanded
5  the scope of the license to DG to use the SinCo name on the factory so that U.S. Customers
6  visiting the SinCo employees would see uniformity between the development and manufacturing
7  aspects of SinCo. The license for DG to use the SinCo mark never extended beyond the Republic
8  of China ("P.R.C.") SinCo continued to maintain the U.S. relationships and would receive
9  purchase orders from U.S. customers directly. Thereafter, SinCo would negotiate separately with
10 DG to have the parts made under a separate purchase order. According to Mr. Tjoa, DG never
11 knew the prices SinCo charged the U.S. customers.  Mr. Tjoa has since left the company.

   After DG's conspiracy was revealed, DG changed the English name on the factory from SinCo to XingKe (phonetic equivalent). As confirmed in Mr. Ng's and Mr. Tjoa's testimony, the Chinese characters for the company SINCO ELECTRONICS (DONGGUAN) CO., LTD. and XINGKE ELECTRONICS (DONGGUAN) CO., LTD. Are identical. XINGKE ELECTRONICS (DONGGUAN) CO., LTD. is the same entity as DG doing business under the phonetic equivalent of its English name in an attempt to sidestep U.S. trademark laws, while keeping the same colors as SinCo's trademark to deceive and divert SinCo's customers..

   DG, Mr. Tjoa, Mr. Liew and Mr. Ng have used three variations of SinCo's trademarks, all at the same address: SinCo/SinCoo/XingKe. The addition of an "o" to SinCo, contradicts Defendants' assertion that Electronics DG ever had the right to the mark "SinCo," beyond the scope of work. When contacted Sincoo admitted this was an improper use.

  

**P.R.C. TRADEMARK.** Unknown to SinCo until the State Action, DG filed for a trademark on the SinCo word mark and logo in P.R.C. DG attempted a similar strategy after SinCo initiated the State Action, filing no less than 15 applications in the United States Patent and Trademark Office ("USPTO") for the SinCo word mark and logo in the U.S., which have all been abandoned or suspended. Two of the applications are suspended due to fraud[3] on the USPTO in Opposition No. 91243086. It was revealed to the USPTO that DG filed two applications for the mark "xingke" in which DG fraudulently used the identity of Miriam Paton in the filing and prosecution of the two "xingke" marks, and forged Xu Shugong's signature in Electronics DG's Answer to SinCo's Opposition, which SinCo was led to believe was both ill and had no role in DG since at or around 2016. SinCo also challenged the P.R.C trademark wherein DG perjured itself by claiming to have first designed the SinCo Logo before SinCo, who began using the mark in 1996. The perjury was revealed by the design contract between DG and Dongguan Humen Yuan Su Computer Graphic Design Service Business which was dated **July 1, 2015**. On **April 26, 2018** and **May 4, 2018**, DG's P.R.C. trademarks (Registration Nos. 8607396 and 8607476) were nullified pursuant to Article 31, Paragraphs 1 and 2 of Article 45 and Article 46 of the P.R.C. preamended Trademark Law based on "[DG's] misappropriation, registration and use of the trademark "SinCo (with device)" without authorization from [SinCo] have severely infringed the prior copyright and other legitimate rights and interests of the [SinCo]." The Trademark office in the P.R.C invalidated DG's attempt to use SinCo's trademarks beyond the scope as a contract manufacturer, just as the USPTO has rejected over a dozen trademark applications filed by XingKe for "SinCo," and "XingKe." Mr. Tjoa confirmed at his deposition that he submitted a perjured declaration to the USPTO in support of these applications.

**CONSPIRACY**. In 2015-2016, U.S. customers brought up safety and quality concerns in the form of audits. At that time SinCo considered an outright acquisition of the factory and land, provided they could address the quality and working conditions and obtained certain documents. DG in an attempt to avoid the significant cost of addressing these concerns began conspiring with Mr. Ng and Mr. Liew to divert SinCo's business to DG and planned to sell the company out from under SinCo. DG and Mr. Ng were able to steal accounts from SinCo leveraging the SinCo

---

[3] On **October 26, 2018**, Michelle G. Trevino (counsel for SinCo) filed a declaration detailing the discovery that: (1) applications nos. 87/658,522 and 87/658,544 falsely indicated as being filed by Miriam Paton (Ex. A – Miriam Paton's Declaration confirming improper use of her identity), and forgery of Xu Shugong's signature on Electronics DG's Answer to SinCo's Opposition, filed on **September 26, 2018** (Ex. B is USPTO's Order requesting DG explain the fraudulent use of Miriam Paton's identity and Xu Shugong's capacity to sign on behalf of DG). (ECF 84.)

trademarks as early as **August 21, 2015**, and with this success sold 70.59% to Wenzhou Runze, that owned a substantial portion of JinLong Machinery & Electronics Co., Ltd. ("JinLong") a majority interest in DG through a holding company. After the shareholder had been paid out at a rate of 400 million RMB JinLong the holding company (owner of JinLong) then sold itself the same assets for a revised price of $1.1B RMB. As discussed by SinCo's experts this difference in valuation of 600 million RMB was associated Mr. Tjoa (president of JinLong and XingKe) and JinLong's purchase price of $1.1B RMB which was not limited to the factory and related assets, but was in substantial part focused on the acquisition of SinCo's: marks, trade secret information, customers and embedded employees. Mr. Tjoa (as the new CEO and President of DG) and Mr. Ng directed Mr. Liew to travel to the U.S. in **July of 2016** to capture the SinCo business for DG. Mr. Liew falsely told SinCo he was traveling to the U.S. on vacation, a fact contradicted by his visa application to the United States Department of Homeland Security. SinCo's U.S. customers having never met with Mr. Liew or Mr. Ng in the U.S., questioned SinCo as to this change in protocol. SinCo began to investigate. After meeting with several U.S. customers as "SinCo," Mr. Liew and Mr. Tjoa were successful in converting business to DG, by claiming to be SinCo.

**INFRINGEMENT**. While employees of SinCo and without their knowledge or consent, Mr. Liew and Mr. Ng first entered the United States on **July 18, 2016** and **January 5, 2017,** respectively. Mr. Liew and Mr. Ng had never traveled to the U.S. previously in the scope of their employment as SinCo maintained sales staff stationed in the U.S. and Singapore that facilitated those relationships. Mr. Liew and Mr. Ng were accompanied not by SinCo sales representatives, but by *sales representatives of DG (Now Xingke.)* Mr. Tjoa and Mr. Ng were in California meeting with SinCo's U.S. customers, on or about **August 6, 2017**. Although according to Mr. Ng, his new employer stopped using the SinCo mark in P.R.C. on or about **March 15, 2017**, Mr. Ng continued to use his SinCo business card and email address, communicating with SinCo's U.S. customers, even though he claimed he was XingKe. Even before this action was filed, and while still employed by SinCo, DG, Mr. Tjoa and Mr. Liew converted an existing legacy project with SinCo and a Mountain View company worth ten of millions in annual revenue away from SinCo. It is no surprise that Mr. Liew had been previously working on that project months as an employee of SinCo, as was the case with another SinCo customer out of the Boston area that also switched to DG. The tooling that SinCo had purchased from DG was never returned, but was instead used to support and improperly retain the diverted U.S. contracts to DG. DG and Mr. Tjoa

could not have succeeded without the facilitation of Mr. Ng and his subordinate Mr. Liew, as they leveraged the fact that SinCo's U.S. clients knew them as SinCo employees.

**DEFENDANTS' STATEMENT:**

*(i) The Relationship of the Parties and XingKe's Continued Use of the "Sinco" Name for Many, Many Years.*

SinCo was founded by Bryan Lim in 1995 in Singapore and served as a supplier of various electronic components to many western firms. SinCo itself was and is primarily a sales and marketing company without any manufacturing facility. Since the very beginning, after obtaining purchase orders from customers, SinCo would outsource to different manufacturing factories in Asia including China.

Sinco Electronics (Dongguan) Co., Ltd., now known as XINGKE ELECTRONICS (DONGGUAN) CO., LTD. ("XingKe"), was one of such manufacturing factories that SinCo used since early 2000s. As a separate legal entity, XingKe was registered in China in around 2005 by three individuals, including Bryan Lim as a minority shareholder and Shugong Xu ("Mr. Xu") and Bingyi Gao ("Mr. Gao") as majority shareholders. Even though SinCo did not own any interest in XingKe, the companies worked closely because Bryan Lim was a shareholder behind both.

Since the very beginning, the relationship between SinCo and Xingke was intertwined, as intentionally designed by Bryan Lim. In fact, Bryan Lim deliberately established a very close relationship between SinCo, XingKe, and several other companies affiliated with Bryan Lim and even gave a name to the group of companies, the "Sinco Group". Since the very beginning, Bryan Lim and SinCo held themselves out to be a large, capable and sophisticated enterprise called the Sinco Group. The Sinco Group had multiple locations around the globe, including a sales office in Singapore (i.e. SinCo Singapore), companies in Hong Kong, Samoa, Taiwan, and manufacturing factories in China (i.e. XingKe) and Malaysia. In reality, there was never a legal entity called the Sinco Group who served as the parent company or had the controlling ownership of the member companies.

The grouping of so many different companies together was to create the impression that

the Sinco Group was a world-wide leader in the industry and more importantly, that it had its own manufacturing facilities. In this way, customers would feel that they were dealing with manufacturing factories directly without going through some middlemen, which was good for quality control and cost savings.

As a result, customers were led to believe that the Sinco Group was a top-tier enterprise in the industry with its own manufacturing facilities.

*(ii) The Signs and Consequences of the Relationship between XingKe and SinCo and the Use of the "Sinco" Name.*

Bryan Lim and SinCo went to great lengths to ensure that XingKe would always appear as part of the Sinco Group, including but not limited to the following:

· Xingke was only a Chinese company and had an official Chinese name registered with the Chinese government. But when communicating with outside customers, its official English name became "Sinco Electronics (Dongguan) Co. Ltd." This name was used for more than ten years (from 2005 until 2017). The word "Sinco" was intentionally used to signal that XingKe was part of the Sinco Group as Bryan Lim intended.

· For more than ten years since 2005, XingKe used the "@sincocn.cn" email address and used "sincocn.cn" as its company website, further indicating that XingKe was part of the Sinco Group.

· For more than ten years since 2005, SinCo required XingKe and its employees to use SinCo's "Sinco" trademarks and logos for all internal or external purposes without any restrictions, making XingKe appear as part of the Sinco Group.

· For more than ten years since 2005, SinCo's marketing materials including websites consistently listed XingKe as its manufacturing facility under the common and joint name of "Sinco".

· For more than ten years since 2005, SinCo repeatedly informed customers that Xingke was the manufacturing facility of the Sinco Group, and SinCo arranged frequent customer visits to XingKe's factory in China and told customers that they were actually visiting the manufacturing facility of the Sinco Group.

As a result of this close relationship, from the very beginning SinCo and XingKe shared resources, technologies, and customers. For example, SinCo and XingKe shared customers in a way that customers always believed that there was no distinction between SinCo and XingKe. More importantly, SinCo gave an open ended and free license to XingKe to use the "Sinco trademarks" since 2005.

As a result, XingKe had the full right to use the "Sinco" name and trademark and do business with the customers. Consequently, XingKe neither infringed SinCo's trademarks nor stole trade secrets from SinCo. In fact, documents indicate that SinCo instructed XingKe to use the "Sinco" Marks without restriction. (*See* Chee 30(b)(6) Deposition, Exhibit 3.)

*(iii) Mr. Cy and Mr. Liew as Employees of Xingke or SinCo.*

As part of this close relationship, both companies acted together to hire engineers. For example, when Xingke had trouble hiring qualified engineers, SinCo stepped in and tried to recruit and hire local Singapore engineers for XingKe. Defendants Mr. Ng and Mr. Liew were hired in this manner. The initial employment agreements were executed between these engineers and SinCo, making them appear as employees of SinCo. However, they were stationed in XingKe's factories, controlled by XingKe, and paid by XingKe. Under the law they were therefore "employees" of XingKe, not SinCo. Because SinCo and XingKe acted in concert closely, the hired engineers could not tell the distinction between SinCo and XingKe.

*(iv) The End of the Relationship between SinCo and XingKe.*

The relationship between SinCo and XingKe continued until XingKe's ownership experienced a change in 2016 when one of XingKe's shareholders (Mr. Xu Shugong) became very ill and wanted to retire. Eventually all shares of XingKe – including Bryan Lim's minority shares – were sold to Jinlong Machinery & Electronics Co. Ltd (also known as KOTL) in around 2016. KOTL's purchase of the shares and general business operations of XingKe included all of XingKe's assets and right to use the "Sinco" name and trademark and right to do business with the customers.

After the ownership change, XingKe decided to shift its business strategies by spending more effort on developing and serving its own customers, and to reduce the reliance on the

business from SinCo. XingKe always had the freedom to go after its own clients and indeed had its independent business since the very beginning. This meant that XingKe became a major competitor of SinCo in many markets, which is one of the reasons for the present litigation.

As a result, the relationship between the parties has deteriorated since 2016. SinCo for the first time started to allege that XingKe was infringing its trademarks, stealing its customers, breaching various agreements, and engaging in unfair competition.

Despite this, SinCo still had some unfinished orders with XingKe. Because SinCo could not find a replacement factory in time, XingKe agreed to honor its promise and completed the orders for SinCo. But in early 2017, because of the lawsuits, XingKe decided to disassociate itself with Sinco Group and to rebrand itself. XingKe in 2017 changed its company English name from "Sinco Electronics (Dongguan) Co. Ltd." to "XingKe Electronics (Dongguan) Co. Ltd." XingKe also filed a trademark application for the "XingKe" trademark.

Because the relationship between SinCo and XingKe began to disintegrate in 2016 and 2017 due to the ownership change in XingKe, SinCo started to take a wide range of unfair and illegal actions as an attempt to tarnish Xingke's reputation and interfere with XingKe' relationships with its customers, by making false reports about XingKe's violations of environmental regulations to XingKe's customers as well as Chinese governmental authorities. In 2017 SinCo also brought a lawsuit in China against XingKe but voluntarily dismissed its lawsuit because it lacked evidence to continue its frivolous case against XingKe. SinCo also chose to file two separate lawsuits in the U.S. including the present action and a related State Court action.

*(v) No Confusion.*

Due to the fact that customers of both SinCo and XingKe are highly sophisticated, there was no confusion as to the origin of goods shipped from Defendant as being separate and distinct from Plaintiff, despite in many instances the efforts of Plaintiff and Bryan Lim to confuse customers that any "SinCo" entity was commonly owned. For example, one major customer learned in 2013 from one of the individual Defendants that the two companies were separate, as acknowledged by Brian Lim, who wanted to discipline the Defendant for mentioning that the two companies were separate. Another major customer sent an email to an individual Defendant

1  where it stated that it would treat the two entities as independent of one another despite the fact
2  that samples requested from Plaintiff were apparently sent by Plaintiff but made by Defendant
3  XingKe.

4      *(vi) Other defenses:  Equitable Estoppel, Naked License and License.*

5      Defendants also intend to assert the defense of equitable estoppel since Bryan Lim and
6  SinCo Singapore secretly filed for the "SinCo" trademark applications without disclosing such
7  applications to Defendants, despite the fact that Bryan Lim was then on the board of directors of
8  Defendant XingKe (at that time SinCo DG).  After filing for the US trademarks, Bryan Lim, then
9  a board member of XingKe (at that time SinCo DG) caused the marks to be emailed to the
10 Defendants with instructions to use the marks as "Standard Template" without restriction, causing
11 damage to Defendants.  Thus, the very behavior now alleged to be improper was encouraged by
12 Bryan Lim, as a simultaneous director of SinCo DG (now XingKe) and owner of SinCo
13 Singapore.  Additionally, Bryan Lim knew that Jinlong was purchasing all of the assets of
14 XingKe, which included the right to use the "Sinco" name and trademark and do business with
15 the customers, but never claimed that XingKe did not have the right to use the "Sinco" name and
16 trademark or do business with the customers.

17     Defendants also intend to raise the defense of naked licensing, where Plaintiff allowed
18 Defendants to use its marks without proper supervision.

19     Clearly Defendants had permission to use the marks in some manner, and Defendants
20 contend that the manner was unrestricted and open ended, a full license contrary to the limited
21 "oral" agreement asserted by Plaintiff.  Moreover, by instructing Defendants to use its marks as
22 "Standard Template," Plaintiff granted a license to Defendants that superseded any oral
23 agreements (if they existed at all) that occurred earlier.

24     *(vii.) Summary.*

25     It is no surprise that XingKe was using the same marks as SinCo, since this use was
26 *intended and indeed required* by SinCo and Bryan Lim, to indicate that Sinco Group was a vast
27 enterprise.  Shortly after XingKe was sold to a third party is when SinCo, alone, claimed
28 ownership of the SinCo marks.  Of note is that the unfettered permission to use the SinCo Marks

over the last decade was not reflected in any written agreement, nor was there any oversight by SinCo over the use of its mark with associated products. Moreover, the customers of SinCo, as well as XingKe are highly sophisticated large corporations who were never misled as to the origin of the goods they were purchasing.

Like Mr. Ng, Mr. Liew was and is an engineer working for XingKe at its factory in China. Although his employment agreement was nominally with SinCo. For purposes of this case, the individual defendants were "employed," supervised and directed by XingKe.

## II. DISCOVERY.

*SinCo's statement:*

SinCo served its Opening Expert Report on **January 9, 2020** by mail and Defendants served their Expert Rebuttal Report by mail on **January 30, 2020** according to the Case Management Scheduling Order. [ECF 225.] SinCo deposed Defendants Rebuttal Expert Mr. Henry Kahrs on **February 4, 2020** and Defendants deposed Plaintiffs' Expert Dr. Alan Cox on **February 6, 2020**. Fact and Expert discovery are closed.

*Defendants' statement*:

SinCo served its Opening Expert Report on **January 9, 2020** by mail (and did not send a courtesy copy by email) and Defendants served their Expert Rebuttal Report by mail on **January 30, 2020** (with a courtesy copy by email) according to the Case Management Scheduling Order. [ECF 225.] SinCo deposed Defendants Rebuttal Expert Mr. Henry Kahrs on **February 4, 2020** and Defendants deposed Plaintiffs' Expert Dr. Alan Cox on **February 6, 2020**. Defendants have also served their Supplemental Initial Disclosures.

## III. LEGAL ISSUES.

*SinCo's Issues:*

Although there is a dispute as to Mr. Ng's and Mr. Liew's Employment status, given the evidence and testimony, SinCo believes it is a question of law. Mr. Ng and Mr. Liew do not agree. There is a stipulation that California law will be applied as to the employment agreements.

Assuming Mr. Ng and Mr. Liew were an employee of SinCo what was the scope of their license to use the trademark? Was it limited to the scope of their employment?

***Defendants' Issues***:

The most obvious legal issue is whether, given the closeness in the relationship between SinCo and XingKe and XingKe's continued use of the SinCo name and trademark for many, many years. XingKe and other individual defendants should not be held liable for the alleged wrongdoings.

There are, however, a myriad of additional legal issues to be decided. What legal standard governs whether the individual defendants or others impacted by this case are to be considered as employees of one entity or the other": US law, Chinese law or the law of Singapore?

As SinCo states: "Assuming Mr. Ng and Mr. Liew were an employee of SinCo what was the scope of their license to use the trademark? Was it limited to the scope of their employment? The further question that arises is whether the law of Singapore, China or the US governs these issues. Moreover, since the "license" is (apparently) not in writing, what law governs the terms and conditions of the "license?"

What legal standard governs the decade or more of admittedly permissive use of SinCo's marks by entities such as XingKe? Is it the legal standard of Singapore, China or the US?

Did SinCo exercise appropriate control over the use of the "Sinco" marks for over a decade by XingKe and other entities who had permission to use the marks or is there a "naked license" to the Defendants. Did SinCo wait too long to bring this case, knowing that XingKe was using its marks?

Does Singapore or China present a forum that is more convenient for resolving the present dispute between a company of Singapore and a company of China over the acts of individuals residing in China and Singapore?

Were the highly sophisticated entities that are customers of Defendants confused by the source of the goods they were purchasing? Evidence from various customers indicate that they clearly were not confused, or that they made purchasing decisions based on criteria other than the trademark.

Moreover, due to the recent submission of expert reports, the following issues are raised: if Defendants infringed (which is disputed), are they liable to Plaintiff's for only those lost profits

1  attributable to customers who were confused as to the source of goods?  Or are Defendants liable
2  for lost profits for all sales they made, regardless of confusion, or whether Plaintiff had the
3  capability to manufacture the goods, or whether other factors lessened sales?  And are Defendants
4  additionally liable for other expenses incurred by Plaintiff that are not tied to the infringement by
5  any particular customer or act by any Defendant.  Moreover, should Plaintiff prove the lost profits
6  attributable to each defendant, or can Plaintiff vaguely allege lost profits across all Defendants?

## IV.    MOTIONS.

### SinCo's Potential Motions:

SinCo has filed and obtained an entry of default by the clerk against DG on **August 24, 2018.** [ECF 51] and against SinCoo on **December 7, 2018**. [ECF 104.] All parties to this action have appeared and are before the Court. Pending before this court are the parties' cross Motions for Partial Summary Judgment [ECF 248 and 299.]  SinCo intends on moving to exclude the expert reports of Mr. Kahrs and Mr. Adrian Fleissig by Daubert motion. SinCo additionally plans to exclude all evidence produced after the **January 9, 2020** fact discovery cutoff. For example, documents related to litigation in China for the sale of XingKe, which happen to be the same documents that Mr. Wang stated that he needed at the first hearing in front of your Honor on **June 13, 2019.** [ECF 311 and 312 at 7:1-4.]  Lastly, SinCo will move for a default judgment against Sincoo based on the **January 9, 2020** report of Dr. Cox in the amount of $71.6 million, in light of the facts that Defendants have not admitted that Sincoo is a DBA of XingKe.

### Defendants' Potential Motions:

Defendants intend to file motions in limine and a *Daubert* motion.  The Daubert motion will seek to exclude certain aspects of the damages report and certain opinions of SinCo's expert Dr. Cox as failing to meet acceptable scientific standards, among other reasons.  For example, Dr. Cox has based his lost profits damages in this case not on the acts of Defendants or sales lost by SinCo, but on a Singapore production index, asserting that SinCo's profits should have increased along with the production index in the country of Singapore.  This analysis lacks scientific methodology.  Dr. Cox has also necessarily awarded to SinCo as part of his analysis lost profits on sales to entities that were told that SinCo and XingKe were different entities, i.e, he awarded lost profits for sales to customers that were not confused by the trademark issues in this case.  He

1   has also attributed, without scientific analysis, $98 million dollars of damages based on the sale
2   price of XingKe.

3   ***Defendants' COVID-19 Update.***

4   The individual defendants and XingKe's representatives and witnesses reside in China and
5   Singapore.  As of now, due to travel restrictions imposed as a result of the COVID-19 pandemic,
6   the individual defendants and XingKe's representatives and witnesses are unable to travel to the
7   United States.  Furthermore, as of now, it is unknown when they will be available to travel to the
8   United States.

9   Defendants respectfully request that any trial date scheduled be scheduled with that in
10  mind.  Defendants also respectfully request that any trial date scheduled be scheduled without
11  prejudice to a motion to continue the trial, if trial is approaching and the individual defendants
12  and XingKe's representatives and witnesses are still unable to travel to the United States.

13  On a somewhat related issue, XingKe employee and China resident Deqian Liu was set to
14  be deposed after the settlement conference scheduled for July 23, 2020, which has now been reset
15  for November 4, 2020.  Mr. Liu has already been deposed for the full amount of time permitted
16  by law on November 1, 2019, but SinCo requested two hours of additional time and Defendants'
17  agreed to provide Mr. Liu for two hours as a courtesy since he was expected to attend the
18  settlement conference in person.

19  However, as of now, it is unknown as to whether Mr. Liu will be able to travel to the
20  United States to attend the November 4, 2020 settlement conference in person.  Therefore, if Mr.
21  Liu is unable to travel to attend the settlement conference  in person, it is respectfully requested
22  that the Court order that Mr. Liu's deposition be taken telephonically or through available video
23  conferencing technology.

24  **V.    AMENDMENT OF PLEADINGS.**

25  ***SinCo's statement***:

26  No amendments are anticipated.

27  ***Defendants' statement:***

28  No amendments of the pleadings are anticipated.

## VI. EVIDENCE PRESERVATION.

*SinCo's statement*:

As of the close of fact discovery **January 9, 2019** SinCo has only received 18,000 (4%) documents as opposed to the 450,000 documents that Defendants stated would be produced and referenced by counsel on **August 30, 2019**. Plaintiff assert that no documents can be provided by Def, especially given the fact that the only docs that has been produced to date are evidence that supports Defendants theory of the case. Based on the fact that Defendants have had the opportunity and time to produce, SinCo will move exclude any documents provided after the close of fact discovery.

*Defendants' statement:*

Plaintiff's statement does not relate to evidence preservation. It is believed that both sides have preserved evidence. With respect to document production, Defendants sought additional time to produce additional documents (which was opposed by Plaintiff), and the Court denied any extension to the schedule and fact discovery expired. Docket No. 326. Because of this, Plaintiff can no longer claim that it did not receive documents it was entitled to, as it was the party who opposed action in this case to accommodate this issue.

## VII. TRIAL.

*SinCo's statement:*

SinCo is available and ready for trial starting from January through April of 2021. Based on the Court's comment that the Court, "did not intend to give the parties three weeks to try the case," and "they should be prepared to compress their presentation of evidence," SinCo anticipates that Trial can be compressed to two weeks. As previously referenced, the trial length is longer than the anticipated four days previously discussed based on the myriad of defenses provided by Defendants on legal issues that the Court identified in the Order of **February 25, 2020** which SinCo will need to respond to before the Jury. [ECF 348] (*i.e.,* employment status; relationship of the companies; scope of use for claim of abandonment, etc.)

4814-2085-5494.1

- 16 -

STATUS CONFERENCE STATEMENT
3:17CV5517

***Defendants' statement:***

A settlement conference is set for November 4, 2020.  Furthermore, as of now, due to the COVID-19 pandemic, the parties and respective representatives and witnesses are unable to travel to the United States, and it is unknown when they will be able to do so.  Defendants also recognize that the Court has taken great precautions in response to COVID-19, including postponing or vacating all civil and criminal jury trials through September 30, 2020.

Defendants respectfully suggest that the better practice would be for the Court to not schedule a trial until (a) after the conclusion of the settlement conference and/or (b) it is known when the parties and their respective representatives and witnesses will be able to travel to the United States.  This will promote a more realistic expectation that a trial scheduled will be able to take place, which will then allow the Court, the parties and their respective representatives and witnesses to plan accordingly.  Respectfully, the current circumstances do not provide the reasonable expectation to do so.  Defendants wish not to create an unnecessary and avoidable burden on the Court to set a trial date in this case at this time, especially when criminal matters that take precedent still have yet to be set for trial.  Accordingly, Defendants requests that the Court set a further status conference to a date convenient to the Court after November 4, 2020, so that the Court is better prepared to evaluate its calendar and set a realistic trial date for all.

As part of Defendants' request to the Court and the Court's consideration thereof, Defendants' counsel would also like to notify the Court that they have already committed to two trials in early 2021.  In addition, the Santa Clara Superior Court has set the trial in the companion state court action on May 17, 2021.  This provides the likelihood that Defendants' counsel will be unavailable up to at least July, 2021, if not later, as a result of these various trials.  Thus, in any event, a trial date during the period January through April, 2021 is problematic.

However, Defendants do agree that the length of the trial is longer than previously anticipated and have no objection to SinCo's estimation of time.

| | | |
|---|---|---|
| 1 | Dated: July 31, 2020 | Respectfully submitted, |
| 2 | | ROPERS MAJESKI PC |
| 4 | | By: */s/ Lael D. Andara* |
| 5 | |     TODD A. ROBERTS<br>    LAEL D. ANDARA<br>    JENNIFER E. ACHESON<br>    MARIO A. ISKANDER<br>    DANIEL E. GAITAN<br>    Attorneys for Plaintiff<br>    SINCO TECHNOLOGIES PTE LTD |
| 9 | Dated: July 31, 2020 | WHGC, P.LC. |
| 11 | | By: */s/ Jeffrey C.P. Wang*<br>    Jeffrey C.P. Wang<br>    John E. Giust<br>    Kathleen E. Alparce<br>    Jessica A. Crabbe<br>    Attorneys for Defendants<br>    NG CHER YONG; MUI LIANG TJOA; LIEW YEW SOON; & XINGKE ELECTRONICS (Dongguan) CO., LTD formerly known as SINCO ELECTRONICS (Dongguan) CO. LTD. |