**ROPERS MAJESKI PC**
LAEL D. ANDARA (SBN 215416)
lael.andara@ropers.com
ROBIN PEARSON (SBN 146704)
robin.pearson@ropers.com
DANIEL E. G.A.I.T.A.N. (SBN 326413)
daniel.gaitan@ropers.com
545 Middlefield Road, Suite 175
Menlo Park, CA 94025
Telephone:     (650) 364-8200
Facsimile:     (650) 780-1701

*Attorneys for Plaintiff*
SINCO TECHNOLOGIES PTE LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SINCO TECHNOLOGIES PTE LTD, | Case No. 3:17CV5517 |
| Plaintiff, | **PLAINTIFF SINCO TECHNOLOGIES PTE LTD'S TRIAL BRIEF** |
| v. | PRETRIAL HEARING |
| SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGLE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual), | Date: October 5, 2021<br>Time: 3:00 p.m.<br>Place: Courtroom 5 – 17th Floor<br>Hon. Edward M. Chen |
| Defendants. | TRIAL DATE<br>November 1, 2021 |

A Professional Corporation
Menlo Park

ROPERS
M A J E S K I

4814-7936-6134.8

# TABLE OF CONTENTS

**I.   INTRODUCTION** ...................................................................................................... 1

  A.  United Stated Registered/incontestable Trademarks for SINCO ........................... 2

  B.  Unfair Competition by Passing Themselves off as SINCO .................................... 2

**II.  SINCO'S CLAIMS OF INFRINGEMENT & UNFAIR COMPETITION** ..................... 3

  A.  Sleekcraft Factors ................................................................................................. 3

  B.  Relationship of XINGKE with Sincoo ................................................................... 4

  C.  Safe Distance Rule ................................................................................................ 5

**III.  DEFENDANTS' AFFIRMATIVE DEFENSES** ............................................................ 6

  A.  Abandonment ........................................................................................................ 6

    1.  Recordal Requirement for Trademark License ................................................ 6

    2.  Quality Control Obligation Of A Trademark Licensor In CHINA ................... 8

    3.  Quality Control in the United States: .............................................................. 9

    4.  Defendants' Attempt to Exclude Evidence in China ...................................... 11

    5.  Defendants' Lower the Standard of Proof Required for Abandonment .......... 12

  B.  Defendants' Mistate the Elements of False Advertising ...................................... 13

  C.  Defendants' Mistate the Statute of Limitation for Lanham Claims ...................... 13

  D.  Defendants' Invalidity Defense is Waived .......................................................... 14

  E.  SINCO's Trademarks Are Incontestable ............................................................. 14

**IV.  THE PROPOSED JURY VERDICT FORMS** .............................................................. 15

  A.  SINCO'S Proposed Verdict Form is Simple and Should be Adopted .................. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park

**TABLE OF AUTHORITIES**

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Alexander Ave. Kosher Restaurant Corp. v. Dragoon*,
  306 A.D.2d 298, 762 N.Y.S.2d 101 (2d Dep't 2003) ..............................................................10

*Allstate Ins. Co. v. Barnett*,
  No. C-10-0077 EMC, 2012 WL 707421 (N.D. Cal. Mar. 5, 2012) ........................................3

*Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.*,
  259 F.2d 314 (2d Cir. 1958) ..................................................................................................14

*Broderick & Bascom Rope Co. v. Manoff*,
  41 F.2d 353 (6th Cir.1930) ......................................................................................................5

*Burgess v. Gilman*,
  78 U.S.P.Q.2d 1773, 2006 WL 449212 (D. Nev. 2006) ........................................................12

*Cash Processing Services v. Ambient Entertainment, Inc.*,
  418 F. Supp. 2d 1227, 78 U.S.P.Q.2d 1780 (D. Nev. 2006) .................................................12

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
  841 F. Supp. 1339, 33 U.S.P.Q.2d 1961 (E.D. N.Y. 1994) ...................................................13

*E. F. Prichard Co. v. Consumers Brewing Co.*,
  136 F.2d 512, 58 U.S.P.Q. 362 (C.C.A. 6th Cir. 1943) ........................................................12

*E.H. Yacht, L.L.C. v. Egg Harbor, L.L.C.*,
  84 F. Supp. 2d 556, 53 U.S.P.Q.2d 1640 (D.N.J. 2000) .......................................................13

*Electro Source, L.L.C. v. Brandess-Kalt-Aetna Group, Inc.*,
  458 F.3d 931, 80 U.S.P.Q.2d 1161 (9th Cir. 2006) ..............................................................12

*Eliminator Custom Boats v. Am. Marine Holdings, Inc.*,
  2007 WL 4978243 (C.D. Cal. Nov. 5, 2007) .........................................................................13

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
  754 F.2d 591 (5th Cir. 1985) ..................................................................................................11

*Grocery Outlet, Inc. v. Albertson's Inc.*,
  497 F.3d 949 (9th Cir. 2007) ..................................................................................................12

*Hokto Kinoko Co. v. Concord Farms, Inc.*
  738 F.3d 1085(9th Cir. 2013) ...................................................................................................9

*Horphag Research Ltd. v. Pellegrini*,
  337 F.3d 1036 (9th Cir. 2003) ..................................................................................................5

*K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
　408 F.3d 596 (9th Cir. 2005)..........................................................................................15

*Miller v. Glenn Miller Prods.*,
　318 F.Supp.2d 923 (C.D.Cal. 2004)................................................................................13

*Park' N Fly, Inc. v. Dollar Park & Fly, Inc.*,
　469 U.S. 189 (1985)...................................................................................................14, 15

*Perry v. H. J. Heinz Company Brands, L.L.C.*,
　994 F.3d 466 (5th Cir. 2021)....................................................................................12, 13

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
　No. CV-15-04950, 2017 WL 10434404 (C.D. Cal. Jan. 20, 2017) .............................11

*Plough, Inc. v. Kreis Laboratories*,
　314 F.2d 635 (9th Cir.1963)..............................................................................................5

*Retail Services, Inc. v. Freebies Publishing*,
　364 F.3d 535 (4th Cir. 2004)............................................................................................14

*Rice v. Fox Broadcasting Co.*,
　330 F.3d 1170 (9th Cir. 2003)..........................................................................................13

*Rossi Ventures, Inc. v. Pasquini*,
　2012 WL 5949770 (D. Colo. Nov. 28, 2012) ...................................................................6

*Scandia Down Corp. v. Euroquilt, Inc.*,
　772 F.2d 1423, 227 U.S.P.Q. 138 .....................................................................................6

*Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*,
　486 F.2d 114, 179 U.S.P.Q. 577, 17 Fed. R. Serv. 2d 1435 (5th Cir. 1973) ...............11

*Sinhdarella, Inc. v. Vu*,
　No. C 07-04353 WHA, 2008 WL 410246 (N.D. Cal. Feb. 12, 2008) .............................5

*Sunbeam Prods. Inc. v. West Bend Co.*,
　123 F.3d 246 (5th Cir. 1997)............................................................................................5

*Taco Cabana Intern., Inc. v. Two Pesos, Inc.*,
　932 F.2d 1113, 19 U.S.P.Q.2d 1253 (5th Cir. 1991) .....................................................10

*Transgo v. Ajac Transmission Parts Corp.*,
　211 U.S.P.Q. 598 A.L.R. Fed. 97 (9th Cir. 1985.)...........................................................6

*Tumblebus Inc. v. Cranmer*,
　399 F.3d 754, 73 U.S.P.Q.2d 1561 .................................................................................12

*United States v. An Article of Drug*,
　661 F.2d 742 (9th Cir.1981).............................................................................................6

ROPERS
M A J E S K I
A Professional Corporation
Menlo Park

*Vanity Fair Mills, Inc. v. The T. Eaton Co.,*
   234 F.2d 633 (2d Cir. 1956)................................................................................11

*Wolfard Glassblowing Co. v. Vanbragt,*
   118 F.3d 1320 (9th Cir. 1997)...............................................................................6

*Wood v. Milyard,*
   566 U.S. 463 (2012) .................................................................................................3

*Woodstock's Enterprises Inc. (California) v. Woodstock's Enterprises Inc.*
   (Oregon), 43 U.S.P.Q.2d 1440, 1997 WL 440268 (T.T.A.B. 1997), aff'd, 152
   F.3d 942 (Fed. Cir. 1998)...................................................................................10

*Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 U.S.P.Q. 335, 341,
   1980 WL 30138 (T.T.A.B. 1980) .......................................................................12

**STATUTES**

Lanham Act § 7(b), 15 U.S.C.A. § 1057(b)...........................................................14

Lanham Act § 33(a), 15 U.S.C.A. § 1115(a) ..........................................................14

Lanham Act § 33(b), 15 U.S.C.A. § 1115(b)...........................................................14

P.R.C. Trademark Law ....................................................................................6, 7, 8

Rest. (2d) of Judgments § 27, cmt. (e) ...................................................................3

**OTHER AUTHORITIES**

5 C. Wright and A. Miller, Federal Practice and Procedure, Civil § 1278 ...............3

Ninth Circuit Model Civil Jury Instructions §15.18 ................................................3

Kossof, The New Chinese Trademark Law, 104 Trademark Rptr. 867, 892 (2014).
   § 18:54...........................................................................................................7

Cangzhou Healthy Feeds Development Co., Ltd. v Tianjin Nanda High
   Technology Co., Ltd. and Tianjin Nanda Haitai Technology Co., Ltd. (Case
   No.: S.P.C. 2008 Min Shen Zi No. 923-1)).. .......................................................8

McCarthy on Trademarks and Unfair Competition § 17:12 ....................................12

McCarthy on Trademarks and Unfair Competition § 32:138 ...................................14

McCarthy on Trademarks and Unfair Competition § 30.13 .......................................6

*WANG Baoqiang v Sichuan Songmaoshijia Technology Co., Ltd.* ..........................8



A Professional Corporation
Menlo Park

ROPERS
M A J E S K I

1    Pursuant to the Court's **February 1, 2021** Third Amended Case Management and Pretrial

2    Order for Jury Trial [ECF 380], Plaintiff SINCO TECHNOLOGIES PTE LTD., ("S.I.N.C.O.")

3    hereby respectfully submits this Trial Brief.

4    **I.    <u>INTRODUCTION</u>**

5    SINCO initially granted its contract manufacturer, XingKe[1] Electronics (Dongguan) Co.

6    Ltd., ("XINGKE.") a geographically-limited license to use its trade name in China within the

7    scope of work for SINCO prior to 2012.   In 2012 SINCO entered into a written Supply

8    agreement with XINGKE., which limited the use of the SINCO trademark and other Intellectual

9    property to work provided for SINCO, which was extended by continued written Purchase

10    Orders, whose terms and conditions also contained this limitation. The damages that are asserted

11    occurred after the written agreements, and therfore the oral agreement was superseded by the

12    written agreements. The alleged ex-employees of SINCO are individually named with Mui Liang

13    Tjoa for their specific statements and conduct in the U.S.

14    In 2016, SINCO learned that its employees,[2] who were by written agreement stationed to

15    oversee SINCO's interests at the factory, had traveled to the United States to meet with SINCO

16    customers with representatives of XINGKE. Mr. Liew had indicated he was traveling to

17    California to go to Disneyland and he had never before been to the United States.  When

18    customers informed SINCO of Mr. Liew's visitis with Mr. Tjoa SINCO filed suit against

19    XINGKE and the employees coming to the United States who met with SINCO's customers

20    without permission or disclosure. In 2017, SINCO brought this suit in this case when it learned

21    that XINGKE and its agents had used SINCO's trademarks and employees to divert SINCO's

22    United States business. [E.C.F. 1] SINCO sought to have this matter consolidated, which

23    Defendants' counsel initially agreed to, but then changed his mind, hence two pending cases.

24

25

26    [1] XingKe is the same company as SinCo Elec; "XingKe" is simply the phonetic equivalent of
"SinCo" in Hanyu Pinyin. *See* SAC ¶ 19 and ECF 348 FN1. In 2016, SinCo Elec was renamed to

27    XingKe. Unless necessary to refer to SinCo Elec as it existed prior to XingKe, this order will refer to
XingKe.

28    [2] To the extent the employment status of Mark Liew and Cy Ng are disputed at trial the
agreements make clear that Singapore law would be applied to define their relationship.

A Professional Corporation
Menlo Park

ROPERS
M A J E S K I

A.    United Stated Registered/incontestable Trademarks for SINCO

SINCO will prove at trial that Defendants Ng Cher Yong aka Cy Ng ("Mr. Ng"), Liew Yew Soon aka Mark Liew ("Mr. Liew"), Mui Liang Tjoa ("Mr. Tjoa"), and XingKe Electronics (Dongguan) Co. Ltd., ("X.I.N.G.K.E.") (collectively, "Defendants") willfully infringed one or more of the following SINCO registered trademarks, specifically one or more of SINCO's four federally regiseetered marks: (1) Reg. No. 3,188,**537**; (2) Reg. No. 4,524,**165** [word mark]; (3) Reg. No. 4,524,**172**; and Reg. No. 4,524,**173** (collectively, "Marks"), as shown:

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| The color green appears in the "sin" component and the right-half of the ying-yang circle. the color red appears in the "co" component and the left-half of the ying-yang circle. The color(s) green and red is/are claimed as a feature of the mark. | 3,188,**537** |  | 9 |
| The mark consists of standard characters without claim to any particular font, style, size, or color. | 4,524,**165** | SINCO | 42 |
| The mark consists of the wording "S.I.N.C.O." where the "N" and "C" are superimposed over a ying-yang circle. | 4,524,**172** |  | 42 |
| The mark consists of the wording "S.I.N.C.O." where the letters "sin" are depicted in green and the letters "co" are depicted in red and where the letters "n" and "c" are superimposed over a green and red yin-yang circle. | 4,524,**173** |  | 17 |

B.    Unfair Competition by Passing Themselves off as SINCO

SINCO will prove at trial that Defendants passed themselves off as SINCO by visisting existing SINCO United States clients with SINCO employees, buiness cards, and project specific information to divert SINCO's business to XINGKE This process took several week to months for most customers, and some who were confused initially, proceeded to contract with XINGKE rather than risk a disruption in their supply chain. But for, Defendants trademark infringement

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park

1    and unfair competition, Defendants would never have made it past the front door to obtain this

2    business.

3    **II.      SINCO'S CLAIMS OF INFRINGEMENT & UNFAIR COMPETITION**

4           **A.      Sleekcraft Factors**

5           The eight "Sleekcraft" factors govern whether a likelihood of confusion exists for

6    trademark claims. (see Ninth Circuit Model Civil Jury Instructions §15.18). In addition, the

7    parties have jointly submitted a Jury Instruction setting forth the Sleekcraft factors. Thus, there

8    appears to be agreement that these factors govern in this case. SINCO however objects to

9    Defendants modifications that weave their factual allegations within to imply a finding that has

10   not yet been made by the Jury, this is improper. Specifically, they modify the factor as to actual

11   confusion, Consumer's Degree of care, and Defendants' Intent in such a way as to give those

12   factors more weight.  Furthermore, they add a mitigation Jury instruction, which has no place in a

13   Lanham act case. Moreover, Defendants have not asserted any affirmative defenses for failure to

14   mitigate as it relates to SINCO's complaint.

15          An affirmative defense, once forfeited, is "exclu[ded] from the case." *Wood v. Milyard*,

16   566 U.S. 463, 470, (2012). If a defense is not raised in the answer or responsive pleading, it is

17   generally waived. *See* 5 C. Wright and A. Miller, Federal Practice and Procedure, Civil §

18   1278.  *Allstate Ins. Co. v. Barnett*, No. C-10-0077 EMC, 2012 WL 707421, at *4 (N.D. Cal. Mar.

19   5, 2012) (Judge Chen: "[i]t was never raised as an affirmative defense in Mr. Barnett's answer

20   and, therefore, has been waived.")

21          Judge Chen citing the Restatement (Second) of Judgments notes:

22          An issue is not actually litigated if the defendant might have interposed it as an
            affirmative defense but failed to do so; nor is it actually litigated if it is raised by a
23          material allegation of a party's pleading but is admitted (explicitly or by virtue of a
            failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in
24          an allegation by one party and is admitted by the other before evidence on the issue
            is adduced at trial; nor is it actually litigated if it is the subject of a stipulation
25          between the parties.

26   Rest. (2d) of Judgments § 27, cmt. (e).

27

28

A Professional Corporation
Menlo Park

ROPERS
M A J E S K I

1    Applying the factors, there is no question that XINGKE was using the **same mark (SinCo)**

2    for the **same goods** and goods SINCO was likely to **expand** to. This is shown in their

3    presentation materials to SINCO's customers, and trademark application with the same ying-yang

4    symbol, same red and green colors and same letters and font, and a **confusing similar** mark

5    SinCoo and XingKe, which also mirrored the same colors and font, and is pronounced the same

6    by a Chinese speaker (noting that Chinese representative spoke with U.S. customers). Cy Ng took

7    SINCO's powerpoint slides and reused them for XINGKE, replacing Jonathan Chee with Mui

8    Liang Tjoa.  XINGKE's **intent** in using the SINCO marks is evidenced by the fact it met only

9    U.S. customers that had a pre-existing relationship with SINCO, while accompanied by SINCO

10   employees, and discussed specific SINCO projects. Moreover, they filed trademark applications

11   for the same marks and the confusingly similar marks. This evidences a clear intent to trade on

12   SINCO's goodwill and trademark. XINGKE justifies this by redefining SINCO as its sales agent,

13   while ignoring the Supply agreement and purchase Orders that show a customer hiring a

14   manufacturer.

15       **B.     Relationship of XINGKE with Sincoo**

16       Defendants object to the Jury instruction related to Plaintiff establishing that Sincoo is in

17   fact the same as XINGKE is a factual question that should go to the Jury. The Defendants have

18   consistently argued different positions as it relates to their relationship with Sincoo. Regardless, it

19   is just as likely that XINGKEstole the identity of SinCoo to perpetuate the infringement in the

20   United States, much as they did to SINCO In 2015, XINGKE was providing anodizing services to

21   SINCO, but magically SinCoo materialized in 2014 at the exact location using the same

22   equipment and providing competing services as XINGKE.  Of the numerous SINCO employees

23   that had visited the factory in that time frame, none recall an entity separate from XINGKE, much

24   less one that was called SinCoo.  There is no evidence that between 2014 and 2015, SinCoo

25   existed anywhere except on paper. Mr. Tjoa testified that SinCoo's identical website claiming to

26   be part of XINGKE was copyright infringement, but two years later, they are still apparently in

27   operation. Tjoa testified they worked on the same projects for U.S. customers and acknowledged

28   that SinCoo made metal parts, but XINGKE only made plastic parts. Yet, in every presentation

1    that XINGKE used and produced in this litigation, they claim to manufacture metal parts and

2    have CNC and anodizing capabilities.  The objective evidence to be presented to the Jury is not

3    only did XINGKE use the SINCO marks, they also induced or actually created the SinCoo mark.

### C.    Safe Distance Rule

4    Defendants were obligated to maintain a safe distance from SINCO's trademark, but instead

5    they adopted an alternative translation of SINCO in the form of XINGKE While SINCO

6    acknowledges that the English words and spelling appear different, the issue is that Chinese

7    speakers do not, so when they pronounce the name XINGKE it sounds exactly the same as

8    S.I.N.C.O., which was demonstrated multiple times during the depositions of XINGKE's

9    employees.   The change from SINCO to X.I.N.G.K.E., maintained the same colors and

10   pronunciation, even if the letters and words were clearly different. Trademarks are considered in a

11   context and their sound is an important aspect, especially as here when the pronunciation lands

12   squarely on SINCO trademark.

13   Under the 'Safe Distance' rule a trademark owner is entitled to protection against identical

14   marks and all those marks that are "confusingly similar" to the protectable mark. *Sinhdarella, Inc.*

15   *v. Vu*, No. C 07-04353 WHA, 2008 WL 410246, at *7 (N.D. Cal. Feb. 12, 2008) citing *Horphag*

16   *Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003).  This rule was created to prevent

17   known infringers from using trademarks whose use by non-infringers would not necessarily be

18   actionable. See *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir.1930).  The safe

19   distance rule is meant to ensure that the defendant does not retain any lingering benefit or goodwill

20   from its past infringing activities. *Sunbeam Prods. Inc. v. West Bend Co.*, 123 F.3d 246 (5th Cir.

21   1997) ("The 'safe distance' rule vests broad discretion in the district court, to ensure that the

22   Lanham Act is not frustrated by manufacturers who seek to circumvent injunctions with subsequent

23   modifications. Accordingly, the 'safe distance' rule permits the court to issue injunctions that sweep

24   even more broadly than the Lanham Act would permit against a manufacturer who has not already

25   been found liable for trademark infringement."). The safe-distance rule is intended to proscribe

26   infringers who have been caught "red handed," as it were, from using a name intended to continue

27   to profit from the goodwill established by the trademark owner. As the Ninth Circuit held in *Plough,*

28   *Inc. v. Kreis Laboratories*, 314 F.2d 635, 639 (9th Cir.1963):

> *"We also agree with [the trademark owner] that an infringer, once caught, should have his*
> *conduct carefully scrutinized in any future operations so as to determine his intent in going as far*
> *as he does. He must be required to keep a safe distance away from the margin line…[A trademark*
> *infringer] should have its conduct carefully scrutinized in future use and should not be allowed to*

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1

2

3

*claim the same leniency accorded a good faith user who starts use of the mark which the enjoined defendant has shifted to. Otherwise, the enjoined defendant could simply make a tiny change and start a new trademark contest all over again in the context of the contempt hearing as to the use of the "new" format."*

*Wolfard Glassblowing Co. v. Vanbragt,* 118 F.3d 1320, 1323 (9th Cir. 1997) (citing McCarthy on

4

Trademarks § 30.13[1] (1996))

5

6

7

8

There is substantial evidence indicating Defendants copied Plaintiff and the likelihood that phonetic equivalent of "XingKe" is being used to continue the deception by maintaining the same color scheme, capitalization, and literal translation. Again, this is an aspect of pronunciation of a Chinese speaker.

9

10

11

12

13

14

These similarities in a vacuum may be explained in the first instance, but this is in the context of being accused on infringement, demonstrated that they developed a similar mark to trade on the goodwill established by SinCo. *Rossi Ventures, Inc. v. Pasquini*, 2012 WL 5949770, at *4 (D. Colo. Nov. 28, 2012) (after the Preliminary Injunction Defendants must stay a 'safe distance' away from the Plaintiff's mark").  The Ninth Circuit stated a defendant can't attempt to "walk as close to the line as they can" by a de minimis change in the mark. *Transgo v. Ajac Transmission Parts Corp.*, 211 U.S.P.Q. 598, 82 A.L.R. Fed. 97 (9th Cir. 1985.)

15

16

17

18

19

20

21

22

According to XINGKE, ML Tjoa asked it to change the logo and its English name, to be distinct from SinCo. This is far from reality as demonstrated on the next page regarding the similarity analysis.  The Ninth Circuit has stated that "[a]n injunction may be framed to bar future violations that are likely to occur." *United States v. An Article of Drug*, 661 F.2d 742, 747 (9th Cir.1981). Thus, under this doctrine, defendants should be barred from using XingKe, and must do more than just see how close they can come with safety to that which they were enjoined from doing. The court may require the defendant to choose a distinctively different mark rather than to hew so close to the line that the parties must interminably return to court to haggle about every mark. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 227 U.S.P.Q. 138 (7th Cir. 1985.

23

### III.   **DEFENDANTS' AFFIRMATIVE DEFENSES**

24

    A.   **Abandonment**

25

        1.   **Recordal Requirement for Trademark License**

26

27

28

A trademark license shall be filed by the licensor for recordal with the P.R.C. Trademark Office ("T.M.O."), provided that such trademark has been approved by T.M.O. for registration ("registered trademark"), according to Article 43 of the P.R.C. Trademark Law (2019 Revision).

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

1   The 2013 Revision and 2001 Revision of the P.R.C. Trademark Law also provided similarly.

2   China requires that a trademark licensor record a trademark license with the Chinese Trademark

3   Office. See Kossof, The New Chinese Trademark Law, 104 Trademark Rptr. 867, 892 (2014). §

4   18:54. Federal, foreign and state trademark licensing law compared, 3 McCarthy on Trademarks

5   and Unfair Competition § 18:54 (5th ed.). SINCO has investigated, and while XINGKE did

6   register for the "SinCo" mark as their own in China it never recorded a license, which is

7   inconsistent with their current position in this litigation.

8           a.     **XINGKE Did Not File For Trademark License Recordal.**

9       SINCO ran a proprietary trademark search against "SINCO TECHNOLOGIES PTE

10   LTD" ("SinCo") on T.M.O.'s database, which revealed a total of eight trademark applications

11   dated **August 24, 2012**. They were applications for "SinCo" and "SinCo & Device" marks in

12   Classes 9, 17, 40 and 42, some of which were approved for registration while some were rejected.

13   SinCo's Class 17 registrations only cover a standalone item "plastic film, not for packaging"

14   because they were partially rejected. XINGKE has applied for "SinCo & Device" mark in Class

15   17 (rubber products, etc.) on **August 25, 2010**. SINCO moved to cancel this pirate mark based on

16   non-use ground, which was granted on two of the registrations. XINGKE has appealed to the

17   Beijing High People's Court. As such, Xingke DG's pirate registration for "SinCo & Device"

18   mark in Class 17 was approved before SinCo filed an application for the same mark. Therefore,

19   SinCo did not need to, and in fact could not, file for license recordal because SinCo did not own

20   prior P.R.C. registrations. It was fine for SinCo to authorize the use of SinCo/SinCo & Device

21   logo and its associated copyright by Xingke DG for contractual manufacturing purpose, if any.

22           b.     **The Absence Of A License Recordal Will Not Render The License Invalid**

23    

24       Even if the licensor has valid P.R.C. registrations, the absence of a license recordal will

25   not render the license invalid, but such license shall not be used against a good faith third party

26   (para. 3, Article 43 of the P.R.C. Trademark Law).  We ran a quick search on T.M.O.'s online

27   database against the Chinese name of Xingke as licensee, cross-referencing "Sinco" as the

28   licensed trademark, and did not locate any hits.

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

2. **Quality Control Obligation Of A Trademark Licensor In CHINA**

Defendants claim that SINCO's lack of adequate control in CHINA over XINGKE resulted in abandonment of SINCO's U.S. trademark rights. The licensor of a registered trademark shall supervise the quality of goods on which the licensed trademark is used. A licensor's failure to perform such obligation may give rise to joint liability for defective goods produced or sold by the licensee (see *Cangzhou Healthy Feeds Development Co., Ltd. v Tianjin Nanda High Technology Co., Ltd. and Tianjin Nanda Haitai Technology Co., Ltd.* (Case No.: S.P.C. 2008 Min Shen Zi No. 923-1)). Nevertheless, courts may require proof of licensor's participation in, or awareness of, the licensee's infringing activities during the use of the licensed mark, before holding the licensor jointly liable (see *WANG Baoqiang v Sichuan Songmaoshijia Technology Co., Ltd.* and others (Case No.: Beijing Internet Court 2019 Jing 73 Min Zhong No. 1202)). SINCO did not know that XINGKE was selling products to U.S. customers until summer of 2016, and immediately upon learning of the U.S. activity filed suit to protect its rights.

A licensor's failure to perform the quality control obligation will not render the licensed trademark invalid, or lead to abandonment of the licensor's right to the licensed trademark in China. First, the grounds for cancelling and invalidating a registered trademark are provided by the P.R.C. Trademark Law, which do not include a licensor's failure to perform the quality control obligation. Second, nowhere in the P.R.C. Trademark Law or any other relevant P.R.C. laws provides for automatic abandonment of the right to a trademark, except for non-renewal or failure to respond to trademark cancellation applications. We reproduce the full provision of Article 43 of the P.R.C. Trademark Law (2019 Revision) for your references: Article 43:

"A trademark registrant may enter into a trademark licensing contract to license the use of its registered trademark to others. The licensor shall supervise the quality of commodities on which the said registered trademark is used by the licensee. The licensee shall ensure the quality of commodities on which the said registered trademark is used.

For licensed use of a registered trademark, the name of the licensee and the place of origin of the commodities shall be stated on the commodities on which the said registered trademark is used.

For licensed use of a registered trademark, the licensor shall file record of the licensing of the said trademark with the trademark bureau, and the licensing shall be gazetted by the trademark bureau. Non-filing of the licensing of a trademark shall not be contested against a good faith third party."

PLAINTIFF'S TRIAL BRIEF
3:17CV5517

1

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

### 3.    Quality Control in the United States:

SINCO embedded employees in CHINA for quality control. Although inaccurate, Defendants assert that these were their employees doing quality control.   Even absent formal quality control provisions, a trademark owner does not abandon its trademark where "the particular circumstances of the licensing arrangement" suggest that the public will not be deceived. (internal quotation marks omitted). *Hokto Kinoko Co. v. Concord Farms, Inc.* 738 F.3d 1085, 1098(9th Cir. 2013). Such circumstances exist "where the licensor is familiar with and relies upon the licensee's own efforts to control quality." *Id*. (internal quotation marks omitted). More specifically, the licensor may establish adequate quality control by demonstrating a close working relationship between the licensor and the licensee. *Id*.

### a.    Employment Issues are Subject to Singapore Law

Defendants propose Jury instructions as to the employment relationship, using California law to define it. This is a red herring issue used to distract the Jury, because whether Mark Liew and Cy Ng were employees of SINCO or of XINGKE, they are both guilty of trademark infringement and unfair competition.  However you define the relationship with SINCO, the Defendants were being paid by SINCO and working on SINCO projects subject to written agreements, and their actions violated those agreements.

The objective evidence was that Mr. Liew and Mr. Ng were hired by S.I.N.C.O., because (1) they applied for a job with S.I.N.C.O., (2) they referenced SINCO as their employer in government documents, (3) they were paid in Singapore dollars from S.I.N.C.O., and (4) they worked exclusively on SINCO projects.[3] Yet Mr. Ng and Mr. Liew subjective understanding was that they worked for XINGKE, but admittedly never informed SINCO of that understanding. More importantly, Mr. Liew and Mr. Ng never expressed that understanding to U.S. customers who understood them to be SINCO employees, based on their objective actions and prior

---

[3] Mr. Ng stated that if he was barred from working on all projects previously related to SINCO he would lose 90 % of his work at XINGKE. **July 6, 2018** Decl. Ng. at ¶ 18 ("*I am not fluent and Chinese, and losing the ability to speak with the English customers that SinCo Singapore claims are its customers alone would take away about 90 percent of my work, leaving me effectively with no work.*")

1   engagement on projects with S.I.N.C.O., just as SINCO objectively believed them, to be its

2   employees.  The written employment agreements make clear that Singapore law will apply.

3     Similarly, XINGKE's subjective understanding was that it had a free unlimited license to

4   exploit the trademarks of its largest customer, contrary to the objective evidence of its dozens of

5   trademark applications claiming sole creation and ownership of the mark. SINCO on the other

6   hand believed that XINGKE would honor the terms of the Supply Agreement and related

7   purchase Orders, based on an affirmative signature acknowledging that commitment. Thus,

8   SINCO's reliance on its employees and contract manufacturer was objectively unreasonable.

9   Upon learning of quality issues, SINCO immediately addressed them with the factory, who in

10  response sold the company to SINCO's competitor.

11    For a licensor to justifiably rely on a licensee for quality control, there must be some form

12  of special relationship between the parties, such as a familial relationship or a long period of close

13  business association. *Taco Cabana Intern., Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1121, 19

14  U.S.P.Q.2d 1253, 1259 (5th Cir. 1991) (Brothers cross-licensed each other to use the same trade

15  dress in their restaurants and sufficient quality control was found. "Where the license parties have

16  engaged in a close working relationship, and may justifiably rely on each parties' intimacy with

17  standards and procedures to ensure consistent quality, and no actual decline in quality standards is

18  demonstrated, we would depart from the purpose of the law to find an abandonment simply for

19  want of all the inspection and control formalities.") See also: *Alexander Ave. Kosher Restaurant*

20  *Corp. v. Dragoon,* 306 A.D.2d 298, 762 N.Y.S.2d 101 (2d Dep't 2003) (Licensor could validly

21  rely on the ability of the licensee to adhere to the required quality standards because the licensee

22  operated a restaurant property purchased indirectly from the licensor and the licensee was a

23  former manager of that restaurant.)  SINCO worked with XINGKE for over 15 years.

24    In some cases, a less demanding level of quality control may be tolerated in a license

25  between companies with a long-lasting and close relationship. *Woodstock's Enterprises Inc.*

26  *(California) v. Woodstock's Enterprises Inc.* (Oregon), 43 U.S.P.Q.2d 1440, 1997 WL 440268,

27  *9 (T.T.A.B. 1997), aff'd, 152 F.3d 942 (Fed. Cir. 1998) (No abandonment from an informal,

28  implied license of a mark to restaurants which had a close association and overlapping ownership

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

PLAINTIFF'S TRIAL BRIEF
3:17CV5517

of corporate shares. "The restaurants' and their owners' close association warrant a relaxation of policing formalities.") SINCO had helped build XINGKE into a million-dollar manufacturing company over 15 years and had closely been involved in its success, and XINGKE's resale eight months later at twice the price demonstrated the business that was taken from SINCO.

### 4.    Defendants' Attempt to Exclude Evidence in China

Defendants claim worldwide abandonment of the "SINCO" U.S. trademarks, based on actions limited to China, but move to exclude evidence that in 2016 The Trademark Review and Adjudication Board of the People's Republic of China determined that Defendant XINGKE had no valid use to the mark based on SINCO's rights. Joseph Farris Declaration ("*Farris Decl.*") ISO MIL NO. 2 Exhibits D and I. This double standard as to the evidence is simply unreasonable. Defendants' cannot simply disavow their actions when it tends to prove SINCO's case. In the same vein, XINGKE must make more than conclusory assertion absent evidence or witness.

#### a.    Defendants' Attempt to Expand Evidence in China to the World

Defendants further argue that the factory's use in China resulted in a worldwide abandonment. Still, the issue of abandonment is presently limited to the United States, the jurisdiction these asserted trademarks were registered. This paradox is best illustrated by Defendants' Motion in Limine 2:

> However, under the well-established territoriality principle, evidence relating to Chinese trademark proceedings are irrelevant to these claims. *See, e.g.*, *Vanity Fair Mills, Inc. v. The T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956) ("[W]hen trademark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant and inadmissible."); *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985) (same); *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, No. CV-15-04950, 2017 WL 10434404, at *3 (C.D. Cal. Jan. 20, 2017) ("Central to trademark law is the territoriality principle—'trademark rights exist in each country solely according to that country's statutory scheme.'" DEF MIL 2

Moreover, many courts have held that a finding of uncontrolled licensing should not work as a total abandonment of the mark, but a forfeiture of mark rights only in those geographic locations where use of the mark has not been adequately controlled. Even if they are successful in demonstrating abandonment in China, which is doubtful, courts have determined the abandonment of right to be limited geographic location. *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park

1   F.2d 114, 124, 179 U.S.P.Q. 577, 17 Fed. R. Serv. 2d 1435 (5th Cir. 1973) ("[W]e deem it

2   consistent with general principles of trademark law to hold that a user may abandon a trademark

3   in certain states without abandoning it in others.");See also *E. F. Prichard Co. v. Consumers*

4   *Brewing Co.,* 136 F.2d 512, 522, 58 U.S.P.Q. 362 (C.C.A. 6th Cir. 1943) (abandonment only of

5   rights in geographic area where uncontrolled licensing); See also *Tumblebus Inc. v. Cranmer,* 399

6   F.3d 754, 765, 73 U.S.P.Q.2d 1561, 2005 F.E.D. App. 0021P (6th Cir. 2005) ("[T]here is

7   considerable support for the concept that rights in a mark may be abandoned in certain geographic

8   areas but not others (i.e., 'partial geographic abandonment.'" Possible abandonment in territories

9   other than that where the accused use is made is irrelevant.); See also Winnebago Industries, Inc.

10  v. Oliver & Winston, Inc., 207 U.S.P.Q. 335, 341, 1980 WL 30138 (T.T.A.B. 1980) (dictum that

11  uncontrolled licensing could result in abandonment only of market of licensed toys).

12          **5.      Defendants' Lower the Standard of Proof Required for Abandonment**

13          The party who raises the challenge that a mark has been abandoned for non-use has the

14  burden of proof.  *Perry v. H. J. Heinz Company Brands, L.L.C.,* 994 F.3d 466, 474 (5th Cir. 2021)

15  (The District Court erroneously put the burden of proof of a lack of sales on the trademark owner,

16  not on the challenger. Since abandonment results in a forfeiture of rights, the courts are reluctant

17  to find an abandonment. § 17:12. Clear and convincing proof of abandonment is required, 3

18  McCarthy on Trademarks and Unfair Competition § 17:12 (5th ed.).

19          Defendants attempt to change the standard regarding the standard needed to prove

20  abandonment. *Grocery Outlet, Inc. v. Albertson's Inc.,* 497 F.3d 949, 951 (9th Cir. 2007)

21  ("[a]bandonment of a trademark, being in the nature of forfeiture, must be strictly proved," by

22  clear and convincing evidence).   The majority of courts, including this district, have interpreted

23  the "strictly proved" rule to mean that evidence of the elements of abandonment must be clear

24  and convincing. *Cash Processing Services v. Ambient Entertainment, Inc.,* 418 F. Supp. 2d 1227,

25  1231-1232, 78 U.S.P.Q.2d 1780 (D. Nev. 2006) ("Strictly proved" means that abandonment must

26  be proven by clear and convincing evidence.  Summary judgment of abandonment was denied.);

27  *Burgess v. Gilman,* 78 U.S.P.Q.2d 1773, 2006 WL 449212 (D. Nev. 2006) (accord); *Electro*

28  *Source, L.L.C. v. Brandess-Kalt-Aetna Group, Inc.,* 458 F.3d 931, 80 U.S.P.Q.2d 1161 (9th Cir.

1   2006) (Court of appeals did not decide, but noted that a district court had held that "strictly

2   proved" means "clear and convincing evidence."); *Dial-A-Mattress Operating Corp. v. Mattress*

3   *Madness, Inc.,* 841 F. Supp. 1339, 1355, 33 U.S.P.Q.2d 1961 (E.D. N.Y. 1994)("[A]n affirmative

4   defense alleging a break in Plaintiff's chain of priority under the doctrine of abandonment must

5   be proven by clear and convincing evidence.") *E.H. Yacht, L.L.C. v. Egg Harbor, L.L.C.,* 84 F.

6   Supp. 2d 556, 564, 53 U.S.P.Q.2d 1640 (D.N.J. 2000) ("Abandonment being in the nature of a

7   forfeiture," the elements of discontinuance of use and intent not to resume use must be "strictly

8   proved." This means proof by "clear and convincing evidence.") *Perry v. H. J. Heinz Company*

9   *Brands, L.L.C.,* 994 F.3d 466, 474 (5th Cir. 2021) ("Courts have equated the requirement for

10   strict proof to the burden of providing clear and convincing evidence.")

**B.      Defendants' Mistate the Elements of False Advertising**

12          Defendants' Proposed Jury instruction, is inconsistent with 15.5 and the precedential case

13   they cite, *Rice v. Fox Broadcasting Co.,* 330 F.3d 1170, 1180 (9th Cir. 2003).  Defendants'

14   expand on the four elements provided for in Rice.

**C.      Defendants' Mistate the Statute of Limitation for Lanham Claims**

16          Defendants' Proposed Jury instruction, ignore the four-year stute of limitations for

17   Lanham act claims and replace it with an instruction as to the Stute of limitations as to Fraud or

18   Mistake. *See* C.A.C.I. 1925 Affirmative Defense—Statute of Limitations—Fraud or Mistake.

19          In general, the statute of limitations for a Lanham Act claim brought in conjunction with a

20   claim of trademark dilution under state law is four years. *Miller v. Glenn Miller Prods.*, 318

21   F.Supp.2d 923, 942 n. 11 (C.D.Cal. 2004) (stating that "[t]he Lanham Act does not contain a

22   statute of limitations, and therefore Lanham Act claims are governed by the analogous state

23   statute of limitations," which is four years). The statutes of limitations for statutory and common

24   law unfair competition claims are also four years. *Eliminator Custom Boats v. Am. Marine*

25   *Holdings, Inc.,* 2007 WL 4978243, at *3 (C.D. Cal. Nov. 5, 2007) (statute of limitations for claim

26   of common law unfair competition claim is same as statute of limitations for state statutory unfair

27   competition claim, which is four years).

28

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park

### D.      Defendants' Invalidity Defense is Waived

Defendants' have for the first time in their verdict form claimed that the SINCO trademarks are potentially invalid. The Lanham Act provides that marks registered on the Principal Register "shall be prima facie evidence" of the validity of the registered mark, of its registration, of the registrant's ownership, and of the registrant's exclusive right to use the mark on the goods or services specified in the registration. Lanham Act § 33(a), 15 U.S.C.A. § 1115(a); Lanham Act § 7(b), 15 U.S.C.A. § 1057(b). The Lanham Act provides that registration of a mark on the Principal Register "shall be prima facie evidence" of the validity of the registered mark, of its registration, of the registrant's ownership, and of the registrant's exclusive right to use the mark on the goods or services specified in the registration. McCarthy on Trademarks and Unfair Competition § 32:138 (5th ed.) See § 32:139. (citing Lanham Act § 33(a), 15 U.S.C.A. § 1115(a); Lanham Act § 7(b), 15 U.S.C.A. § 1057(b). Courts view "prima facie evidence" of validity as having the more robust impact of shifting the "burden of proof" to the challenger, who must shoulder the burden of proving invalidity by a preponderance of the evidence. The Second Circuit Court of Appeals held that the prima facie effect of a registration means not only that the party challenging the mark has the burden of going forward with the evidence, but that the party contesting the validity of the mark "has the burden of proof and in order to prevail it must put something more into the scales than the registrant." *Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.,* 259 F.2d 314, 316 (2d Cir. 1958). However, as shown below the marks are incontestble and thus the validity of the trademarks may not be challenged.

### E.      SINCO's Trademarks Are Incontestable

Section 33(b) provides that if the right to use has become incontestable under § 15, then the registration shall be conclusive evidence of the validity of the registered mark and its registration, of the registrant's ownership of the mark, and of the registrant's "exclusive right to use" the registered mark on the goods or services. Lanham Act § 33(b), 15 U.S.C.A. § 1115(b).The 1995 Supreme Court decision in the Park' N Fly case held that the validity of an incontestably registered mark could not be challenged. *Park' N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, (1985). *Retail Services, Inc. v. Freebies Publishing,* 364 F.3d 535, (4th Cir.

ROPERS
MAJESKI
A Professional Corporation
Menlo Park

2004) The Supreme Court's 1985 Park 'N Fly decision holds that the validity of the incontestably registered mark cannot be challenged on the ground that the designation is not a valid trademark because it is descriptive and lacks a secondary meaning. *Park' N Fly* concerned the issue of validity. The Supreme Court has agreed with this metaphor, remarking that:

> The incontestability provisions, as the proponents of the Lanham Act emphasized, provide a means for the registrant to quiet title in the ownership of his mark. … The opportunity to obtain incontestable status by satisfying the requirements of § 15 thus encourages producers to cultivate the good will associated with a particular mark.

("The validity of the same registered mark, after qualifying for incontestable status, is conclusively presumed and may not be challenged as merely descriptive.") *K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596, 606, (9th Cir. 2005) ("[T]he challenger of an incontestable mark cannot assert that the most salient feature of the mark is descriptive and lacks secondary meaning.").

## IV.   THE PROPOSED JURY VERDICT FORMS

### A.   SINCO'S Proposed Verdict Form is Simple and Should be Adopted

SINCO prepared its proposed Jury Verdict Form with the goals of simplicity and minimizing the burden on the jurors. SINCO's proposed Verdict Form includes just 17 questions, each of which calls for a single "Yes" or "No" answer or the entry of a the dollar amount or year. In contrast, Defendants is complicated and disjointed to attempt a strategic advantage and color the law provided for in the Jury instructions. The questions mix legal theories inconsistent with the headings provided.

Dated: September 14, 2021

Respectfully submitted,

ROPERS MAJESKI PC

By:/s/ *Lael D. Andara*
LAEL D. ANDARA
DANIEL E. GAITAN
Attorneys for Plaintiff
SINCO TECHNOLOGIES PTE LTD

A Professional Corporation
Menlo Park

ROPERS
M A J E S K I