DOUGLAS A. WINTHROP (SBN 183532)
Douglas.Winthrop@arnoldporter.com
JEREMY T. KAMRAS (SBN 237377)
Jeremy.Kamras@arnoldporter.com
JOSEPH FARRIS (SBN 263405)
Joseph.Farris@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400

WHGC, P.L.C.
Jeffrey C.P. Wang (SBN 144414)
*JeffreyWang@WHGCLaw.com*
Michael G. York (SBN 89945)
*MichaelYork@WHGCLaw.com*
Kathleen E. Alparce (SBN 230935)
*KathleenAlparce@WHGCLaw.com*
Jessica A. Crabbe (SBN. 263668)
*JessicaCrabbe@WHGCLaw.com*
1301 Dove Street, Suite 1050
Newport Beach, CA 92660
Tel. (949) 833-8483; Fax: (866) 881-5007

*Attorneys for Defendants*
XINGKE ELECTRONICS (DONGGUAN) CO., LTD., formerly known as SINCO ELECTRONICS (DONGGUAN) CO., LTD., LIEW YEW SOON aka, MARK LIEW, NG CHER YONG. aka CY NG, and MUI LIANG TJOA aka ML TJOA

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SINCO TECHNOLOGIES PTE LTD., <br><br> Plaintiff, <br><br> vs. <br><br> SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual), <br><br> Defendants. | Case No. 3:17-CV-05517-EMC <br><br> Action Filed: September 22, 2017 <br><br> **MOTION IN LIMINE NO. 1 TO EXCLUDE THE TESTIMONY OF DR. ALAN J. COX** <br><br> **FRE 702** <br><br> **Judge:** Honorable Edward M. Chen <br><br> **Trial:** November 1, 2021 |

## I. INTRODUCTION

Defendants[1] hereby file this Motion in Limine No. 1 for an order excluding the testimony of Plaintiff SinCo Technologies Pte Ltd.'s ("SinCo SG") damages expert, Alan J. Cox. Cox's disclosed opinions are predicated on unsupported speculation: they assume that any variance in SinCo SG's sales is due to the alleged trademark infringement, in contravention of the evidence and to the exclusion of any other factors such as competition and market conditions. Cox's opinions are also duplicative and conflicting; and in some cases, purport to calculate damages that are not cognizable as a matter of law. For all of these reasons, Cox's opinions fail the fundamental requirements of relevance and reliability required by Federal Rule of Evidence 702 and set forth by the Supreme Court in *Daubert v. Merrerll Dow Pharm.*, 509 U.S. 579, 589 (1993).

## II. BACKGROUND

Cox's damages calculations fall into three categories: (1) recovery of SinCo SG's lost profits, (2) disgorgement of Defendants' profits, and (3) recovery of Defendants' "unjust enrichment." *See* Farris Decl. Ex. A, Expert Report of Alan J. Cox, Ph.D. ("Cox Report").

### A. Lost profits.

In calculating SinCo SG's lost profits, Cox first employs a "regression analysis of lost sales." Cox Report, ¶ 47. In summary, Cox derives a function that describes SinCo SG's sales prior to January 2016, including as a function of the Singapore Electronics Production Index. *Id.*, ¶¶ 40-44. He assumes that Defendants' infringement "started to have an effect on SinCo SG's sales in January 2016." *Id.*, ¶ 47. And then he assumes for the period January 2016 through December 2018, that any divergence in actual sales from that which he extrapolates based on his derived function are "lost sales" due to the alleged trademark infringement. *Id.*, ¶¶ 52-53. Cox then applies an assumed margin of 14% in order to derive lost profits in the amount of $33.4 million. *Id.*, ¶ 55. Cox does not evaluate whether any of these alleged lost sales in fact resulted from customer confusion; he simply assumes that any decrease in SinCo SG's sales after January 2016 must be solely caused by Defendants' alleged misappropriation.

---

[1] For all motions in limine filed by Defendants, "Defendants" refers to Defendants SinCo Electronics (Dongguan) Co., Ltd.; XingKe Electronics (Dongguan) Co., Ltd. ("XingKe"); Mui Liang Tjoa; Ng Cher Yong; and Liew Yew Soon ("Mark Liew") (collectively, "Defendants").

In addition to his lost sales analysis, Cox presents two additional measures of lost profit damages. First, Cox argues that SinCo SG suffered lost profits as a result of the reduced profit margins on its existing sales. *Id.*, ¶¶ 57-59. That is, Cox estimates damages on sales that SinCo SG *continued* to make. He argues that because labor costs cannot be quickly reallocated or reduced in response to reduced sales, SinCo SG's margins were reduced for sales that it did make in 2016 through 2018. By comparing the allegedly reduced margins from prior margins in 2015, Cox calculates an additional loss of $10.2 million. *Id.* Second, Cox argues that SinCo SG suffered losses due to the cost of "mitigating the harm caused by DG's actions"; this theory argues that following XingKe's acquisition, SinCo SG was forced to maintain an increased staff to satisfy the long certification periods required by U.S. customers, and "hire additional administrative staff and incur other fixed costs in order to show that it was ready to meet the exacting standards of U.S. customers." *Id.*, ¶¶ 60-64. Cox, thus, appears to first calculate "reduced profit margins" as a result of having to maintain staff, and then appears to opine that maintaining the same staff was required to mitigate damages. Cox calculates the total for such mitigation as $22.8 million. *Id.*

**B.     Disgorgement.**

In his Summary of Conclusions, Cox asserts that "DG has admitted to making sales of $15.1 million to U.S. customers" and that "[t]o the extent these were opportunities taken from SinCo, profits on those sales represent lost profits to SinCo and should be added to lost profits damages. This amounts to $2.1 million." *Id.*, ¶11. These three sentences are the only mention of this theory in Cox's expert report, and Cox conducts no analysis to determine which, if any, of Defendants' $15.1 million in sales were "opportunities taken from SinCo."

**C.     Unjust enrichment.**

Last, Cox opines that Defendants unjustly enriched themselves in the amount of almost $100 million. *Id.*, ¶¶ 68-71. Cox reaches this conclusion not by analyzing any of Defendants' actual sales, but by using a "market price" model. Cox argues that "[t]he present value of a firm's expected profitability is approximately equivalent to its market price . . . [and] a change in the present value of a firm's expected profitability is approximately equivalent to the change in its market price." *Id.*, ¶ 68. Cox then compares the market value of XingKe when it was sold to

1  Wenzhou Runze Equity Investment Fund LP ("Wenzhou") in mid-2016 from the subsequent value
2  when it was sold to Jinlong Machinery and Electronics Co., Ltd. ("Jinlong") in early 2017. Cox
3  concludes that XingKe was unjustly enriched by the difference, approximately $100 million. *Id.*,
4  ¶¶ 68-71. This is not a proper measure of unlawful profits; and indeed, to the extent it purports to
5  estimate Defendants' unlawful profits, it is in conflict with the disgorgement analysis (above),
6  which is 1/50 of the amount. Further, nowhere does Cox consider any other factors or market
7  conditions that may have influenced the price over time.

## III.  ARGUMENT

### A.  The Court should exclude Cox's lost profits opinion.

#### 1.  Cox's lost sales analysis improperly assumes causation.

Cox's regression analysis of lost sales should be excluded because it improperly assumes that SinCo SG's lost sales resulted entirely and exclusively from customer confusion. While actual confusion is not required to demonstrate infringement (that is, liability), it is required to prove causation and damages. *Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors, LLC*, 367 F. Supp. 3d 1072, 1105 (N.D. Cal. 2019); *see also*, *Blau v. YMI Jeanswear, Inc.*, No. 02-cv-9511-FMC, 2004 WL 5313967 (C.D. Cal. Jan. 2, 2004). The customers for which SinCo SG and XingKe competed are the world's leading consumer electronics manufacturers, including Apple, Bose, and Google. They are highly sophisticated, and both testimonial and documentary evidence proves that they were not confused when making purchasing decisions: they knew with whom they were contracting and that XingKe was a separate entity from SinCo SG.

For example, Minh Chi Nguyen, SinCo SG's North American Corporate Vice President, testified in his deposition that Apple "just cut us off after I had kind of divulged that we are no longer part of the DG -- that we are splitting" (which occurred in 2016).[2] Farris Decl., Ex. C. Bose had actual knowledge that SinCo SG and XingKe were distinct entities at least by January 2017, when SinCo SG's COO Jonathan Chee e-mailed Bose's Senior Director of Procurement, explaining that SinCo SG chose "not to retain its shares in DG" allegedly due to DG's "very shady and complicated financial" practices. Farris Decl., Ex. D. Chee's plan backfired because, as he

---

[2] There is no dispute that "DG" is short for "Dongguan" and refers to XingKe. *See also* Farris Decl. Ex. G, at 34:4-13 (respecting the date when XingKe was acquired by third parties).

1   testified during his deposition, as a result of this disclosure, Bose gave SinCo SG a "warning" and
2   it was "prevented from doing business with Bose." Faris Decl., Ex. E. Google also knew that
3   SinCo SG and XingKe were separate companies, as evidenced by an August 2016 email from
4   Google's Andy Lim, in which he expressed a desire to "treat both [XingKe and SinCo] as separate
5   companies, and would like both to show their own capabilities independently." Farris Decl., Ex.
6   F. As a result, any profits that SinCo SG "lost" from these and other customers are not cognizable
7   as damages insofar as they did not result from trademark confusion.

8        SinCo SG may seek to dispute these facts, but by simply assuming causation and "ignoring
9   [other] 'factors that could be significant to his analysis," Cox engaged in unsupported speculation
10  and "ensured his calculations would be particularly inaccurate." *Flowers Bakeries Brands, Inc. v.*
11  *Interstate Bakeries Corp.,* No. 1:08-CV-2376-TWT, 2011 WL 1004657, at *3 (N.D. Ga. March
12  17, 2011); *see also*, *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan.
13  2000) (expert in trademark matter "improperly attributed all losses to the defendants' allegedly
14  illegal acts, despite the presence of other factors that could be significant to his analysis" and his
15  estimates were "based—without any evidentiary or even statistical support—on an assumption
16  that defendants caused all declines suffered by plaintiff"). *Flowers Bakeries* is directly on point.
17  There, plaintiff's damages expert purported to calculate lost profits resulting from claimed
18  trademark infringement. *Id*. at *2. As here, the expert "failed to account for factors other than
19  confusion that may have caused the Plaintiffs' losses." *Id*. at *3. The trial court therefore
20  excluded the opinion: "It is not necessary that the Plaintiff allocate damages between legal and
21  actionable conduct with exact certainty. To be admissible, however, [the expert] *cannot assume*
22  *that* all *lost profits were attributable to the Defendant's infringement*." *Id*. (emphasis altered).

23       Relatedly, Cox also ignores other factors that might have resulted in SinCo SG's lost sales,
24  such as increased costs, increased competition, or other market factors. *See e.g.,* Farris Decl. Ex.
25  B, Expert Report of Henry J. Kahrs ("Kahrs Report"), at 11-20. *Oracle Am., Inc. v. Google, Inc.*,
26  No. 10-03561 WHA, 2016 WL 2342365, at *7-8 (N.D. Cal. May 3, 2016) is instructive. There,
27  the plaintiff's expert purported to calculate lost profits resulting from defendant's copyright
28  infringement of the Oracle API by extrapolating licensing revenue data from 2007-2008 through
    to 2015. The court rejected this analysis as too speculative, finding that the expert had failed to

1  "perform any analysis regarding whether Oracle underperformed relative to the forecast due to
2  market shifts or events unrelated to [defendant's] alleged infringement. Nor did he offer any
3  analysis to support extending the growth projections five years beyond the end of the forecast."
4  *Id.* Here, Cox's regression model analysis of SinCo SG's "but-for" sales suffers from the same
5  fatal flaws. He asserts that the data pre-2016 can be extrapolated to December 2018 (Cox Report,
6  ¶¶ 41-53), but performs no analysis regarding any possible factors that could have caused SinCo
7  SG's sales to underperform relative to his forecast due to "market shifts or events unrelated to
8  [Defendants'] alleged infringement." *Oracle*, 2016 WL 2342365, at *8.

9  A related, but distinct—and uncurable flaw—is that Cox's model does not permit the jury
10  to disaggregate damages by customer or project. It therefore does not assist the trier of fact.
11  *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 04–CV–1082, 2006 WL 1663357,
12  at *5 (N.D. Ga. June 14, 2006) (excluding damages opinion in trademark matter: "The inability or
13  failure to allocate damages between legal and actionable conduct highlights the fact that [the
14  expert's] testimony would not assist the trier of fact.") (citing *Computer Access Tech. Corp. v.
15  Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063 (N.D. Cal. 2003)); *see also Lindy Pen Co. Inc. v. Bic
16  Pen Corp.*, No. CV-80-0010-WDK(EX), 1989 WL 296762, at *8 (C.D. Cal. Aug. 1, 1989), *aff'd*,
17  982 F.2d 1400 (9th Cir. 1993) (rejecting calculation of lost profits because plaintiff failed to
18  segregate losses due to defendants' infringing telephone orders from other, non-infringing orders;
19  plaintiff's calculation "includes sales . . . in which no likelihood of confusion existed").[3]

20      **2.    Cox's gross margin and mitigation theories should also be excluded.**

21  Cox's theory of lost profits due to decreased gross margin should be excluded for the same
22  reasons as his lost sales opinion; his theory of decreased gross margin posits that SinCo SG's
23  margin decreased because its sales decreased, while its costs and expenses stayed static. This
24  theory relies upon the same underlying assumptions as his lost profits analysis: that Defendants'
25  alleged misappropriation was the cause of all of SinCo SG's decreased sales after 2016.

26  Cox's opinion on mitigation damages should be excluded for the further reason that the
27  claimed damages are entirely untethered to trademark infringement. Cox opines that SinCo SG

---

[3] XingKe is producing relevant revenue data that will illustrate this flaw for the jury, if necessary.

suffered losses because it hired and maintained additional administrative staff and incurred other costs to meet the "exacting standards of US customers." Cox Report, ¶¶ 60-64. Specifically, "once SinCo began to recognize Defendants were misappropriating its trade secrets [sic] and diverting sales away from SinCo, . . . [i]t attempted, for instance, to reallocate more production to SCM, its own factory in Malaysia." *Id.*, ¶ 60. SinCo SG's "reallocate[ion]" of sales has nothing to do with any trademark infringement, as Cox implicitly acknowledges by referring to *trade secret misappropriation*. Very simply: XingKe was acquired by third parties. XingKe was not obligated to manufacture goods for SinCo SG; nor were the individual defendants obligated to continue to coordinate with SinCo SG. Its "mitigation" costs were due to the loss of XingKe as a contract manufacturer; not trademark infringement.[4]

### B. The Court should exclude Cox's disgorgement opinion.

An expert report must provide "a complete statement of all opinions to be expressed and the basis and reasons therefore." Fed. R. Civ. P. 26(a)(2)(B). Cox's "opinion" on disgorgement is one entry in his Summary of Conclusions, in which he asserts that XingKe's profits, to the extent they were opportunities taken from SinCo SG, should be included in SinCo SG's lost profits damages. Cox Report, ¶ 11. Cox contends that these profits amount to $2.1 million, but provides no evidence or analysis to support his conclusion. *Id.* His opinion is therefore unsupported speculation, and should be excluded for lacking any reliability or relevance to the claims at issue. *See Humphreys v. Regents of Univ. of Cal.*, No. C 04-03808 SI, 2006 WL 1867713, at *6 (N.D. Cal. July 6, 2006) (excluding export report that lacked any explanation of the basis or reasons for opinion for failing the basic requirements of Rule 26).

### C. The Court should exclude Cox's unjust enrichment opinion.

#### 1. Unjust enrichment is not a cognizable form of relief.

Unjust enrichment of the type calculated by Cox is not a cognizable theory of relief for trademark infringement. It is correct, of course, that in some cases defendants' profits are a

---

[4] Although not included in his Summary of Conclusions, Cox also opines that SinCo SG suffered "capital expenditure" damages in investing in and improving its Astro facility to replace production at XingKe, once XingKe was no longer a manufacturer. Cox Report, ¶¶ 65-66. This further illustrates the extent to which Cox's mitigation theory is untethered from trademark infringement, as SinCo SG would have incurred these expenditures once XingKe was no longer a manufacturer for it, regardless of any alleged trademark infringement.

1  cognizable form of relief.  *See* Ninth Circuit Model Rules, 15.29 Trademark Damages -
2  Defendant's Profits (citing 15 U.S.C. § 1117(a)) ("the plaintiff is entitled to any profits earned by
3  the defendant that are attributable to the infringement").  But this is not what Cox has calculated as
4  unjust enrichment.  By his own admission, Cox did not assess data reflecting "sales diverted from
5  SinCo through its trademark application."  Cox Report, ¶31.  Rather, that is his disgorgement
6  theory, addressed above.  Instead, for unjust enrichment, he employs an "alternative method for
7  determining the extent to which DG has unjustly enriched itself," which is his "market value"
8  approach.  *Id*.  But a market valuation does not constitute "profits" within the meaning of the
9  Lanham Act and is not a cognizable theory of relief.  15 U.S.C. § 1117(a) ("In assessing profits
10 the plaintiff shall be required to prove defendant's *sales only*" (emphasis added)); *see also*, *Oculu,*
11 *LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204, at *23 (C.D. Cal. June 8,
12 2015) (granting motion in limine excluding expert opinion on plaintiff's unjust enrichment theory
13 because "Plaintiff's unjust enrichment theory, as articulated by its expert witness Mr. Drews, is
14 based on Facebook's valuation of Defendant's 'Tradename and other' asset, which does not
15 constitute 'profits' within the meaning of the Lanham Act.").

16              **2.      Cox assumes causation and ignores relevant considerations.**

17          Cox's analysis of unjust enrichment should also be excluded because his analysis
18 improperly assumes causation, and does not adequately consider alternative causes for XingKe's
19 increase in valuation.  Cox's "market value" approach to analysis amounts to nothing more than
20 simple arithmetic.  Nowhere in his analysis of unjust enrichment — four paragraphs, amounting to
21 $100 million — does Cox provide any analysis as to causation; he simply asserts without any
22 evidence that any enrichment *must be* as a result of Defendants' alleged trademark
23 misappropriation.  Cox Report, ¶ 70.  Cox fails to consider other factors that could have impacted
24 XingKe's market price, such as the differences in how Wenzhou, a private equity firm, and
25 Jinlong, an electronics manufacturing company, may have been able to deploy XingKe.  Cox also
26 ignores factors such as IRS Revenue Ruling 59-60, which requires consideration of "current and
27 prospective conditions as of the date of the appraisal, both in the national economy and in the
28 industry in which the corporation is allied."  *See* Kahrs Report, at 25-27.  *Id.*

| | |
|---|---|
| Dated: September 3, 2021. | ARNOLD & PORTER KAYE SCHOLER LLP |
| | By: /s/ *Douglas A. Winthrop* <br> DOUGLAS A. WINTHROP |
| | *Attorneys for Defendants* <br> XINGKE ELECTRONICS (DONGGUAN) CO., LTD., formerly known as SINCO ELECTRONICS (DONGGUAN) CO., LTD., LIEW YEW SOON aka, MARK LIEW, NG CHER YONG. aka CY NG, and MUI LIANG TJOA aka ML TJOA |

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served a copy of the foregoing MOTION IN LIMINE NO. 1 via the Court's CM/ECF system on _____.

                                                 /s/ *Attorney Name*
                                                 ATTORNEY NAME

1  LAEL D. ANDARA (SBN 215416)
   DANIEL E. GAITAN (SBN 326413)
2  ROPERS MAJESKI PC
   545 Middlefield Road, Suite 175
3  Menlo Park, CA 94025
   Telephone:    650.364.8200
4  Facsimile:    650.780.1701
   Email:        lael.andara@ropers.com
5                robin.pearson@ropers.com
                 daniel.gaitan@ropers.com
6
   Attorneys for Plaintiff
7  SINCO TECHNOLOGIES PTE LTD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SINCO TECHNOLOGIES PTE LTD,<br><br>    Plaintiff,<br><br> v.<br><br>SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGLE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual),<br><br>    Defendants. | Case No. 3:17CV5517<br><br>**PLAINTIFF SINCO TECHNOLOGIES PTE LTD'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE TESTIMONY OF DR. ALAN J. COX**<br><br>PRETRIAL HEARING<br>Date: October 5, 2021<br>Time: 3:00 p.m.<br>Place: Courtroom 5 – 17th Floor<br>Hon. Edward M. Chen<br><br>TRIAL DATE<br>November 1, 2021 |

Plaintiff SINCO TECHNOLOGIES PTE LTD ("SINCO") hereby files this opposition to Defendants Motion in Limine to Exclude the Testimony of SinCo's expert Dr. Alan J. Cox. Defendants refers to Defendants SinCo Electronics (Dongguan) Co., Ltd.; XingKe Electronics (Dongguan) Co., Ltd. ("XINGKE"); Mui Liang Tjoa; Ng Cher Yong; and Liew Yew Soon ("Mark Liew") (collectively, "Defendants"). Dr. Cox's opinions are based upon the material reviewed and calculations set forth in his report. Dr. Cox opinions meet the fundamental requirements of relevance and reliability required by Federal Rules of Evidence 702. Defendants concerns are better addressed during cross-examination at trial, rather than a basis for exclusion.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants criticize Dr. Cox's analysis for three reasons: **[1]** Cox's regression analysis of lost sales should be excluded because it improperly assumes that SinCo SG's lost sales resulted entirely and exclusively from customer confusion - MIL at 3:11-12; **[2]** The U.S. customers were not confused when making purchasing decisions: they knew with whom they were contracting and that XingKe was a separate entity from SINCO - MIL at 3:19-20.; and **[3]** Cox's model does not permit the jury to disaggregate damages by customer or project - MIL at 5:9-10.

Defendants' willfully ignore the realities of how these part purchases are actually made. Declaration of Daniel Gaitan ("*Gaitan Decl.*") at Exh. 339 ¶9. These are not widgets that can be sold to any consumer, these are custom-made parts that can only be used in the specific U.S. customers electronic devices. Declaration of Joseph Farris ("*Farris Decl.*") at Exhibit 1 ¶16. Once, Defendants interfered with the U.S. customer accounts the tools that SINCO developed and paid for, specific to these parts, were transferred to XINGKE or XINGKE refused to return them to SINCO. *Gaitan Decl.* at Ex. 175.

Ultimately, the damages in this case are based on the loss of a dozen specific contracts each of which are worth tens if not hundreds of millions of dollars, each. *Id*. Ex. 138 and 339 ¶9. For example, Google had an MSA with XINGKE dated **October, 20, 2016**, that they obtained based on initial interest confusion when a SINCO employee, while still employed with SINCO, visited Google with Tjoa on **July 17, 2016**, and subsequently thereafter. *Gaitan Decl.* at Ex. B Supp Tjoa Rog. No. 2 and Ex. 118)  SINCO has evidence of confusion prior to XINGKE signing the agreement, but Defendants are arguing that should be dismissed out of hand, because Google wasn't confused when it signed the agreement. As Dr. Cox referenced that once SINCO tools were moved to XINGKE, no parts could be made, other facts are irrelevant.  But for Defendants' infringement and unfair competition SINCO would have maintained the tools and therefore the business.  The evidence of this is not in the scope of the Expert, who understands the unique operation of the sales of these parts as unique to specific customers and are dependent on the tooling used to make the parts. The Expert's Role is to determine what was lost assuming 1.) that there was infringement or unfair competition and 2.) sales that SINCO had using tools transferred to XINGKE, related to XINGKE's conduct were as a result of XINGKE infringement or unfair competition.  Defendants' criticism no. 2, ignores realities, namely this is not hundreds of little sales.  This is negotiation of a CONTRACT to supply millions of parts, wherein a single

1  transaction accounts for millions of dollars. Defendants attempt to limit all SINCO's damages into a single Sleekcraft factor in the form of "Actual confusion," by ignoring initial interest confusion and redefining confusion to be limited to the time of contracting. Defendants criticism of failure to identify by customer, disregards Dr. Cox's analysis and reference to documents that specifically allocate each specific project by customer. *Farris Decl. Ex. 1 at* ¶ 11 citing Exhibit 1 to the Report and *Gaitan Decl.* Exs. 8-12, as referenced as a Source for Dr. Cox Exhibit 1.

## II.   FACTUAL BACKGROUND

In the complaint SINCO alleges that, starting in 2015, Defendants have carried out acts that were designed to divert business away from SinCo, and to allow Defendants to compete directly with SinCo. Declaration of Joseph Farris ("*Farris Decl.*") at Exhibit 1, ¶5. These acts included trademark infringement and misrepresenting themselves as employees of SinCo. *Id*. The individual Defendants passed themselves off as representatives of SinCo and misappropriated SinCo's trademark in marketing and sales activities. *Id*. Defendants met with U.S. customers while Mr. Liew was still an employee of SinCo, he did not resign from SinCo until **March 21, 2017**. *Id*. Defendant Mr. Ng was a SinCo employee from 2006 until he resigned in **June 29, 2017**. The deception was validated by the presence of known SinCo employees. This trademark misappropriation allowed Defendants to divert sales from SinCo without going through the tedious certification process for becoming a preferred vendor and possibly and generally accelerating their entry into a new position in the supply chain in which it operates. *Id*. and Declaration of Daniel Gaitan ("*Gaitan Decl.*") at Ex. 339 ¶¶'s 11-19.

SinCo designs molds, "test vehicle tools" used to help in the design of a manufacturing facility, prototypes, and production tools for making components. *Farris Decl.* at Exhibit 1, ¶18. It undertakes engineering analysis of those molds and tools and compiles the data necessary to manufacture these components. *Id*. It also arranges for the manufacture of those components, often through contract manufacturers. *Id*. In providing these tools they disclose to SinCo the concepts for the products that they are planning to introduce, information that is a closely held secret because of its strategic importance. *Id*. ¶19.

The draft design of tools and the manufacturing processes are released by SINCO to the contract manufacturer who does further work to establish the production line. *Id*. ¶19. Before component manufacturing begins, U.S. Customers frequently require that one of their representatives inspect the plant to make sure that product is being made to the contract specifications, that it meets the manufacturer's standards and complies with the requirements for

security, labor, environmental and other standards that the U.S. Customers may require. *Id.* Only then can product be made that will be accepted by the U.S. Customer who ordered it from SinCo. *Id.* Companies at all levels of this supply chain are making what economists refer to as "specific investments" which lock them into long-term relationships. *Id.* ¶22. Specific investments are assets that cannot be used for any purpose other than that for which it was constructed. *Id.* Once a factory has been qualified by a U.S. customer, production of that product cannot be transferred to another facility by taking the tools to another facility. *Id.*

Having used SINCO's mark and status to its benefit, XINGKE continues to profit from its misconduct, making sales that it otherwise would not have achieved by itself. *Id.* ¶24. Through its misconduct, XINGKE was able to accelerate on the building of customer relationship at the expense of SINCO. *Id.* This jump start allowed XINGKE to avoid the costs and time necessary for building customer relationships. *Id.* This unfair acquisition allowed it to not only secure the projects it originally misappropriated, but also to establish a relationship directly with SINCO's customers. *Id.* XINGKE supplemented its misleading use of SINCO's trademark to secure purchase orders by using prototypes and engineering that had been developed by SINCO. *Id.* ¶27.

### III. ARGUMENT
#### A. DEFENDANTS' MOTION FAILS TO ACCOUNT FOR REAL WORLD SALES

Defendants contend that Dr. Cox's regression analysis of lost sales should be excluded because it improperly assumes that SinCo's lost sales resulted entirely and exclusively from the alleged wrong. This allegation is false and directly contradicted by Dr. Cox's Expert Report. Specifically, the issue of causation is addressed in Section VI. B. where he describes SinCo's position in the supply chain and, in ¶24, how XINGKE's behavior would cause a material and measurable decline in sales and profits. *Farris Decl.* at Exhibit 1, ¶24. This point is summarized in Section VI, where Dr. Cox states:

> "Given the circumstances in the industry, described in Section VI.B, above, it appears very unlikely that XINGKE could have increased its profitability without misappropriating SinCo's trademark." "From the above it appears likely that XINGKE's activities caused sales to be diverted from SINCO, causing it to lose profits." *Id.*, at ¶28.

Moreover, Dr. Cox's Expert Report provides:

> "The application of economic and business principles clearly demonstrates that the misappropriation of trademarks as asserted by plaintiffs in the case will generally have damaging effects on the owner of the trademark. Such misappropriation allowed Defendants to divert sales that should have been made by SINCO. It also allowed Defendants to strongly accelerate its expansion into the segment of the market which SINCO operates."

While data regarding XINGKE's increased profitability due to its misappropriation is not available, market data is available that allowed Dr. Cox to get an estimate of the minimum amount by which XINGKE unjustly enriched itself. This equivalence is a fundamental principle of finance, economics and valuation. The present value of a firm's expected profitability is approximately equivalent. *Id.*, at 31-32, para. 68.

### B.   DEFENDANTS REDEFINE CONFUSION INCONSISTENT WITH THE LAW

As referenced above, Defendants intentionally ignore how this all happened in the first instance and simply gloss over the initial confusion that occurred. Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion. § 23:6. Whose confusion and about what?—Initial interest confusion, 4 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.), and *HRL Associates, Inc. v. Weiss Associates, Inc.,* 12 U.S.P.Q.2d 1819, 1989 WL 274391 (T.T.A.B. 1989), aff'd on other grounds, 902 F.2d 1546, 14 U.S.P.Q.2d 1840 (Fed. Cir. 1990) (Initial interest confusion is actionable under Lanham Act § 2(d) in PTO inter partes proceedings. A senior user/opposer may suffer injury "if a potential purchaser is initially confused between the parties respective marks in that opposer may be precluded from further consideration by the potential purchaser in reaching his or her buying decision." Here, the likelihood of initial interest, pre-sale confusion overcomes the sophisticated purchaser defense.).

### C.   DEFENDANTS COMPLETELY FAIL TO ADDRESS THEIR BURDEN OF PROOF

The Defendants move to exclude Dr. Cox's testimony based upon the presumption that his opinions assume that any variance in SinCo's sales is due to the trademark infringement or unfair competition, in contravention of the evidence and the exclusion of any other factors such as competition and market conditions. In reaching this conclusion, Defendants have failed to consider one important element – their burden to prove that the infringement had no bearing on SinCo's profits. "If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, *the burden of showing this is upon the poacher*." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) (emphasis added); *see also Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987) ("It is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales.").

### D. DEFENDANTS HAVE FAILED TO PROVIDE EVIDENCE TO SUPPORT CLAIM OF ALTERNATIVE CAUSES FOR THE INCREASE IN VALUATION

In their motion Defendants argue that Dr. Cox failed to consider other factors that could have impacted XingKe's market price, such as "the differences in how Wenzhou, a private equity firm, and Jinlong, an electronic manufacturing company, may have been able to deploy XingKe. Ironically, the Defendants are throwing out theories in an attempt to divert attention from the fact that they have failed to provide any evidence to support their claim of alternative causation. In fact, over the period April through October 2016, XINGKE was sold in parts to Wenzhou Runze Equity Investment Fund LP ("Wenzhou") and Mr. Liming Lin. The total price paid was about **$64 million (USD)** at the prevailing exchange rates yet, eight months later Jinlong Machinery & Electronics. Co Ltd agreed to purchase 100% of XINGKE from Wenzhou and Mr. Lin for approximately **$161.6 million (USD)**. Thus, over a period of about eight months the value of XINGKE increased by almost $100 million (USD), more than doubling its value. (Cox Expert Report p. 32 para 69-70.) Defendants are silent concerning the dramatic increase in XINGKE's value when SinCo's sales loss of products made by XINGKE were almost $100 million (USD).

Defendants further muddied their motion by adding additional irrelevant information. Specifically, they cite IRS Revenue Ruling 59-60, which they contend requires consideration of "current and prospective conditions as of the date of the appraisal, both in the national economy and in the industry in which the corporation is allied." Appraisals are not market transactions and have no bearing on the present case as there was no appraisal conducted or considered by Dr. Cox in preparing his Expert Report or by Wenzhou or JinLong when they purchased XINGKE.

### E. DR. COX'S REPORT DEMONSTRATES THAT XINGKE GENERATED REVENUE BY STEALING SINCO'S BUSINESS

The Defendants used the SinCo marks to target SinCo's customers to divert business away from SinCo. There has been no evidence or assertions presented by Defendants that explain the steep increase in the value of XINGKE was attributable to anything other than its ill gotten gains in the form of SINCO U.S. customers and business. This is supported in part by the fact that when Mr. Gouki Gao was asked during his deposition whether he had "any understanding as to what would have increased the value in 2017, by 600 million Renminbi, of the factory" he responded that he did not know. (Exh. A, p. 126, II. 12-22.) In the preparation of his Expert Report, Dr. Cox

reviewed SinCo's Memorandum of Points and Authorities for Partial Summary Judgement, dated **August 28, 2019** which evidenced that Defendants' trademark infringement was the basis for it to rapidly build new business in a relatively short period of time.

Dr. Cox's opinion is consistent with Ninth Circuit law, in that he clearly provided a damage calculation based on the Defendants' trademark infringement in the form of SinCo's lost profits. Defendants concerns are better addressed during cross-examination at trial, rather than a basis for exclusion.

### F. DEFENDANT CONFLATE ADMISSIBILITY WITH THE WEIGHT OF THE EVIDENCE

"The Ninth Circuit has placed great emphasis on Daubert's admonition that a district court should conduct this analysis "with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014). Accordingly, the Ninth Circuit has emphasized that the gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." A*laska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960, 969 (9th Cir. 2013). The relevancy bar is low, demanding only that the evidence "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995). Dr. Cox's report is relevant and reliable, and Defendants complaints are best addressed by cross-examination.

## VI. CONCLUSION

For all the reasons set forth above, SinCo respectfully moves the Court to deny Defendants' Motion in Limine No. 1 to Exclude the Testimony of Dr. Alan J. Cox.

Dated: September 13, 2021

Respectfully submitted,

ROPERS MAJESKI PC

By: */s/ Lael D. Andara*
LAEL D. ANDARA
DANIEL E. GAITAN
Attorneys for Plaintiff
SINCO TECHNOLOGIES PTE LTD