DOUGLAS A. WINTHROP (SBN 183532)
Douglas.Winthrop@arnoldporter.com
JEREMY T. KAMRAS (SBN 237377)
Jeremy.Kamras@arnoldporter.com
JOSEPH FARRIS (SBN 263405)
Joseph.Farris@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400

**WHGC, P.L.C.**
Jeffrey C.P. Wang (SBN 144414)
*JeffreyWang@WHGCLaw.com*
Michael G. York (SBN 89945)
*MichaelYork@WHGCLaw.com*
Kathleen E. Alparce (SBN 230935)
*KathleenAlparce@WHGCLaw.com*
Jessica A. Crabbe (SBN. 263668)
*JessicaCrabbe@WHGCLaw.com*
1301 Dove Street, Suite 1050
Newport Beach, CA 92660
Tel. (949) 833-8483; Fax: (866) 881-5007

*Attorneys for Defendants* XINGKE ELECTRONICS (DONGGUAN) CO., LTD., formerly known as SINCO ELECTRONICS (DONGGUAN) CO., LTD., LIEW YEW SOON aka, MARK LIEW, NG CHER YONG. aka CY NG, and MUI LIANG TJOA aka ML TJOA

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SINCO TECHNOLOGIES PTE LTD., <br><br> Plaintiff, <br><br> vs. <br><br> SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual), <br><br> Defendants. | Case No. 3:17-CV-05517-EMC <br><br> Action Filed: September 22, 2017 <br><br> **DEFENDANTS' TRIAL BRIEF** <br><br> Date: October 5, 2021 <br> Time: 3:00 p.m. <br> Place: Courtroom 5, 17th Floor <br><br> **Judge: Honorable Edward M. Chen** <br><br> **Trial: November 1, 2021** |

I.     INTRODUCTION

This case is about the end of a longtime business relationship between Defendant XingKe Electronics Technology Co. Ltd. ("XingKe") and Plaintiff SinCo Technologies Pte. Ltd. ("SinCo SG" or "Plaintiff"). At its core, this was a supplier-distributor relationship—with XingKe manufacturing products at a factory in the city of Dongguan, China, and SinCo SG serving as a middleman based in Singapore that bought and then re-sold a portion of the products manufactured by XingKe to a small group of the largest and most sophisticated makers of consumer electronics in the world. Since the end of the relationship, SinCo SG has attempted to use litigation to prevent XingKe from competing for business from those customers. SinCo SG first initiated litigation against XingKe in October 2016 in the parallel state court action,[1] in which SinCo SG is asserting that XingKe "stole" customer by misappropriating "confidential information and trade secrets" and leveraging the efforts of alleged SinCo SG employees "embedded" at XingKe who allegedly had a "duty of loyalty" to SinCo SG (Defendants Mark Liew and CY Ng).

In this action, SinCo SG claims the same harm, but under the alternative theory that XingKe "confused" these sophisticated customers by using its own name, SinCo Electronics (Dongguan) Co., Ltd. ("SinCo DG"), thereby committing trademark infringement under the Lanham Act and other related torts.  The evidence at trial will show that Defendants are not liable, including but not limited to the following reasons:

*First*, Plaintiff will not be able to meet its burden to prove infringement because XingKe never used the SinCo name *without consent*. 15 U.S.C. § 1114(a). It is undisputed that, for many years, XingKe used the English name SinCo Electronics (Dongguan) Co., Ltd. ("SinCo DG") with the consent of Plaintiff based on what Plaintiff has asserted was a verbal agreement. In fact, the evidence will show that this use was not only with the express permission but also the strong encouragement of SinCo SG and its principal, Bryan Lim. *See, e.g.*, Ex. A (*Trial Ex.* 207: 2007 email from SinCo SG to XingKe regarding use of the SinCo logo). SinCo SG now retroactively characterizes this as a limited license subject to unwritten restrictions, but it was never anything of the sort. No contemporaneous, pre-dispute evidence will show that. Rather, the evidence will show that XingKe had the right to use

---

[1] Case No. 16CV30187 in Santa Clara Superior Court ("the State Action").

its former name for any purpose—including for sales independent of SinCo SG—and that Lim / SinCo SG not only knew about those independent sales for years and never objected (*see, e.g.*, Ex. B (*Trial Ex.* 555: 2013 email from SinCo SG to XingKe acknowledging XingKe's independent sales to U.S. customer), but that Lim benefited from these sales. That is, until Lim sold his shares in XingKe in 2016, at which point he no longer stood to gain from XingKe's revenue and, instead, faced competition from XingKe. It was only **then** that Lim first asserted for many years there had been "unwritten" limitations on the use of the name. Not only does SinCo's consent vitiate any trademark liability, SinCo's actions here give rise to a number of affirmative defenses to the claim for infringement, including acquiescence, laches, estoppel, and abandonment via naked licensing.

**Second,** even assuming Plaintiff could prove that XingKe's use of name was actually subject to restrictions and without consent, XingKe did not use any "SinCo" trademark in a way **likely to cause confusion** or that **caused SinCo SG damages**. The evidence will show that there were only a handful of relevant customers that formed the U.S. customer base of these companies, and which were allegedly "confused" by XingKe's former use of the "SinCo" name. Fatal for SinCo SG's claims of "confusion" is that these are literally among the most sophisticated and well-resourced companies in the world—Google, Apple, Amazon. In contrast to mass market consumers making point-of-sale decisions based on a glance at the colors on a logo, these sales are for "goods [that] are expensive and purchased after careful consideration" in complex commercial transactions. *Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983).

**Third**, not only are these companies very careful and selective about which companies they do business with, the evidence will show they were **actually** aware that XingKe and SinCo SG were distinct companies **well before** making any purchasing decisions. Further, by early 2017, just months after the dispute erupted, XingKe had already changed its English name and ceased use of "SinCo" to make a clean break from its former business partner. At that point, SinCo SG had obtained the chief remedy that a trademark plaintiff typically may obtain—the end of the allegedly confusing use of the trademark. Yet, SinCo SG has persisted with the case on the premise that it is entitled to extraordinary and grandiose damages figures—including that extend well beyond early 2017—that are not supported by the facts or the law. Trial will confirm that SinCo SG deserves no

such windfall.

## II. BACKGROUND - KEY EVIDENCE

### A. Brief History of the "SinCo Group"

Around the year 2000, an earlier version of the company that would later become Defendant **XingKe** was founded in China as a manufacturing company focused on the design, manufacturing and production of silicone, rubber, and plastic components. It was called SinCo Silicone Rubber Producing Co. Ltd. ("**SinCo Rubber**"). SinCo Rubber was founded by XingKe's longtime principals—Xu Shugong and Gao Bing Yi—and was also associated with SinCo SG's principal, Bryan Lim. Around 2007, SinCo Rubber's operations were transferred to a new factory complex in the "Humen Town" area of the city of Dongguan. The new factory was owned by XingKe, which had been formed as a separate company in 2005. XingKe had three principal beneficial owners: Xu Shugong, Gao Bing Yi, and Bryan Lim, each of whom held shares through various holding companies over the years until 2016, when the company was sold to holding companies under the control of Chinese publicly listed conglomerate Jinlong Machinery & Electronics Co. Ltd. ("Jinlong") (in the first part of a transaction that would later see ownership transferred to Jinlong directly in 2017).

For many years prior to Jinlong's acquisition of XingKe, SinCo SG and XingKe conducted business together, including on certain projects where XingKe manufactured products (generally parts or components related to electronics products or accessories for electronic components, such as phone cases) that were sold to SinCo SG and then re-sold by SinCo SG to end customers. Over the years, XingKe also had numerous independent customers. Over time, XingKe's business grew to include direct sales to customers in the U.S., Europe, and elsewhere. Throughout this entire period, XingKe used the name "SinCo" without restriction.  This was a mutually beneficially relationship for a long time, as it allowed SinCo SG to market itself as larger than it was by telling customers that XingKe was part of a loose grouping of companies called the "SinCo Group." At the same time, XingKe could sell to any customers it brought in on its own; indeed, XingKe needed to do so because SinCo SG had no obligation to send it business, and frequently directed business to separate companies, such as its actual subsidiaries.

As SinCo SG has long maintained, this relationship was never formalized via written contract. Recently, in pretrial filings, SinCo SG has advanced a novel position that the informal arrangement ended in 2012, when XingKe and SinCo SG signed a temporally-limited "Supply Agreement" (the "2012 Supply Agreement"). As Defendants have set forth more fully in their Opposition to Plaintiff's Motion in Limine No. 3, that 2012 Supply Agreement was not an integrated agreement concerning trademark rights. It also did not set forth *any* restrictions on XingKe's right to use its name to sell to other customers. Further, the 2012 Supply Agreement set a "Term" of one year. *Id.* § 7 ("This Agreement shall be effective for a term of one (1) year from the both parties' execution."). Thus, on January 2, 2013, the 2012 Supply Agreement expired. *Id.* After that time, the parties once again did business without any general written contract setting the terms of the business relationship.

### B. Defendants CY Ng, Mark Liew, and ML Tjoa

In 2003, SinCo Rubber hired Defendant ***CY Ng*** ("Ng") as an Engineering Manager for SinCo Rubber as set forth in a 2003 letter titled "Offer of Employment." Ex. C (*Trial Ex.* 502: 2003 SinCo Rubber-Ng Offer Letter). It is disputed whether Ng became an employee of XingKe or SinCo SG following the dissolution of SinCo Rubber. However, the facts will show that Ng continued to work at the XingKe factory at all times, and always identified himself to the outside world as a XingKe (formerly SinCo DG) employee.

In 2013, Defendant ***Mark Liew*** ("Liew") was hired as an Engineering Manager, reporting to Ng. Again, it is disputed whether Liew was an employee of SinCo SG or XingKe. However, the facts will show that Liew always worked at the XingKe factory, and always identified himself to the outside world as a XingKe (formerly SinCo DG) employee.

In 2016, Defendant ***ML Tjoa*** ("Tjoa"), who was the CEO of Jinlong at that time, first became associated with XingKe as a result of its acquisition by Jinlong.

### C. The Sale of XingKe

After years of a successful business relationship, around 2014, SinCo SG and XingKe were facing an uncertain economic future based on market conditions. Separately, XingKe's longtime majority owner, Xu Shugong, was fighting a years-long battle with a rare nerve disease. In 2015,

Xu told Bryan Lim (who, again, was a minority shareholder in XingKe) that he intended to sell XingKe because of concerns due to economic concerns and his worsening health problems. Xu offered Lim and SinCo SG a chance to purchase the company at that time. Lim initially showed interest, but ultimately offered only a low-ball price that Xu could not accept.

That same year, Xu was connected with another prospective, well-funded, and well-connected buyer—the conglomerate Jinlong. ML Tjoa, who was then the CEO of Jinlong, will confirm at trial that during the negotiations and purchasing process, Bryan Lim never represented to him that XingKe was subject to any restriction as to the use of its name or the customers it could sell to, despite his having direct conversations with Lim during the acquisition process. Jinlong ultimately did buy the company via a series of transactions in 2016 and 2017.

### D.  The Dispute

Following the acquisition of XingKe, the parties continued their business relationship for a time. Notably, even after the completion of the first phase of the sale in April 2016, SinCo SG still did not indicate to XingKe that there were any restrictions on the use of the name "SinCo" under its new ownership. Tjoa's leadership and the backing of Jinlong opened new doors for XingKe. For example, by summer 2016, Tjoa had developed a lead on Google business via his longtime connection, Andy Lim, a Google purchasing manager.  During that same period, SinCo SG was trying to develop Google business to send to its Malaysia factory. It was a known fact that the companies were competing head-to-head for this business. Ex. D (*Trial Ex*. 49: email between Tjoa and Google regarding project pitch).  However, SinCo SG never told XingKe that there was an issue with XingKe using its "SinCo" name in the competition for this Google business.

The evidence will show that SinCo ultimately lost that competition because it was outperformed by XingKe's technical team.  The evidence will further show that it was only then, *after* the Google business was won by XingKe's superior performance, that SinCo SG first accused XingKe of violating an alleged agreement between the parties.  As will be shown at trial, the story is similar for the other major customers that SinCo SG now claims were confused.  In each case, the customer knew that SinCo SG was a different entity than XingKe, sometimes because SinCo SG itself made that clear in a bid for the business. To the extent XingKe secured business from these

5

DEFENDANTS' TRIAL BRIEF                                                          3:17-CV-05517-EMC

customers, it was because the customer affirmatively chose to work with XingKe *over* SinCo SG.

The breakdown in the parties' relationship progressed quickly after that. XingKe continued to manufacture and sell products to SinCo SG for a time thereafter for older projects, forcing the two companies to work together to finish those projects. Despite its rightful claim to use its SinCo name, in January 2017 (two months after the original lawsuit), XingKe made the decision to cease use of the name, formally adopting a new English name, XingKe.

## III.  LEGAL ISSUES

### A.  Trademarking Infringement - Use Without Consent

As Plaintiff, SinCo SG will have the burden to prove that defendants used the alleged marks (1) "without consent of the plaintiff" and (2) "in a manner that is likely to cause confusion." 15 U.S.C. § 1114(a); Ninth Circuit Model Jury Instruction No. 15.16; *Century 21 Real Est. LLC v. All Pro. Realty, Inc.,* 600 F. App'x 502, 508 (9th Cir. 2015). *Applied Info. Scis. Corp. v. eBay, Inc.,* 511 F.3d 966, 969–70 (9th Cir. 2007). SinCo SG will be able to prove neither of these elements.

It is undisputed that XingKe had permission to use the name "SinCo" for many years under what Plaintiff alleges was a verbal agreement based on a "handshake deal." Ex. E (excerpt of deposition of Bryan Lim of April 5, 2019). Indeed, SinCo never attempted to withdraw any alleged permission at any point. Even after SinCo SG filed its "trade secret" lawsuit in the State Action in 2016, it did not tell XingKe to change its name. However, XingKe nonetheless did that voluntarily a few months later.

It is disputed what the scope of the permission under any oral agreement was—with SinCo SG claiming that that XingKe had a "geographically limited" license that did not permit it to make independent sales to U.S. customers under the name "SinCo," and XingKe claiming that no restrictions existed. To resolve this dispute, evidence concerning how the parties conducted business before the dispute arose in 2016 is highly probative. *Kennecott Corp. v. Union Oil Co. of California*, 196 Cal. App. 3d 1179, 1189 (1987) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.").

SinCo SG has recently taken a new position that the prior permission to use the name

6
DEFENDANTS' TRIAL BRIEF                                    3:17-CV-05517-EMC

"SinCo" was extinguished when the parties executed a "Supply Agreement" in 2012. *See* SinCo SG's Motion in Limine No. 3; Ex. F (*Trial Ex.* 535: 2012 Supply Agreement). However, the Supply Agreement was not a fully integrated contract concerning the trademark license; it therefore did not extinguish the oral license as a matter of law. *Rutherford v. Palo Verde Health Care Dist.*, No. ED CV13–01247 JAK (OPx), 2014 WL 12637902, at *6 (C.D. Cal. Nov. 25, 2014) ("Under California law, the factors to consider when determining whether a contract is integrated are: (i) the presence of an integration clause, (ii) the language and completeness of a written agreement, (iii) the terms of any alleged oral agreement and whether they contradict the terms of a written agreement, and (iv) whether the oral agreement might naturally be made as a separate agreement."). Further, to the extent the 2012 Supply Agreement was ever relevant to trademark issues, it expired in 2012 and was not extended. Accordingly, when the disputed sales occurred (all after that time), there was no written contract restricting XingKe's rights.

### B.  Trademark Infringement - Likelihood of Confusion

If SinCo SG is able to prove that it is the owner of valid registered trademarks and that XingKe did not have its consent to use "SinCo," the evidence nonetheless will show that any use of the SinCo trademarks was not likely to cause confusion under the well-established *Sleekcraft* factors. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979 (the factors include: (1) strength or weakness of the plaintiff's mark; (2) defendant's use of the mark; (3) similarity of plaintiff's and defendant's marks; (4) actual confusion; (5) defendant's intent; (6) marketing/advertising channels; (7) consumer's degree of care; and (8) product line expansion).

This is not, however, a typical trademark case involving mass-market consumer goods or services. Here, the key *Sleekcraft* factor will be the degree of care used by the plaintiff's target customers. This is because the "sales" here are purchasing decisions by well-resourced international corporations of the highest conceivable level of sophistication. In such situations, courts have found there to be little chance of likelihood of confusion:

> Perhaps the most critical factor that weighs against Astra in our consideration of this issue is the sophistication of the class of prospective purchasers of the subject products. If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser. And there is always less likelihood of confusion where goods are expensive and purchased after careful consideration.

*Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983); *see also* McCarthy on Trademarks and Unfair Competition, § 23.101 (5th ed. 2021).

The *Astra Pharm.* case is particularly instructive here given that SinCo SG is likely to claim that there was a degree of fleeting confusion by some employees of customers based on the similarity of the names alone. But the law is clear that the confusion must be in a "relevant person"— *i.e.*, the person making the purchasing decision. Thus, in *Astra Pharm.*, the court found it to be significant that there was "no evidence that any temporary confusion that may have occurred regarding the identity of the salesmen had any effect whatever on the ultimate decision of a purchaser whether to buy a particular product." *Id.* at 1207. *See also Alpha Indus., Inc.*, *Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440 (9th Cir. 1980) (confusion less likely when purchasers are "knowledgeable, sophisticated specialists in their area").

Other *Sleekcraft* factors will also weight decisively in Defendants' favor. Plaintiff's mark is inherently weak as a common amalgamation of the words "Singapore" and "company" that has been adopted by countless other companies in Singapore. Further, when XingKe was using its "SinCo" name, it still identified itself as a separate company from SinCo SG, using a different name, email address, website, and other identifiers. XingKe also clearly had no bad intent when it adopted the name SinCo—as Plaintiff admits, it *encouraged* XingKe to use that name, including for its official corporate name. Finally, as discussed below further with respect to damages, but also highly relevant here: There is zero evidence of actual confusion. In other words, not only were these highly-sophisticated customers *unlikely* to be confused, the evidence shows not a single one of them ever *was* confused.

B. **Trademark Registration**

SinCo SG claims to be the owner of valid and registered U.S. trademarks. Defendants reserve their rights to challenge the validity of the those registered trademarks at trial based on the evidence offered by SinCo SG.

C. **Abandonment - Naked License**

Defendants also have a legal affirmative defense of abandonment by naked licensing.

"Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002); *Hokto Kinoko Co. v. Concord Farms, Inc.,* 738 F.3d 1085, 1097 (9th Cir. 2013); *FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 512 (9th Cir. 2010). If naked licensing exists, the trademark holder is "estopped" from asserting the trademark. *Baramerica,* 289 F.3d at 596. Further, the absence of an agreement with provisions restricting or monitoring the quality of goods or services produced under a trademark supports a finding of naked licensing. *Hokto Kinoko Co.*, 738 F.3d at 1097. Contrary to Plaintiff's claim, the standard of proof to establish a naked license is a preponderance of the evidence and not clear and convincing. *See Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 953-54 (9th Cir. 2007) (McKeown, J., concurring) and additional authorities cited in Defendants Objection to Proposed Jury Instruction No. 22.

Here, the evidence will show that SinCo SG never bothered to enter into a formal agreement concerning its trademarks with XingKe or any of the companies that were associated in the uncontrolled "SinCo Group." There were no rules and no restrictions at all on the use of the name—those were only conjured when Bryan Lim sold his shares and changed his previous *laissez-faire* policy as to the use of the name "SinCo." Accordingly, it does not matter that SinCo SG took the formal steps of registering trademarks, it abandoned those trademarks through its naked licensing.

### D.     Dilution

There is no evidence at all to support SinCo SG's claim for dilution. In order to prove dilution, a mark must first be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2). Accordingly, the plaintiff carries the burden of proving the mark is famous to the degree that is it a "household name." *Nissan Motor Co.*, 378 F.3d 1002, 1011 (9th Cir. 2004). This is a "rigorous standard." *ArcSoft, Inc. v. CyberLink Corp.*, 153 F. Supp. 3d 1057, 1065 (N.D. Cal. Dec. 28, 15). Among the examples the Ninth Circuit has provided of such "famous" marks are "**Tylenol** snowboards, **Netscape** sex shops and **Harry Potter** dry cleaners." *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) (quotations and citation omitted) (emphasis added). "SinCo" is not even close.

### E. Damages - Actual Confusion

Finally, if SinCo SG were to prove liability for infringement, it will still not be able to prove damages. Indeed, damages are rare in trademark infringement actions. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed. 2021) ("A permanent injunction is the usual and normal remedy once trademark infringement had been found in a final judgment."); *id.* § 30:58 ("Some plaintiff's attorneys carefully counsel their clients in advance that obtaining a strongly worded injunction should be viewed as a 'win' in a trademark infringement case and that the recovery of a monetary award of any kind is problematical.").

"Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), governs the award of monetary remedies in trademark infringement cases and provides for an award of … any damages sustained by the plaintiff." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993), *abrogated on other grounds*, *Sun Earth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016). "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned **but for** the infringement." *Id*. at 1407 (emphasis added). "Compensatory damages must be established with 'reasonable certainty' and not be based on speculation or conjecture." *Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors, LLC*, 367 F. Supp. 3d 1072, 1105 (N.D. Cal. 2019) (citing *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996)).

As discussed above with respect to likelihood of confusion, the evidence will show that there was no actual confusion and therefore no provable injury. Customers like Google do not casually enter supply relationships based on names that sound familiar. In fact, the process of developing business with companies like Google is intensive and based on extensive vetting of the possible supplier—as confirmed by the months of competition for Google between the companies here. The evidence will show that the customers here were well aware at all relevant times that SinCo and XingKe were distinct entities.

As with most trademark cases, damages are not warranted here. XingKe long ago re-branded and the companies have gone their separate ways.

### H. Equitable Issues

Plaintiff has asserted a claim under California Business & Professions Code Section 17200. In the parallel state action, the Superior Court Judge recently granted summary judgment on Plaintiff's 17200 claim on choice of law grounds. Defendants would expect to bring a similar motion before the Court after trial, as well as Defendants' other defenses to this cause of action. In addition, Defendants have raised certain equitable defenses to Plaintiff's claims that, depending on the results of the trial, would be presented to the Court for resolution, including acquiesce, estoppel, and laches.

## IV. CONCLUSION.

Defendants look forward to demonstrating to the jury that Plaintiff's claims are without merit.

Dated: September 14, 2021.                     ARNOLD & PORTER KAYE SCHOLER LLP

                                               By: /s/ *Douglas Winthrop*
                                                   DOUGLAS WINTHROP

                                               *Attorneys for Defendants*
                                               XINGKE ELECTRONICS (DONGGUAN) CO., LTD., formerly known as SINCO ELECTRONICS (DONGGUAN) CO., LTD., LIEW YEW SOON aka, MARK LIEW, NG CHER YONG. aka CY NG, and MUI LIANG TJOA aka ML TJOA

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served a copy of the foregoing DEFENDANTS' TRIAL BRIEF on September 14, 2021.

                                        /s/ *Douglas A. Winthrop*
                                        DOUGLAS A. WINTHROP