1    DOUGLAS A. WINTHROP (SBN 183532)
     Douglas.Winthrop@arnoldporter.com
2    JEREMY T. KAMRAS (SBN 237377)
     Jeremy.Kamras@arnoldporter.com
3    JOSEPH FARRIS (SBN 263405)
     Joseph.Farris@arnoldporter.com
4    **ARNOLD & PORTER KAYE SCHOLER LLP**
5    Three Embarcadero Center, 10th Floor
     San Francisco, CA 94111-4024
6    Telephone: 415.471.3100
     Facsimile: 415.471.3400
7

8    *Attorneys for Defendants* XINGKE ELECTRONICS
     (DONGGUAN) CO., LTD., formerly known as
9    SINCO ELECTRONICS (DONGGUAN) CO., LTD.,
     LIEW YEW SOON aka, MARK LIEW, NG CHER
10   YONG. aka CY NG, and MUI LIANG TJOA aka ML
     TJOA
11

**WHGC, P.L.C.**
Jeffrey C.P. Wang (SBN 144414)
*JeffreyWang@WHGCLaw.com*
Michael G. York (SBN 89945)
*MichaelYork@WHGCLaw.com*
Kathleen E. Alparce (SBN 230935)
*KathleenAlparce@WHGCLaw.com*
Jessica A. Crabbe (SBN. 263668)
*JessicaCrabbe@WHGCLaw.com*
1301 Dove Street, Suite 1050
Newport Beach, CA 92660
Tel. (949) 833-8483; Fax: (866) 881-5007

12

13                    **UNITED STATES DISTRICT COURT**

14              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                        **SAN FRANCISCO DIVISION**

16

| | |
|---|---|
| 17  SINCO TECHNOLOGIES PTE LTD., | Case No. 3:17-CV-05517-EMC |
| 18              Plaintiff, | Action Filed: September 22, 2017 |
| 19        vs. | **DEFENDANTS' RESPONSE TO COURT'S ORDER OF OCTOBER 26, 2021 RE JURY INSTRUCTIONS** |
| 20  SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO ELECTRONICS TECHNOLOGY CO., LTD.; MUI LIANG TJOA (an individual); NG CHER YONG aka CY NG (an individual); and LIEW YEW SOON aka MARK LIEW (an individual), | Date:          October 20, 2021 |
| 21 | Time:          3:00 p.m. |
| 22 | Place:         Courtroom 5, 17th Floor |
| 23 | **Judge:   Honorable Edward M. Chen** |
| 24 | **Trial:    November 1, 2021** |
| 25              Defendants. | |

26

27

28

1    Solely for the purpose of preserving a clear record and without rearguing the point,

2    defendants reassert their objections to any instruction regarding the plaintiff's purported claim for

3    "passing off" or unfair competition.

4    Attached are true and correct copies of *Public Prosecutor v. Jurong Country Club* (2019) 5

5    SLR 554, *BNM v. Nat'l Univ. of Singapore* (2014) 4 SLR 931, and *National University Hospital*

6    *(Singapore) PTE Ltd. v. Cicada Cube PTE Ltd.* (2017) SGHC 53.

7    Defendants urge the court to drop the "false advertising" claim for the reasons set forth in the

8    Court's order.

9    Finally, defendants believe that any award with respect to the individual defendants of both

10   statutory and compensatory damages would be duplicative and contrary to the language of 15 U.S.C.

11   § 1117(d) that statutory damages are available "*instead of* actual damages and profits."  *See*

12   *Tavaglione v. Billings* (1993) 4 Cal. 4th 1150, 1158-59 (Plaintiff "is not entitled to more than a single

13   recovery for each distinct item of compensable damage supported by the evidence.  Double or

14   duplicative recovery for the same items of damage amounts to overcompensation and is therefore

15   prohibited.")(internal citation omitted); *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 497 (2nd

16   Cir. 1997) ("A plaintiff seeking compensation for the same injury under different legal theories is of

17   course entitled to only one recovery"); *MuscleTech Research and Dev. Inc. v. East Coast*

18   *Ingredients, LLC,* 2007 WL 655755, *5 (W.D.N.Y. 2007)(same); *cf. Joe Hand Prods., Inc. v.*

19   *Nguyen,* 2012 WL 1183738, *3 (N.D. Cal. 2012)(noting that "[s]everal courts have denied recovery

20   for conversion damages as 'cumulative' where statutory damages were already awarded").

21   Dated:  October 28 2021.                          ARNOLD & PORTER KAYE SCHOLER LLP

22

23                                               By:    /s/ *Douglas A. Winthrop*
                                                        DOUGLAS A. WINTHROP

24
                                                        *Attorneys for Defendants*
25                                                      XINGKE ELECTRONICS (DONGGUAN) CO.,
                                                        LTD., formerly known as SINCO
26                                                      ELECTRONICS (DONGGUAN) CO., LTD.,
                                                        LIEW YEW SOON aka, MARK LIEW, NG
27                                                      CHER YONG. aka CY NG, and MUI LIANG
                                                        TJOA aka ML TJOA

28

                                                        1

# Public Prosecutor

v

# Jurong Country Club and another appeal

### [2019] SGHC 150

High Court — Magistrate's Appeals Nos 10 of 2018/01 and 10 of 2018/02
See Kee Oon J
3 April; 12 June 2019

*Criminal Law — Statutory offences — Central Provident Fund Act (Cap 36, 2013 Rev Ed) — Employer charged for failing to pay Central Provident Fund contributions in respect of employee — Whether person concerned in fact employee or independent contractor — Sections 2(1) and 58(b) Central Provident Fund Act (Cap 36, 2013 Rev Ed)*

## Facts

Jurong Country Club ("JCC") was formerly owned by Jurong Country Club Pte Ltd ("JCCL"). JCC took over the business of JCCL on 1 December 2003, and operated primarily as a golf club which also provided ancillary sports, lifestyle and social services. It eventually ceased operations on 31 December 2016.

Mr Mohamed Yusoff bin Hashim ("Yusoff") was employed by JCCL on 1 February 1991 as its gym instructor. He worked under a series of annual or biennial contracts until the club ceased operations, and was the only gym instructor engaged at the club at least until 2014.

Until 31 October 1998, JCCL treated Yusoff as an employee and paid Central Provident Fund ("CPF") contributions as his employer. On 1 November 1998, JCCL purportedly converted his status to that of an independent contractor and Yusoff stopped receiving CPF contributions from then on. This change in Yusoff's status resulted in the general revocation of his employee benefits. Yusoff was also permitted to conduct personal training sessions for non-members at the gym outside working hours.

The contracts entered into by JCC and Yusoff expressly referred to Yusoff as an independent contractor. These contracts stated that they were "contract[s] for service", and that nothing in their terms should be construed as constituting or having the effect of creating an employer-employee relationship.

In 2016, Yusoff approached the CPF Board to enquire whether he was entitled to (employer's) CPF contributions. This led to JCC's prosecution and conviction after trial of four charges under s 7(1) read with s 58(*b*) of the Central Provident Fund Act (Cap 36, 2013 Rev Ed) ("CPFA"). The District Judge imposed fines totalling $3,600. The Prosecution sought an order for payment of arrears in CPF contributions and interest from December 2003 to the date of conviction under s 61B(1) of the CPFA. The District Judge declined to grant the order.

The Prosecution appealed against the District Judge's dismissal of its application under s 61B(1) and JCC cross-appealed against its conviction.

**Held, dismissing the appeal and allowing the cross-appeal:**

(1)     The question as to whether a particular person should be deemed an employee for the purposes of the CPFA was, to an extent, one of contractual interpretation. Due regard should be had for parties' intentions particularly where there was no evidence of a lack of good faith, and no indication that the parties had tried to conceal the true nature of their relationship to avoid payment of CPF contributions. The express intentions of parties were not conclusive. Where the parties had either inadvertently or deliberately used a label that did not match the reality of their working relationship, the court should not hesitate to depart from the express wording of the contract. The court had to also take into account the relative bargaining powers of the parties in deciding whether the terms of the written agreement represented what was agreed: [46], [47], [54] and [92].

(2)     In determining whether the label of "independent contractor" utilised accurately represented their true relationship, the multi-factorial approach was to be adopted. This would be adaptable to different industries and working conditions. Under this approach, the court was to look at the totality of the parties' working relationship with reference to a non-exhaustive list of factors. This assessment should be done holistically and with due regard to all relevant factors: [49], [51], [54] and [59].

(3)     The pertinent inquiry was whether there were clear indicia of an employer-employee relationship such that this was proven beyond reasonable doubt. Assessing whether a particular factor was suggestive of an employment relationship required the court to take a pragmatic and holistic view of the circumstances. This was especially since the existence of any given factor might not in itself point one way or the other: [55] and [93].

(4)     While JCC had some level of control over the manner in which Yusoff carried out his responsibilities, in context, this was a neutral factor that did not point towards a finding that Yusoff was either an employee or an independent contractor. This was primarily because the level of control and supervision in the present case would not have been inconsistent with either a finding that Yusoff was an independent contractor or that he was an employee: [61] and [70].

(5)     The fact that Yusoff was not contractually entitled to delegate his responsibilities and had to perform them personally was another neutral factor. A core part of Yusoff's work involved the personal training of clients, and the fact that the replacement instructor was generally arranged for by JCC should be understood in light of the fact that JCC had on occasion deployed one of its full-time staff to the gym in Yusoff's absence instead of engaging another instructor: [72].

(6)     There was mutuality in the sense that Yusoff was obliged to provide his services as a gym instructor and JCC was obliged to pay the "retainer fee" and to provide work for Yusoff. This was not inconsistent with an independent contractor relationship. It appeared that an element of mutuality would usually be present in contracts for service as well: [73].

(7)     In context, the other factors considered were not determinative or strongly indicative of an employment or independent contractor relationship: [77], [78], [82] and [83].

(8)    The differences between Yusoff's working arrangements and those that applied to JCC's other employees clearly indicated that the parties intended for Yusoff to be an independent contractor. The conduct of JCC and Yusoff provided cogent evidence of their agreement for Yusoff to be an independent contractor, in form and substance, throughout the entire period of engagement. The removal of benefits such as hospitalisation or medical leave coincided with the purported formal change in Yusoff's status from employee to independent contractor. The fact that Yusoff was given paid leave in 2007 was an anomaly in the otherwise consistent position taken on employee benefits in the contracts spanning 2003 to 2016. It was also significant that Yusoff had been permitted to conduct public programmes in the JCC gym after his stipulated working hours in the written contract following JCCL's decision to retain him as an independent contractor. This signalled a substantive shift in Yusoff's rights that was consistent with the formal shift from his status as an employee to independent contractor: [84], [86], [88] and [89].

(9)    The reality of the working relationship was not at odds with the express intention for Yusoff to be an independent contractor. Even disregarding the express intentions as stated in the contracts, the fact that a particular factor was not indicative of Yusoff being an independent contractor need not have suggested that he was an employee. Further, even if it could be said that there was ambiguity as to the actual status of the relationship over the years after 2007, such doubt should have been resolved in favour of finding an independent contractor relationship. The Prosecution had not proven beyond reasonable doubt that Yusoff was an employee. Accordingly, JCC's appeal was allowed and it was acquitted of all four charges: [90] and [93] to [95].

[Observation: The s 58(*b*) CPFA offence was one of strict liability. The CPFA pertained to an issue of social concern. Imposing strict liability for the s 58(*b*) offence would promote the objects of the CPFA and increase compliance with it. This would signal to employers that their honest belief is insufficient to avoid liability under s 58(*b*) of the CPFA and that reasonable care was necessary. Whether reasonable care had been exercised would remain a fact-specific inquiry. Steps taken, such as the seeking of legal advice and/or guidance from a lawyer, Ministry of Manpower or the CPF Board would go some way towards showing reasonable care. Courts also had to have regard to the totality of the circumstances, including whether the relationship was obviously one of employment: [100], [101], [103] to [105] and [114].

An order under s 61B(1) of the CPFA could be made in relation to all the arrears and interest thereon certified to be due at the time of conviction, whether or not these were the subject of the charges preferred. There was no qualifier in the provision suggesting that "any contributions" should be limited to those arising from the subject matter of the conviction or the charges preferred. Further, this interpretation would be in line with the legislative intent to enable the CPF Board to recover the contributions due and payable in a more expeditious manner: [117] to [121] and [125].

The time bar applicable to a s 65 CPFA suit was not relevant to the determination as to whether a s 61B(1) CPFA order ought to be made. The underlying concern was the need to ensure that Singaporeans who were entitled

to CPF would be able to benefit from the scheme. Further, the text of s 61B(1) did not suggest that any time bar would be applicable: [132].

A court before which a s 61B(1) CPFA application was made should consider whether the offender had raised any real dispute of law or fact, which required either evidence to be led, or a protracted hearing for its determination. A mere assertion that it was unclear how the certified amounts had been derived would be insufficient: [133].]

**Case(s) referred to**

*Autoclenz Ltd v Belcher* [2011] 4 All ER 745 (refd)

*BNM v National University of Singapore* [2014] 4 SLR 931 (refd)

*Centre for Laser and Aesthetic Medicine Pte Ltd v GPK Clinic (Orchard) Pte Ltd* [2018] 1 SLR 180 (refd)

*Chng Wei Meng v PP* [2002] 2 SLR(R) 566; [2002] 4 SLR 595 (refd)

*Chua Hock Soon James v PP* [2017] 5 SLR 997 (refd)

*Comfort Management Pte Ltd v PP* [2003] 2 SLR(R) 67; [2003] 2 SLR 67 (refd)

*Consistent Group Ltd v Kalwak* [2007] IRLR 560 (refd)

*Gammon (Hong Kong) Ltd v Attorney-General of Hong Kong* [1985] AC 1 (refd)

*Kureoka Enterprise Pte Ltd v Central Provident Fund Board* [1992] SGHC 113 (refd)

*MCST Plan No 3322 v Mer Vue Developments Pte Ltd* [2016] 2 SLR 793 (refd)

*Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173 (refd)

*Massey v Crown Life Insurance Co* [1978] 1 WLR 676 (refd)

*Montgomery v Johnson Underwood Ltd* [2001] IRLR 269 (refd)

*National University Hospital (Singapore) Pte Ltd v Cicada Cube Pte Ltd* [2017] SGHC 53 (refd)

*PP v KATS Cleaning Services (S) Sdn Bhd* [1995] 1 MLJ 371 (refd)

*Ready Mixed Concrete (South East) Ltd v Minister of Pensions and National Insurance* [1968] 2 QB 497 (refd)

*Soh Meiyun v PP* [2014] 3 SLR 299 (refd)

*Sweet v Parsley* [1970] AC 132 (refd)

*Tan Cheng Bock v AG* [2017] 2 SLR 850 (refd)

*Tan Cheng Kwee v PP* [2002] 2 SLR(R) 122; [2002] 3 SLR 390 (refd)

*Tay Wee Kiat v PP* [2018] 5 SLR 438 (refd)

**Legislation referred to**

Central Provident Fund Act (Cap 36, 2013 Rev Ed) ss 2(1), 58(*b*), 61B(1) (consd);
     ss 7(1), 58(*a*), 58(*a*)(i), 58(*a*)(ii), 58(*c*), 60, 61, 61(2), 61(2)(*b*), 61B, 65, 66A, 66A(1)

Central Provident Fund Regulations (Cap 36, Rg 15, 1998 Rev Ed)

Criminal Procedure Code (Cap 68, 2012 Rev Ed) ss 359, 359(1), 359(2)

Government Proceedings Act (Cap 121, 1985 Rev Ed)

Limitation Act (Cap 163, 1996 Rev Ed) ss 6(1)(*d*), 33(1)

Penal Code (Cap 224, 2008 Rev Ed)

Employees Provident Fund Act 1991 (No 452 of 1991) (M'sia) s 63(1)

*Lim Jian Yi and Wu Yu Jie (Attorney-General's Chambers) for the appellant in*
*MA 10/2018/01 and the respondent in MA 10/2018/02;*
*Yim Wing Kuen Jimmy SC and Ang Si Yi (Drew & Napier LLC) for the respondent in*
*MA 10/2018/01 and the appellant in MA 10/2018/02;*
*Kevin Lee (Aequitas Law LLP) as Young* Amicus Curiae.

[Editorial note: This was an appeal from the decision of the District Court in
[2018] SGDC 314.]

12 June 2019                                            Judgment reserved.

**See Kee Oon J:**

1       These appeals arose from the decision of the district judge ("the
District Judge") in *PP v Jurong Country Club* [2018] SGDC 314 ("GD").
Jurong Country Club ("JCC") was convicted of four charges under s 7(1)
read with s 58(*b*) of the Central Provident Fund Act (Cap 36, 2013 Rev Ed)
("CPFA") at the close of its trial. JCC has appealed against its conviction
and the Prosecution has appealed against the District Judge's dismissal of its
application for payment of arrears in contributions and interest under
s 61B(1) of the CPFA.

2       I reserved judgment after the hearing on 3 April 2019. Having
carefully considered the submissions of the parties as well as those of
Mr Kevin Lee, the young *amicus curiae* ("YAC"), I conclude that the
District Judge erred in finding that Mr Mohamed Yusoff bin Hashim
("Yusoff") was an employee of JCC at the material times. As such, I allow
JCC's appeal and acquit it of the four charges. I dismiss the Prosecution's
appeal accordingly.

3       I now set out the reasons for my decision.

**Facts**

4       The District Judge outlined the background facts of this case
at [6]–[15] of the GD. I shall refer to the facts in more detail as they become
relevant in the course of my judgment. It suffices to highlight the following
facts at this juncture.

5       JCC was formerly a proprietary club owned by Jurong Country Club
Pte Ltd ("JCCL"), a wholly-owned subsidiary of JTC Corporation. On
1 December 2003, JCC took over the business of JCCL. JCC operated
primarily as a golf club and golfing services were its main source of revenue.
JCC also provided ancillary sports, lifestyle and social services. JCC ceased
operations on 31 December 2016 after it was notified by the Singapore Land
Authority that its land would be acquired for redevelopment.

6       Yusoff was employed by JCCL on 1 February 1991 as its gym
instructor. He then worked under a series of contracts until the club ceased
operations. These contracts were negotiated on an annual or biennial basis.

Until 31 October 1998, JCCL treated Yusoff as an employee and contributed to his Central Provident Fund ("CPF"). On 1 November 1998, JCCL purportedly converted his status to that of an independent contractor and Yusoff stopped receiving CPF contributions from this point on. This change resulted in the revocation of Yusoff's employee benefits such as paid annual leave, medical coverage, annual wage supplement and so on. Yusoff was also permitted to conduct personal training sessions for non-members at the JCC gym outside working hours.

7       Yusoff was the only gym instructor engaged at the club at least until 2014. Between August 2014 to December 2014, DW5 Wan Xueming Kenric ("DW5") was engaged as an assistant gym instructor. Yusoff testified that this was to cover the hours he was not at the gym, and DW5 agreed that their working hours seldom overlapped. Both parties accepted that DW5 had been an independent contractor. Yusoff testified that there was another gym instructor engaged by JCC for a few months, again to cover the hours he was not at the gym.

8       Investigations began in 2016 after Yusoff approached the CPF Board to enquire whether he was entitled to (employer's) CPF contributions as he found out that JCC would be closing down. The CPF Board found that he was so entitled. This eventually led to JCC's prosecution and trial before the District Judge on the four charges in question.

**Decision below**

9       The District Judge identified two main issues to be addressed. The first was whether Yusoff was in fact an employee of JCC from 2003 to 2016 within the meaning of the CPFA such that CPF contributions were payable. The second question was whether the s 58(*b*) CPFA offence was one of strict liability (GD ([1] *supra*) at [19]).

10      The District Judge considered that the first question required her to determine whether Yusoff was engaged by JCC under a contract of service, having regard to s 2(1) of the CPFA which defines "employed" as being, *inter alia*, engaged under a contract of service in respect of which contributions are payable under the Central Provident Fund Regulations (Cap 36, Rg 15, 1998 Rev Ed) (GD at [21] and [23]). She then observed that a multi-faceted test must be applied. Under this test, the decisive factors in each case may differ, and would depend on the specific facts of the case. The District Judge described this fact-based "adaptable approach" as logical since employment arrangements are increasingly varied and complex (GD at [26]).

11      The District Judge applied the approach adopted by the High Court in *Kureoka Enterprise Pte Ltd v Central Provident Fund Board* [1992] SGHC 113 ("*Kureoka*"). While the Prosecution had argued that the main focus of any test determining the existence of an employment relationship

SINGAPORE LAW REPORTS

should be the degree or extent of control exercised and the manner of remuneration, the District Judge noted that the Court of Appeal had stated that control may not be the only, or decisive, factor in *BNM v National University of Singapore* [2014] 4 SLR 931 ("*BNM*") (GD at [24] and [27]). The District Judge took into account the following factors (GD at [29]):

(a)   the degree or extent of control exercised by JCC over Yusoff;

(b)   whether Yusoff was given any employment benefits;

(c)   whether the contractual terms allowed JCC to terminate the relationship without notice;

(d)   whether Yusoff was required to render the services personally;

(e)   whether Yusoff was required to supply or use his own gym equipment;

(f)   whether Yusoff took on any degree of financial risk or made any investment in the running of the gym for the opportunity to profit; and

(g)   whether the gym services were an integral part of JCC's business or if they were an accessory to its main business.

12   The District Judge assessed these factors in light of all the evidence adduced, including the various employment contracts between Yusoff and JCC. Particular attention was paid to the contracts dated 1 December 2003, 1 January 2007, 30 November 2010 and 1 December 2015 as they directly related to the four charges before the court (GD at [30]).

13   The District Judge found that JCC exercised considerable control over Yusoff (GD at [34]). The District Judge referred to *Montgomery v Johnson Underwood Ltd* [2001] IRLR 269 at [19] ("*Montgomery*"), where Buckley J held that it suffices for the employer to have no more than a "very general idea" of how the work is done, although some sufficient framework of control must exist. The evidence clearly showed that JCC maintained a sufficient framework of control over Yusoff and this clearly pointed to an employment relationship (GD at [45]). The District Judge further found that the lack of employment benefits was not a reliable indicator that Yusoff was an independent contractor: the evidence showed a lack of clarity as to what benefits JCC was prepared to give him. There was "ambiguity" in the "mixed-up" contract that had been executed in 2007 – *eg*, the provision of 14 days' paid leave was at odds with his alleged status as an independent contractor. According to the District Judge, this ambiguity continued until 2016 (GD at [51]). While other differences existed in the manner JCC treated Yusoff compared to its other employees, such as the fact that Yusoff was not subject to the employee performance appraisal framework, these were the result of JCCL's decision to reclassify him as an independent

contractor, ostensibly as part of a headcount reduction exercise (GD at [52] and [53]).

14    Further, the terms of termination in Yusoff's contracts did not change after 1998, and there was no evidence to show that these differed from those JCC's employees were subject to. The right to terminate at will and to discipline, which had been exercised, were strongly indicative of an employer-employee relationship. The contractual terms between Yusoff and JCC did not allow or require Yusoff to engage a replacement instructor when Yusoff was not able to work or on leave, and JCC had paid the replacement trainer directly when one was engaged. The fact that Yusoff was not allowed to delegate or subcontract to another person meant that his position was "no different from that of an employee" (GD at [54]–[56]).

15    The following factors were at odds with the proposition that Yusoff was running a business on his own account. First, JCC provided and maintained all the gym equipment. There was no evidence Yusoff had been consulted on the gym equipment that was made available, as would have been expected if he had been conducting business on his own account as an independent contractor after 1998. Second, the personal training programmes and the rates for these programmes had to be approved by JCC's Sports and Recreation Committee ("SRC"). Third, Yusoff made no efforts to increase his opportunity to profit, such as by promoting the training programmes. Instead, he trained any member or guest who approached him because of their connection to JCC. Fourth, the overall management and operational costs of running the gym were dealt with by JCC. While the payment of commissions formed a significant proportion of Yusoff's remuneration package, this was "at best" a neutral factor as there were other staff members who had similar arrangements. The contracts and the conduct of the parties therefore did not support the propositions that Yusoff had been running a business on his own account as an independent contractor or that he had invested in the running of the gym (GD at [57]–[65]).

16    JCC had contended that Yusoff's contract was specifically amended in 1998 to allow him to train outsiders in the gym such that he had the opportunity to profit as an independent contractor. The District Judge did not place weight on this submission given that the evidence adduced to show that Yusoff had trained non-members was "rather nebulous". There was also no evidence that suggested Yusoff had publicised his training programmes to non-members outside the club (GD at [63]).

17    Finally, the District Judge found that the gym services were ancillary to JCC's core business. While persons who provide such services are more likely to be independent contractors, this was not true in every case. In any event, the gym services were a necessary part of JCC's business (GD at [67] and [68]).

18    Based on the above reasons, as well as the degree of "permanency" in the relationship between JCC and Yusoff, the District Judge found that Yusoff had been "misclassified" as an independent contractor when he was in fact an employee for the purposes of the CPFA (GD at [69]).

19    The District Judge also held that the s 58(*b*) CPFA offence was one of strict liability. This was because it pertained to an issue of social concern, and imposing strict liability would serve the objectives of the CPFA by encouraging employers to exercise greater care in ensuring compliance with their CPF payment obligations. The District Judge further held that employers could take steps to avoid committing the offence, but that JCC had not exercised "all reasonable care to ensure compliance" in the present case (GD at [76]–[79]). JCC had not sought any legal advice, nor advice from the Ministry of Manpower or the CPF Board. The District Judge thus convicted JCC of the four charges, and imposed fines totalling $3,600 accordingly.

20    However, the District Judge declined to grant the order for payment of arrears in CPF contributions and interest due under s 61B(1) of the CPFA sought by the Prosecution. She held that the court would have to consider additional and likely untested evidence before coming to a decision on the quantum of the order. This was notwithstanding that the relevant CPF Board certificate pursuant to s 66A of the CPFA specifying the outstanding sum had been tendered by the Prosecution. The order sought covered 81 additional months of alleged non-payment of CPF contribution sums which were not the subject matter of the proceedings before her and JCC disputed both liability for and quantum of these sums. Further, the District Judge took into account "the fact that the CPFB has the power under [s 65 of the CPFA]" to recover the arrears. She declined to grant an order solely in respect of the four convicted charges as well, as it would be logical and practical for the CPF Board to pursue recovery of all arrears in one cause of action (GD at [95]–[97]).

**The parties' cases on appeal**

*JCC's submissions*

21    JCC and the Prosecution made submissions on three main issues relating to the convictions. These were: what the appropriate test for determining whether a person is an employee for the purposes of the CPFA is, whether the District Judge erred in finding that Yusoff was an employee, and whether s 58(*b*) of the CPFA is a strict liability offence.

22    JCC emphasised that the question as to whether a person is an employee under a contract of service was one of contractual interpretation. It submitted that where parties have made a *bona fide* declaration on the nature of the contracts between them, and acted in accordance with that declaration, the courts should have "great regard" to parties' express

intentions in determining the objective intention of the parties and their true relationship. This is distinct from cases where the label is used as a dishonest device or deception to conceal the true nature of their agreement, or where the express declaration does not reflect the true nature of the parties' relationship. In those cases, the court will look behind the label and not be misled by it.

23     JCC cited a number of English cases in support of this proposition. For example, in *Ready Mixed Concrete (South East) Ltd v Minister of Pensions and National Insurance* [1968] 2 QB 497 ("*Ready Mixed Concrete*") at 513, MacKenna J held that a declaration by the parties as to the nature of their relationship may be helpful where it is doubtful what rights and duties the parties wished to provide for. A similar sentiment was expressed in *Massey v Crown Life Insurance Co* [1978] 1 WLR 676 ("*Massey*") at 679. Lord Denning MR held that where the parties' relationship is ambiguous and capable of being one or the other, this ambiguity can be removed by the agreement they made, which becomes the best material from which to determine the true legal relationship between them.

24     JCC then argued that, on the facts of the present case, Yusoff was an independent contractor between December 2003 and December 2016. There was no suggestion that the clear declaration in Yusoff's contracts from 2004 that he was an independent contractor was intended to conceal a master-servant relationship. Rather, the contracts which stated that Yusoff was an independent contractor removed Yusoff's employee benefits and did not require him to attend staff training programmes unlike full-time employees. Further, Yusoff was expressly permitted to conduct personal training programmes for non-members of JCC, had a large degree of control over the manner in which he ran his operations and had to undertake a degree of financial risk. He also petitioned a number of members to speak up on his behalf in December 2013 when JCC sought to replace him.

25     The parties' subsequent conduct was consistent with their understanding that Yusoff was an independent contractor. While subsequent conduct is only relevant where it provides cogent evidence of the parties' agreement at the time when the contract was concluded (*Centre for Laser and Aesthetic Medicine Pte Ltd v GPK Clinic (Orchard) Pte Ltd* [2018] 1 SLR 180 at [51]), the parties' conduct in the present case provided cogent evidence that Yusoff was an independent contractor. Most significantly, Yusoff contributed to his CPF as a self-employed person and did not ask for a reversion to employee status. According to JCC, the relevant factors clearly showed that Yusoff was an independent contractor operating under a contract for service.

26     JCC further submitted that the District Judge had erred in holding that s 58(*b*) of the CPFA was a strict liability offence. Instead, JCC

submitted that a reasonable interpretation of s 58(*b*) of the CPFA is that *mens rea* is required for this offence, which would involve at least negligence, if not knowledge. This interpretation is suggested by the statutory context of the provision, in particular, ss 58(*a*), 58(*c*) and 61(2)(*b*) of the CPFA, which also contain *mens rea* requirements. In its skeletal arguments, JCC stated that it agreed with the reasoning of the YAC and also submitted that the *mens rea* requirement was of knowledge or reason to believe (which JCC appeared to equate with negligence).

27    On the Prosecution's appeal against the District Judge's decision not to order the recovery of arrears under s 61B(1) of the CPFA, JCC submitted that the provision did not permit the court to order the payment of contributions not relating to the subject matter of any charge. In exercising its discretion under s 61B(1) of the CPFA, the court ought to apply the principles set out in *Tay Wee Kiat v PP* [2018] 5 SLR 438 ("*Tay Wee Kiat*") and *Soh Meiyun v PP* [2014] 3 SLR 299 on compensation orders. The s 61B(1) CPFA order should not have been made in the present case as the sums would not have been recoverable in a civil action: Yusoff would have been estopped and the claim was time barred. Further, this was not a case where the fact and extent of damage is readily and easily ascertainable. The manner in which the sums certified by the CPF Board had been derived is unclear. It would be unjust for an order relating to all 85 months to be made when the evidence for 81 months remained untested, and JCC has not had the opportunity to examine or respond to such evidence.

### The Prosecution's submissions

28    The Prosecution observed that the local courts have articulated a flexible multi-factorial approach to determine whether a person is an employee under a contract of service. However, it identified two main drawbacks to this approach. First, it can engender significant difficulties, particularly for vulnerable workers, in determining whether a particular worker is an employee or independent contractor. Second, there must be core, irreducible aspects to the employment relationship that render it distinct from other kinds of working arrangements. This would accord with common sense and be in line with the common law on employment contracts as interpreted by the English courts.

29    As such, the Prosecution submitted that the relevant local authorities can and should be interpreted consistently with a more structured approach. Under the Prosecution's proposed approach, the court should first consider "key factors" such as control, personal service and mutuality of obligations. If these "key factors", taken together, point in a single direction, it would take a strong preponderance of other factors pointing the other way before a court should decide otherwise.

30    The Prosecution asserted that the structured approach has been consistently adopted by the English courts. It relied mainly on two cases in

distilling this approach. First, in *Montgomery* ([13] *supra*), Buckley J held that it was desirable for a clear framework or principle to be identified and kept in mind (at [23]). The following passage from MacKenna J's judgment in *Ready Mixed Concrete* ([23] *supra*) at 515 was said to be "the best guide and as containing the irreducible minimum by way of legal requirement for a contract of employment to exist" (at [18] and [23]):

> … A contract of service exists if these three conditions are fulfilled. (i) The servant agrees that, in consideration of a wage or other remuneration, he will provide his own work and skill in the performance of some service for his master. (ii) He agrees, expressly or impliedly, that in the performance of that service he will be subject to the other's control in a sufficient degree to make that other master. (iii) The other provisions of the contract are consistent with its being a contract of service.

31     The Prosecution also relied on *Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173 ("*Market Investigations*") at 183 and 185. According to the Prosecution, Cooke J, in *Market Investigations*, essentially adopted MacKenna J's approach.

32     The Prosecution then argued that its proposed structured approach is consistent with the multi-factorial test adopted in Singapore. Reference was made to *Kureoka* ([11] *supra*), where Chan Sek Keong J listed control and personal provision of services as the first two factors to be considered in determining whether the hostesses in that case were performing their services as persons in business for their own account. There was nothing in *Kureoka* that contradicted the approaches adopted in *Ready Mixed Concrete* or *Market Investigations*. Chan J also found that, on the facts, there was mutuality. The Prosecution therefore submitted that *Kureoka* would have been decided in the same manner if the three-stage approach in *Ready Mixed Concrete* was explicitly applied. Similarly, it submitted that the approaches of the Court of Appeal in *BNM* ([11] *supra*) and High Court in *MCST Plan No 3322 v Mer Vue Developments Pte Ltd* [2016] 2 SLR 793 were not inconsistent with the approach in *Ready Mixed Concrete*. Instead, the Prosecution argued that the multi-factorial approach was simply an elaboration of the last limb of its structured approach.

33     In the present case, the Prosecution submitted that JCC had "extensive control" over Yusoff, who was obliged to personally provide his services, and JCC was bound to pay him a "retainer fee" as well as to provide work for him. The other provisions of the contract also buttressed the conclusion that Yusoff was an employee. JCC had a right to terminate Yusoff's services (with or without notice) upon the occurrence of various conditions that did not pertain directly to the services he provided, Yusoff did not take on financial risks that suggested he was doing business on his own account, and Yusoff did not provide his own gym equipment or have input on the equipment used. The remaining factors were described as neutral factors which did not support JCC's contention that Yusoff was an

independent contractor. The District Judge therefore correctly decided that Yusoff was an employee under the CPFA.

34    The Prosecution went on to submit that the s 58(*b*) CPFA offence is one of strict liability. The CPF scheme relates to an issue of social concern and is a key pillar in ensuring Singaporeans' social welfare. The imposition of strict liability for the s 58(*b*) CPFA offence would promote the objects of the CPFA by requiring employers to ensure that their systems for paying CPF contributions are sound. Appropriate steps can be taken by employers to avoid committing the offence, and the defence of reasonable care remains available even if strict liability is imposed.

35    As for the s 61B(1) order, the Prosecution submitted that the court can impose an order for the payment of any CPF contributions, together with interest, so long as the contributions are due at the date of conviction, and are duly certified by the CPF Board officer. This interpretation is supported by the text and context of the provision, and would be the most consistent with the legislative purpose of the provision and the CPFA as a whole. Section 61B(1) of the CPFA was intended to enable the expeditious recovery of arrears without having to commence further civil action. Underlying this concern is the need to ensure that Singaporeans entitled to CPF are able to benefit from the scheme. The Prosecution then submitted that the District Judge erred in dismissing the application for a s 61(B)(1) order. This decision was made on demonstrably wrong principles as the District Judge did not consider that the Prosecution had a *prima facie* case on the basis of the CPF Board certificate that was tendered. Further, the District Judge had dismissed the Prosecution's application despite JCC not raising any real disputes which would have required a protracted inquiry.

**The YAC's submissions**

36    I had requested the assistance of the YAC with submissions on three main issues. First, what the applicable legal test is for determining whether an individual is employed under a contract of service. Second, whether there is a *mens rea* requirement for a s 58(*b*) CPFA offence. Lastly, whether a court can order payment of arrears in CPF contributions in respect of periods not covered by the charges in a particular case, and the circumstances under which it should do so.

37    The YAC submitted that the applicable legal test for determining whether an individual is employed under a contract of service is the "multiple factors" test which has as its objective the examination of the true nature of the parties' agreement regarding their working relationship. The YAC also identified a non-exhaustive list of factors which might be relevant. This included factors such as control, the parties' understanding of their relationship, supply of tools and provisions, whether the alleged employee is entitled to take on other work, terms of termination, and whether the work is delegable.

38    On the question of *mens rea*, the YAC submitted that s 58(*b*) requires an offender to have knowledge that the CPF member in question is an employee. This would include actual knowledge, wilful blindness and situations where the employer had reasonable grounds for believing that the person in question was an employee. The offender must additionally have intentionally failed to pay the CPF contributions in respect of the employee. The YAC argued that the offence is premised on the employer's omission to act and an employer can only fulfil his statutory obligation to pay CPF if he is first aware that the CPF member in question is an employee. Moreover, imposing strict liability for the s 58(*b*) CPFA offence may not result in increased compliance. An unintentional offender would not think to consult the CPF Board or the Ministry of Manpower ("MOM") since he would have had an honest belief that a worker is not an employee.

39    The YAC further submitted that his proposed interpretation of s 58(*b*) of the CPFA is consistent with parliamentary intention. Section 58(*b*) was intended to be a "truly criminal" offence as opposed to a "quasi-criminal strict liability prohibition that [is] a gateway for recovery of arrears in CPF contributions under s 61B". Alternatively, the YAC submitted that the absence of *mens rea* would nevertheless be relevant by virtue of the general defences under the Penal Code (Cap 224, 2008 Rev Ed).

40    Finally, the YAC submitted that under s 61B(1) of the CPFA, a court may order the payment of arrears in contributions arising from periods not covered by the charges preferred, where such charges have resulted in a conviction. The court should exercise its discretion to order payment of arrears where it is just and fair to do so in accordance with the object of the CPFA. In this regard, the YAC identified a list of factors the court should consider in exercising its discretion. These factors included whether the offender's liability to pay the arrears is controversial, whether the accused has any valid reason to contest the amount due, whether the accused is impecunious and whether the offender would be entitled to claim back the portion of arrears which would have had to be contributed by the employee, amongst others.

**Issues to be determined**

41    The main issues which were addressed at the hearing of this appeal substantially mirrored the conceptual questions posed to the YAC. These were as follows:

    (a)    whether Yusoff was an employee for the purposes of the CPFA at the material times ("Issue 1");

    (b)    what the *mens rea* requirement for the s 58(*b*) CPFA offence is ("Issue 2"); and

(c)   whether a s 61B(1) CPFA order can be made in respect of periods not covered by the charges preferred, and whether the District Judge should have made this order ("Issue 3").

42    Given my conclusion that Yusoff was not an employee of JCC, there is no need, strictly speaking, for me to address the second and third issues. Nevertheless, the parties and the YAC made comprehensive submissions on these issues, which are of considerable importance and have not hitherto been considered by the High Court. Thus, I take this opportunity to put forth my views in relation to these issues *obiter* in this judgment.

**Issue 1: Whether Yusoff was an employee under the CPFA**

43    Having regard to the parties' submissions as set out above, this issue requires consideration of two distinct questions: first, what the appropriate legal test for determining whether a person is an employee under the CPFA is, and second, whether, applying this test, Yusoff should be considered an employee under a contract of service.

*The appropriate test*

44    Section 2(1) of the CPFA defines an "employee" to mean any person who is employed in Singapore by an employer otherwise than as a master, seaman or an apprentice in any vessel. The word "employed" is then defined as:

> … engaged under a *contract of service* or apprenticeship or in an employment in respect of which contributions are payable under regulations made under section 77 [emphasis added]

45    As identified by the District Judge and the parties, the relevant question is therefore whether Yusoff was engaged under a contract of service.

46    I accept that the question as to whether a *particular* person should be deemed an employee for the purposes of the CPFA is, to an extent, one of contractual interpretation, in which due regard should be had for parties' intentions. As was observed in *Massey* ([23] *supra*) at 679, there may be situations in which the parties' relationship is ambiguous and the agreement is capable of being construed as either a contract for or of services. In such cases, parties can remove the ambiguity by the very agreement they make with each other. In my view, this is consistent with the general approach our courts take towards contractual interpretation.

47    It is clear and undisputed that the express intentions of parties are not conclusive. JCC rightly accepted that the court must consider whether such declarations reflected the reality of the arrangement. Where the parties have either inadvertently or *deliberately* used a label (*eg*, of an independent contractor) that does not match the reality of their working relationship, the court should not hesitate to depart from the express wording of the

contract (*eg*, by finding that the worker was in fact an employee). In this regard, I note that the Prosecution cited the case of *Autoclenz Ltd v Belcher* [2011] 4 All ER 745 ("*Autoclenz*") for the propositions that where employment contracts are concerned, the relative bargaining powers of the parties must be taken into account in deciding whether the terms of any written agreement in truth represent what was agreed, and that the true agreement will often have to be gleaned from all the circumstances of the case (at [35]). Within the CPFA context, this would be consistent with the comments made by the Minister of State for Manpower in 2012, cited to me by the Prosecution (*Singapore Parliamentary Debates, Official Report* (17 February 2012) vol 88 at p 1,200 (Tan Chuan-Jin, Minister of State for Manpower)):

> … in instances where employers attempt to disguise their employees as 'freelancers', let me emphasise that they would not be absolved of their responsibilities under the law, including the Employment Act and the [CPFA]. …

48     This is essential to ensure that the statutory entitlements of employees are not easily removed through the mere insertion of express terms in the contract that are at odds with the parties' actual relationship.

49     It is therefore necessary to first identify the characteristics which would suggest an employer-employee relationship at law. The multi-factorial approach under which the court looks at the totality of the parties' working relationship with reference to a non-exhaustive list of factors should continue to apply. This assessment should be done holistically, and with due regard to all relevant factors.

50     I decline to affirm the Prosecution's structured approach. The consistent thread through the local authorities is that the applicable test is flexible and fact-sensitive. For example, in *National University Hospital (Singapore) Pte Ltd v Cicada Cube Pte Ltd* [2017] SGHC 53 ("*NUH*"), Aedit Abdullah JC held at [84] that there is no single, general test that is determinative of whether a person is an employee, or a mere contractor or supplier for services. Instead, Abdullah JC identified a number of expressly non-exhaustive factors which had been distilled from the authorities. I accept that the Prosecution's structured approach was not technically inconsistent with Abdullah JC's observations in *NUH*. That said, in my view, it is not possible to discern a clear reason why one set of factors should be given particular emphasis, or to set out a general rule which places significant weight on these factors in all cases.

51     Instead, it would be preferable to retain a flexible approach that is adaptable to different industries and working conditions. For example, the parties accepted that the factor of control is of less significance where the employee has been retained on account of his special skills or expertise. I note that the Prosecution cited Cooke J's statement in *Market*

SINGAPORE LAW REPORTS

*Investigations* ([31] *supra*) at 183 to the effect that where the worker has particular skill and expertise, the employer cannot direct the worker as to how to carry out his work. In such circumstances, "the absence of control and direction in that sense can be of little, if any, use as a test". While the Prosecution also cited *Montgomery* ([13] *supra*) at [19] for the proposition that "some sufficient framework of control must surely exist" even where direct control is absent, I do not see how placing significant weight on control would be useful in these situations. This is because an element of control would, in any event, generally not be inconsistent with an independent contractor relationship: see, *eg*, *BNM* ([11] *supra*) at [25]. Therefore, to my mind, it is unhelpful to set out general rules as to which factors should carry greater weight. This must be a determination made by the relevant court, having regard to all relevant facts and circumstances before the court.

52     Further, the Prosecution suggests that courts should *first* consider the irreducible aspects of the employment relationship as they may otherwise overlook the factors that distinguish an employment relationship from other working arrangements. In my opinion, this step-wise approach is somewhat artificial. The factors of control, personal service and mutuality of obligations ought to be understood and evaluated in context, and with reference to other considerations, *eg*, industry practices and the parties' intentions. This is particularly since there may be a degree of overlap between these factors. For example, the District Judge considered the termination clauses Yusoff was subject to as relevant to control, but also as an independent factor pointing towards an employment relationship.

53     Finally, while the Prosecution observed that criticisms regarding the difficulty in applying the multi-factorial approach have been made, it is not clear to me those criticisms are necessarily cogent or weighty, or that the structured approach is more capable of consistent application. In so far as the Prosecution suggested in its submissions that "if [the three] factors are present, generally an employment relationship will be found", I do not think this can be correct. This is because all three factors of control, personal service and mutuality of obligations are, to an extent, assessed on a spectrum. The fact that all these three factors are present would not necessarily be conclusive. Ultimately, the court must engage in a qualitative balancing exercise that must be sensitive to the specific facts of the particular case. This would still be the case under the structured approach, where there would be considerable difficulty in assessing to what extent the three factors, taken together, are strongly suggestive of an employment relationship, or otherwise.

54     As such, when considering whether a particular person is an employee for the purposes of the CPFA, a court should have regard to the parties' intentions, either expressly stated or evinced through the terms of the engagement. This is particularly where there is no evidence of a lack of

good faith and no indication that the parties have tried to conceal the true nature of their relationship to avoid payment of CPF contributions. Thereafter, it is necessary to consider the totality of the parties' working relationship, and to determine whether this was consistent with the parties' express intentions. At this stage, the court ought to consider all relevant factors, including those identified by Abdullah JC at [84] of *NUH* ([50] *supra*).

55    For completeness, I address two other points made by the Prosecution in its submissions. It appears to me that a key point of disagreement between the Prosecution and JCC was whether the reasons for an employer's exercise of control over an alleged employee were relevant. There was some suggestion by the Prosecution that the operational or business reasons underlying the presence of control were unimportant, and that it was the *fact* that JCC maintained significant control over Yusoff that should be given weight. This was a somewhat puzzling contention. The Prosecution had rightly agreed that the extent of control exercised has to be considered in the context of the type of work being undertaken and the level of skill involved in performance of the work. This essentially amounted to a consideration of an underlying reason for the extent of control exercised. I do not see why the operational or business reasons for, *eg*, dictating Yusoff's working hours should be treated differently. In assessing whether a particular factor is suggestive of an employment relationship or not, the court should instead take a pragmatic and holistic view of the circumstances. This is especially since the existence of any given factor may not in itself point one way or the other: the mere presence of control, for example, is not inconsistent with either an employment or independent contractor relationship.

56    The Prosecution also argued that the "presence or absence of employment benefits would generally be a neutral factor when the question is whether a worker would be entitled to certain benefits". Allegedly, employers would otherwise be able to prevent workers from claiming employee benefits by taking away even more benefits. While the court should be aware of the relative bargaining powers of the employer and employee, this should not detract from their freedom to determine the terms of their working relationship. These terms would include the benefits provided under the contract. Further, I do not think that taking into account the provision of employee benefits as part of the multi-factorial approach would lead to the consequence suggested by the Prosecution, since this factor would only be one facet of a wider, composite analysis. There is also some authority to the effect that the provision of employee benefits is a relevant factor, which I agree with. For example, in *NUH*, Abdullah JC stated that a person who was contractually entitled to medical leave and related benefits was more likely to be an employee (at [84(g)]). Thus, under the multi-factorial approach, courts should consider whether

the package of benefits provided to the worker as a whole suggested that the relationship was one of employer and employee.

57    I turn next to assess the relevant indicia of employment where Yusoff was concerned.

### Assessment of the relevant indicia of employment

58    I note at the outset that the contracts entered into by the parties expressly referred to Yusoff as an independent contractor, and also stated that they were "contract[s] for service". The contracts further stated that nothing in their terms should be construed as constituting or having the effect of creating an employer-employee relationship. It is pertinent to note that the Prosecution's case does not appear to have been that this was a deliberate or *mala fide* attempt to conceal an employer-employee relationship. Instead, the Prosecution appeared to concede that JCC had (at least at some point) a genuine and honest belief that Yusoff was not an employee.

59    The question is therefore whether the label of "independent contractor" utilised by the parties accurately represented their true relationship. This should be answered adopting the multi-factorial approach.

60    Taking the Prosecution's case at its highest, I begin my analysis by applying its structured approach and examining the three "key factors" first. Even then, it remains unclear to me that the factors of control, personal service, and mutuality of obligations pointed incontrovertibly towards employment in this particular case.

### Control

61    I broadly agree that JCC had some level of control over the manner in which Yusoff carried out his responsibilities. However, in context, I think this was a neutral factor that did not point towards a finding that Yusoff was either an employee or an independent contractor.

62    Specifically, the fact that Yusoff had to use a punch card system when he reported to and left work was unremarkable. The District Judge noted at [35] of the GD ([1] *supra*) that Yusoff had been subject to the same system throughout the time he was at the club, including when he had been classified as an employee. A similar method was also used to track JCC's employees. I accept that this suggested JCC exercised control over Yusoff's working hours and attendance. However, I do not see how this would have clearly suggested an employment relationship. The fact that the same system had been used throughout the time Yusoff worked at the club was immaterial and could equally have been due to some administrative or operational reason, or simply pure convenience. Indeed, JCC argued that Yusoff had to use a punch card in order for it to track the number of days

Yusoff worked, so that the appropriate deductions could be made from his salary. Yusoff had also agreed in his examination-in-chief that it would have been important for JCC to know when he would be at work, and that was the reason he had been asked to use the punch card system. The fact that Yusoff had to use this system was therefore equally consistent with an independent contractor relationship.

63     For similar reasons, the fact that Yusoff's working hours were fixed in each contract, and that JCC retained absolute discretion to alter them were also neutral factors. Yusoff's evidence was that JCC's members had requested for his presence at specific timings, and that this was taken into account when his working hours were fixed in the contracts. In this context, it was unsurprising that JCC retained control over the work hours of Yusoff, who was its sole gym instructor for many years. This would have given it the flexibility to make any necessary arrangements to cater to its members. To my mind, this factor again did not point clearly to either an independent contractor or employer-employee relationship.

64     I turn now to the fact that Yusoff had designed his personal training programmes with little or no input from JCC, and that he had carried out his work without supervision. These were also neutral factors. Yusoff had been employed as a trained expert in the field of fitness training, and the lack of direct and specific control over the manner in which Yusoff carried out his work was hardly surprising. As alluded to above, the absence of control and direction in such circumstances is generally of little significance: *Market Investigations* ([31] *supra*) at 183.

65     I also considered the following facts. The personal training programmes developed by Yusoff were submitted to the SRC for their approval. JCC also determined the rates for training programmes and facilitated the collection of payment. Further, JCC was contractually entitled to give "lawful and reasonable instructions" and dictated the rules and bylaws Yusoff had to enforce. This included rules on what Yusoff had to do to maintain the cleanliness of the gym. Again, to my mind, these were neutral factors when seen in light of the fact that the training programmes were being carried out at a club, and catered primarily to JCC's members. In this context, the fact that JCC retained oversight of the training programmes, the rates charged and facilitated payment, could be consistent with either an independent contractor or an employer-employee relationship. I also accept JCC's submission that it had to ensure that certain standards were met at the gym, and that this did not detract from Yusoff's status as an independent contractor. As JCC submitted, it was reasonable for a club being run for the benefit of its members to subject its independent contractors to a certain degree of control.

66     I should also state that even if Yusoff considered himself bound to train any member who approached him, as contended by the Prosecution, this would not be at odds with his being engaged as an independent

contractor. Again, it is relevant that Yusoff was engaged as the sole gym instructor at JCC at least until 2014, and that JCC's gym was intended to cater primarily to its members.

67     The Prosecution also argued that JCC had exercised scrutiny over Yusoff by disciplinary means. Yusoff testified that if he broke JCC's rules or bylaws, Mr Raymond Ong would administer a verbal warning followed by a warning letter. He further testified that he had been verbally warned by Mr Raymond Ong when a member complained that Yusoff had not given that member sufficient attention. I note that while Yusoff had agreed this was a "warning", his evidence was also that Mr Raymond Ong had not told him that there would be any consequences, but had merely informed him that JCC had received a complaint. In any event, I accept JCC's submission that it had to ensure certain standards were met given the context of its operations as a golf and country club, and its ability to do so did not detract from Yusoff's status as an independent contractor.

68     The District Judge also found that Yusoff was not permitted to take leave as and when he wanted. Instead, whenever Yusoff wanted to take leave, he had to fill in a leave application form and to explain why he was applying to take leave. Where this was for a medical reason, he had to submit a medical certificate to support his application. Where Yusoff intended to take a long period of leave, he had to apply three days in advance. From 2010, the contracts stated that any application for leave would be subject to JCC's rules and regulations, as well as the approval of "Head Lifestyle". While there was some dispute as to whether approval was in fact necessary, I accept that, under the contracts, Yusoff's applications for leave (at least after 2010) were subject to JCC's approval. Again, seen in light of the fact that Yusoff was the sole gym instructor at least until 2014, this was a neutral factor. It was also eminently reasonable and practical. I could not see how else JCC would have been able to plan and arrange for its gym operations if Yusoff could simply come and go as he pleased, especially since he was not expected to arrange for a replacement to cover his duties. While the District Judge placed weight on the fact that DW5 was not subject to the same leave application process and merely had to inform the Lifestyle Manager over Whatsapp when he wanted to take leave (GD at [43]), this was, to my mind, also a neutral factor. This was especially since there was evidence that the process used by Yusoff was *also* different from that used by JCC's employees.

69     Finally, JCC had a right to terminate Yusoff's services (with or without notice) upon the occurrence of various conditions that did not pertain directly to the services he provided. In addition, JCC had the unilateral right to review and alter the terms of the contract. While I accept that these factors, on their own, would have been suggestive of a high level of control, they did not incontrovertibly point to an employment relationship in the present case. In coming to this conclusion, I took into

account the fact that JCC's right to alter the contract was limited in that this could only be done in order to fulfil the objectives of the contract. Further, in so far as termination without notice was concerned, JCC's right to do so was predicated upon the occurrence of a limited list of events. With the exception of bankruptcy and the commission of a criminal offence, the other prescribed events were related to Yusoff's job performance. In any event, in determining whether the factor of control was suggestive of an employment or independent contractor relationship, these were merely two facts to be considered along with the ones discussed above.

70     Having considered the factors above, I agree that they indicate that JCC exercised a degree of control over the manner in which Yusoff did his work. For the reasons I have already alluded to above, considered in context, the degree of control was nevertheless a neutral factor overall that did not clearly point to either an employment or independent contractor relationship. I conclude thus primarily because the level of control and supervision in the present case would not have been inconsistent with either a finding that Yusoff was an independent contractor or that he was an employee. I therefore do not agree with the District Judge's finding at [45] that the fact that JCC "maintained a sufficient framework of control over [Yusoff] from 2003 to 2016 … clearly pointed towards an employment relationship".

*Personal service*

71     I shall examine the factor of personal service next. The District Judge held that the fact that Yusoff's contract did not allow him to delegate or subcontract his responsibilities to another person meant that his "position was no different from that of an employee". The District Judge also noted that it was JCC who arranged for a replacement instructor when one was necessary, save for one occasion when Yusoff had introduced an instructor to JCC. Even then, JCC paid the replacement trainer directly (GD ([1] *supra*) at [55] and [56]). The Prosecution observed that Mr Raymond Ong had characterised this as a favour on Yusoff's part. On the other hand, JCC argued that Yusoff "indirectly" paid the part-time gym instructor: since Yusoff had no paid leave benefits (with the exception of the "mixed-up" 2007 contract), a portion of his remuneration was deducted whenever he went on leave.

72     In my opinion, the fact that Yusoff was not contractually entitled to delegate his responsibilities and had to perform them personally was another neutral factor. As the Prosecution acknowledged, this inability to delegate was "unsurprising" given that a core part of his work involved the personal training of clients. Further, the fact that the replacement instructor was generally arranged for by JCC should be understood in light of the fact that JCC had on occasion deployed one of its full-time staff to the gym to ensure safety there in Yusoff's absence instead of engaging another

instructor. Yusoff also testified that he had been told by the members that the staff member deployed there would not stay in the gym full-time, but instead would only be there for five to ten minutes. Considered as a whole, while there was an obligation for Yusoff to personally fulfil his responsibilities towards the club, this did not clearly point to either an employment or an independent contractor relationship.

*Mutuality of obligations*

73     In relation to mutuality of obligations, the Prosecution rightly noted that personal training of members was only one aspect of Yusoff's duties as the gym instructor. The contracts entered into between the parties over the years consistently indicated that Yusoff was to supervise all gym activities and to ensure the safety of gym users. The contracts further stated that the provision of structured gym lessons were not to interfere with his overall duties and responsibilities. Therefore, I agree there was mutuality in the sense that Yusoff was obliged to provide his services as a gym instructor and JCC was obliged to pay the "retainer fee" and to provide work for Yusoff. There was some suggestion by JCC that there was no contractual limit on the number of days of unpaid leave Yusoff was allowed to take, at least before 2010. The contracts from before 2010 in evidence did not place a limit on the number of days of unpaid leave. Yusoff confirmed this in his examination-in-chief. A limit was only specified in the contracts from 2010 to 2015 which stated that Yusoff would be allowed to take 14 days of unpaid leave, subject to the approval of JCC. However, Yusoff's evidence had been that there were one or two years in which he exceeded the 14-day limit during this period. JCC had allowed it on the condition that he found a replacement. Considered in totality, while I agree that there was mutuality, I do not think once again that this was inconsistent with an independent contractor relationship. Indeed, it appears to me that an element of mutuality will usually be present in contracts for service as well.

74     As such, I do not think the Prosecution's three "key factors" of control, personal service and mutuality of obligations, taken together, can be said to point unequivocally towards a single conclusion. I turn now to consider the other relevant factors.

*Financial risks, earnings and ownership of assets*

75     The Prosecution contended that Yusoff did not take on any independent financial risks separate from those undertaken by JCC. In this connection, the Prosecution relied on the fact that the rates set for the personal training programmes were ultimately decided upon by the SRC. Yusoff's pay structure was also not inconsistent with employee status. The fact that Yusoff's commission of 70% to 80% was higher than the usual fees in commercial gyms was not indicative of an independent contractor relationship or of independent financial risks borne by Yusoff. The training

of non-member clients also did not amount to Yusoff running his own business. At best, this was an additional benefit provided to Yusoff that did not alter his relationship with JCC. Finally, the fact that Yusoff was not required to supply or use his own gym equipment was indicative of an employment relationship.

76    I am conscious of the relevance of these factors highlighted by the Prosecution. In *BNM* ([11] *supra*), the Court of Appeal had placed weight on the fact that the independent contractor undertook the risks of running its business, had its own assets and personnel, retained its own profits, took out its own public liability insurance and so on in finding that the company was carrying on a business on its own account (at [32]).

77    However, these factors are by no means determinative. As the YAC argued, the extent to which the supply of tools and provisions is relevant would depend on the industry in question. The YAC suggested that where these tools are large, immobile or costly, the fact that the tools were provided by the alleged employer may not be indicative of a contract of service. This appears eminently sensible and applicable to the present case, where gym equipment was involved. It is quite unimaginable that Yusoff (or any personal trainer or gym instructor for that matter, perhaps with the exception of a gym owner-instructor) might have to purchase and provide his own treadmills, weights machines or elliptical cross-trainers, just to name a few common items of equipment one might expect to find in any reasonably well-equipped gym. The fact that JCC had provided the equipment without input from Yusoff should equally be viewed in this context.

78    Further, to my mind, it is relevant here that Mr Farrock Ebrahim testified that the gym was a "must-have" for JCC: understood in context, the fact that JCC provided the equipment, subsidised the cost of running the gym and controlled the rates charged for the personal training programmes was unsurprising. I accept that the financial risks adopted by Yusoff were in line with those accepted by JCC: if Yusoff earned more through commission payments, JCC would similarly earn more as well. However, while Yusoff was not at liberty to decide the rates charged for his programmes, he did have an element of control over how much he earned. For example, he designed the programmes with limited input from JCC (even though the latter had to approve them). To this extent, he did have an "opportunity of profiting from sound management in the performance of his task": *Market Investigations* ([31] *supra*) at 185, cited in *Kureoka* ([11] *supra*). I therefore did not think that this factor strongly pointed to an employment relationship.

79    I note also that, to the extent that it is relevant to consider whether the gym services were an ancillary or core portion of JCC's business (see [84(a)] of *NUH* ([50] *supra*), the fact that JCC had considered engaging the services

of an independent contractor (*ie*, Fitness Motion) to replace Yusoff would be relevant as well.

*Renegotiation and renewal of the contracts*

80    Of potential relevance was the fact that Yusoff's contract was renewed on an annual or biennial basis. The District Judge stated that she "could not ignore the fact that there was a certain degree of permanency" in Yusoff's relationship with JCC, and that she had taken into account the fact that Yusoff worked at the club for about 25 years when assessing the other relevant factors. According to the District Judge, the evidence showed that there was some expectation on the part of both parties for the relationship to continue indefinitely. This was qualified by her acknowledgment that this did not necessarily mean that Yusoff was an employee (GD ([1] *supra*) at [69]).

81    I disagree with the District Judge's characterisation of the evidence. The fact that the contracts were renegotiated on a near yearly basis suggested that the parties understood that Yusoff's employment was not intended to be permanent or for an indefinite duration. The contracts entered into specified the length of the engagement to be between one to two years each. Further, evidence to the effect that JCC had intended to replace Yusoff's services with those of an independent contractor named Fitness Motion was also adduced. In so far as the "permanency" of employment is relevant, therefore, this would have been a factor pointing towards an independent contractor relationship. Moreover, despite the 25-odd years that Yusoff had spent working at JCC, the purported change in his employment status from employee to independent contractor was made after only seven years or so.

82    That said, I have not placed considerable weight on this factor. This is because I agree that the length of the relationship or any expectations the parties may have of this is not in itself strongly indicative of either an employment or independent contractor relationship. This is illustrated by the fact that Chan J in *Kureoka* had, in the alternative, described the arrangement as comprising successive short contracts of service each time a hostess reported for work. However, this factor may, in certain circumstances, take on more significance. For example, in *Montgomery* ([13] *supra*) at [40], Buckley J stated that "[i]t may … be more difficult to find that necessary mutuality in a very short assignment as opposed to one which was or had become more permanent".

*Remuneration and commission*

83    The fact that Yusoff's remuneration package was weighted towards commission may be characterised as suggestive of an independent contractor relationship. I note that in *NUH*, Abdullah JC held that a person who was remunerated through a regular salary rather than commission was

more likely to be considered an employee (at [84(b)]; see also Ravi Chandran, *Employment Law in Singapore* (LexisNexis, 5th Ed, 2017) at paras 1.35 and 1.36). In context, however, this fact, taken alone, does not point strongly towards an independent contractor relationship. This is especially since JCC apparently had a number of employees who also had a remuneration package with a variable component.

*Comparative working arrangements and benefits*

84    Both parties attempted to compare Yusoff's working arrangements with those that applied to JCC's other employees. To my mind, the evidence on this was cogent and clearly indicated that the parties intended for Yusoff to be an independent contractor. The District Judge identified a number of differences between JCC's treatment of Yusoff and its employees at [52] of her GD ([1] *supra*). The Prosecution did not dispute that these differences existed.

85    These differences were pertinent and merit some elaboration. Yusoff was not on JCC's list of employees which was used for budgeting purposes, and was not invited to staff functions such as JCC's "Dinner and Dance". The human resources ("HR") manager Ms Teo Peh Yen ("Ms Teo") testified that the "Dinner and Dance" was compulsory for *all* employees, and that the failure to attend would have resulted in a deduction of one day's leave. Yusoff had only been invited to this dinner while he was classified as an employee, and never when he was employed by JCC. Further, Yusoff did not report to the HR department, was not issued the HR manual, was not subject to JCC's employee performance appraisal framework and had no key performance indicators to meet. The latter two factors were particularly significant in view of Ms Teo's evidence that employees would usually get a yearly increment depending on their performance, as indicated on their appraisal forms. In contrast, Yusoff was not subject to this appraisal process and was not eligible for annual increments. Any increment to Yusoff's pay instead resulted from the renegotiation of his contract.

86    The evidence further suggested that Yusoff was given biometric access only to the gym, unlike employees who could access all areas of JCC's office. JCC also did not require Yusoff to sign personal data protection forms even though it required this of all employees. The identification number given to him was also distinct from that given to staff members. In my opinion, these differences were deliberate; they demonstrated that the parties' express intention for Yusoff to be treated as an independent contractor was not deceptive or at odds with reality. Instead, the conduct of the parties provided cogent evidence of their agreement for Yusoff to be an independent contractor, in form and substance, throughout the entire period of engagement.

87    The benefits Yusoff received under the contracts were also indicative of an independent contractor relationship. The District Judge found that the fact that JCCL continued to provide the insurance required under the Workmen's Compensation Act from 1998 to 2002 called into question JCC's claim that Yusoff's position had changed to that of an independent contractor from 1998 (GD at [48]). This insurance had been provided despite the fact that there was some indication JCCL had not intended to do so when converting Yusoff to an independent contractor. However, as the Prosecution rightly acknowledged, the entitlement to insurance was withdrawn from the 2003 contract onwards. The 2003 contract was dated 1 December 2003, the same date JCC took over ownership and management of the club. In so far as the arrangement with JCC is concerned, it appears to me that no weight should be placed on the provision of insurance to Yusoff by JCCL. If at all, the removal of the contractual entitlement to insurance in the 2003 contract was entirely consistent with Yusoff's alleged status as an independent contractor.

88    In addition, Yusoff was not given medical benefits, hospitalisation leave or medical leave under the contracts he entered into with JCC. As indicated above at [56], this may be indicative of an independent contractor relationship. This is particularly since the removal of these benefits in 1998 coincided with the purported formal change in Yusoff's status from employee to independent contractor. While I note that Yusoff was given paid leave in 2007 upon his request, this was an anomaly in the otherwise consistent position taken on employee benefits in his contracts with JCC spanning 2003 to 2016. Taken at its highest, this was a neutral factor that did not point clearly to either an employment or independent contractor relationship.

89    Another significant factor was the fact that Yusoff had been permitted to conduct public programmes in the JCC gym after his stipulated working hours in the contract dated 29 October 1998. This was the first written contract following JCCL's decision to retain him as an independent contractor. By 1 December 2003, the contract expressly stated that these public programmes could be conducted for non-members as well. This was in contrast to the general position that employees were not allowed to engage in personal work at JCC's premises without permission from the management, as illustrated by the HR policy manual ("the Manual") JCC referred me to. The Manual also suggested that engaging in any employment or business without written approval from the general manager would result in dismissal of the employee. Whether or not Yusoff had in fact exercised this right was not material. As was held in *Consistent Group Ltd v Kalwak* [2007] IRLR 560 at [58], cited in *Autoclenz* ([47] *supra*) at [25], the mere fact that a right conferred has not been exercised does not render the right meaningless where the clause reflects what might realistically be expected to occur. In any event, there was undisputed

evidence that Yusoff had trained non-members of the club, as is indicated by the deduction of guest fees from his payslip (exhibit D5). To my mind, the fact that the 29 October 1998 contract provided for this right signalled a substantive shift in Yusoff's rights under the contract that was consistent with the formal shift from his status as an employee to independent contractor. In so far as the Prosecution characterised the permission given to Yusoff to conduct these programmes as an "additional benefit", it appears that this was a benefit conferred on Yusoff because of the desired change in his status to that of an independent contractor.

### Evaluation and conclusion on Issue 1

90 Having assessed the factors above, I conclude that the reality of the parties' working relationship was not at odds with the express intention for Yusoff to be an independent contractor. This was mutually understood and accepted between the parties. There was no subterfuge on JCC's part. Neither was there any indication that the label utilised was fraudulent, dishonest or deceptive. This was underscored by the fact that Mr Raymond Ong testified that there had been an agreement with Yusoff for the latter to be engaged as an employee upon the expiration of his 2015 contract. This did not materialise as the land on which JCC operated was later acquired by the Singapore Land Authority.

91 In its written submissions, the Prosecution had suggested that this case "has wide implications on whether employers can, through contractual machinations, deprive employees of CPF contributions". The Prosecution had *not*, however, argued that JCC engaged in any such "contractual machinations" as JCC had not deliberately acted to avoid its obligations under the CPFA. This was also the District Judge's finding at [83] of the GD ([1] *supra*). The totality of the evidence showed consistency in conduct, and indicated that both JCC and Yusoff did not consider the latter to be an employee. It was clear that Yusoff entered into the contracts each time knowing that the result was that JCC would not make CPF contributions, but that he would have to do so as a self-employed person. Yusoff's evidence had been that he had been told by JCCL in 1998 that it intended to convert his status to a full-time contractor, which meant that he would have to pay his own CPF. He testified that he had been shocked, but had accepted the arrangement. This took place after some discussion and consultation with JCCL. This was also clearly illustrated by his letter dated 15 March 2000.

92 While Yusoff initially testified that he had asked for his CPF contributions to be reinstated, he later agreed that he had not done so, and instead had simply asked for his salary to be increased. In any event, the contracts he entered into excluded the benefits he had been entitled to as an employee before 1998, including the payment of CPF contributions. It is curious that Yusoff claimed only in 2016 that the clear terms of the

SINGAPORE LAW REPORTS

contracts did not in fact reflect the true nature of their agreement, particularly in light of the substantive changes that had followed from the formal change in his status. The key terms of the contracts were not so vague or unclear that they could not be understood or discerned by Yusoff. Moreover, as I had noted above at [47], the court should take into account the relative bargaining powers of the parties in deciding whether the terms of the written agreement represent what was agreed. The facts suggest that Yusoff did have some bargaining power and it was not the Prosecution's case that he was a victim of exploitative conduct. For the reasons above, I conclude that the parties did in fact intend for and understand Yusoff to be an independent contractor.

93     Even disregarding the express intentions of the parties as stated in the contracts, the fact that a particular factor was not indicative of Yusoff being an independent contractor need not have suggested that he was an employee. The pertinent inquiry in the present case was whether there were *clear indicia* of an employer-employee relationship such that this was proven beyond reasonable doubt. In assessing the factors, the District Judge appeared to have been predisposed towards inferring the existence of an employment relationship. As I have indicated above, many of the factors the District Judge relied on in coming to her conclusion should have been properly contextualised and considered neutral factors instead.

94     The District Judge observed at [51] of the GD that a "mixed-up contract" was executed in 2007 as there was ambiguity as to the actual status of the relationship that continued until 2016. In my view, the ambiguity did not necessarily permeate the relationship from 1998 right through to 2016. As I have emphasised, the evidence was that the parties did have a common understanding of their working relationship. Even if it could be said that this ambiguity remained unresolved and gave rise to lingering doubt over the years after 2007 as Yusoff continued working for JCC, such doubt should have been more fairly resolved in favour of finding an independent contractor relationship. It remained incumbent on the Prosecution to prove beyond reasonable doubt that Yusoff was an employee. I find that it had not discharged this burden on the facts of the present case.

95     With respect, the District Judge's finding that Yusoff was an employee was plainly wrong and against the weight of the evidence. The totality of the objective evidence showed that neither JCC nor Yusoff had considered the latter an employee, and had not arranged their affairs as such. Accordingly, I allow JCC's appeal and acquit it of all four charges.

**Issue 2: The *mens rea* requirement under section 58(*b*) of the CPFA**

96     The second issue identified at [41] above is whether s 58(*b*) of the CPFA is a strict liability offence. This is fundamentally a question of statutory interpretation.

97    Section 58(*b*) of the CPFA reads:

> **58.**    If any person —
>
> …
>
> (*b*)    fails to pay to the Fund within such period as may be prescribed any amount which he is liable under this Act to pay in respect of or on behalf of any employee in any month;
>
> …
>
> he shall be guilty of an offence.

### The presumption of **mens rea**

98    The relevant law in this area is well established. There is a presumption that *mens rea* is a necessary ingredient of any statutory provision that creates an offence. This presumption can be rebutted by the clear language of the statute or by necessary implication. Where the language of the provision is unhelpful, the court will have to look at all relevant circumstances to determine the legislative intent. Relevant considerations include the nature of the crime, the punishment prescribed, the absence of social obloquy, the particular mischief and the field of activity in which the crime occurred: *Tan Cheng Kwee v PP* [2002] 2 SLR(R) 122 at [13].

99    The presumption of *mens rea* is often displaced in situations where the offence pertains to issues of social concern (*Tan Cheng Kwee* at [14]). In such situations, the presumption of *mens rea* may be rebutted and displaced where strict liability will be effective in promoting the objects of the statute by encouraging greater vigilance to prevent the commission of the prohibited act: *Gammon (Hong Kong) Ltd v Attorney-General of Hong Kong* [1985] AC 1 ("*Gammon*") at 14; *Tan Cheng Kwee* at [15]. It must be shown that accused persons can do something to avoid committing the offence: *Chua Hock Soon James v PP* [2017] 5 SLR 997 ("*Chua Hock Soon James*") at [165].

### Section 58(b) of the CPFA involves strict liability

100    Having considered the submissions, I am of the view that the s 58(*b*) CPFA offence is one of strict liability. It is clear that the CPFA pertains to an issue of social concern. JCC accepted this at the proceedings below. This is underscored by Acting Minister for Manpower Mr Tan Chuan-Jin's statement on 14 November 2012 that CPF helps Singaporeans save for their retirement and pay for housing and health care expenses. The CPF scheme is a "key conduit" through which the Government channels financial assistance to more economically vulnerable Singaporeans (*Singapore Parliamentary Debates, Official Report* (14 November 2012) vol 89, "Written Answers to Questions for Oral Answer Not Answered

by 3.00 pm – Breach of CPF Employers' Contribution Rules" (Tan Chuan-Jin, Acting Minister for Manpower)).

101   Imposing strict liability for the s 58(*b*) CPFA offence would also promote the objects of the CPFA and increase compliance with it. I do not agree with the YAC's submission that an unintentional offender "would not think" to consult the CPF Board or MOM, and therefore the displacement of a *mens rea* requirement under s 58(*b*) of the CPFA may not result in greater compliance. The imposition of strict liability would signal to employers that their honest belief is insufficient to avoid liability under s 58(*b*) of the CPFA. Rather, what is necessary is the exercise of reasonable care. The CPFA places the responsibility for ensuring that contributions are made on employers (s 7(1) of the CPFA), and employers are best placed to ensure that they comply with the law: see *Chua Hock Soon James* at [166]. As in *Chua Hock Soon James*, employers can do so by seeking legal advice and by utilising sound guidelines in classifying its employees. In my view, these are not unduly onerous expectations.

102   I am mindful that only the court's determination of whether a person is an "employee" under the CPFA would be conclusive. The question as to whether accused persons can do something to avoid committing the offence is relevant. However, as the Prosecution rightly notes, the test as identified in *Sweet v Parsley* [1970] AC 132 at 163 and affirmed in *Gammon* at 13–14 as well as *Chua Hock Soon James* at [165] was whether steps could be taken to promote the observance of the obligation. This is distinct from a requirement that it be possible to ensure the obligation will be met.

103   In any event, any steps taken by an employer evincing reasonable care would nevertheless be relevant. As parties acknowledged, strict liability is distinguishable from absolute liability in so far as there is a defence of reasonable care. Steps taken such as the seeking of legal advice and/or guidance from a lawyer, MOM or the CPF Board would certainly go some way towards showing reasonable care. Amongst others, these are proactive steps employers can take in exercising reasonable care in relation to their obligations to pay CPF contributions in respect of their employees. This would not be difficult for employers to appreciate. While the question as to whether reasonable care had been exercised must remain a fact-specific one, courts should also have regard to the totality of the circumstances, including whether the relationship was obviously one of employment.

104   Moreover, I do not agree with the YAC's argument that the s 58(*b*) offence is one that is "truly criminal" in nature. I fully accept that s 58(*b*) of the CPFA was not primarily intended for the recovery of arrears in CPF contributions. However, this was not material in determining whether the offence was a "truly criminal" one. Yong Pung How CJ in *Chng Wei Meng v PP* [2002] 2 SLR(R) 566, contrasted a "truly criminal" offence with one that is regulatory in nature (at [18]). In *Comfort Management Pte Ltd v PP* [2003] 2 SLR(R) 67, Yong CJ suggested at [32] that whether the offence

carries social stigma is relevant in determining whether it is "truly criminal" in nature. In the present case, the offence is largely regulatory in nature, carries little to no social stigma, and cannot be described as "truly criminal" in character.

105  Finally, the severity of the maximum penalties is relevant as it may indicate that Parliament could not have intended to afflict such harsh punishments without *mens rea* being proven beyond a reasonable doubt. However, this is not determinative as it may be consistent with Parliament's intent to deter such conduct (*Comfort Management* at [30], referring to *Gammon* at 17). The punishment prescribed under s 61 of the CPFA is a fine of up to $5,000 or an imprisonment term not exceeding six months or both for a first time offender. This cannot be said to be particularly severe or harsh, particularly when seen in light of the centrality of the CPF scheme to social security.

106  I turn now to briefly explain my disagreement with the main submissions put forth by JCC and the YAC. It was argued that it would be inappropriate to impose strict liability given the complexity involved in determining whether a particular contract is one of or for service. I do not agree: as I have already stated above, the imposition of strict liability does not render an employer who genuinely believed a worker was not an employee under the CPFA liable unless the employer has also failed to exercise reasonable diligence.

107  JCC also argued that the offences under s 58(*a*)(i), s 58(*a*)(ii) and s 58(*c*) of the CPFA have a *mens rea* requirement, and used this to argue that "there should be no reason why *mens rea* is not required for the [s 58(*b*) CPFA offence]", particularly since these offences attract the same penalty. I am not convinced by this argument. As the court in *Gammon* held at 17, the fact that a provision appears in a section which creates many other offences, some of which clearly require full *mens rea*, proves nothing given that one would expect a wide range of very different offences within the statute. It can equally be said that if *mens rea* were required, it would have been expressly stated.

108  I also do not agree with JCC's argument on s 61(2) of the CPFA. Under this provision, an officer of a body corporate which commits a s 58(*b*) CPFA offence with the consent or connivance of the officer, or which can be attributable to any act or default of the officer, can be liable under s 60 of the CPFA. According to JCC, there is no reason why the requirement of *mens rea* under the primary charge in s 58(*b*) of the CPFA for the body corporate should be dispensed with if there is a clear requirement for *mens rea* where the offender is an officer of the body corporate. I am not persuaded by this argument. The requirement of consent or connivance limits the scope of ss 60 and 61(2)(*b*) of the CPFA by narrowing the situations in which an officer of the body corporate can be held liable for the latter's commission of the s 58(*b*) offence. The same

consideration does not arise under s 58(*b*), and the comparison was unhelpful.

109    The YAC also referred me to passages of Hansard and suggested that parliamentary intent could be inferred from the statements therein. Read in context, I do not find these statements helpful. At best, they were equivocal as to whether Parliament intended for s 58(*b*) to be a strict liability offence. I illustrate this point with one example.

110    One passage from Hansard relied on by the YAC was from the parliamentary debates on the 2007 Central Provident Fund (Amendment No 2) Bill, where the Minister for Manpower Dr Ng Eng Hen said (*Singapore Parliamentary Debates, Official Report* (12 November 2007) vol 83 at col 2612 (Ng Eng Hen, Minister for Manpower)):

> Mdm Halimah also brought up a very important point – that the CPF is such an integral part of our structure that we ought to make sure that people make contributions … *But the way to do this also has to be customised. There will be groups that we want to take a very hard line. And these are employers who systematically or basically cheat and do not pay their employees CPF. Even those who say that they are the contract workers, but if it is proved in practice that they are the employees, we will take action.* So there will be a group that we will use the law and we will send a very strong signal and, from time to time, we will do that to make sure that the employers know that they are liable to pay their employees CPF.
>
> [emphasis from the YAC's submissions]

111    The YAC argued that Dr Ng was drawing a distinction between employers who cheat their employees (where a "very hard line" is taken), and employers who say that their employees are in fact contract workers (where action is taken). With respect, having regard to the context of this paragraph, I do not think that Dr Ng's remarks support the YAC's submissions. Dr Ng in fact goes on to say that there is:

> … a group, on the other hand, which we do not want to use the stick but carrot, and this is where the Medisave Contributions Draw comes in. And this is where we need persuasion by unions to get these self-employed to put in money so they can benefit from Workfare.

112    It thus appears that the true distinction being drawn is between employers who do not pay their employees CPF (where legal action will be taken), and self-employed people (where persuasion will be used). Dr Ng's statement indicates that legal action will be taken against employers who mischaracterise their employees, even without a dishonest intention to cheat. At the very least, Dr Ng's remarks are inconclusive as to whether there is a *mens rea* requirement for the s 58(*b*) CPFA offence.

113    I should also state that I did not find the YAC's submissions on what he described to be "similarly worded criminal statutes" entirely helpful. Ultimately, the question as to whether the s 58(*b*) CPFA offence is one of

strict liability must be determined with regard to the factors identified at [98] above.

114   I conclude that the s 58(*b*) CPFA offence is one of strict liability for the reasons above. The imposition of strict liability also does not render s 65 of the CPFA obsolete as suggested by the YAC. Not every offender will be prosecuted. Even where the offender has been convicted, a s 61B(1) CPFA order may not be made in every case.

### Issue 3: The scope of section 61B of the CPFA

115   The Prosecution appealed against the District Judge's decision not to order the payment of contributions and interest due under s 61B(1) of the CPFA. As I have allowed JCC's appeal against conviction, it follows that the Prosecution's appeal in connection with s 61B(1) of the CPFA must accordingly be dismissed. For completeness, I similarly set out my views on the scope of this provision, since I have had the benefit of full submissions from the parties and the YAC.

#### *Interpretation of section 61B(1) of the CPFA*

116   Section 61B(1) of the CPFA reads:

> **61B.**—(1) The court before which any conviction under section 7(3) or 61 is had may in addition to the penalty prescribed in those sections order the person convicted to pay the amount of any contributions together with any interest due thereon certified by an officer appointed by the Board in that behalf to be due from that person at the date of the conviction.

117   Section 58(*b*) is punishable under s 61 of the CPFA. The Prosecution sought an order for the payment of arrears in CPF contributions plus interest from December 2003 to the date of conviction, which amounted to $416,924. The primary question here was whether s 61B(1) allows the court to order the payment of *any* contributions due to the CPF Board, including sums arising from periods not covered by the charges which have been preferred by the Prosecution. JCC argued that the proper construction of s 61B(1) of the CPFA does not permit an order for recovery of arrears to be made where these do not relate to the subject matter of the charges preferred. On the other hand, the Prosecution argued that a s 61B(1) order can be made in relation to all the arrears and interest thereon certified to be due from JCC at the time of conviction. The YAC agreed that the court may order the payment of arrears arising from periods not covered by the charges preferred by the Prosecution.

118   I agree with the Prosecution's interpretation of s 61B(1) of the CPFA. The ordinary meaning of the provision would allow the court to order the payment of *any* contributions due at the date of conviction, together with the interest payable, as certified by the CPF Board officer. There is no qualifier in the provision suggesting that "any contributions" should be

limited to those arising from the subject matter of the conviction or the charges preferred. A useful comparison may be made with compensation orders under s 359 of the Criminal Procedure Code (Cap 68, 2012 Rev Ed) ("CPC"). In s 359 of the CPC, there is an express requirement that the compensation should relate to the offence or offences for which sentence is passed or which are being taken into consideration for sentencing purposes. No such requirement is contained in s 61B(1) of the CPFA.

119    The Prosecution submitted that its interpretation is also suggested by the context of the provision. I agree. Section 61B(1) of the CPFA refers to "any conviction under section 7(3) or 61" and therefore captures a wide range of offences. This includes offences such as the making of false statements or obstruction of CPF Board officers, for which there is no requirement of any failure to pay CPF contributions. Consequently, in these situations, there may be no contribution arrears relating to the convicted charges, even if there are otherwise contributions due. The fact that these convictions would nevertheless be sufficient to empower the court to make an order under s 61B(1) does, in my view, suggest that the court has wide powers under s 61B(1) of the CPFA to make an order pertaining to any contributions due as at the date of conviction.

120    This interpretation appears to be in line with parliamentary intent, as indicated by the parliamentary debates. As the District Judge noted at [89] of the GD ([1] *supra*), the Minister for Manpower had said that (*Singapore Parliamentary Debates, Official Report* (22 November 2000) vol 72 at col 1224 (Lee Boon Yang, Minister for Manpower)):

> … Clause 18 [providing for the earlier version of s 61B] will allow the court to order the recovery of CPF arrears … in the same manner as a judgement in civil proceedings. This will enable the CPF Board to help members to recover the arrears more expeditiously …

121    Interpreting s 61B(1) of the CPFA to cover all due contributions would be in line with the legislative intent to enable the CPF Board to recover the contributions due and payable in a more expeditious manner. In contrast, interpreting s 61B(1) of the CPFA to mean that the court can only make an order pertaining to periods covered by the charges preferred would not be in line with legislative intent. Where the charge preferred does not concern CPF arrears arising as a result of the offence, the CPF Board would still have to commence civil proceedings separately. Further proceedings would also be necessary to recover arrears which have accrued since the time the charges were preferred. This would not promote the expeditious recovery of contributions suggested by the parliamentary debates.

122    I note also the YAC's reference to s 63(1) of the Employees Provident Fund Act 1991 (No 452 of 1991) (M'sia), which fulfils a similar function and refers to "any amount of contributions". The YAC referred me to

*Public Prosecutor v KATS Cleaning Services (S) Sdn Bhd* [1995] 1 MLJ 371, in which it was held that the provision unambiguously refers to "any contributions", and is not restricted to the offences for which there has been a finding of guilt.

123    JCC argued that s 61B(1) of the CPFA refers to s 66A(1) of the CPFA, which provides that the certification of a CPF Board officer provides *prima facie* evidence that the amounts certified are due and payable as at the date of certification. JCC submitted that the certificate under s 66A of the CPFA cannot be considered *prima facie* evidence without a conviction, because "the evidence relating to the quantum to be paid out would have been led in the course of the proceedings leading to the conviction". To my mind, this argument has no merit. While JCC also argued that unfairness arose from the fact that it did not have the opportunity to lead or examine evidence on the contributions due, this has no bearing on the effect of the s 66A CPFA certificate. Section 66A merely refers to "any proceedings relating to the recovery or non-payment of contributions under section 7". I therefore do not see why the s 66A certificate cannot be considered *prima facie* evidence notwithstanding that the contributions due do not relate specifically to the charges preferred.

124    I am not persuaded that any unfairness results from this interpretation. JCC contended that it had not known the certificate was going to be placed before the District Judge, and that the application under s 61B(1) would be made, until after the evidence had been heard. It further submitted that s 61B does not allow for the hearing of any inquiry, whether protracted or otherwise. As I indicate below, no unfairness results from this as a court should not exercise its discretion to order payment in situations where the offender can show that there is a dispute of law or fact that would require evidence to be led, or a protracted hearing to determine.

125    I conclude, therefore, that s 61B(1) of the CPFA allows the court to order the payment of any contributions due at the date of conviction, whether or not these were the subject of the charges preferred. As the District Judge noted, however, the power under s 61B(1) of the CPFA is discretionary in nature, as is indicated by the text of the provision. The next question is, therefore, what principles ought to guide the exercise of this discretion.

### Principles guiding the court's exercise of discretion

126    The District Judge applied the approach set out in *Tay Wee Kiat* ([27] *supra*) on compensation orders. This was on the basis that both ancillary orders were intended to be shortcuts to remedies that the "victim" could obtain in a civil suit against the offender. The parties were essentially agreed that this was correct.

127   At the outset, I note three differences between orders made under s 359 of the CPC and s 61B(1) of the CPFA. First, s 359 of the CPC imposes an *obligation* on the court to consider, upon conviction, whether to make an order and further states that the court *must* do so if it deems it appropriate: ss 359(1) and 359(2) of the CPC. There are no equivalent provisions under s 61B(1) of the CPFA; the court is not obligated to consider making such an order unless it is applied for by the parties. Second, in setting out the guiding principles in *Tay Wee Kiat*, I was conscious of the pending amendments to s 359 of the CPC, which require the court to "have regard to the offender's means so far as those means appear or are known to the court": *Tay Wee Kiat* at [4] and [10]. Again, no such requirement is imposed under s 61B(1). Finally, under s 66A of the CPFA, the certificate of the CPF Board certifying the amount of contributions and interest due is *prima facie* evidence that the amount stated is due and payable; no equivalent provision exists for compensation orders.

128   In *Tay Wee Kiat* at [10], I stated that since criminal compensation is essentially a proxy for civil damages, the amount of compensation ordered should not exceed what would be reasonably obtainable in civil proceedings. One key issue in the s 61B(1) CPFA context is the relevance of the time bar that would apply to civil actions but not to an ancillary order made under s 61B(1) of the CPFA. The parties appeared to disagree on this. The Prosecution noted in its submissions that the CPF Board is empowered under s 65 of the CPFA to sue for and recover moneys due as if they were debts owed to the Government under the Government Proceedings Act (Cap 121, 1985 Rev Ed). Under s 6(1)(*d*) of the Limitation Act (Cap 163, 1996 Rev Ed), an action cannot be brought after the expiration of six years from the date on which it accrued: in the context of s 65 of the CPFA, time would run from the date the sum became due. This time bar applies to the CPF Board by virtue of s 33(1) of the Limitation Act.

129   JCC essentially argued in the appeal that, *inter alia*, a civil action to recover the arrears would have been time barred, and therefore, applying the principles in *Tay Wee Kiat*, the court should not exercise its discretion to order payment under s 61B(1) of the CPFA. While JCC's submission was specifically that *Yusoff's* civil claim would have been time barred, the fact that it is the CPF Board that would have commenced a civil suit under s 65 of the CPFA does not detract from the intuitive appeal of JCC's submission. This would be especially so if the legislative intent behind s 61B(1) of the CPFA is merely for the order to provide a more expeditious route to recovery.

130   On the other hand, the Prosecution suggested that the time bar is one reason the court should be slow to dismiss an application under s 61B(1) of the CPFA. It suggested that it would be highly undesirable if the court fails to grant an order under s 61B(1) of the CPFA in circumstances where the

CPF Board is unable to recover the CPF contributions because a civil claim would have been time barred. This is because of the centrality of CPF to social security, as well as the fact that non-payment of CPF contributions may span long periods of time. Further, the time bar was a procedural bar that did not extinguish liability, and s 61B(1) of the CPFA did not contain any suggestion that the court's powers thereunder were circumscribed by any limitation period.

131   This issue should be resolved with reference to parliamentary intent. The court in *Tan Cheng Bock v AG* [2017] 2 SLR 850 distinguished between the specific purpose underlying a particular provision and the general purpose (or purposes) underlying the statute as a whole or the relevant part of the statute (at [40]). The Court of Appeal then stated that the courts should begin by presuming that any specific purpose does not go against the grain of the relevant general purpose, but rather is subsumed under, related or complementary to it (at [41]).

132   The Prosecution submitted that the underlying concern is the need to ensure that Singaporeans who are entitled to CPF would be able to benefit from the scheme as CPF savings are used for a number of essential payments. Having reviewed the relevant parliamentary debates on this, I agree with the Prosecution's submission. It appears to me that the desire for expeditiousness was driven by a need to "safeguard CPF members' interests", and to deal "effectively and promptly with employers who have failed to pay CPF contributions for their employees within the prescribed time" (*Singapore Parliamentary Debates, Official Report* (20 June 1998) vol 69 at cols 289–291 (Lee Boon Yang, Minister for Manpower)). Having regard to the fact that the text of s 61B(1) does *not* suggest that any time bar would be applicable, and to the underlying concern identified by the Prosecution, I do not think that the time bar applicable to a s 65 CPFA suit should be relevant to the determination as to whether a s 61B(1) CPFA order ought to be made.

133   As such, a court before which a s 61B(1) CPFA application is made should consider whether the offender has raised any real dispute of law or fact, which either requires evidence to be led, or a protracted hearing for its determination. A mere assertion that it is unclear how the certified amounts have been derived would be insufficient, particularly since the rates of contribution and interest payable are statutorily prescribed and therefore capable of being ascertained by an offender.

134   For completeness, I should state that I am not persuaded by JCC's arguments on estoppel. JCC had argued that the s 61B(1) CPFA order should not be made on the ground that Yusoff would have been estopped from claiming any employee benefits under a civil action. Any estoppel would not have bound the CPF Board. It would thus have been irrelevant to the question of whether the arrears were recoverable in a civil suit.

**Conclusion**

135   For the above reasons, I allow JCC's appeal on conviction and dismiss the Prosecution's appeal in relation to the District Judge's dismissal of the s 61B(1) CPFA application. As the conviction is set aside, I order that the fines paid by JCC be refunded. I am grateful to the parties and the YAC for their detailed and helpful submissions.

Reported by Tan Jia Qi, Rachel.

# BNM (administratrix of the estate of B, deceased) on her own behalf and on behalf of others
## v
# National University of Singapore and others and another appeal

### [2014] SGCA 49

Court of Appeal — Civil Appeals Nos 21 and 22 of 2014
Sundaresh Menon CJ, Chao Hick Tin JA and Steven Chong J
29 July; 26 September 2014

*Tort — Negligence — Deceased drowning in swimming pool owned by first defendant — Whether first defendant under duty to provide lifeguards trained in use of automated external defibrillators — Whether lifeguards negligent — Whether causation established*

*Tort — Vicarious liability — First defendant hiring second defendant to supply lifeguards for swimming pool — Whether first defendant vicariously liable for lifeguards' negligence*

## Facts

The plaintiff's husband ("the Deceased") drowned in a swimming pool owned by the first defendant ("NUS"). A negligence claim was brought by the estate of the Deceased against NUS and the second defendant ("Hydro"), the company engaged by NUS to supply lifeguards and provide maintenance services for the pool. The High Court judge ("the Judge") held that Hydro's lifeguards had been negligent in the discharge of their duties and that NUS was vicariously liable for Hydro's negligence. However, he found that causation had not been proved because the medical evidence showed that the Deceased would not have survived even if the lifeguards had attended to him earlier. The claim was therefore dismissed. The plaintiff appealed while NUS cross-appealed against the Judge's finding that the lifeguards were negligent.

## Held, dismissing the appeals:

(1)    NUS's focus on the precise time before the lifeguards became aware of the emergency situation, *ie*, whether it would have taken three minutes or less, was misplaced as regards the finding of negligence. A finding of negligence would depend on a number of factors in determining whether the difficulties of a swimmer in the water should have been apparent to the lifeguard on duty had he performed his duties diligently. There can be no inflexible rule that the lifeguard is entitled to a certain amount of time to react before which an inference of negligence can be drawn. What is clear is that the longer it takes for a lifeguard to detect a swimmer in distress in the water, the more likely an inference of negligence would be drawn. In the present case, the Judge correctly found that the lifeguards were negligent in carrying out their duties in scanning the swimming pool area not because they took three minutes to notice that the

Deceased was in difficulty but rather because the lifeguards were completely oblivious of the situation as it unfolded until they were alerted by the Deceased's friend's shout for help: at [47] to [49].

(2)    At the time the Deceased drowned, NUS was not under a duty to provide an automated external defibrillator ("AED") and Oxyviva resuscitation machine at its swimming pool or lifeguards trained in their use. At best the evidence indicated that while there was an emerging acceptance of the importance of AEDs circa 2007, it had not yet coalesced into a general practice: at [54].

(3)    Causation had to be examined with reference to the operative negligence. Having found that NUS was under no duty to provide lifeguards trained in the use of AED, the Judge should not have examined the causation issue from the perspective of whether an earlier application of the AED would have saved the Deceased, though he rightly concluded that it would not: at [58].

(4)    Even if the lifeguards had spotted the Deceased's distress earlier, it would still have taken them some time (they were stationed at the opposite side of the pool) to reach the Deceased and some additional time to pull him to the surface and out of the pool. By then, the Deceased had already been pulled out of the pool by his friend. The effect of the "delay", if any, was that the CPR administered by the lifeguards had commenced later than it should have been. But CPR alone would not have been sufficient to save the Deceased given his underlying heart condition. Consequently, causation was not established: at [61], [63] and [66].

[Observation: In analysing the issue of vicarious liability for the lifeguards' negligence, the correct inquiry should have been to evaluate NUS's control over the lifeguards and not over Hydro. *Prima facie*, Hydro was vicariously liable for the negligence of its own employees, the lifeguards, and the proper approach should have been to consider whether that presumption had been displaced. Furthermore, the control test is not the only test for determining whether a contractor is an independent contractor, nor is it even necessarily the decisive factor; other factors indicate that the contract between NUS and Hydro was that of a contract for services. Thus, had it been necessary to decide the question of vicarious liability, the court would have found that NUS was not vicariously liable for Hydro's negligence: at [20], [21], [28] and [31] to [33].]

## Case(s) referred to

*Anne Teresa Hanlon or Gallacher v City of Glasgow District Council* (1983) Inner House Cases 122 (refd)

*Argent v Minister of Social Security* [1968] 1 WLR 1749 (refd)

*Kureoka Enterprise Pte Ltd v Central Provident Fund Board* [1992] SGHC 113 (refd)

*Lee Ting Sang v Chung Chi-Keung* [1990] 2 AC 374 (refd)

*Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173 (refd)

*Mersey Docks and Harbour Board v Coggins & Griffith (Liverpool) Ltd* [1947] AC 1 (folld)

*Performing Right Society Ltd v Mitchell and Booker (Palais de Danse) Ltd* [1924]
  1 KB 762 (refd)

*S v Chiping Rural Council* 1988 (2) ZLR 275 (S) (refd)

*Beh Eng Siew and Suja Sasidharan (Lee Bon Leong & Co) for the appellant in
CA 21/2014 and the respondent in CA 22/2014;
Anparasan s/o Kamachi, Tan Hui Ying Grace and Audrey Wong (KhattarWong
LLP) for the first respondent in CA 21/2014 and the appellant in CA 22/2014;
Allagarsamy s/o Palaniyappan (Allagarsamy & Co) for the second respondent in
CA 21/2014;
Michael Eu Hai Meng and Francis Chan (United Legal Alliance LLC) for the third
respondent in CA 21/2014.*

[Editorial note: The decision from which this appeal arose is reported at [2014]
2 SLR 258.]

26 September 2014                              Judgment reserved.

**Steven Chong J (delivering the judgment of the court):**

**Introduction**

1      A weekly routine swim in the swimming pool at the Sports and
Recreation Centre of the National University of Singapore ("NUS") led to
the tragic and unfortunate drowning of the deceased ("the Deceased"). A
negligence claim was brought by the estate of the Deceased against NUS
and Hydro Aquatic Swimming School ("Hydro"), the company engaged by
NUS to supply lifeguards and provide maintenance services for the pool.
The judge ("the Judge") below found that Hydro was not an independent
contractor *vis-à-vis* NUS and that the lifeguards were negligent in the
discharge of their duties. However the claim was nonetheless dismissed on
the basis that causation had not been proved because the medical evidence
showed that the Deceased would not have survived even if the lifeguards
had attended to him earlier. NUS cross-appealed against the finding of
negligence while Hydro did not join in the cross-appeal.

2      The pivotal issue in these two appeals relates to the question of
causation. Although there is no dispute that NUS owed a duty of care to the
Deceased, the extent and content of that duty would ultimately determine
the causation issue.

**Background facts**

*Parties to the dispute*

3      The appellant in CA 21/2014 and the respondent in CA 22/2014 is the
Deceased's widow and the administratrix of his estate ("the Appellant").

4     NUS is the first respondent in CA 21/2014 and the appellant in CA 22/2014. It is the owner of the swimming pool in which the Deceased drowned.

5     The second respondent in CA 21/2014, Hydro, was the contractor appointed by NUS to supply lifeguards and cleaning services in respect of the swimming pool at the time the Deceased drowned.

6     The third respondent in CA 21/2014, The Overseas Assurance Corporation Limited ("OAC"), is an insurance company. It was Hydro's public liability insurer at the material time.

### Background to the dispute

7     On 6 June 2007 at about 12.49pm, the Deceased went swimming with a friend, Er Chee Teck ("Er"), at the Olympic-sized swimming pool at NUS. This was their regular weekly swim, a routine they started in January 2007. The pool had nine lanes, with Lane 1 being the closest to the entrance and Lane 9 being the furthest. After taking about five to ten minutes to change and warm up, the Deceased and Er began swimming in Lane 9. At that time, there were only ten to 15 swimmers in the pool. However, apart from Er and the Deceased, there were no other swimmers in Lane 9.

8     While Er was swimming his seventh lap, he saw the Deceased struggling about 20m away from him. The Deceased was submerged in the water and waving his hands, his legs were touching the floor of the pool which was about 1.8m deep at that point and he appeared to be trying unsuccessfully to get to the surface. Er swam as fast as he could to the Deceased. He reached the Deceased, grabbed him under the arms, pulled him up to the surface and then towed him to the side of the pool, which was about a metre away.

9     When Er reached the side of the pool with the Deceased, he shouted for help. At the time, the two lifeguards on duty ("the lifeguards"), Cheong Juan Meng ("Cheong") and Chua Li Qi ("Chua"), were seated at the other side of the pool near the entrance. Cheong ran down the gallery steps towards the Deceased and Er while Chua remained where she was. Upon seeing Cheong waving his arm at her as he ran towards the Deceased and Er and hearing his shout at her, she called for an ambulance and then went to the lifeguards' office to get the safety equipment. This was approximately 1.10pm.

10     Cheong helped Er pull the Deceased out of the water and performed cardiopulmonary resuscitation ("CPR") on him. As for Chua, she had found an Oxyviva resuscitation machine ("Oxyviva") but could not find the automated external defibrillator ("AED"). She brought the Oxyviva to the poolside and went back to search for the AED, which she eventually located and brought to the scene. However, neither Cheong nor Chua could use the

AED or the Oxyviva on the Deceased as they were not trained in the use of the equipment.

11     A facilities officer employed by NUS, Sim Lye Hock ("Sim"), arrived shortly after. On his instructions, the Deceased was carried away from the swimming pool edge to a dry spot and Sim administered a shock on him using the AED. By then, the Judge estimated that at least 16 minutes would have elapsed since the onset of difficulties.

12     Dr Tan Tong Nam, a doctor at the University Health Centre, then arrived at the scene at around 1.20pm. He took over the CPR and noticed that the Deceased had no pulse. Dr Tan also tried to deliver a shock to the Deceased but the AED indicated that the Deceased could not be administered another shock.

13     At 1.25pm, the ambulance arrived. The paramedic tried using a defibrillator on the Deceased to no effect: the Deceased had by then gone into asystole which meant there was no longer any heartbeat. The Deceased was rushed to the National University Hospital and reached there at 1.39pm. The doctor on duty noted that on arrival, the Deceased was unresponsive, without pulse and was not breathing. His vital signs could not be recorded. An electrocardiogram monitor showed he was still in asystole. At 2.27pm, the Deceased was pronounced dead. The autopsy report recorded the cause of death as consistent with drowning with ischaemic heart disease. The Deceased left behind his wife and two young children aged three and six.

**Decision below**

14     The Judge held that NUS owed a duty of care to provide properly trained lifeguards. The lifeguards would be expected, *inter alia*, to survey the pool regularly, to remain alert and be trained to spot swimmers in difficulty. He further found that the duty did not extend to the provision of lifeguards trained in the use of Oxyviva and AED. Although this duty was delegable, the Judge found that Hydro was not an independent contractor because NUS had retained a high degree of control over the manner in which Hydro was to carry out its work. Thus, if the Appellant had succeeded in her claim, NUS would have to share a third of the liability with Hydro bearing two-thirds.

15     On the facts, the Judge found that although the lifeguards had achieved the requisite certification, they were negligent in the performance of their duties as they were not surveying the pool as they should have been doing and only became aware of the Deceased's difficulties in the water when they heard Er's shout for help. However, the Judge ultimately dismissed the claim on the basis that the negligence was not causative of the loss. He was of the view that the Deceased had suffered cardiac arrhythmia which incapacitated him whilst he was swimming, and given his underlying

heart condition, the lifeguards would not have been able to save him even if they had intervened earlier.

**Our decision**

*Was Hydro an independent contractor and if so to what end?*

16     In light of the Judge's finding that the lifeguards were negligent in the discharge of their duties, it was essential to determine the party who should be held responsible for their negligence – NUS or Hydro or both. As the lifeguards were not parties to the action, liability would arise if either NUS or Hydro or both were found to be *vicariously* liable for the negligence of the lifeguards. Typically, a defence to a claim in vicarious liability can take the form of denying that the servant or agent was negligent and/or asserting that the servant or agent was an independent contractor whose negligence he is not responsible for.

17     It is apposite to begin our analysis by first examining the basis of the negligence claim brought by the Appellant and how Hydro's status as an independent contractor featured in the case. Initially, the claim was brought only against NUS. NUS's defence was simply that it had delegated the management and maintenance of the pool to Hydro as an independent contractor. After NUS added Hydro as a third party seeking from it an indemnity and/or contribution, the Appellant added Hydro as the second defendant. The claim against NUS and Hydro after two rounds of amendments was premised on the negligence of their servants and/or agents, in particular that both NUS and Hydro were negligent in failing to ensure that the lifeguards were adequately trained in the use of AED and/or Oxyviva. In addition, the Appellant separately alleged that NUS was vicariously liable for the negligence of Hydro, its agents and/or servants and was further negligent in appointing Hydro knowing that Hydro was not able to provide qualified lifeguards trained in the use of AED. The Judge found that NUS was not negligent in appointing Hydro in light of his finding that there was no duty to provide lifeguards trained in the use of AED and/or Oxyviva.

18     Hydro's status as an independent contractor was examined by the Judge *only* in relation to the Appellant's averment that NUS was negligent in *supervising* Hydro "to ensure that properly trained lifeguards were stationed at the swimming pool". In this connection, it should be borne in mind that this averment was pleaded as particulars under the alternative negligence claim against NUS for appointing Hydro for the provision of lifeguard services. Thus, strictly speaking, by the Judge's own approach, the inquiry whether Hydro was an independent contractor would only arise if NUS was found to have been negligent in appointing Hydro, which he found otherwise. Further as the Judge observed, "NUS's defence is that if Hydro Aquatic was a properly appointed independent contractor, it

followed that its employer NUS would not be vicariously liable for *Hydro Aquatic's negligence*, if any" [emphasis added]. However it is essential to bear in mind that the negligence as found by the Judge was that of the lifeguards in the discharge of their duties and not Hydro. There is no question of NUS being vicariously liable for the vicarious liability of Hydro in respect of the negligence of its lifeguards. That being the case, it is strictly no longer relevant or necessary to decide whether Hydro (as distinct from the lifeguards) was an independent contractor *vis-à-vis* NUS.

19     We should add NUS did not appeal against the Judge's determination that Hydro was not an independent contractor. However, on our review of the Judge's approach and finding on this point and in particular the law in this area, we came to a different view though we should make it clear that it did not change the eventual outcome of the Appellant's appeal. If it did, we would have invited further submissions from the parties.

20     Before explaining why we have arrived at a different view, we should make a salient observation as to the proper approach in analysing the vicarious liability of the lifeguards' negligence. In our view, for the purposes of attributing vicarious liability to either Hydro or NUS or even both in respect of the lifeguards' negligence, the correct inquiry should be to evaluate the question of control which NUS had exercised *over the lifeguards* and *not over Hydro*. This is clear from *Mersey Docks and Harbour Board v Coggins & Griffith (Liverpool) Limited* [1947] AC 1 ("*Mersey Docks*"), a decision which was cited by NUS in its closing submissions. In that case, the harbour authority had hired out a mobile crane and a craneman to a firm of stevedores for loading a ship. The craneman was employed, paid and liable to be dismissed by the harbour authority, though the general hiring conditions stipulated that cranemen so provided should be the servants of the hirers. The craneman negligently injured someone while driving the crane and the issue arose as to whether the harbour authority or the stevedores should be vicariously liable for this tort. The House of Lords determined the issue by examining whether control over the negligent craneman had remained with the harbour authority as his employer or had been transferred to the stevedores (at 12–13):

> My Lords, the only question for your Lordships' determination is whether on the principle of respondeat superior, the responsibility for the negligence of the driver of the crane lies with the stevedores or with the appellant board, whom the plaintiff sued alternatively. The answer depends on whether the driver was acting as the servant of the stevedores or as the servant of the appellant board when he set the crane in motion. That the crane driver was in general the servant of the appellant board is indisputable. The appellant board engaged him, paid him prescribed the jobs he should undertake and alone could dismiss him. The letting out of cranes on hire to stevedores for the purpose of loading and unloading vessels is a regular branch of the appellant board's business. In printed regulations and rates issued by the appellant board the cranes are described as 'available for general use on the

dock estate at Liverpool and Birkenhead' and as regards portable cranes the stipulated rates vary according as they are provided 'with board's driver' or 'without board's driver.' *Prima facie therefore it was as the servant of the appellant board that Newall was driving the crane when it struck the plaintiff. But it is always open to an employer to show, if he can, that he has for a particular purpose or on a particular occasion temporarily transferred the services of one of his general servants to another party so as to constitute him pro hac vice the servant of that other party with consequent liability for his negligent acts.* The burden is on the general employer to establish that such a transference has been effected. … [emphasis added]

21    Here, there is no dispute that the lifeguards were employed by Hydro. *Prima facie*, Hydro would be vicariously liable for the negligence of its own employees, the lifeguards, and the proper approach should have been to consider whether that presumption has been displaced. We therefore disagree with the Judge's approach of focusing on NUS's control over Hydro. Having said that, this was how the issue was addressed by the parties in the court below, and we go on to consider whether the Judge's finding was correct.

22    The Judge below found that Hydro was not an independent contractor because NUS had retained a significant degree of control over the manner in which Hydro was to carry out its work. In so doing, he adopted the control test as explained in *Performing Right Society, Limited v Mitchell and Booker (Palais de Danse), Limited* [1924] 1 KB 762 at 767 that "certainly the test to be generally applied, lies in the nature and degree of detailed control over the person alleged to be a servant". It would appear that the test cited by the Judge directed the inquiry to examine the question of control *over the person alleged to be the negligent servant* and not the company who had employed the servant though in the application of the test, he directed his mind to the question of control over Hydro instead.

23    The Judge concluded from his review of the tender specifications that NUS's relationship with Hydro "was not one in which NUS had fully delegated all aspects of *pool safety* to an independent contractor" [emphasis added]. He examined a number of provisions of the tender specifications. It is important to bear in mind that for the purposes of determining whether those provisions have any bearing on Hydro's status as an independent contractor, the reference point of the provisions should be their impact or effect on matters relating to *pool safety*. The provisions examined were:

(a)    Hydro was to carry out the works in accordance with the tender specifications, conditions of contract and to the satisfaction of the facility officer ("the Facility Officer") – cl 1.2.

(b)    The lifeguards were required to attend twice-weekly briefings – cl 4.2.

(c)    The Facility Officer was permitted to request for the deployment of extra lifeguards at two weeks' notice – cl 4.3.

(d)    In the absence of the Facility Officer or his assistants, the appointed lifeguard in charge was to be fully responsible for the proper supervision of the pool – cl 6.1(ix).

(e)    The lifeguards were required to do any additional duties assigned by the Facility Officer as required – cl 6.1(xiii).

(f)    The lifeguards had to position themselves as instructed by the Facility Officer or his assistants – cl 7.3.

(g)    The lifeguards were to take instructions only from certain persons: the senior manager, managers and sports officers of the Sports and Recreation Centre, and the Facility Officer and his assistants, duty officers, and "any other personnel as authorised by the Facility Officer from time to time" – cl 7.13.

(h)    Hydro was contractually liable to pay liquidated damages set at $50 for each case of "failure to carry out instructions given by staff from NUS" and $100 for each instance of failure to be alert while on duty – cl 15.1.

24    In our view, none of these clauses with the possible exception of cl 7.3 dealt directly with *pool safety* matters. They also did not relate to NUS's control over *how* the lifeguards were to perform their duties. Some, for example the assignment of additional duties under cl 6.1(xiii), show at best that NUS could tell the lifeguards *what* to do. Others, such as cll 1.2, 4.2, 4.3 and 7.13, are largely administrative in nature. In fact, cl 6.1(ix) suggests that the default position is that the responsibility for the proper supervision of the pool rests with the Facility Officer of NUS or his assistants. The distinction between the ability to tell a worker *what* to do and the ability to tell him *how* to do it is significant: in *Mersey Docks*, the court held that the employment of the craneman was not transferred from the harbour authority to the stevedores because although the stevedores could tell the craneman what they wanted him to do, they had no authority to tell him how he was to handle the crane in doing his work (at 13).

25    The only provision that has some bearing on pool safety is cl 7.3 which stipulated that the lifeguards had to position themselves "as instructed by the Facility Officer and his assistants". In our view, some measure of control over the manner in which the lifeguards are to position themselves in the discharge of their duties is not inconsistent with Hydro's status as an independent contractor, especially when viewed with the other relevant factors as set out in [31] to [32] below. In any event, regardless of the contractual position, the evidence led at the trial showed that NUS's instructions on the positioning of the lifeguards were communicated to

Hydro and not to the lifeguards directly, and Hydro did not always agree with or follow those instructions.

26    The Judge also found it significant that the tender specifications provided for liquidated damages for breach of contract at $50 for each case of "failure to carry out instructions given by staff from NUS" and $100 for each instance of failure to be alert while on duty. In our view, such a clause was intended to provide some measure of financial deterrence for non-compliance and it could not have the effect of displacing Hydro's status as an independent contractor. We would have thought that such provisions would be more consistent with the status of an independent contractor.

27    Finally, the Judge appeared to have attached weight to the fact that after the drowning incident, NUS held a meeting with Hydro on 19 September 2007 to review the safety conditions at the pool and to communicate the findings of the review which included the direction to station one lifeguard at either the mid-point opposite the pool entrance or near the deep end to better observe the swimmers in the pool during peak hours and to patrol the opposite side whenever the pool was crowded. A review of its safety rules by NUS to introduce improvements does not, in our view, change the independent contractor status of Hydro if it was in fact an independent contractor prior to the review. NUS was simply acting responsibly to prevent the reoccurrence of such incidents in the future.

28    Developments in this area of the law however indicate that the control test is not the only test for determining whether a contractor is an independent contractor, nor is it even necessarily the decisive factor. As Roskill J noted in *Argent v Minister of Social Security* [1968] 1 WLR 1749 at 1758–1759:

> If one studies the cases to which I have been referred, a number of tests have been propounded over the years for resolving the problem which I have to solve. For example, in the earlier cases it seems to have been suggested that the most important test, if not the all-important test, was the extent of the control exercised by the employer over the servant. If one goes back to come of the cases in the first decade of this century, one sees that that was regarded almost as the conclusive test. *But it is also clear that as one watches the development of the law in the first 60 years of this century and [particularly] the development of the law in the last 15 or 20 years in this field, the emphasis has shifted and no longer rests so strongly upon the question of control.* Control is obviously an important factor. In some cases it may still be the decisive factor, but it is wrong to say that in every case it is the decisive factor. It is now, as I venture to think, no more than a factor, albeit a very important one. … [emphasis added]

29    The flaws of the control test were in fact highlighted by Cooke J in *Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173. He concluded that the fundamental test to be applied is whether the contractor

was performing services as a person of business on his own account (at 183–185):

> I think it is fair to say that there was at one time a school of thought according to which the extent and degree of the control which B was entitled to exercise over A in the performance of the work would be a decisive factor. However, it has for long been apparent that an analysis of the extent and degree of such control is not in itself decisive. Thus in *Collins v. Hertfordshire County Council* [1947] K.B. 598, it had been suggested that the distinguishing feature of a contract of service is that the master cannot only order or require what is to be done but also how it shall be done. The inadequacy of this test was pointed out by Somervell L.J. in *Cassidy v. Ministry of Health* [1951] 2 K.B. 343, 352, where he referred to the case of a certified master of a ship. The master may be employed by the owners under what is clearly a contract of service, and yet the owners have no power to tell him how to navigate his ship. As Lord Parker C.J. pointed out in *Morren v. Swinton and Pendlebury Borough Council* [1965] 1 W.L.R. 576, 582, when one is dealing with a professional man, or a man of some particular skill and experience, there can be no question of an employer telling him how to do work; therefore the absence of control and direction in that sense can be of little, if any, use as a test.
>
> …
>
> The observations of Lord Wright, of Denning L.J. and of the judges of the Supreme Court suggest that the fundamental test to be applied is this: 'Is the person who has engaged himself to perform these services performing them as a person in business on his own account?' If the answer to that question is 'yes,' then the contract is a contract for services. If the answer is 'no,' then the contract is a contract of service. No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of the considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. *The most that can be said is that control will no doubt always have to be considered, although it can no longer be regarded as the sole determining factor; and that factors which may be of importance are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task.*
>
> The application of the general test may be easier in a case where the person who engages himself to perform the services does so in the course of an already established business of his own; but this factor is not decisive, and a person who engages himself to perform services for another may well be an independent contractor even though he has not entered into the contract in the course of an existing business carried on by him.
>
> [emphasis added]

30     Cooke J's formulation of the test was endorsed by the Privy Council in *Lee Ting Sang v Chung Chi-Keung* [1990] 2 AC 374 at 382. This decision

was in turn applied locally in *Kureoka Enterprise Pte Ltd v Central Provident Fund Board* [1992] SGHC 113.

31    Unfortunately, none of these authorities were cited to the Judge for his consideration. He appeared to apply the control test exclusively with reference to the tender specifications without regard to other factors which indicated that the contract between NUS and Hydro was that of a contract for services. We agree with NUS that the following factors were more consistent with Hydro providing a contract for services:

(a)    Hydro was responsible for paying its lifeguards' wages;

(b)    Hydro was responsible for scheduling its lifeguards' duty roster;

(c)    Hydro alone had the power to dismiss its lifeguards from employment;

(d)    Hydro was directly responsible for supervising and overseeing its lifeguards' performance of their duties;

(e)    Hydro was responsible for training its lifeguards in the use of AED, Oxyviva and other resuscitation equipment;

(f)    Hydro had the power and authority to dictate how the lifeguards discharged their duties; and

(g)    Hydro was responsible for providing the resuscitation equipment.

32    Other factors which were not specifically mentioned by NUS but in our view are equally material include the fact that Hydro undertook the financial risks of running its business, owned its own assets and personnel, selected the lifeguards for deployment at the NUS pool, provided lifeguarding services to other institutions apart from NUS, retained the profits from its business and also took out its own public liability insurance. These additional factors point to the irresistible conclusion that Hydro was indeed carrying on a business on its own account and was therefore an independent contractor and not a servant of NUS.

33    For the same reasons, had it been necessary for us to decide the question of vicarious liability, we would have found that Hydro had control over the lifeguards and not NUS. As such NUS would not have been liable even if causation were to be established.

### Were the lifeguards negligent in carrying out their duties?

34    In the Court below, NUS accepted, quite correctly, that they owed a duty of care to visitors like the Deceased to provide qualified lifeguards of reasonable competence according to the prevailing standards at the material time. Despite the concession, the Judge nonetheless examined the law in this area and found that NUS as the owners and/or operators of a

large Olympic-sized swimming pool accessible to its members and their guests indeed owed a duty to provide an adequate system of safety including the provision of properly trained lifeguards stationed at appropriate locations around the pool. He held that NUS should be treated no differently from those who run large public swimming pools.

35    However, the Judge found that at the time the incident took place, *ie*, 6 June 2007, the standard of care did not extend to providing AED and/or oxygen resuscitator and lifeguards trained in the use of such equipment. The significance of this finding will be further elaborated when the causation issue is examined below.

36    The operative negligence as found by the Judge was the failure of the lifeguards to effectively scan the swimming pool with the consequence that they failed to notice that the Deceased had stopped swimming and then sunk to the bottom feet first, and that Er had swum to the Deceased and then struggled with the Deceased to the side of the pool. The lifeguards only realised that something was amiss when they heard Er's shout for help after Er managed to pull the Deceased to the side of the pool. By this time, the Judge found that about three minutes had passed from the time when the Deceased first got into difficulties to the time Er was able to pull him to the edge of the pool and shout for help.

*The CCTV recordings*

37    The Judge's finding that three minutes had elapsed was based on a reconstruction of the crucial events of the day. He observed that the various times given were not synchronised and therefore their accuracy could not be taken for granted.

38    Much time was expended in the reconstruction of the events leading to Er's shout for help. Such reconstruction where possible should be based on available objective evidence. CCTV recordings (which are not uncommon in such facilities) would certainly be extremely helpful in any reconstruction exercise. Unfortunately this issue was not properly dealt with at the pre-trial stage. NUS omitted to mention the existence of the CCTV recordings in its affidavit verifying its list of documents. That such CCTV recordings were available was made manifest in Cheong's statement to the police dated 7 March 2008:

> Q1:   Did you notice when the casualty came to the swimming pool?
>
> A1:   I only know that he came to the swimming pool at about 1249hrs. This is based on the *CCTV recording* which is targeted at the entrance of the swimming pool. I was sitting on the left side at that time thus I did not saw [*sic*] them coming in.
>
> [emphasis added]

39    The CCTV recordings were not the subject of any specific discovery application by the Appellant though for the appeal, much emphasis was

placed by her on the fact that NUS had failed to disclose the CCTV recordings.

40    It was unfortunate that the issue of the CCTV recordings was only raised in the course of the cross-examination of Cheong in the Court below. Cheong was asked when he viewed the CCTV recording that was mentioned in his police statement. Cheong gave an unhelpful answer that it was "after the incident". The Appellant's counsel did not press him for a more specific time though it would have been some time prior to 7 March 2008, the date of the police statement.

41    However the utility of the CCTV recordings, for the purposes of reconstructing the critical events, would largely depend on the angle at which the CCTV cameras were installed. It emerged during the cross-examination of Sim that NUS had installed four to five CCTV cameras covering the swimming pool complex. When asked by the Judge, Sim testified that *all* the cameras were facing the public area where the people sat and that none of them faced the pool. His evidence was not challenged by the Appellant.

42    The CCTV recordings may well have provided the best evidence to assist the Court in the reconstruction of the critical events. It is regrettable that no evidence was properly adduced by NUS as to whether the relevant CCTV recordings were still available especially as it was not in dispute that the police had taken possession of the recordings. No effort was made by NUS to verify with the police whether the CCTV recordings were still in their possession. The issue was somewhat unsatisfactorily dealt with by way of NUS's closing reply submissions which at best appear speculative:

> 15.    Be that as it may, NUS submits that the CCTV recording was no longer in its possession, custody and/or power by the time it was first notified of the Plaintiff's intention to seek compensation for Roland's demise. The Plaintiff had only sent a Letter of Demand to NUS notifying it of the same on 16 June 2009, i.e. more than 2 years after Roland's demise. By then, the applicable retention period for the CCTV recording had elapsed and the relevant CCTV recording had been automatically overwritten.

> 16.    As pointed out by the Plaintiff's counsel himself, *it was also likely that the police do not have a copy of the CCTV recording* since the Coroner's Case Investigation Report as well as the Findings of Coroner's Inquiry made no reference to any CCTV. Thus, NUS had no means of retrieving the CCTV recording.

> [emphasis added]

43    Having said that, in light of Sim's unchallenged evidence that the CCTV cameras were not facing the pool, the probative value of the CCTV recording had they been preserved and discovered would probably not have been helpful in the reconstruction exercise.

*Failure to detect the Deceased's difficulties until the shout for help*

44    The Judge rejected the evidence of Chua and Cheong that they were scanning the swimming pool area some five to ten seconds before the incident. He found, and we accept, that the lifeguards were only alerted to the emergency when they heard Er's shout for help. This finding is also in line with Cheong's own statement to the police that "[w]hen I heard the shout, I saw that there were two male Chinese subjects inside the swimming pool", which in itself was indicative that Cheong only became aware of the situation in the pool after Er's shout. By then Er was already at the side of the pool with the Deceased. The Judge found that by the time the lifeguards were alerted to the emergency, about three minutes had already elapsed. In its appeal against the finding of negligence, NUS submitted that this estimate of three minutes by the Judge was erroneous and that it would have taken no more than one minute instead.

45    NUS's estimate is premised on the following assumptions:

(a)    Er was able to notice the Deceased's distress in the pool almost immediately after the onset of the difficulties;

(b)    Er took only ten seconds to swim 20m towards the Deceased; and

(c)    Er took only a few seconds to pull the Deceased to the side of the pool before shouting for help.

46    However, these assumptions are inconsistent with their own expert evidence adduced at the trial. The joint expert witness of NUS and Hydro, Prof Venkataraman Anantharaman ("Prof Anantharaman"), estimated that:

(a)    When a person begins to drown, it can take between twenty seconds and two to three minutes for him to reach the floor of the pool. When Er first noticed the Deceased's difficulties, the latter's legs were already touching the floor of the pool. Therefore, it is unrealistic for NUS to claim that Er was able to notice the Deceased's distress immediately after its onset.

(b)    Er took twenty seconds to swim to the Deceased – and this was already a "good speed".

(c)    Er took another fifteen seconds to stabilise the Deceased's arms and call for help.

(d)    It took Cheong sixty seconds to react to Er's shout and then run towards the end of the pool.

47    Further, it seems to us that NUS's focus on the precise time before the lifeguards became aware of the emergency situation, *ie*, whether it would have taken three minutes or less, is misplaced as regards the finding of

negligence. The emphasis on the three minutes appears to bear reference to the decision in *Anne Teresa Hanlon or Gallacher v City of Glasgow District Council* (1983) Inner House Cases 122 ("*Anne Teresa Hanlon*"). In that case, the deceased, for some unknown reason, got into difficulties while swimming. Shameen, one of three teenaged girls swimming in the vicinity, spotted the deceased and then went to one of the lifeguards on duty to inform her about the deceased's difficulty. The lifeguard replied, "I'll come in a minute" but continued to chat with some other girls. Shameen then returned to the pool and directed her sisters' attention to the deceased's difficulty and the three girls thereafter went to rescue the deceased. The lifeguard only noticed the situation when Shameen entered the pool together with her sisters to rescue the deceased. By then about three to four minutes had passed. The three girls brought the deceased to the surface and pulled him to the side of the pool. By the time the deceased was lifted out of the water, he was already dead. The court found that the lifeguard had failed to respond timeously to the emergency in that by the time the lifeguard had noticed the situation, it was already too late.

48     In our view, *Anne Theresa Hanlon* does not stand for the proposition that a lifeguard would invariably be found negligent if he took three minutes to notice a swimmer in difficulty. A finding of negligence would depend on a number of factors in determining whether the difficulties of a swimmer in the water should have been apparent to the lifeguard on duty had he performed his duties diligently. The view of the lifeguard would be particularly material in this assessment and that would in turn depend on a number of factors such as the size of the pool, the number of swimmers in the pool and the available lighting, *ie*, whether it was day or night. Other relevant considerations would include whether there were shouts for help by the swimmer in distress or other users of the pool, whether there was unusual splashing, whether the swimmer was struggling or motionless in the pool or whether there were other distractions which the lifeguard was required to attend to. There is no inflexible rule that the lifeguard is entitled to a certain amount of time to react before which an inference of negligence can be drawn. What is clear is that the longer it takes for a lifeguard to detect a swimmer in distress in the water, the more likely an inference of negligence would be drawn. The lapse of time before reacting is only one factor for consideration. For instance, a swimmer who suffers a severe cramp while swimming and shouts for help should attract the attention of the lifeguard almost immediately. We would be slow to lay down any specific response time for a reasonably competent lifeguard to appreciate the difficulties of a swimmer in the water particularly since no proper study has been carried out in Singapore. Besides, it is undesirable for this court to lay down any rule that failure to detect the difficulties encountered by a swimmer beyond a given time, in this case three minutes, is in itself negligence.

49     In the present case, the Judge found that the lifeguards were negligent in the discharge of their duties because of their complete failure to notice a series of events as they unfolded before their very eyes, *ie*, that the Deceased had stopped swimming, that he had effectively sunk to the bottom feet first, that he was struggling to resurface, that Er had swum towards the Deceased and finally that Er was struggling to bring the Deceased to the side of the pool. These events occurred literally in broad daylight at about 1.00pm. At that time, the pool was not crowded. It was estimated that there were around ten to 15 swimmers in the pool. The lifeguards had an unobstructed view of the swimming pool. The Judge referred to photograph C-5 (adduced at the Coroner's Inquiry) which showed that a swimmer under the surface was still visible from the gallery where the lifeguards were stationed. The lifeguards also agreed that there was nothing happening at the entrance of the pool which might have distracted their attention at that point in time. While we accept the dictum in *S v Chipinge Rural Council* 1988 (2) ZLR 275 (S) that lifeguards "cannot be expected to keep an eye on every [swimmer] every minute", in this case, the Judge found and we agree that the lifeguards were negligent in carrying out their duties in scanning the swimming pool area not because they took three minutes to notice that the Deceased was in difficulty but rather because the lifeguards were completely oblivious of the situation as it unfolded until they were alerted by Er's shout for help. In our view, this is sufficient to support a finding of negligence on the part of the lifeguards.

50     We pause to observe that the Judge's estimate of three minutes from the time the Deceased first got into difficulties before Er managed to struggle with him to the edge of the pool and call for help was probably on the generous side. In arriving at his estimate of three minutes, the Judge must have adopted the higher end of the range given by Prof Anantharaman for the time it took Er to notice the Deceased's distress (namely, two to three minutes). However, when the Deceased got into difficulties, he was on his seventh lap having crossed Er earlier. Er was in fact swimming towards the Deceased who was about 20m away when he spotted him in difficulty. In our view, with that information, it is more likely that about a minute would have passed from the time the Deceased first started experiencing difficulties before it was spotted by Er. It would have taken Er at least twenty seconds or more to reach him and some additional time to stabilise him, pull him to the surface and struggle with him to reach the edge of the pool before shouting for help. In all, a more realistic estimate was probably in the range of two minutes or slightly less. However as explained at [48] above, the precise time, in the circumstances of this case, did not affect the finding of negligence against the lifeguards.

*Was NUS under a duty to provide lifeguards trained in the use of AED and Oxyviva?*

51    Before dealing with the merits of this issue, we should first deal with and dispose of the pleading point raised by the Appellant. In short, the Appellant asserted that since NUS did not expressly deny that it had any duty to provide lifeguards trained in the use of AED and Oxyviva and further since NUS had expressly adopted the Appellant's particulars of negligence against Hydro, it was not open to the Judge to find as he did that NUS had no such duty. In our view, there was simply no strict necessity for NUS to *expressly* deny the existence of such a duty. A denial of the Appellant's pleading as was done in this case was sufficient to give rise to a joinder of issues on these matters. Further it was not inconsistent for NUS to adopt the particulars of negligence against Hydro as the third party in the event that it is found liable to the Appellant. This is in essence the nature of any third party claim.

52    The Judge very carefully and comprehensively surveyed the prevailing industry practice and standard of lifeguard services as of June 2007. He found that it was neither common nor industry practice for pool owners or operators to provide AED and Oxyviva or lifeguards trained in their use. He noted, among other things, that:

    (a)    AED training was still not widespread in June 2007. The generally accepted certification for lifeguard qualification – the Bronze Medallion Award – did not require them to be trained in the use of AED.

    (b)    The first edition of the Singapore Life Saving Society's ("SLSS") lifesaving manual published in 1992, which was the edition in use at the time of the Deceased's death, did not require the use of AED by lifeguards.

    (c)    The National Resuscitation Council's ("NRC") 2006 guidelines on basic cardiac life support advocated only the use of CPR, while the 2011 guidelines advocated the use of CPR combined with AED.

    (d)    As at 2007, the SLSS had not issued guidelines which required lifeguards to be trained in the use of Oxyviva or even in the use of any kind of oxygen resuscitator.

    (e)    The training syllabus for the Bronze Medallion Award did not require learners to know how to use any kind of oxygen resuscitator, let alone the Oxyviva machine.

53    In this appeal, the Appellant contends that the Judge had failed to take into account the following facts which underscored the importance of AEDs:

(a)    Dr Vivian Balakrishnan, the then Minister for Community Development, Youth and Sports, made a parliamentary speech in July 2005 when he said that "[b]y the end of August [2005], every swimming pool will have a defibrillator and staff would have been trained on how to use it" (*Singapore Parliamentary Debates, Official Report* (19 July 2005) vol 80 at col 923).

(b)    The NRC's 2001 and 2006 Guidelines, which recommended the installation and use of AED in public areas including sports facilities.

(c)    The drastic reduction in the price of AED from $15,000 in 1989 to $2,000 in February 2006.

(d)    NUS's tender specifications which required lifeguards to be trained in the use of AED.

(e)    Defibrillation training conducted by SLSS in January 2007 for its members through the Australian Royal Life Saving Society.

(f)    Chua's testimony that she had personally watched AED demonstrations a few times during her employment at Wild Wild Wet from 2004–2005.

(g)    The fact that after the drowning incident, NUS had acquired some 44 sets of AED and recommended the placement of AED and Oxyviva at the lifeguard posts.

54    In our view, the above factors relied on by the Appellant were in fact properly considered by the Judge. They are not sufficient to establish that a reasonable pool operator in June 2007 would have provided lifeguards trained in the use of AED. It was also the Appellant's own evidence through Alfred Chua (a senior manager with the SLSS) that notwithstanding the Minister's speech, it was not common practice even for public pools operated by the Singapore Sports Council to have AEDs in 2007, some two years after the speech. We agree with the Judge's finding that based on the industry practice at the material time, NUS was not under a duty to provide AED and Oxyviva at its swimming pool or lifeguards trained in their use at the time the Deceased drowned. At best the evidence indicates that while there was an emerging acceptance of the importance of AED *circa* 2007, it had not yet coalesced into a general practice. Of course, as the Judge correctly noted, it is possible for the prevailing industrial standards to fall below the standard of reasonableness required by law, and it might be argued that pool operators should have immediately provided AED training for their lifeguards the moment its benefits became known. However, in our view, pool operators are entitled to take guidance from the prevailing standards promulgated by authoritative bodies like the SLSS, unless those standards were manifestly inadequate.

55     Further, NUS's tender specifications with Hydro do not assist the Appellant. Hydro's obligations under contract to NUS cannot, in our view, constitute a basis for liability to a non-party like the Appellant.

56     Finally, the post-incident steps taken by NUS to acquire more sets of AEDs merely serve to show that NUS took responsible measures to enhance its safety standards in the operation of the pool. They do not, in our view, constitute any acknowledgment of a legal duty to do so at the time of the unfortunate drowning incident. In any event, although pool operators are encouraged to aim for higher standards, they should not be penalised for trying and failing to do so. It would, in the words of the Judge, "be against public policy to discourage parties from trying to achieve safety or other standards of care that exceed industry or acceptable standards of that time by penalising them if they fail to reach the same". It would also result in an incongruous situation as rightly observed by the Judge where one pool operator who conformed to the prevailing industry standard would not be found liable while another pool operator who tried to achieve a higher standard but failed to do so would.

**Was causation established?**

57     Strictly speaking, in light of our finding that NUS was neither negligent in appointing Hydro nor vicariously liable for the negligence of the lifeguards, causation need not be considered as regards NUS. Causation should instead only be addressed as regards Hydro since we find that the control of the negligent lifeguards had remained with Hydro. However for completeness, we will address them together since the claim in negligence against both NUS and Hydro was mounted on, *inter alia*, the basis that (a) the lifeguards were negligent in failing to properly scan the pool to notice the Deceased's distress prior to Er's shout for help *and* (b) NUS and Hydro had failed to provide lifeguards trained in the use of AED and Oxyviva. However the Judge found that the operative negligence was limited only to the failure of the lifeguards to have spotted the Deceased's difficulties in the pool before they heard the shout for help by Er.

58     Causation must therefore be examined with reference to the operative negligence. Having found that there was no duty to provide lifeguards trained in the use of AED, we are of the view that the Judge should not have examined the causation issue from the perspective whether an earlier application of the AED would have changed the outcome, though he rightly concluded that it would not. Even Dr Jimmy Lim, the Appellant's expert, conceded that even if AED had been applied earlier, his chances of survival would have improved from "very poor to poor" and that his overall prognosis "would have been very bad". Causation instead should be examined with reference to the question whether the Deceased would have survived if the lifeguards had spotted the Deceased's difficulties earlier before hearing Er's shout for help *without the benefit of any application of*

*the AED* by the lifeguards. This leaves the causation issue to be examined with reference only to an earlier application of CPR.

59     There are two hurdles for the Appellant to overcome on the causation issue. First, whether earlier detection of the Deceased's difficulties by the lifeguards would have made any difference given the fact that by the time the lifeguards were alerted to the situation, the Deceased had already been pulled out of the water by Er. Second, given the finding that the duty of care did not extend to the provision of lifeguards trained in the use of AED and/or Oxyviva, whether the Deceased would have survived with earlier CPR without the benefit of AED.

60     It is important to bear in mind that the three minutes estimated by the Judge included the time Er took to pull the Deceased to the surface and to the side of the pool. He also found that the Deceased was struggling and that Er took some effort to get him to the side of the pool. That being the case, as we have observed at [50] above, the Deceased would have been in the water for less than two minutes. This was unlike the situation in *Anne Teresa Hanlon* ([47] *supra*) where three to four minutes had passed before the deceased was pulled out of the water by other swimmers in the pool after the lifeguard had ignored the plea for help by the other swimmers. By the time the deceased was pulled out of the water, he had already passed the "point of no return". In the present case, when the Deceased was pulled to the side, he was still conscious with his eyes half open and trying to expel water.

61     Thus, even if the lifeguards had spotted the Deceased's distress earlier, it would still have taken them some time (they were stationed at the opposite side of the pool closer to Lane 1) to reach the Deceased and some additional time to pull him to the surface and out of the pool. By then, the Deceased had already been pulled out of the pool by Er. The effect of the "delay", if any, was that CPR administered by the lifeguards had commenced later than it should have been. Would that have made a material difference to the Deceased's survival rate?

62     Both parties devoted much attention in the court below as well as in the present appeals as to which medical expert's evidence should be preferred. The experts held divergent views on a number of issues such as whether the Deceased should have been classified as either Class 1 or 2 under the New York Heart Association classification (which bears on the severity of the patient's heart condition) or whether, given the Deceased's heart condition, anything could have been done to save him and in particular whether an earlier application of AED would have made a difference. None of these points of contention has any bearing on the causation issue given our concurrence with the Judge's finding that the duty of care, in the first place, did not extend to providing lifeguards trained in the use of AED.

63    Despite the opposing views of the medical experts on several issues, there was at least one significant point on which there was common ground – CPR alone would not have been sufficient to save the Deceased given his underlying heart condition. Dr Jimmy Lim, in his supplementary affidavit of evidence-in-chief, emphasised the importance of early defibrillation to a person such as the Deceased, who may have reduced cardiac reserve due to the narrowing of his heart arteries. The time from the onset of arrhythmia to the ability to successfully restore normal rhythm was therefore even shorter. For a person with such a heart condition, Dr Lim stated that defibrillation by an AED should be done within the first three to five minutes of a sudden cardiac arrest collapse as survival rate decreases about 7% to 10% with every minute of delay in defibrillation; the survival rate drops drastically once the delay exceeds ten minutes. Dr Lim added that however good the CPR provided, it could only prolong ventricular fibrillation and maintain circulation; it could not convert ventricular fibrillation to a normal rhythm. Eventually the heart would still enter asystole.

64    It was acknowledged in the Appellant's closing submissions in the court below that all the four medical experts – Dr Jimmy Lim, Dr Dana Elliot, Prof Anantharaman, and Dr Michael Lim – agreed that CPR plus defibrillation within three to five minutes of collapse can produce a survival rate as high as 72% in situations outside hospital and that basic CPR alone without defibrillation would not have eliminated ventricular fibrillation and restored a perfusing rhythm. This was also candidly accepted by the Appellant's counsel during the appeals before us. For this reason, it was critical for the Appellant to persuade this court to reverse the Judge's finding as regards the provision of AED and/or Oxyviva and lifeguards trained in the use of such equipment. However, we have already found against her on this pivotal point.

65    Finally, the Appellant also raised an issue about the adequacy of the CPR administered by Cheong. The Appellant's complaint is that Cheong was the only one providing CPR for more than ten minutes and would have become fatigued after a while. First, this is purely speculative and does not address the evidence that the Judge had cited in coming to his conclusion that the CPR provided was of acceptable quality, in particular the chart log produced by the AED. Second, as shown above, CPR alone would not have saved the Deceased whatever the quality administered.

66    In the premises, causation cannot be established and consequently the claim against Hydro must likewise fail.

**Conclusion**

67    Although our findings on several issues differed from the Judge, we nonetheless agree with his eventual decision. In the result, both appeals are dismissed. As for costs, we make the following orders:

(a)    As the Appellant's appeal in CA 21/2014 involved more issues than NUS's appeal in CA 22/2014, we award NUS net costs fixed at $12,000, such costs order to be satisfied out of the Appellant's security deposit to NUS.

(b)    The Appellant to pay costs fixed at $5,000 to Hydro and $3,000 to OAC, such costs orders also to be satisfied out of the Appellant's security deposit.

(c)    NUS's security deposit to be returned.

Reported by Daniel Gaw.

# National University Hospital (Singapore) Pte Ltd v Cicada Cube Pte Ltd
## [2017] SGHC 53

| | |
|---|---|
| **Case Number** | : Originating Summons No 239 of 2015 |
| **Decision Date** | : 14 March 2017 |
| **Tribunal/Court** | : High Court |
| **Coram** | : Aedit Abdullah JC |
| **Counsel Name(s)** | : Tan Tee Jim, SC, Christopher de Souza, and Darrell Wee (Lee & Lee) for the plaintiff; N Sreenivasan, SC, Andrew Heng and Ivan Qiu (Straits Law Practice LLC) and Jevon Louis (Ravindran Associates) for the defendant. |
| **Parties** | : National University Hospital (Singapore) Pte Ltd — Cicada Cube Pte Ltd |

*Patents and Inventions – ownership*

*Patents and Inventions – employee's invention*

[LawNet Editorial Note: The appeals from this decision in Civil Appeals Nos 138 and 139 of 2016 were dismissed by the Court of Appeal on 28 August 2018. See [2018] SGCA 52.]

14 March 2017

**Aedit Abdullah JC:**

**Introduction**

1       What was at stake in the present case was the ownership and recognition as inventors of a patented process ("the Patent") for the collection of laboratory specimens. Who came up with the invention was strongly disputed between the parties: the defendant, a software engineering company, argued that its officers came up with the invention, almost on the back of the proverbial envelope while brainstorming; the plaintiff, on the other hand, claimed that its employees, including a senior doctor, had developed the idea after years of experience in medical testing.

2       The registered proprietor of the Patent was Cicada Cube Pte Ltd (" Cicada "), and the named inventors were Cicada 's founders and directors, Dr Anil Kumar Ratty ("Dr Ratty") and Dr Danny Poo ("Dr Poo"). The National University Hospital (Singapore) Pte Ltd ("NUH") contended that its employees, Dr Sunil Kumar Sethi ("Dr Sethi") and Peter Lim, were the ones who had actually came up with the invention disclosed in the Patent ("the Invention"), and that it was therefore the rightful owner of the Patent.

3      The dispute fell primarily on the determination of who contributed to the inventive concept, or the "heart", of the Invention. After hearing the parties and considering the evidence, I found that there were in fact two inventive concepts embodied in the Invention. I was persuaded that one of the inventive concepts was contributed by Dr Sethi (although not Peter Lim). NUH failed, however, to discharge its burden of proving that Dr Ratty and Dr Poo did not contribute to the other inventive concept. Accordingly, I ordered that Dr Sethi, Dr Ratty and Dr Poo be named as joint inventors of the invention, and for NUH to be named as a joint proprietor of the Patent together with Cicada . Both parties are dissatisfied with the decision and have appealed.


**Background**


*The parties*


4      The plaintiff, NUH, was a Singapore-incorporated company that operated a tertiary hospital. Until 2008, it was part of a group of healthcare institutions known as the National Healthcare Group ("NHG"). Since 2008, it had been a member of an agglomeration called the National University Health System[note: 1]. Dr Sethi held the position of Chief of NUH's Department of Laboratory Medicine between 1 July 2002 and 31 March 2016[note: 2], whereas Peter Lim was NUH's Principal Medical Technologist at the material time[note: 3].


5      The defendant, Cicada , was founded by Dr Ratty and Dr Poo, who were both directors of Cicada at the material time.


*Events leading up to the Invention*


6      In 2004, the NHG embarked on a project to digitise the clinical care processes in its hospitals (including NUH). At that time, NUH had a mixture of manual and electronic processes for its clinical care workflows. For instance, laboratory tests ordered by doctors for patients were done manually on hardcopy forms and subsequently keyed into an electronic system called the Laboratory Information System ("LIS"). The digitisation project contemplated the development of an Electronic Medical Records ("EMR") system to computerise records generated and/or stored within NHG's hospitals. In relation to the specific workflow of the doctor's order for specimen testing in the laboratory, the plan was that there should be a Computerised Physician Order Entry ("CPOE") which could enable doctors to order medication, laboratory and radiological tests electronically[note: 4]. To that end, a request for proposal was called by NHG sometime in 2004 to solicit proposals for an EMR system with CPOE capability. A vendor was eventually appointed in June 2005 for the supply and implementation of the EMR system[note: 5].


7      According to NUH, despite implementation of an EMR system, it realised that an additional component, namely, one pertaining to sample collection, was required in order to have in place a complete electronic laboratory trail from test ordering right through to result reporting. NUH decided to develop a software for this purpose. One of the various relevant workflows that needed to be translated to code and made to work with both the EMR and the LIS was the printing of test tube labels when specimens were taken from patients and registration of the specimens to the LIS[note: 6]. Cicada was subsequently appointed by NUH to develop a software in a project called the Advanced Test Ordering Management System ("ATOMS")[note: 7].


8      As NUH did not have sufficient funds for the ATOMS project, Cicada applied for and successfully obtained external funding from the Prime Minister's Office ("PMO") through its The Enterprise Challenge ("TEC") program. Subsequently, a tripartite agreement ("the TEC Agreement") was entered between Cicada , NHG, and the PMO for Cicada to leverage on the expertise and resources of NHG and NUH to conduct pilot trials of ATOMS[note: 8].


*The Patent*

9       On 14 August 2007, Cicada filed an application to register the Patent. The Patent was granted by the Intellectual Property Office of Singapore ("IPOS") on 30 July 2010. It was titled "Laboratory Specimen Collection Management System" and named Dr Ratty and Dr Poo as the inventors[note: 9].

10      The specification of the Patent described the Invention disclosed therein as "a laboratory specimen collection management system for the clinical laboratory, and especially, a system to identify the type and number of tubes to use to collect patient specimens for testing by the laboratory analy[s]er and facilitate the collection of the specimens at the point of care"[note: 10].

11      The specification then listed three problems with the existing system for the management of laboratory specimen collection[note: 11]:

(a)      Specimen collection required a specimen taker to determine, before taking the specimen, the type of tube, number of tubes, and the amount of specimen to be collected in each tube. This was not a simple exercise and required experiential knowledge on the part of the specimen taker. The specimen taker would usually consult a chart for each of the specimen test orders ordered by a doctor. However, as there were a number of different permutations in tube selection, the process was tedious and error-prone, compromising patient safety.

(b)      Specimens collected at the point of care were labelled to identify them with the patients providing the specimens. As the labels were non-standard labels pre-generated *en masse* and applied to the tubes when the specimens were collected, errors where a tube became labelled with a wrong patient identification could occur.

(c)      When the specimens arrived at the laboratory, a new set of labels, containing such information as the accession number essential for the laboratory analysis process, would be generated and affixed to each tube. In other words, there would be two labels for each tube of specimen collected (one affixed at the point of collection and another affixed at the laboratory). The need to print and affix two labels per tube was time-consuming, inefficient, and also error-prone.

12      The specification then averred that the Invention was a laboratory specimen collection management system which comprised a number of specimen collection stations coupled to a specimen processing system[note: 12]:

(a)      The specimen processing system contained the business logic for determining the specimen requirements including the type of tube, number of tubes, colour code of the tube, and the amount of specimen to be taken for each patient. It had a processing unit that was coupled to a database containing, among other information, the laboratory analyser test accession numbers for specimens.

(b)      The specimen collection stations were located at the point of care and were used by clinicians to collect samples. Each consisted of a user interface device, a hand-held scanner or data input device, a processing unit, and a printer. Patients were identified and verified electronically via the hand-held scanner. The specimen tests ordered by the doctors were displayed graphically on the user interface and this informed the specimen taker of the specimen requirements for the test order (the type of tube, number of tubes, colour code of the tube, and the amount of specimen to be taken for each patient, as determined by the specimen processing system). For each tube, a label would be printed *in situ* and this contained all the essential information such that in all, only one label had to be affixed onto each tube (as opposed to two labels per tube under the existing system).

13      According to the specification, the Invention offered the following advantages over the existing system:

(a)    Since information on the tubes to be used for the collection of specimens was controlled by the system, this helped to ensure that the correct types and number of tubes were used for the collection, thereby ensuring patient safety and improving efficiency in specimen collection.

(b)    Since the labels were printed *in situ* at the point of care, chances for label mix-up and errors were reduced, again enhancing patient safety.

14    The Patent was accompanied by several diagrams. In particular, FIG. 1 showed a number of specimen collection systems connected to a set of specimen processing system via the internet. FIG. 4 gave a schematic view of various components of the specimen processing system, such as (a) a listener server that listened to incoming messages bearing information about specimen orders from a computerised clinician ordering system; (b) a database server that stored the incoming messages; (c) a user interface; (d) a laboratory analyser connector that coupled the specimen processing system to the laboratory analyser; and (e) a "proprietary processing logic", stated to be "the heart of the specimen processing system", that controlled the behaviour of the specimen processing system[note: 13]. FIG. 1 and FIG. 2 are reproduced below.



FIG. 1: Laboratory Specimen Collection Management System



FIG. 4: Specimen Processing System

15    The Patent comprised a number of claims, set out at [63] below.

**Procedural History**

16    On 27 July 2012, NUH filed a reference to the Registrar of Patents ("the Registrar") pursuant to s 47(1) of the Patents Act (Cap 221, 2005 Rev Ed), for the following orders:[note: 14]

        (a)    that NUH be named as the sole and rightful proprietor of the Patent, in place of Cicada ; and

        (b)    that Dr Sethi be named as the sole and rightful inventor of the Invention disclosed in the Patent, in place of Dr Ratty and Dr Poo.

17    On 18 February 2015, pursuant to s 47(8) of the Patents Act, the Registrar issued a decision declining to deal with the reference, on the basis that the reference would more properly be determined by the court as the matter was "complex"[note: 15].

18    On 17 March 2015, NUH commenced the present OS proceedings for, among other things, the following orders[note: 16]:

        (a)    that NUH be named as the sole and rightful proprietor of the Patent in place of Cicada ; and

        (b)    that Dr Sethi and Peter Lim be named as the rightful inventors of the Patent in place of Dr Ratty and Dr Poo.

19    On 10 July 2015, NUH applied for, and obtained, leave to amend the OS to seek the following orders:

        (a)    that NUH be named as the sole and rightful proprietor of the Patent in place of Cicada or, alternatively, as the joint proprietor of the Patent together with Cicada ; and

        (b)    that Dr Sethi and/or Peter Lim be named as the rightful inventor(s) of the Patent in place of Dr Ratty and Dr Poo or, alternatively, as the joint inventor(s) of the Patent together with Dr Ratty and Dr Poo[note: 17].

**NUH's case**

20    According to NUH, the inventive concepts of the Invention were[note: 18]:

        (a)    a specimen processing system which determined, through a "business logic", the specimen requirements for the specimen test orders ("Determination Concept"); and

        (b)    the graphical display of the specimen requirements at a specimen collection station ("the Graphical Display Concept").

21    NUH contended that the Patent rightfully belonged to it as its employee, Dr Sethi, was the one who had formulated the inventive concepts in the course of his employment as the Chief of NUH's Department of Laboratory Medicine. Dr Sethi was assisted by Peter Lim, who was also NUH's employee at the material time and who was, "in substance", jointly responsible with Dr Sethi for devising the Inventive Concepts[note: 19].

22    Based on NUH's version of the events, Dr Sethi was alive to the problems with the pre-existing system of laboratory specimen collection outlined in the Patent (see [11] above) and had, sometime in the middle of 2004, came up with "some sort of conception of what the electronic solution to the problems might be"[note: 20]. He decided to pursue that solution as part of NUH's ambitious digitisation project (see [6] above). This required a software. Although NUH could have developed the software in-house, the Information Technology Department of the NHG was rather occupied at that point in time, which was in June 2005, and could not spare the resources[note: 21]. As a result, NHG appointed  Cicada  to develop the software based on information and parameters provided by NUH/NHG. Subsequently, NHG and  Cicada  entered into a Memorandum of Understanding on 16 December 2005 to develop what became known as ATOMS (see [7] above)[note: 22].

23    With respect to the proposal to the PMO to apply for funding under the TEC programme (see [8] above) ("the TEC Proposal"), Dr Sethi maintained that  Cicada , being merely a software company, did not have the wherewithal to put together the proposal on laboratory management and specimen collection replete with references to academic journals in this field. He was the one who put together the TEC Proposal.  Cicada  was, however, listed as a co-proposer in the TEC Proposal, only because one of the prerequisites of the TEC was that the proposal must include a private sector participant[note: 23].

24    In the course of engaging  Cicada  to write the software for ATOMS, NUH shared with  Cicada  what later became the inventive concepts of the Patent.  Cicada  then surreptitiously applied for and obtained the Patent that encompassed the pre-existing and envisioned workflows and processes of NUH's laboratory specimen collection management system which it became aware of during the development of the software[note: 24]. Although NUH was aware that  Cicada  had filed for a patent in 2007 in connection with the ATOMS project, it had always been its understanding that the patent was only for the software that  Cicada  developed and not a process patent. It only realised that the Patent was a process patent in 2011 and hence commenced proceedings for determination of the inventorship and proprietorship of the Patent shortly after.

**Cicada 's case**

25    According to  Cicada , the inventive concept of the Invention is the integration of a front-end test ordering system such as the CPOE with a back-end laboratory information system, so as to eliminate errors such as mislabelling of test tubes, inadequate collection of specimen samples and use of wrong test tubes, by doing the following two things at the same time and place:

    (a)    collating information on the specimen collection requirements based on the specimen test ordered and then graphically displaying the specimen collection requirements; and

    (b)    generating a unique laboratory accession number, which also contained patient information, in a single label to be affixed on the specimen collection test tube[note: 25].

26    The CPOE and the Sample Volume Metrics ("SVM") (see [68] below) *per se* were not part of the said inventive concepts[note: 26].

27    Cicada  claimed that Dr Ratty and Dr Poo were the ones who had come up with the abovementioned inventive concepts, and so were rightly named as joint inventors in the Patent. It was not disputed that Dr Sethi and Dr Ratty had been childhood friends for about 50 years and would meet up regularly for chats on various issues. According to Dr Ratty, during one of these chats which happened in the latter half of 2004, Dr Sethi alluded to the impact of laboratory errors in specimen collections in hospitals[note: 27]. Dr Ratty made a mental note of the problems raised by Dr Sethi and subsequently had a discussion with Dr Poo, who had substantial IT engineering experience. After brainstorming, Dr Ratty and Dr Poo jointly devised a solution to the problems[note: 28]. By the end

of 2004, Dr Ratty informed Dr Sethi that he had conceived of a solution to address the problems faced by Dr Sethi and presented the solution to Dr Sethi in the form of ATOMS[note: 29]. As Dr Sethi informed Dr Ratty that NUH had no funds to implement the solution, Dr Ratty explored funding through the PMO's TEC program[note: 30].

28      Cicada  further made a number of other arguments, including that Dr Sethi was not an employee of NUH at the material time, and that the present action was subjected to s 47(9) of the Patents Act.

## The issues

29      At some points in the present proceedings, NUH argued that the Patent was not validly registered for want of inventiveness. However, whether or not the Patent ought to be granted or amended in some way was not properly a question before me. What was before me was the issue of to whom the Patent should be granted, and who should be recognised as the inventor or inventors. In answering these questions, I had to take the Patent as it was.

30      The allegations made by NUH that  Cicada  had filed the Patent in secrecy were not directly relevant in the present proceedings either, except in so far as they might form part of the background for the question of who had contributed to the inventive concept(s) of the Invention to be addressed.

31      What I had to consider were as follows:

(a)      what was/were the inventive concept(s) of the Invention disclosed in the Patent;

(b)      who contributed to the inventive concepts; and

(c)      who was/were the rightful owner(s) of the Patent.

32      Further, I had to determine a preliminary issue raised by the parties on whether the present proceedings were subject to s 47(9) of the Patents Act, and also questions raised by  Cicada  concerning Dr Sethi's status as an employee of NUH at the material time.

## The decision

33      I found that the present proceedings before me were not subject to s 47(9) of the Patents Act.

34      In establishing who the rightful owner of the Patent was, the principles that could be distilled from the relevant case law interpreting the Patents Act or provisions that were *in pari materia* were that the court should identify who contributed to the inventive concept, or what had been described as the "heart", of the Invention.

35      In determining what the inventive concept of an invention was, the court must look at the patent as a whole. In doing so, the court was entitled to examine both the claims and descriptions, bearing in mind the purpose of each part of a patent application. I was of the view that in construing the inventive concept of a patent, it might be that there were in fact several such concepts encompassed within a single patent; in that regard, there might not be a single "heart" of the invention as such.

36      Further, it had been said that where an inventive concept consisted of a combination of elements, it was the person who had come up with the actual combination who ought to be credited as having contributed to the inventive concept of the invention, and not those who might have created the individual elements. That was to my

mind correct in so far as it could be specified who had come up with the combination as a whole. However, in some cases, the combination might not be the product of a single inventor.

37    In the present case, I was of the view that there were two inventive concepts within the Invention disclosed by the Patent. In this, my finding differed from the position of either party. The two inventive concepts were:

    (a)    the linkage or interaction between what was done in the ordering of a medical test (*ie*, the processes for ordering tests), and what was done at the specimen-taking side (*ie*, the processes for collecting specimens), so that, adopting the language of operations management or quality assurance, errors or mistakes were prevented ("the 1st Inventive Concept"); and

    (b)    the specification for the taking of specimens, *ie*, among other things, how the system actually ensured identification or determination of relevant constraints (such as the type of tube, number of tubes, and the amount of specimen to be collected in each tube) in each case, and the process of actual interaction or communication of different components of the system, including information processing and the display of the specification to the clinician taking the specimens ("the 2nd Inventive Concept").

38    With respect to the 1st Inventive Concept, I was satisfied that this was, on the evidence before me, invented by Dr Sethi. While there was an absence of a single contemporaneous record clearly showing a specific and definite point by which Dr Sethi came up with the 1st Inventive Concept, I was satisfied that this was done before the involvement of Dr Ratty and Dr Poo. In particular, I was satisfied that the handwritten note of Dr Ratty capturing the integration of the various components of the system was something that arose after Dr Sethi's creation of the idea of linking the various components.

39    As for the 2nd Inventive Concept, I was in the end not persuaded that NUH had shown that Dr Ratty or Dr Poo did not come up with it. The focus of the arguments and the evidence that was put before me was really elsewhere. I could not say that Dr Poo's contribution in terms of coding what was required was not inventive or did not touch on the 2nd Inventive Concept. As for Dr Ratty, his contribution was perhaps less tangible or apparent than Dr Poo's but again I could not conclude that this contribution did not involve any invention or contribution to the 2nd Inventive Concept.

40    In contrast, I noted that while Mr Peter Lim might have made a contribution to the better functioning of the Invention, his contribution was not to the inventive concepts but was to a particular mode of facilitating the working of these inventive concepts. The line between an inventive concept and a mode or way of implementing that inventive concept was not capable of being specified in an abstract way. All would depend on the facts.

41    Finally, as regards the employment status of Dr Sethi, I would emphasise that even in the absence of opposition by  Cicada , the onus was on the claimant (NUH in this case) to ensure that the elements of its claim were satisfied. On a review of further submissions of the parties and affidavits filed, I was satisfied that Dr Sethi was employed by NUH at the material time. While there was a contract between him and the National University of Singapore ("NUS"), he was also in a contract of employment with NUH, and in respect of the activities in issue in the present case, he was answerable to the control and supervision of NUH. It could be stated conversely that he was not a contractor or supplier of services to NUH. Furthermore, the courts would need to recognise that there was a strong innovative role inherent in many jobs these days, even if it was not explicitly mentioned within the normal or day-to-day job scope. All employees, whether in the public or private sector, whether managerial or clerical, were expected to contribute to the organisation by proposing innovations or improvements. What counted as being within the scope of employment had to be seen in that light.

**Analysis**

*Preliminary issue – whether the present proceedings were subject to s 47(9) of the Patents Act*

42    Cicada  contended that the present Originating Summons were subject to s 47(9) of the Patents Act.

43     Section 47(1) of the Patents Act provided that after a patent had been granted, any person having or claiming a proprietary interest in or under the patent may refer to the Registrar the question of whether the patent had been rightly granted to the right person(s). Section 47(5) provided that the Registrar was not to make any order transferring a patent on the ground that the patent was granted to a person not rightly entitled to it, if the question of whether the patent had been rightly granted to the right person(s) was referred to it pursuant to s 47(1) more than two years after the date of grant of the patent, unless it was shown that the person registered as the proprietor of the patent knew at the time of the grant that he was not entitled to the patent. Section 47(5) of the Patents Act was not directly relevant in this case as the Patent was granted on 30 July 2010 and NUH had filed the reference to IPOS on 27 July 2012, within (although just barely) the two-year period.

44     An issue arose under s 47(9) of the Patents Act, however, because the Registrar, pursuant to s 47(8), declined to deal with the reference on the basis that it would more properly be determined by the court. The Registrar made this decision on 18 February 2015. Shortly thereafter, on 17 March 2015, NUH commenced the present OS. By that time, as more than two years had already passed since the grant of the Patent, the issue that came up was then whether the OS proceedings were caught by s 47(9) of the Patents Act, which read as follows:

> The court shall not in the exercise of any such declaratory jurisdiction determine a question whether a patent was granted to a person not entitled to be granted the patent if *the proceedings in which the jurisdiction is invoked* were commenced after the end of the period of 2 years beginning with the date of the grant of the patent, unless it is shown that any person registered as a proprietor of the patent knew at the time of the grant or, as the case may be, of the transfer of the patent to him that he was not entitled to the patent.

[emphasis added]

45     The issue rested upon the proper interpretation of the words "the proceedings in which the jurisdiction is invoked". In a situation such as the present, did "the proceedings in which the jurisdiction is invoked" refer to the original reference that was first brought to the Registrar pursuant to s 47(1), or did it refer to the present OS proceedings that NUH brought after the Registrar declined to deal with the reference? I was of the view that the former interpretation must be the correct one. In situations such as the present, the plaintiff could only file the OS proceedings in the court after the Registrar had issued its decision concerning the reference made to it, and the plaintiff had no control over how long the Registrar would take to issue its decision. In this case, the Registrar took more than two and a half years before it decided to decline to decide on the reference. It would be unfair to a plaintiff if, for no fault of its own, it became subjected to the additional requirement of having to prove that the registered proprietor of the patent knew at the time of the grant that he was not entitled to the patent under s 47(9) of the Patents Act, which it otherwise would not have had to prove had the Registrar not declined to decide on the reference that the plaintiff had filed. This could not have been the intention of Parliament in enacting the said provisions in the Patents Act.

46     I would, however, add a caveat to the above. In situations described above, if the relief sought in the OS proceedings in the court were to differ materially from that sought in the original reference to the Registrar, then the OS proceedings must be taken as fresh proceedings detached from the original reference to the Registrar. In such cases, if the OS proceedings were commenced more than two years after the date of the grant of the patent, then s 47(9) of the Patents Act would be attracted, regardless of whether or not the original reference to the Registrar was filed within or after the two year period. In this case, the relief sought by NUH in the reference to IPOS and in the OS proceedings were essentially the same. In both cases, NUH was seeking to be named as a rightful proprietor of the Patent, and for its employee(s) to be named as the rightful inventor(s). There were some

differences in the relief sought in the reference and in the OS proceedings to the extent that in the reference to the Registrar, NUH asked for it to be named as the sole rightful proprietor of the Patent, but later included in the OS an alternative prayer for it to be named a co-proprietor of the Patent alongside Cicada (see [16]-[19] above). The other difference was that NUH originally asked for Dr Sethi to be named as the sole rightful inventor of the Invention, but later included in the OS an alternative prayer for Dr Sethi and/or Peter Lim to be added as joint inventors together with Dr Ratty and Dr Poo. Nonetheless, while there were differences, they related only to the extent of relief sought. The nature or kind of the relief sought in the OS remained the same as that sought in the reference to the Registrar.

47      Given the above, I decided that s 47(9) of the Patents Act did not apply in the present OS proceedings before me.

### *General principles on inventorship and ownership*

48      The issue of ownership of a patent was governed by s 19(2) of the Patents Act. Section 19(2)(*a*) provided that a patent may be granted "primarily to the inventors or joint inventors" of the invention, although in situations exclusively set out in s 19(2)(*b*) and (*c*), persons other than the inventors might be granted a patent. Section 19(2) is set out below:

A patent for an invention may be granted —

(*a*)    primarily to the inventor or joint inventors;

(*b*)    in preference to paragraph (*a*), to any person or persons who, by virtue of any enactment or rule of law, or any foreign law or treaty or international convention, or by virtue of an enforceable term of any agreement entered into with the inventor before the making of the invention, was or were at the time of the making of the invention entitled to the whole of the property in it (other than equitable interests) in Singapore; or

(*c*)    in any event, to the successor or successors in title of any person or persons mentioned in paragraph (*a*) or (*b*) or any person so mentioned and the successor or successors in title of another person so mentioned,

and to no other person.

49      Section 49 of the Patents Act set out the circumstances under which an employer would have ownership of an employee's invention. In such cases, although the employee remains the rightful inventor of the invention, ownership of the invention vests with his employer. Section 49(1) read as follows:

49.—(1) Notwithstanding anything in any rule of law, an invention made by an employee shall, as between him and his employer, be taken to belong to his employer for the purposes of this Act and all other purposes if —

(a)    the invention was made in the course of the normal duties of the employee or in the course of duties falling outside his normal duties, but specifically assigned to him, and the circumstances in either case were such that an invention might reasonably be expected to result from the carrying out of his duties; or

(b)    the invention was made in the course of the duties of the employee and, at the time of making the invention, because of the nature of his duties and the particular responsibilities arising from the nature of his duties he had a special obligation to further the interests of the employer's undertaking.

50    As to who might be considered the inventor of an invention, s 2(1) of the Patents Act provided that an "inventor", in relation to an invention, meant "the actual deviser of the invention". In *Dien Ghin Electronic (S) Pte Ltd v Khek Tai Ting (trading as Soon Heng Digitax)* [2011] 3 SLR 227 ("*Dien Ghin*"), Chan Seng Onn J adopted (at [13]) the following passage in *Yeda Research and Development Co Ltd v Rhone-Poulenc Rorer International Holdings Inc* [2008] RPC 1 ("*Yeda*"), where Lord Hoffman was interpreting provisions in the UK's Patents Act which were *in pari materia* with the relevant provisions in Singapore's Patents Act:

The word 'actual' denotes a contrast with a deemed or pretended deviser of the invention; it means, as Laddie J. said in *University of Southampton's Application* [2005] RPC 11 [at] [39], the natural person who 'came up with the inventive concept'. It is not enough that someone contributed to the claims, because that may include non-patentable integers derived from the prior art: see *Henry Brothers (Magherafelt) Limited v Ministry of Defence* [1997] RPC 693 at 706; [1999] RPC 442. As Laddie J. said in the *University of Southampton* case, the 'contribution must be to the formulation of the inventive concept'...

51    Thus, the inventor was the natural person who had formulated or contributed to the formulation of the inventive concept. What amounted to contribution to an inventive concept could encompass a number of different types of activities. Summarising the discussion at Lionel Bently and Brad Sherman, *Intellectual Property Law* (Oxford University Press, 4th Ed, 2014) ("*Bently and Sherman*") at pp 598 and 599, the following could amount to contributions to the inventive concept:

(a)    solving or helping to solve a particular problem or answering a particular question;

(b)    improvement of an answer previously developed; and

(c)    the formulation of the problem that was addressed.

However, just because an activity or type of contribution fell within the above did not mean that it *ipso facto* amounted to a contribution to the inventive concept of an invention: an assessment still had to be made against the context. While certain contributions (such as posing of the problems to be solved or the answering of these problems) were usually treated as being inventive, other contributions (such as the supply of the test tubes used in the experiments) would usually be regarded as being non-inventive. In between these two extremes there was a range of other types of contributions that were more difficult to categorise. The question that arose here was which of the various contributions that had been made towards the production of an invention ought to be recognised as being inventive (or technically creative) and which ought not to be recognised as such. This was a particularly complex issue, not least because what is considered to be inventive not only changes over time, but also changes between different areas of science and technology: see *Bently and Sherman* at p 598.

52    Where more than one natural person played a role in the formulation of the inventive concept, each of these persons would all be inventors of the invention. Further, where an inventive concept consisted of a combination of elements, it was the person who had, in substance, come up with the actual combination who ought to be credited as having contributed to the inventive concept of the invention. In this regard, I respectfully adopted the following passage of Jacob J (as he then was) in *Henry Brothers (Magherafelt) Ltd v Ministry of Defence and the Northern Ireland Office* [1997] RPC 693 ("*Henry Brothers*") at 706:

I do not think it is right to divide up the claim for an invention which consists of a combination of elements and then to seek to identify who contributed which element. I think the inquiry is more fundamental than that. One must seek to identify who in substance made the combination. Who was responsible for the inventive concept, namely the combination?... [Who] turned a useless collection of elements into something which could work[?]

53     In addition, a person might be a deviser of an invention as claimed, even though he might lack the capability to design or put into place the precise details of how the inventive concept might be realised into a functional product, and had left another person to work out those details: *Dien Ghin* at [13]. On the contrary, the person who merely did what was suggested to him by the actual deviser did not take part in devising the invention, and is not to be regarded as a joint inventor. In determining joint inventorship, the test was whether the second person could be said to be "in substance" jointly responsible for devising the inventive concept of the patent: *Stanelco Fibre Optics Ltd's Applications* [2005] RPC 15 at [18] and [20].

54     In the present case, the burden was on NUH to prove that Dr Sethi and Peter Lim had contributed to the inventive concepts of the Invention. The burden of proof was as set out in *Yeda* (at [21]):

[A] person who seeks to be added as a joint inventor bears the burden of proving that he contributed to the inventive concept underlying the claimed invention and a person who seeks to be substituted as sole inventor bears the additional burden of proving that the inventor named in the patent did not contribute to the inventive concept.

55     What then, was the inventive concept of an invention? The inventive concept had been described as "the heart" of an invention, and in identifying it, the court was essentially "concerned with the identification of the core (or kernel, or essence) of the invention... which entitle[d] the inventor's achievement to be called inventive": *Generics (UK) Ltd v H Lundbeck A/S* [2009] UKHL 12 at [30].

56     In construing from a patent what the inventive concept(s) of the invention disclosed therein was, I was of the view that the court was entitled to, and indeed ought to, look at the patent as a whole, including the specification as well as the claims. There were some disagreements between the parties in this case on whether the inventive concepts should be gleaned from the information in the patent specification rather than from the claims. I concluded that the approach should be as follows.

57     First, in proceedings where the court was tasked to determine the extent of protection of a patent, *ie*, what monopolies were actually claimed and granted, s 113(1) of the Patents Act, as set out below, applied:

For the purposes of this Act, an invention for a patent for which an application has been made or for which a patent has been granted shall, unless the context otherwise requires, be taken to be that specified in a claim of the specification of the application or patent, as the case may be, as interpreted by the description and any drawings contained in that specification, and the extent of the protection conferred by a patent or application for a patent shall be determined accordingly.

Hence, in determining the extent of protection covered in a patent, the claims of the patent were determinative, although the court could use the description and any drawings contained in the specification to interpret what the claims covered. The present proceedings before me did not concern a determination of the extent of protection covered in the Patent.

58     Secondly, in entitlement proceedings such as the present where the court was required to determine what the invention disclosed in a patent was and who contributed to the inventive concepts of the invention, the claims of a patent were not conclusive. In *Markem Corp v Zipher Ltd* [2005] RPC 31 ("*Markem Corp*"), the English Court

of Appeal had to deal with questions of entitlement before the patent was granted. There, the court observed (at [100]) that the question of entitlement could arise before any claims existed, and in principle that question must remain the same regardless of whatever claims that might later emerge. In such cases, the court had this to say (at [102]) with respect to the approach that should be taken in determining who contributed what to the inventive concept and what rights if any they had in the invention:

> It is not possible to be very specific about how this is to be done. But as a general rule one will start with the specific disclosure of the patent and ask whether that involves the use of information which is really that of the applicant, wholly or in part or as joint owner… [W]hat one is normally looking for is "the heart" of the invention. There may be more than one "heart" but each claim is not to be considered a separate "heart" on its own.

59    The present case did not involve questions of entitlement over a patent that had not yet been granted. The Patent in this case was granted in 2010. In *Statoil ASA v University of Southampton* (BL O/204/05), the tribunal observed (at [38]) that in determining what the inventive concept(s) of an invention was, even in a granted patent, the court must look at the information in the specification rather than simply looking at the monopoly claimed, although this did not mean that the court was not to look at the claims at all. In my view, this must be correct. There was a fundamental difference between what was considered an invention on one hand, and what monopoly an inventor chose to obtain on the other hand. In *First Currency Choice Pte Ltd v Main-Line Corporate Holdings Ltd and Another Appeal* [2008] 1 SLR 335, the Court of Appeal cited (at [23]) the following passage of Laddie J in *Merck & Co Inc v Generics (UK) Ltd* [2004] RPC 31:

> The purpose of a patent is to convey to the public what the patentee considers to be his invention and what monopoly he has chosen to obtain. These are not necessarily the same. The former is primarily to be found in the specification [*ie*, the description] and the latter is primarily to be found in the claims.

An inventor was free to exclude an inventive concept of his invention from the scope of monopoly claimed if, for whatever reason, he so wished. Hence, the claims were not determinative when a court had to decide on the question of what the inventive concepts of an invention were, although the court should take them into account, together with the specification.

### Issue 1: What was/were the inventive concept(s) of the Invention

60    With the above principles in mind, I proceeded to determine what the inventive concept(s) of the Invention was/were, by construing the Patent as a whole. I considered all the key features of the Patent, as set out in [10]–[15] above, and I concluded that there were two inventive concepts within the Invention disclosed in the Patent (see [37] above).

61    My conclusions differed from the contentions put forward by each side in relation to the inventive concepts. NUH argued that there were two: the Determination Concept, *ie*, the specimen processing which determined, through a "business logic", the specimen requirements for the specimen test orders; and the Graphical Display Concept, *ie*, the visual display of these requirements (see [20] above). Cicada , for its part, contended that the inventive concept was the integration of front-end test ordering with back-end information, eliminating errors by collating and graphically displaying the requirements and generating a single label containing the accession number and patient information for each tube (see [25] above). Neither conception to my mind properly captured the inventive concept(s) of the Invention. In particular, in my view, the "business logic", *ie*, a system or heuristic parameters that captured a method of dealing with the data, and the graphical display of the specimen requirements, might have been particular modes of facilitating the working of the Invention, but they were not the inventive concepts, or the "hearts" of the Invention, for reasons that are elaborated upon below. As for the

generation of a single label for each tube, this, in my view, was a consequence that flowed from the linkage or interaction between the processes for ordering tests and the processes for collecting specimens (*ie*, the 1st Inventive Concept that I identified), rather than part of an inventive concept itself.

62      Several considerations led me to my identification of the 1st and 2nd Inventive Concepts. First, the Patent disclosed three key problems with the existing system (see [11] above). The first problem (see [11(a)] above) pertained to the difficulty faced by a specimen taker in determining the type and number of tubes to use and the amount of specimen to be collected in each tube. The second and third problems related to the need to affix two labels on each tube and the possibility of mislabelling (see [11(b)] and [11(c)] above), but, in my view, the underlying issue was really the need for tests ordered for each patient to be correctly administered by ensuring that patients were correctly identified at the point of specimen taking and that the specimens collected from them were accurately labelled as having come from particular patients. Errors might arise due to the lack of interaction between the test ordering side and the specimen taking side, such that information on what test was ordered for each patient was not transmitted accurately to the specimen taking side. As a hospital, NUH must have had an existing system for ordering tests, an existing system for taking specimens for the tests, and an existing system for downstream processing of the specimens, even prior to the Invention. The details of each of these systems were not important; what mattered was that based on the evidence, those systems operated as more or less discrete units with little integration between them. The inventive concepts must address the problems identified.

63      The claims in the Patent and the diagrams (especially FIG. 4) also led me to my conclusion on the 1st Inventive Concept. The claims that I found most relevant for the present purpose are reproduced below:

> (Claim 1) A laboratory specimen collection management system comprising a specimen test ordering system having functional features for entering specimen test orders; a specimen collection station having a bar-code scanner or data input device for capturing the identity of the patient providing specimens; a specimen processing system in communication with the specimen collection station and coupled to a database, wherein the specimen processing system determines the specimen requirements for the specimen test orders to be graphically displayed at the specimen collection station; a specimen receipt system; and a laboratory information system.

> (Claim 2) A system according to claim 1, wherein specimen test orders are entered into the specimen test ordering system; information in a specimen test order includes patient unique identification code, the specimen test ordered, the unique identity code of the person ordering the specimen test, and the location where the specimen test is ordered.

> …

> (Claim 5) A system according to claim 1, wherein the specimen collection station retrieves from the specimen processing system the patient unique identification code, the specimen test ordered, the unique identity code of the person ordering the specimen test, and the location where the specimen test is ordered, the specimen test collection station displays graphically on a user interface the type of tube, number of tubes, colour code of the tube and the amount of specimen to take for the identified patient, the specimen test collection station prints *in situ* for each tube displayed a bar-code label or any form of digitally readable label containing the patient identification code, patient name, the unique laboratory analy[s]er test accession number for a specimen, the date and time of print, location, test codes and colour of tube.

> …

(Claim 8) A system according to claim 1, wherein the specimen test ordering system also sends to the specimen processing system patient unique identification code, the specimen test ordered, the unique identity code of the person ordering the specimen test, and the location where the specimen test is ordered to indicate an order has been made.

I was of the view that the above claims clearly established a linkage between the test ordering side and the specimen taking side as a key part of the invention for which monopoly was claimed. There was a flow of information including the patient unique identification code and the specimen test ordered (which were critical information for ensuring that specimens were collected from the correct patient for the correct test) from the test ordering system to the specimen processing system, and then from the specimen processing system to the specimen collecting stations situated at the specimen taking side. Such flow of information addressed head-on the issue underlying the second and third problems identified in the Patent (see [11] above).

64      Similarly, as stated in [14] above, FIG. 4 described the specimen processing system, which was a major component of the Invention, as being made up of "a listener server" that listened to incoming messages bearing information about specimen orders from a computerised clinician ordering system. The specimen processing system was, in turn, coupled to the specimen collection stations which were situated at the specimen taking sites.

65      But the linkage of the test ordering side and the specimen taking side only solved some of the problems. The difficulty faced by a clinician taking the specimens in determining the type and number of tubes to use, and the amount of specimen to be collected in each tube, was a major problem specifically highlighted in the Patent (see [11(a)] above). I considered it significant that at the time of applying for the Patent, the prior art did not teach or suggest an automated system which determined the specimen requirements for test orders, but required clinicians taking the specimens to first obtain from the laboratory "draw lists" instructing which test samples must be taken from the patients. The clinician had to use his or her experiential knowledge to determine the requirements for each test. The Invention was different because, as stated in specification [0007], its specimen processing system contained a "business logic" for determining the specimen requirements. The specimen requirements, automatically determined, were then communicated to the clinician taking the specimens when they were graphically displayed at the specimen collection stations. I was therefore of the view that how the system actually determined the specimen requirements, and processed and relayed these requirements to the clinician taking the specimens, was an inventive concept of the Invention.

66      Before me, the parties argued that graphical display of the specimen requirements on the user interface of the specimen collection station was an inventive concept. I was not so persuaded. The essence of the inventive concepts, as identified, was in the linkage of the various systems and processes and the relay of information. How exactly the information was relayed was not critical, and graphical display was but one mode for relaying the specimen requirements, as determined by the specimen processing system, to the clinician taking the sample. The distinction between an inventive concept, and what was no more than a particular mode or way of implementing that inventive concept, was not capable of being specified in an abstract way. All would depend on the specific facts.

67      I also could not agree with NUH that the SVM was part of the inventive concept. NUH claimed that the SVM had two aspects – a logic and a database. The database fitted into the logic to determine the specimen requirements that would then be graphically displayed to the clinician taking the specimen[note: 31]. According to NUH, this logic that was part of the SVM was the same "business logic" (see [12(a)] above) and "proprietary processing logic" (see [14] above) that was stated in the Patent to be "the heart of the specimen processing system". Further, Peter Lim stated in his statutory declaration that this logic that was part of the SVM was reflected in certain Powerpoint slides that he had done up[note: 32]. However, having reviewed the said Powerpoint slides, it was not apparent to me that they represented the type of "logic" that Peter Lim said they did. In my view, the Powerpoint slides showed no more than data on volumes of specimens (blood) to be taken for different test. I accepted Cicada's contention that the SVM was no more than a dataset which represented the optimisation of the

specimen collection requirements (particularly the volume of specimen to be collected)[note: 33]. I noted that Dr Sethi appeared to have conceded this point during cross-examination. An extract of the Notes of Evidence is provided below[note: 34]:

> Q.    At its most basic version, the SVM was nothing more than a table, am I right?

> A.    Sir, the SVM was an Excel Sheet, yes.

68    The SVM dataset was no more than a compilation of data, as specified by the manufacturers of the testing machines used by NUH, on the amount of blood that needed to be drawn and other specimen requirements for each test. Dr Sethi's evidence was as such during cross-examination:

> Q.    Of course. What type of test tube you use which is coated with what substance would depend on the test and would depend on the machine you have, am I right?

> A.    Yes, your Honour[note: 35].

> …

> Q.    […] The amount of blood that's needed for each test is specified by the manufacturer of the machine, am I right?

> A.    Yes, your Honour[note: 36].

> …

> Q.    Now, the machine will have a requirement for each of those tests in terms of amount of blood, type of test tube, and the size of test tube, am I right[note: 37].

> A.    Yes, your Honour.

And the evidence of Peter Lim was as such[note: 38]:

> COURT:        In terms of the database, the SVM data set, what did you do to develop that?

> A.        The dataset is merely the test specification for each orderable test at NUH, so it's just a listing for tests. Then we assign arbitrary SVM volumes to each of those.

69    NUH could not adduce any evidence to show that apart from being a dataset, there was a "logic" component to the SVM, ie, a system or heuristic parameters that captured a method of dealing with the data. When asked how he had developed the "logic" he contended he had developed, Peter Lim could not give the court a concrete answer[note: 39]:

> Court:        And what did you draw on to develop the logic? How did you actually develop the logic, really? Just through your own thinking and experience or did you –

A.      I was trying to mimic human thinking using those codes, okay to – so that – but at the same time I want the user to have the experience where they will not know what goes behind that screen, so that it's very user-friendly and what goes behind the screen is actually all those logic that works out – are pushing out those graphics to the user.

70      Thus, all that NUH could prove, at the most, was that the SVM was a dataset of manufacturer-defined specimen requirements. There was nothing inventive in this, and the SVM could not be an inventive concept of the Invention.

71      I should finally note that the patent in the present case did not to my mind involve a combination of inventive concepts that called for the recognition as inventor of the person who came up with the combination, as noted in the case of *Henry Brothers*.

### Issue 2: Who contributed to the inventive concepts?

*The 1st Inventive Concept*

72      On the evidence before me, I was satisfied that Dr Sethi was the one who had come up with the 1st Inventive Concept.

73      It was not disputed that in 2004, the NHG embarked on a project to digitise the clinical care processes in its hospitals (including NUH) (see [6] above). In the early part of 2005, as part of this digitisation initiative, the NHG held a series of meetings to discuss and design the workflows which could be incorporated into NUH's existing and proposed electronic systems, and to brainstorm for solutions to identified problems in the existing workflows[note: 40]. Documentary evidence showed that these meetings produced ideas that coincided with several aspects of the Invention as disclosed in the Patent. For instance, the minutes of a particular meeting held in May 2005 indicated that pre-labelling was suggested whereby nurses would affix labels bearing accession numbers onto the tubes at the point of collection of the specimens[note: 41]. This suggestion coincided with the notion of *in situ* printing of labels that was set out in the Patent. Another document, named "CPOE Lab-To-Be", that was created sometimes in mid-April 2005, elaborated on an electronic workflow for specimen collection and management which involved, among other things, nurses/phlebotomists "scan[ning] patient identification to retrieve laboratory request with instructions for sample collection (type of specimen, number of tubes/sample required)" and "request[ing] accession number[s] from LIS"[note: 42]. This coincided with what was reflected in Claim 1 of the Patent (see [63] above). More importantly, I was of the view that this was indicative of an idea for linkage of the specimen collecting processes and the test ordering processes, with a relay of information from the latter set of processes to the former (*ie*, the 1stInventive Concept). It was Dr Sethi's evidence that he was much involved in the brainstorming meetings and that he had vetted the CPOE Lab-To-Be document[note: 43], and I accepted that as much.

74      I also considered it significant that a large part of the TEC proposal was drafted by Dr Sethi. It was not disputed that the first draft of this proposal was created by Dr Poo on 16 February 2005. However, he left portions of the draft uncompleted and asked Dr Sethi "to add your parts" to the draft[note: 44]. Dr Sethi did so on 1 March 2005. Among other things, Dr Sethi wrote the entire portion of the TEC Proposal on "Project Details", where he gave particulars of the novel features of the intended system design, and a proposed management workflow for laboratory test orders with details such as *in situ* printing of labels at the point of specimen collection. Under the "Project Description" section of the TEC Proposal, Dr Sethi wrote about how laboratory information systems "originally deployed to be silos of information, with little need to interact with other systems", were no longer sufficient to meet current needs[note: 45]. He identified the main problem with the current system as being the possibility of errors in test orderings, citing articles which showed that laboratory testing procedure was an

important contributor in improper healthcare delivery. He wrote that "today's laboratory operation require[d] much more", that there was a need to "[move] away from monolithic LIS to enterprise-wide solutions", to "push the LIS beyond initial design", and that "[c]onnectivity and communication [were] critical components for laboratory success". This strongly suggested to me that Dr Sethi was the one who had come up with the 1st Inventive Concept. If Dr Ratty and Dr Poo were the ones who had come up with the 1st Inventive Concept, there was no reason why Dr Poo could not have provided the details in his draft of the TEC Proposal, but had to leave them to Dr Sethi. On the stand, Dr Poo could not provide any satisfactory answer for why he did not fill in the details in the TEC Proposal, except to say that that "was a first draft"[note: 46].

75      In addition, the evidence was that on 16 February 2005, Dr Poo sent an email to Dr Sethi, where he requested Dr Sethi to "write down the 4 areas that you mentioned in our discussion last week for me in this email". Dr Sethi replied just 12 minutes later with the following:

ATOMS

A Four-phased electronic approach to laboratory request order management:

1. Bedside pathology ordering by doctors and nurse practitioners for ward-in-patients.

2. Positive-patient identification

3. Bedside phlebotomy management

4. Electronic linkage between ATOMS and HIS (Hospital Information System) the LIS (Lab Information System)

[emphasis added]

The email exchange as set out above gave me further reason to believe that it was Dr Sethi, and not Dr Poo or Dr Ratty, who had come up with the 1st Inventive Concept, and that he had come up with it by early February 2005.

76      In trying to prove that Dr Ratty and Dr Poo were the rightful inventors, Cicada relied primarily on a two-page handwritten note that Dr Ratty made during a meeting with NHG's representative that was held on 1 February 2005. Dr Ratty said that the first page of the note contained the notes he had taken down when Dr Sethi explained, at the meeting, NUH's existing infrastructure and the infrastructures that NUH was at that time developing (such as the CPOE)[note: 47]. He said that the second page of the note was the "manifestation" of his ideas in relation to ATOMS (which made him an inventor of the Invention), which he claimed he had come up with in late 2004[note: 48]. At a small part on the second page of the handwritten note (there were other notes on the same page which Cicada was not relying on in the present matter), Dr Ratty had written the words "Order entry". An arrow was drawn pointing away from these words to an unlabelled box, and this unlabelled box was in turn linked by a second arrow to a second box. The portion of the second page of the note that Cicada sought to rely on is reproduced below:



Dr Ratty said that based on the above, one would be able to see that neither NUH nor Prof Sethi had any solutions to the problems caused by manual laboratory workflow, and Cicada said that the note "clearly show[ed] the concept, of a link between the front-end and back-end of test ordering and specimen processing". I was not so persuaded. It was not sufficiently clear to me that the note showed the 1st Inventive Concept.

77    While there was an absence of a single contemporaneous record that clearly showed a specific and definite point by which Dr Sethi came up with the 1st Inventive Concept, I was satisfied that this was done before the involvement of Dr Ratty and Dr Poo. In particular, for the reasons above, I was satisfied that the handwritten note, even if it did capture the 1st Inventive Concept, was after Dr Sethi formulated the idea of linking the various components.

*The 2nd Inventive Concept*

78    NUH did not, however, successfully discharge its burden of proving that it was Dr Sethi, and not Dr Ratty and/or Dr Poo, who had contributed to the 2nd Inventive Concept, that is, the specification for the taking of specimens, including how the system actually ensured identification or determination of the specimen requirements in each case, and the process of actual interaction or communication between different components of the system. The focus of the arguments and the evidence that was put before me was really elsewhere, particularly on whether the SVM was part of the Inventive Concept (which I decided was not), but not on who had contributed to the 2nd Inventive Concept. I therefore could not say that Dr Poo's contribution in terms of coding what was required was not inventive or did not touch on the 2nd Inventive Concept. As for Dr Ratty, his contribution was perhaps less tangible or apparent than Dr Poo's (since Dr Poo was the one with the software engineering expertise[note: 49]) but again I could not conclude that this contribution did not involve any invention or contribution to the 2nd Inventive Concept.

79    In the circumstances, I concluded that Dr Sethi had come up with the 1st Inventive Concept, but that it was not disproved that Dr Ratty and Dr Poo had come up with the 2nd Inventive Concept.

80    As for Peter Lim, I was not persuaded that he had contributed to either of the two inventive concepts. NUH's case that Peter Lim was a co-inventor (together with Dr Sethi) rested primarily on its claim that it was Peter Lim who had come up with the SVM and the idea of the graphical display, and Peter Lim confirmed as such on the stand[note: 50]:

Court:        What was that you contributed that may be different than what Prof Sethi had?

A:              The part that we differ…would probably be the details, like materialising the graphical display, actually working out the SVM.

81    Cicada disagreed that it was Peter Lim who had come up with the idea of the graphical display. This was, however, inconsequential, since given my conclusions (at [66]–[70] above) that the graphical display and the SVM were not part of the inventive concepts, the claim that Peter Lim was an inventor of the Invention could not succeed, even if we were to assume that he did contribute to these two aspects. Peter Lim might have made a contribution to the better functioning of the Invention, but his contribution was not to the inventive concepts. Dr Sethi's evidence was that Peter Lim had worked closely with him in relation to the ATOMS project, but there was no evidence to suggest that he did more than what was suggested to him by Dr Sethi (putting aside the SVM and the idea of the graphical display). A person who merely did what was suggested to him by the actual deviser did not take part in devising the invention and could not be regarded as a joint inventor: see [53] above.

**Whether Dr Sethi was an employee of NUH at the material time**

82    Cicada contended that even if Dr Sethi was an inventor of the Invention, he was not an employee of NUH at the material time, and so NUH was not the proper plaintiff in the present matter. NUH maintained that Dr Sethi was its employee at the time he came up with the Invention; he was employed both as a Senior Consultant as well as the Chief of the Department of Laboratory Medicine at NUH[note: 51].

83    As mentioned (see [49] above), the circumstances under which an employer would have ownership of an employee's invention was set out in s 49 of the Patents Act. Put another way, even if Dr Sethi was an inventor or co-inventor (as I had so found), in order for NUH's current claim to succeed, it had to prove that all elements of s 49 were satisfied, ie, that:

(a)    Dr Sethi was NUH's employee at the time that he came up with the Invention; and

either

(b)    (i) the Invention was made in the course of Dr Sethi's normal duties as an employee of NUH, or in the course of duties falling outside his normal duties but specifically assigned to him; and

(ii)    the circumstances in either of the above cases were such that an invention might reasonably be expected to result from the carrying out of his duties;

or

(c)    (i) the Invention was made in the course of the duties of Dr Sethi as the employee of NUH; and

(ii)    at the time of making the invention, because of the nature of his duties and the particular responsibilities arising from the nature of his duties, he had a special obligation to further the interests of NUH's undertaking.

I would emphasise that even in the absence of opposition by Cicada, the onus was on NUH, as the claimant, to prove the above elements on a balance of probabilities.

84    There was no single, general test that was determinative of whether a person was an employee of another, or was a mere contractor or supplier for services. Much would depend on the circumstances of each case. However, the court could take guidance in this analysis by considering the following non-exhaustive factors distilled from the authorities:

(a)     Whether the work of the alleged employee was done as an integral part of the business of the alleged employer – "[U]nder a contract of service, a man is employed as a part of the business and his work is done as an integral part of the business: whereas under a contract for services his work, although done for the business, is not integrated into the business but is only accessory to it": per Denning LJ in *Stevenson, Jordan and Harrison Ltd v Macdonald and Evans* [1952] 69 RPC 10 at 22.

(b)     Whether the alleged employee was paid a regular salary or commission – A person who was remunerated through a regular salary rather than commission was more likely to be considered an employee: Ravi Chandran, *Employment Law in Singapore*, (LexisNexis, 4th Ed, 2014) ("*Employment Law*") at [1.25], citing *Kuala Lumpur Mutual Fund Berhad v J Bastian Leo & Anor* [1988] 2 MLJ 526 ("*Bastian Leo*").

(c)     Whether there were stipulations as to working hours – A person who was subject to working hours was more likely to be considered an employee: *Employment Law* at [1.28], citing *Bastian Leo*.

(d)     Whether the alleged employee was entitled to overtime pay – A person who was not an employee was less likely to get overtime pay: *Employment Law* at [1.29].

(e)     Whether the alleged employer contributed to the Central Provident Fund ("CPF") account of the alleged employee – A person who made and obtained CPF contributions was more likely to be an employee: *Employment Law* at [1.30].

(f)     Whether the alleged employee was entitled to leave and holidays – An employee was more likely to be contractually entitled to leave and holidays: *Kureoka Enterprise Pte Ltd v Central Provident Fund Board* [1992] SGHC 113 ("*Kureoka*").

(g)     Whether the alleged employee was entitled to medical leave – A person who was contractually entitled to medical leave and related benefits was more likely to be an employee: *Kureoka*.

(h)     Whether the alleged employer had the power to dismiss the alleged employee from his service – If an employer was contractually entitled to terminate the services of a person with notice or salary *in lieu* of notice, it was more likely that an employment relationship exists: *Chew Swee Hiang v Attorney-General and another* [1990] 2 SLR(R) 215 at [43].

85     As proof that Dr Sethi was its employee at the time that he came up of the Invention, NUH produced a letter dated 6 June 2002 titled "NUH Appointment" and a letter dated 10 June 2005 titled "Renewal of Chiefship Appointment". Cicada took issue that:

(a)     The letters were titled with the word "appointment", and not "employment".

(b)     Under the 6 June 2002 letter, Dr Sethi was to receive an allowance, and not salary, for his appointment at NUH.

(c)     The fact that Dr Sethi's appointment at NUH was tied to his position as an employee of NUS. The last sentence of the first paragraph of the 28 June 2005 letter stated that Dr Sethi's appointment at NUH would lapse when his NUS appointment lapsed.

On the basis of the above, as well as another letter dated 14 April 1986 that stated that Dr Sethi had been "deployed" from NUS to NUH as a Resident, Cicada argued that Dr Sethi was an employee of NUS at the material time of the Invention, and not of NUH[note: 52].

86      In the overall analysis, I was satisfied that Dr Sethi was an employee of NUH, rather than a mere contractor or supplier of services to NUH, at the material time when he came up with the 1st Inventive Concept. While there was a contract between him and NUS, he was also in a contract of employment with NUH, and in respect of the activities in issue in the present case, he was answerable to the control and supervision of NUH. There were several considerations that led me to this conclusion.

87      First, I attached little value to the 14 April 1986 letter relied upon by Cicada . That letter predated the Invention by nearly two decades, and could not be taken as determinative or dispositive of Dr Sethi's employment status at the material time. Absent other evidence to show that Dr Sethi's evidence remained static all those years, it was more probable than not that changes to employment and deployment would have occurred.

88      Second, the use of the term "appointment" instead of "employment" in the letters mentioned at [85] above was not conclusive that Dr Sethi was not an employee of NUH. In Kureoka, hostesses of a lounge were held to be employees of the owner of the lounge even though they were given letters of "appointment".

89      Third, I was of the view that Dr Sethi's work as Chief of the Department of Laboratory Medicine at NUH was integral to the business of NUH. I accepted that with that appointment, Dr Sethi's duties included having overall responsibility for the department's clinical operations, operating procedures and workflow processes such as specimen collection for laboratory analysis or testing[note: 53]. Such duties seemed to me to by an integral part of NUH's operations as a hospital, rather than just being accessory to such operations.

90      Fourth, although Dr Sethi was paid a yearly allowance for his duties as Chief of NUH's Department of Laboratory Medicine, I did not consider this factor, in and of itself, to be inconsistent with NUH's submission that he was nonetheless an employee of NUH. Furthermore, even though Dr Sethi only received annual allowances for his duties as Chief of NUH's Department of Laboratory Medicine, he was paid a monthly salary as Senior Consultant at NUH[note: 54].

91      Fifth, there was clear evidence that NUH made monthly contributions to Dr Sethi's CPF account at the material time[note: 55]. I considered this to be a significant factor pointing towards the conclusion that Dr Sethi was in NUH's employment[note: 56].

92      Sixth, the letters produced by NUH stated that NUH had the power to terminate Sethi's services by giving a "notice or salary in lieu of notice"[note: 57].

93      There was a host of other factors which further supported NUH's case that Dr Sethi was its employee at the material time. For instance, Dr Sethi was required by NUH to report for work "punctually, according to your work schedule or roster", and any absenteeism by him without authorisation was "subject to discipline"[note: 58]. Dr Sethi was also entitled to benefits such as medical leave, annual leave, and holidays[note: 59]. I did not think that it was particularly significant that Dr Sethi's appointment at NUH appeared to be tied to his position as an employee of NUS. Even if his appointment at NUH was, as Cicada contended, "ancillary" and "secondary" to his employment at NUS[note: 60], this was really irrelevant as what mattered in the current inquiry was whether Dr Sethi was an employee of NUH at the material time (whether it was an appointment that might be "ancillary" or "secondary" to his appointment at the NUS).

94    I therefore concluded that Dr Sethi was in the employment of NUH at the time that he came up with the 1st Inventive Concept. It did not matter that at that time, concurrent with his contract of employment with NUH, there was also an employment contract between him and NUS.

95    The matter did not, however, end here. Cicada submitted that even if the court found Dr Sethi to be NUH's employee, he did not conceive the inventive concepts of the Invention during the course of his duties at NUH, and that in any event, the Invention could not reasonably be expected to result during the course of Dr Sethi's normal duties[note: 61]. Cicada said that Dr Sethi's duties as Senior Consultant would primarily be of a clinical nature which concerned the treatment of patients[note: 62]. He was not employed by NUH as an inventor or researcher and there were no express terms in Dr Sethi's letters of appointment with NUH that imposed any contractual duty for him to research, innovate or invent for NUH[note: 63]. Cicada also submitted that as a hospital, the essential purpose of NUH (and by extension that of its employees) was to treat illness and diseases and not to develop technology that might assist in the treatment of patients[note: 64].

96    I was not so persuaded by Cicada . I was of the view that Dr Sethi did conceive the 1st Inventive Concepts in the course of his normal duties as the Chief of NUH's Department of Laboratory Medicine, and that the circumstances were such that an invention might reasonably be expected to result from the carrying out of his duties. The letters of 6 June 2002 and 10 June 2005 provided that as Chief of NUH's Department of Laboratory Medicine, he was to:

> … be accountable for the professional and administrative activities within your department in accordance with the hospital's Mission and values… [and] maintain the highest standards in professional performance, teaching, research and developments of staff in your department…

And it was NUH's mission to provide:

> … personalised, specialised, accessible and cost-effective care of the highest quality within an environment of intensive research and excellent medical education[note: 65].

It was not disputed that prior to the Invention, there were problems in NUH's existing processes for laboratory specimen collection and management that could compromise patient safety (see [11] above). I accepted that as the Chief of NUH's Department of Laboratory Medicine, it was his duty to try to resolve such problems by looking to improve the hospital's operations and workflow processes for the management of laboratory specimen collection, so as to maintain "the highest standards in professional performance of his department" and also to fulfil NUH's mission to provide "care of the highest quality". It was in the course of performing this duty that Dr Sethi came up with the 1st Inventive Concept.

97    I was further of the view that although Dr Sethi was not employed by NUH as an inventor or researcher and there were no express terms in Dr Sethi's letters of appointment with NUH that imposed any contractual duty for him to research, innovate or invent for NUH, the Invention was reasonably expected to result from his carrying out of his normal duties as Chief of the Department of Laboratory Medicine. The courts needed to recognise that there was a strong innovative role inherent in many jobs these days, even if it was not explicitly mentioned within the normal or day-to-day job scope. All employees, whether in the public or private sector, whether managerial or clerical, were expected to contribute to the organisation by proposing innovations or improvements. What counted as being within the scope of employment had to be seen in that light.

98    Cicada then made a final submission that Dr Sethi was bound by NUS' intellectual property policy that precluded NUH's alleged entitlement to the Invention. The salient terms of NUS' intellectual property policy are set out below[note: 66]:

D. Ownership of Intellectual Property

1.    Subject to Rule G, all rights, title and interest in Intellectual Property *developed in the course or furtherance of University Research* shall vest in and belong to the University.

…

3.    In addition, Intellectual Property developed in the following instances shall be deemed to be developed in the course of University Research:

(a)    Intellectual Property developed by the University Member in fulfilment of his contract of employment as a staff member;

(b)    Intellectual Property developed by the University Member for the purpose of commercial exploitation *if such Intellectual Property falls within the area of expertise of the University Member for which he was hired by the University or is related to his duties as a University Member*.

[emphasis added]

99    In my view, this argument had little merit. The above provisions of NUS' intellectual property policy were not attracted because Dr Sethi came up with the 1st Inventive Concept in his capacity as an employee of NUH, and not "in the course or furtherance of University Research" at NUS. Cicada contended that if Dr Sethi had come up with the Invention, he would be deemed to have come up with the Invention in the course of University Research in view of clause 3(b) above, provided that any intellectual property developed that fell "within the area of expertise of the University Member for which he was hired by the University or is related to his duties as a University Member" would be deemed as such. I could not accept this contention. Dr Sethi was engaged by NUS as a lecturer in the Department of Pathology[note: 67]; he was engaged for this expertise in pathology and his duties were to teach subjects in this field. The Invention did not fall within this area of pathology.

**Conclusion**

100    In view of the above, I ordered that Dr Sethi, Dr Ratty and Dr Poo be named as joint inventors of the invention, and for NUH to be named as a joint proprietor of the Patent together with Cicada . I further awarded costs to NUH fixed at $77,500 and disbursements of $22,072.90.

[note: 1]Plaintiff's Closing Submissions at [34]; Defendant's Closing Submissions at [2].

[note: 2]Dr Sethi's affidavit dated 13 June 2016 at [4(2)].

[note: 3]Plaintiff's Closing Submissions at [77]; NE of 16 March 2016, p 102.

[note: 4]Plaintiff's Closing Submissions at [37] – [41]; Dr Sethi's1st affidavit at [10] – [11].

[note: 5]Dr Sethi's1st affidavit at [12]; Plaintiff's Closing Submissions at [50].

[note: 6]Dr Sethi's1st affidavit at [15].

[note: 7]Plaintiff's Closing Submissions at [61].

[note: 8]Plaintiff's Closing Submissions at [63]; Defendant's Closing Submissions at [20].

[note: 9]Defendant's Closing Submissions at [2].

[note: 10]At [0001] of the Patent.

[note: 11]At [0002] – [0004] of the Patent.

[note: 12]At [0005] – [0007] of the Patent.

[note: 13]At [0014] – [0017] of the Patent.

[note: 14]Plaintiff's Submissions for Validity of the OS Proceedings at [7].

[note: 15]Plaintiff's Submissions for Validity of the OS Proceedings at [8].

[note: 16]Plaintiff's Submissions for Validity of the OS Proceedings at [9].

[note: 17]Plaintiff's Submissions for Validity of the OS Proceedings at [11].

[note: 18]Plaintiff's Opening Statement at [73]; Plaintiff's Closing Submissions at [23].

[note: 19]Plaintiff's Closing Submissions at [10]; Plaintiff's Reply Submissions at [39].

[note: 20]Plaintiff's Closing Submissions at [57].

[note: 21]Plaintiff's Closing Submissions at [60].

[note: 22]Dr Sethi's 1st Affidavit dated 18 March 2015, Exhibit SS-2, at [16]

[note: 23]Dr Sethi's 1st Affidavit dated 18 March 2015, Exhibit SS-2, at [21]

[note: 24]Plaintiff's Closing Submissions at [57].

[note: 25]Defendant's Closing Submissions at [107(a)], [166] and [275].

[note: 26]Defendant's Closing Submissions at [107(b)].

[note: 27]Statutory Declaration of Dr Ratty at pg 2790 of the Plaintiff's Bundle of Documents.

[note: 28]Dr Ratty's 2nd affidavit at [11] and [12].

[note: 29]Dr Ratty's 2nd affidavit at [13]; Defendant's Closing Submissions at [47].

[note: 30]Dr Ratty's 2nd affidavit at [13]; Defendant's Closing Submissions at [48].

[note: 31]N/E Day 2 from Pg 27 line 22 to Pg 28 line 21.

[note: 32]Exhibits PL-2 and PL-3 to Peter Lim's Statutory Declaration dated 11 March 2013 and [22] of the said Statutory Declaration, which appears as SS-3 (Pg 185 of Dr Sethi's 1st Affidavit.

[note: 33]Defendant's Closing Submissions at [65].

[note: 34]N/E Day 1 at Pg 61 lines 21 – 23.

[note: 35]N/E Day 1 at Pg 56 lines 5 – 9.

[note: 36]N/E Day 1 at Pg 58 lines 2 – 5.

[note: 37]N/E Day 1 at Pg 58 lines 22 – 25.

[note: 38]N/E Day 2 at Pg 38 lines 13 – 18.

[note: 39]N/E Day 2 at Pg 38 lines 2 – 12.

[note: 40]Plaintiff's Closing Submissions at [42].

[note: 41]Plaintiff's Closing Submissions at [43].

[note: 42]Plaintiff's Submissions at [46] – [48].

[note: 43]Dr Sethi's 1st Affidavit dated 18 March 2015, Exhibit SS-2, at [36].

[note: 44]Plaintiff's Submissions at [64].

[note: 45]Plaintiff's Core Bundle at Pg 63.

[note: 46]Notes of Evidence, Day 2, at Pg 86 lines 18-25.

[note: 47]Dr Ratty's 1st Affidavit at [17].

[note: 48]Dr Ratty's 1st Affidavit at [19].

[note: 49]Dr Ratty's 1st Affidavit at [20].

[note: 50]Notes of Evidence, Day 2, at Pg 34 lines 5-9.

[note: 51]Plaintiff's Submissions on Employment at [9].

[note: 52]Defendant's Closing Submissions at [12].

[note: 53]Plaintiff's Submissions on Employment at [10].

[note: 54]Plaintiff's Submissions on Employment at [11].

[note: 55]Dr Sethi's CPF statements for 2004 to 2007 at Pg 51-58 of his affidavit.

[note: 56]Plaintiff's Submissions on Employment at [14].

[note: 57]Plaintiff's Submissions on Employment at [17].

[note: 58]Plaintiff's Submissions on Employment at [12].

[note: 59]Plaintiff's Submissions on Employment at [15] and [16].

[note: 60]Defendant's Submissions (Employment) at [32] and [35].

[note: 61]Defendant's Submissions (Employment) at [41] and [42].

[note: 62]Defendant's Submissions (Employment) at [47].

[note: 63]Defendant's Submissions (Employment) at [48] and [60].

[note: 64]Defendant's Submissions (Employment) at [61].

[note: 65]Plaintiff's Submissions on Employment at [33] and [34].

[note: 66]Dr Sethi's affidavit dated 13 June 2016, p 91.

[note: 67]Defendant Submissions (Employment) at [80].

BACK TO TOP

Copyright Â© Government of Singapore.