1   LAEL D. ANDARA (SBN 215416)
    ERNEST E. PRICE (SBN 164534)
2   ROPERS MAJESKI PC
    545 Middlefield Road, Suite 175
3   Menlo Park, CA 94025
    Telephone:   650.364.8200
4   Facsimile:   650.780.1701
    Email:       lael.andara@ropers.com
5                ernest.price@ropers.com

6   Attorneys for Plaintiff
    SINCO TECHNOLOGIES PTE LTD
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  SINCO TECHNOLOGIES PTE LTD,                Case No. 3:17CV5517

12              Plaintiff,                     Date Action Filed: 9/22/2017

13       v.                                    **PLAINTIFF'S OPPOSITION TO
                                               DEFENDANTS' MOTION FOR
14  SINCO ELECTRONICS (DONGGUAN) CO.,          JUDGMENT AS A MATTER OF LAW,
    LTD.; XINGKE ELECTRONICS                   FOR FINDINGS AND CONCLUSIONS,
15  (DONGGUAN) CO., LTD.; XINGKE               AND FOR NEW TRIAL**
    ELECTRONICS TECHNOLOGY CO., LTD.;
16  SINCOO ELECTRONICS TECHNOLOGY              *Fed.R.Civ.P. Rules 50(b), 52(a), 59*
    CO., LTD.; MUI LIANG TJOA (an
17  individual); NG CHER YONG aka CY NG (an    **Judge:    Honorable Edward M. Chen**
    individual); and LIEW YEW SOON aka
18  MARK LIEW (an individual),                 Date:      February 3, 2021
                                               Time:      1:30 p.m.
19              Defendants.                    Courtroom: 1, 17th Floor

20

21

22

23

24

25

26

27

28

4876-0435-0728.1

ROPERS
MAJESKI

A Professional Corporation
Redwood City

**TABLE OF CONTENTS**

I.      SUMMARY OF ARGUMENT AND OPPOSING POSITION ........................ 1

II.     RULE 50(B) STANDARD:   TRIAL EVIDENCE DOES NOT COMPEL
        "ONLY ONE" CONCLUSION COUNTER TO THE JURY VERICT ...................... 4

III.    PLAINTIFF'S TRIAL PRESENTATION WAS NOT SOLELY FOCUSED
        ON "INITIAL INTEREST" CONFUSION – AND "LASTING LONG
        ENOUGH" IS NOT A REQUISITE FOR LIKELIHOOD OF CONFUSION .......... 6

IV.     ROTE PURPORTED BALANCING OF EACH *SLEEKCRAFT* FACTOR IS
        STRAINED ...................................................................................................... 11

        A.      *Sleekcraft* Factor Evidence ................................................................. 13

        B.      "Intent" Is Not Required for Infringement, But Nevertheless Its Existence
                Indicates Bad Faith ............................................................................ 15

V.      LACHES IS NOT AT ISSUE IN THIS ACTION ........................................ 17

        A.      Plaintiff Filed Suit Well Within the Applicable Statute of Limitations ............... 17

        B.      Defendants Failed to Raise Any Factors Supporting Application of Laches
                in Their Earlier Oral Rule 50 (a) Motion ................................................ 20

VI.     DAMAGES ARE RATIONALLY AWARDED AND SUPPORTED BY
        SUBSTANTIAL EVIDENCE ...................................................................... 20

        A.      Actual Notice Exists But Was Not Raised Under Rule 50 (a) ...................... 21

        B.      Damages Awarded Were Rationally Based on Segregation of Each
                Defendant's Respective Improper Conduct ............................................ 22

        C.      Damages Awarded are Supported by Substantial Evidence ...................... 23

                1.      Plaintiff's Economist Testimony is Based on Intellectual Rigor ............ 24

                2.      Therefore, a Reasonable Basis for Computation of Damages Exists ........ 26

        D.      Damages Awarded Were Reasonably "Certain" .................................... 28

        E.      Damages Awarded are Not Excessive ................................................ 29

        F.      Statutory Damages Awarded Against Individuals are Not Duplicative ............... 30

        G.      Statutory Damages Permitted For Counterfeit Marks ............................ 31

VII.    THE JURY VERDICT IS FAIR TO THE DEFENSE SUPPORTED BY THE
        EVIDENCE – AN AMENDED JUDGMENT OR NEW TRIAL IS
        UNWARRANTED ...................................................................................... 33

VIII.   THE ABANDONMENT INSTRUCTION IS NOT ERRONEOUS .......................... 34

IX.     CONCLUSION...................................................................................35

4876-0435-0728.1

TABLE OF CONTENTS
3:17CV5517

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adams v. Murakami*,
   54 Cal.3d 105 (Cal. 1991) ................................................................................2

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*,
   511 F.Supp.2d 1 (D.D.C.2007) ......................................................................19

*Allison v. Chandler*,
   11 Mich. 542 (1863) ......................................................................................26

*ALPO Petfoods, Inc. v. Ralson Purina Co.*,
   913 F.2d 958 (D.C. Cir. 1990) ......................................................................16

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341(9th Cir.1979) ......................................................................11, 12

*Arcona v. Farmacy Beauty*,
   976 F.3d 1074 (9th Cir. 2020) ..................................................................31, 33

*Australian Gold, Inc. v. Hatfield*,
   436 F.3d 1228 (10th Cir. 2006) ......................................................................10

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
   923 F.Supp.2d 1245 (S.D. Cal. 2013) ........................................................25, 27

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir.1999) .................................................................. passim

*Cairns v. Franklin Mint Co.*,
   292 F.3d 1139 (9th Cir. 2002) ......................................................................15

*Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*,
   269 F.3d 270 (3d Cir. 2001) ............................................................................9

*Coach, Inc. v. Asia Pacific Trading Co., Inc.*,
   676 F.Supp.2d 914 (C.D. Cal 2009) ..............................................................21

*Coach, Inc. v. Celco Customs Services Co.*,
   2014 WL 12573411 (C.D. Cal. 2014) ............................................................31

*Custom Mfg. & Engineering, Inc. v. Midway Svcs., Inc.*,
   508 F.3d 641 (11th Cir. 2007) ......................................................................10

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993) ........................................................................... 23, 26 - 28

*Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*,
 934 F. Supp. 796 (S.D. Tex. 1996) ...................................................21

*Digidyne Corp. v. Data Gen. Corp.*,
 734 F.2d 1336 (9th Cir. 1984).........................................................33

*Dolori Fabrics, Inc. v. The Limited, Inc.*,
 662 F.Supp. 1347 (S.D.N.Y.1987).....................................................27

*Dorr–Oliver, Inc. v. Fluid Quip, Inc.*,
 94 F.3d 376 (7th Cir.1996)................................................................10

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
 109 F.3d 1394 (9th Cir.1997).............................................................9

*Dreamwerks Production Group, Inc. v. SKG Studio*,
 142 F.3d 1127 (9th Cir. 1998)...........................................................15

*DSPT Int'l, Inc. v. Nahum*,
 624 F.3d 1213 (9th Cir.2010)....................................................24, 25, 26

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
 967 F.2d 1280 (9th Cir.1992)...........................................................15

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*,
 756 F.2d 1525 (11th Cir.1985)......................................................19, 35

*E.E.O.C. v. Go Daddy Software, Inc.*,
 581 F.3d 951 (9th Cir. 2009)...............................................................4

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
 273 U.S. 359 (1927)...................................................................24, 26

*Eclipse Associates Ltd. v. Data Gen. Corp.*,
 894 F.2d 1114 (9th Cir.1990)...........................................................14

*Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*,
 458 F.3d 931 (9th Cir. 2006)............................................................34

*Eli Lilly & Co. v. Natural Answers, Inc.*,
 233 F.3d 456 (7th Cir.2000)..............................................................10

*Entrepreneur Media, Inc. v. Smith*,
 279 F.3d 1135 (9th Cir.2002)...........................................................13

*Epic Sys. Corp. v. YourCareUniverse*,
 244 F. Supp. 3d 878 (W.D. Wis. 2017) ........................................6, 9, 11

*Erie R.R. Co. v. Tompkins*,
 304 U.S. 64 (1938)............................................................................3

*Fitbug Ltd. v. Fitbit, Inc.*,
78 F. Supp. 3d 1180 (N.D. Cal. 2015) ...................................................................20

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003)..................................................................2, 21, 23, 28

*Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*,
754 F.2d 591 (5th Cir.1985)..................................................................................19

*G.E. Co. v. Joiner*,
522 U.S. 136 (1997) ...............................................................................................25

*Gabbanelli Accordions & Imports, LLC v. Gabbanelli*,
575 F.3d 693 (7th Cir.)......................................................................................29, 30

*Gasperini v. Center for Humanities, Inc.*,
518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ..........................................3

*General Motors Corp. v. Keystone Automotive Inds., Inc.*,
453 F.3d 351 (6th Cir. 2006)..................................................................................10

*George v. City of Long Beach*,
973 F.2d 706 (9th Cir. 1992)....................................................................................4

*Grocery Outlet, Inc. v. Albertson's Inc.*,
497 F.3d 949 (9th Cir.2007)...................................................................................34

*Grotrian, Helfferich Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
523 F.2d 1331 (2d Cir. 1975)...................................................................................9

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ...............................................................................................26

*In Re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001)..................................................................................4

*Intel Corp. v. Terabyte Int'l, Inc.*,
6 F.3d 614 (9th Cir.1993)..................................................................................24, 28

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
559 F.3d 985 (9th Cir. 2009)............................................................................17, 19

*Interstellar Starship Servs., Ltd. v. Epix Inc.*,
184 F.3d 1107 (9th Cir. 1999) cert. denied, 528 U.S. 1155 (2000) ...............9, 14, 16

*Interstellar Starship Servs., Ltd. v. Epix Inc.*,
304 F.3d 936 (9th Cir. 2002)...............................................................................9, 11

*Johnson & Johnson v. Diaz*,
339 F. Supp. 60 (C.D.Cal.1971) .............................................................................19

*Josephs v. Pac Bell*,
  443 F.3d 1050 (9th Cir. 2006).................................................................................4

*Key West Hand Print Fabrics, Inc. v. Serbin, Inc.*,
  269 F.Supp. 605 (S.D.Fla.1966), *aff'd* 381 F.2d 735 (5th Cir.1967) (*per curiam*)........................................................................................................27

*Kode v. Carlson*,
  596 F.3d 608 (9th Cir.2010)...............................................................................34

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
  408 F.3d 596 (9th Cir. 2005)..............................................................................15

*Kumho Tire* Co., *Ltd. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................25

*Lam v. City of San Jose*,
  869 F.3d 1077 (9th Cir. 2017)..............................................................................4

*Lifshitz v. Walter Drake & Sons*,
  806 F.2d 1426 (9th Cir.1986)................................................................................2

*Lindy Pen Co. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir. 1993)..........................................................16, 17, 23, 25

*Los Angeles Memorial Coliseum Com'n v. NFL*,
  791 F.2d 1356 (9th Cir.1986)........................................................................29, 33

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
  658 F.3d 936 (9th Cir. 2011)..............................................................................31

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
  765 F.2d 966 (2d Cir.1985)................................................................................24

*Lytle v. Household Mfg., Inc.*,
  494 U.S. 545 (1990)..............................................................................................4

*Mallard Creek Industries, Inc. v. Morgan*,
  56 Cal.App.4th 426 (1997).................................................................................12

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1060 (Cir.1996).....................................................................................28

*Marketquest Grp., Inc. v. BIC Corp.*,
  862 F.3d 927 (9th Cir. 2017)..............................................................................15

*Maynard v. City of San Jose*,
  37 F.3d 1396 (9th Cir. 1994)................................................................................4

*McClain v. Owens-Corning Fiberglas Corp.*
    139 F.3d 1124 (7th Cir. 1998) ............................................................................34

*McClaran v. Plastic Indus., Inc.*,
    97 F.3d 347 (9th Cir.1996) ...........................................................................25, 27

*McGregor-Doniger, Inc. v. Drizzle, Inc.*,
    599 F.2d 1126 (2d Cir. 1979) .............................................................................14

*Mfrs. Techs., Inc. v. Cams, Inc.*,
    728 F.Supp. 75 (D.Conn.1989) ..........................................................................27

*MLM Property, LLC v. Country Cas. Ins. Co.*,
    2010 WL1948609 (D. Or. 2010) ........................................................................33

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir.1987) ..................................................................................9

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) ..............................................................................33

*Murphy v. City of Long Beach*,
    914 F.2d 183 (9th Cir.1990) .................................................................................2

*New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992) ..............................................................................16

*Nintendo of America, Inc. v. Dragon Pacific Int'l*,
    40 F.3d 1007 (9th Cir.1994) ...............................................................................30

*Nissan Motor Co. v. Nissan Computer Corp.*,
    378 F.3d 1002 (9th Cir. 2004) ..............................................................................9

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) ...........................................................................15, 16

*Ojala v. Bohlin*,
    178 Cal.App.2d 292 (1960) .................................................................................12

*Person's Co., Ltd. v. Christman*,
    900 F.2d 1565 (Fed.Cir.1990) ............................................................................19

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
    894 F. 3d 1015 (9th Cir. 2018) .....................................................................18, 21

*Plumbers & Steamfitters Union, Local No. 598 v. Dillion*,
    255 F.2d 820 (9th Cir.1958) ...............................................................................30

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
    793 F.2d 1132 (9th Cir.1986) .............................................................................24

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

*Prudential Ins. Co. v. Gibraltar Fin. Corp.*,
    694 F.2d 1150 (9th Cir.1982) ..........................................................................34

*Pryer v. C.O. 3 Slavic*,
    251 F.3d 448 (3rd Cir. 2001) ...........................................................................34

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    254 F.R.D. 597 (N.D.Cal.2008) .......................................................................25

*Reader's Digest Association, Inc., v. Conservative Digest, Inc.*,
    821 F.2d 800 (D.C. Cir. 1987) .........................................................................16

*Reese v. County of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018) ...........................................................................4

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ...........................................................................................4

*Rodeo Collection, Ltd. v. West Seventh*,
    812 F.2d 1215 (9th Cir. 1987) .........................................................................15

*Romag Fasteners, Inc. v. Fossil Group*,
    590 U.S. __, 140 S.Ct. 1492 (2020) ................................................................17

*RSO Records, Inc. v. Peri*,
    596 F.Supp. 849 (S.D.N.Y.1984) .....................................................................27

*Skydive Ariz., Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir.2012) .................................................................. passim

*Starbuzz Tobacco, Inc. v. Addison Specialty Services*,
    2015 WL 11251805 (S.D. Cal. 2015) .........................................................29, 30

*Stevens Linen Assocs., Inc. v. Mastercraft Corp.*,
    656 F.2d 11 (2d Cir.1981) ................................................................................27

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
    875 F.3d 426 (9th Cir. 2017) ................................................................14, 16, 17

*Stork Restaurant v. Sahati*,
    166 F.2d 348 (9th Cir. 1948) ......................................................................13, 14

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) .........................................................................................26

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ..............................................................................4

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006) .........................................................................19

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

*Volkswagenwerk Aktiengesellschaft v. Church*,
   411 F.2d 350 (9th Cir. 1969) ..................................................................13

*Wharf v. Burlington Northern R.R. Co.*
   60 F.3d 631 (9th Cir. 1995) ....................................................................34

*Ziegelheim v. Flohr*,
   119 F. Supp. 324 (E.D.N.Y.1954) ...........................................................27

### STATUTES

17 U.S.C. § 504 ...........................................................................................31

15 U.S.C. § 1072 .........................................................................................21

15 U.S.C. § 1117 ...................................................................17, 20, 22, 28

15 U.S.C. § 1115 .........................................................................................15

18 U.S.C. § 2320 ...................................................................................31, 33

F.R.Civ.P. Rule 16 ......................................................................................27

F.R.Civ.P. Rule 30 ........................................................................................6

F.R.Civ.P. Rule 50 ........................................................................................2

F.R.Civ.P. Rule 52 ............................................................................. 1-2, 35

F.R.Civ.P. Rule 59 .............................................................................1, 33, 35

Fed.Rules Evid.Rule 702 .....................................................................25, 26

### OTHER AUTHORITIES

18 C.J.S. Copyright § 127 (2011) ..............................................................31

H.R.Rep. No. 94–1476, 1976 U.S.C.C.A.N. 5659 (1976) .......................31

Restatement (Third) of Unfair Competition § 36(1) (1995) .....................25

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Plaintiff SINCO TECHNOLOGIES PTE LTD ("SINCO," or "Plaintiff") opposes

2  Defendants' SINCO ELECTRONICS (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS

3  (DONGGUAN) CO., LTD.; XINGKE ELECTRONICS TECHNOLOGY CO., LTD.; SINCOO

4  ELECTRONICS TECHNOLOGY CO., LTD (collectively "XingKe"), MUI LIANG TJOA, an

5  individual ("Tjoa"), NG CHER YONG, aka CY NG's, an individual ("Ng"), and LIEW YEW

6  SOON, aka MARK LIEW's, an individual ("Liew") (or, at times collectively the "individual

7  Defendants") Fed.R.Civ.P. Rules 50(b) and 52(a) Motions, or in the alternative, Defendants'

8  Fed.R.Civ.P. Rule 59 Motion.

9  **I.    <u>SUMMARY OF ARGUMENT AND OPPOSING POSITION</u>**

10    Defendants' Motions at their core re-weigh trial evidence and substitute their own

11  credibility and fact determinations for that of the jury, while ignoring objective evidence.  The

12  Motions also do not detail exactly how each argument is attributed to each respective individual

13  defendant, be it XingKe, Tjoa, Liew and/or Ng.  For these and the following reasons, the Motions

14  must be denied.  Furthermore, Defendants' Rule 50 (b) motion is far more expansive than the

15  issues Defendants argued in the Rule 50 (a) motion on November 12, 2021.

16    At times the Motion is difficult to follow.  For example, Defendants argue "this case was

17  originally framed for the jury as a trial about trademark infringement" but "SINCO SG put into

18  evidence" "something else," using "its federal registrations to dress that story up as trademark

19  infringement" (Mtn. p.1:2-7) or "SINCO SG eschewed the sort of evidence typical of a trademark

20  matter – such as why it was named 'SINCO,'…." (Mtn. p.4:22-24).  Weeding wheat from chaff,

21  Defendants appear to be attacking secondary factual or legal positions that the Plaintiff may not

22  have made or did not entirely focus on at trial.  As best as can be deciphered, Defendants *argue*

23  the following primary points in the current Rule 50(b) Motion:

- "Initial Interest Confusion" was Plaintiff's principal approach at trial, and since confusion did not "last long enough," a finding of likelihood of confusion amongst sophisticated consumers cannot be supported;
- SINCO was not diligent in monitoring the factory's use of the SINCO mark for more than four years, thus laches is a complete defense;
- SINCO's hands are unclean, sowing disinformation about its relationship with the Chinese factory – another complete defense;

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

- SINCO is not entitled to damages since it never provided actual notice of its registration;

- SINCO is not entitled to damages since it has not shown causation or reasonable certainty of harm;

  - *A subtext to this point*:  Plaintiff did not present evidence of Defendants revenue, and thus failed [again] to prove causation or profits with reasonable certainty

- Statutory damages cannot be awarded for counterfeiting against individual defendants who did not act willfully or where actual damages are awarded; and

- SINCO abandoned its trademark.

Significantly, if correctly restated, at least three of these arguments were *not* raised by Defendants' earlier oral Fed.R.Civ.P. ("Rule") 50(a) Motion at the end of trial.  As such, these arguments cannot be raised now under Rule 50(b).  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).  Of the foregoing seven points, three were not raised earlier by Defendants' oral Rule 50(a) motion:  those being **1)** SINCO's hands are unclean, **2)** SINCO's registration did not provide actual notice and **3)** that harm was not demonstrated with reasonable certainty.  None of these points was raised before the Court by Mr. Winthrop on **November 12, 2021**.   (ECF 611, pp. 1469 to 1475.)  Defendants are precluded from raising them now as a matter of law under 50(b) [1].  They are no longer at issue. (*Freund, supra,* 347 F.3d at 761.)

---

[1]  F.R.Civ.P. Rule 50(a) permits a party to move for judgment as a matter of law after the opposing party has been fully heard and prior to the submission of the case to the jury. (Fed.R.Civ.P. 50(a).) If such a motion made at the close of all the evidence is denied, Rule 50(b) allows the moving party to "renew" its motion within ten days after the court's entry of final judgment in the case. (Fed.R.Civ.P. Rule 50(b).) *A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion*.  (See, Advisory Comm. Notes to the 1991 Amendments, Fed.R.Civ.P. Rule 50 ("A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion]."). The purpose of this rule is twofold. *First, it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to "engage in an impermissible reexamination of facts found by the jury*." (*Lifshitz v. Walter Drake & Sons*, 806 F.2d 1426, 1428–29 (9th Cir.1986); emp. added.) *Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them.*  (*Lifshitz, supra,* 806 F.2d at 1429.)  In *Freund*, the district court recognized that Nycomed had not raised insufficiency of evidence of malice in its Rule 50(a) motion at the close of the evidence and that Rule 50 would normally preclude Nycomed from raising it after judgment. It noted, however, that under California law the appealability of punitive damage awards is not waivable.  (Citing *Adams v. Murakami*, 54 Cal.3d 105, 115 n. 5 (Cal. 1991).) The district court accordingly entertained Nycomed's challenge and granted its motion.  The Court of Appeals reversed concluding that the

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

Of the other remaining four points, none compels altering the well-considered and carefully analyzed jury verdict or amendment of the Judgment.  This is because:

- "Initial Interest Confusion" was not Plaintiff's sole trial approach and "lasting long enough" is not a preclusive factor for likelihood of confusion in the Ninth Circuit or any other Federal Circuit;
- What sparse evidence was cited to support laches is not applicable to territorial activity in the United States – Defendants ignore Plaintiff's evidence that XingKe was a factory in China receiving conditional purchases orders from its Singaporean customer, SINCO, with limited rights of use for the SINCO mark in China to manufacture SINCO's goods.  SINCO had "embedded employees" at the Chinese factory for a decade prior to this suit to monitor quality control.  Once SINCO discovered the factory attempting to sell directly into the United States, August 2016, SINCO promptly filed suit within three months, i.e., in October 2016;
- Testimony from Plaintiff's economist expert Dr. Cox identified a marked decrease in SINCO's historic sales suddenly starting in July 2016 – coinciding with improper solicitations by the individual Defendants and by misappropriation of SINCO's mark by XingKe – and extending into December 2018.  Dr. Cox utilized a reliable economic "regression model" to accurately quantify lost profits.  Gross revenue figures were also supported by a last-minute document production of XingKe sales for the same period;
- Statutory damages against individual defendants are permitted for counterfeiting where an identical mark is used without authorization in the United States.  Intent and willfulness can be inferred by using identical marks on identical goods; and
- SINCO never abandoned its trademark in China or in the United States.

And although not at issue since *not* mentioned during Defendants' prior Rule 50(a) motion,

- SINCO has no unclean hands;
- XingKe had actual notice of SINCO's trademark registration since 2006 based on its working relationship, prior protests not to sell directly to U.S. customers and embedded quality control employees; and
- SINCO's injury has been demonstrated with reasonable inference of certainty.

SINOC refers to Defendants' Appendices by referenced ECF locator, and supplements:

Appendix D – Trial Transcript from November 1, 2021 to November 17, 2021.

Appendix E – Depositions Clips of Alison Chen.

---

district court erred in permitting California law to trump Federal Rule 50. Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." (*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).)

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   RULE 50(B) STANDARD:  TRIAL EVIDENCE DOES NOT COMPEL "ONLY ONE" CONCLUSION COUNTER TO THE JURY VERICT

For this Motion, all reasonable inferences should be drawn in the nonmoving party's favor.  (*Reese v. County of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018).)  The court should take special care not to reweigh the evidence.  (*Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017) ("Our role is not to overturn the verdict merely because the jury could have reached the opposite conclusion based on the evidence.").)  Further, the court may not make credibility determinations (*Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990)), and the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." (*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000).)  "While the district court may not resolve conflicts in the testimony or weigh the evidence, it may evaluate evidence at least to the extent of determining whether there is substantial evidence to support the verdict.  The Ninth Circuit has defined substantial evidence as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."  (*Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (citing *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992)); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).)  "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  (*E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Josephs v. Pac Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).)  However, if it is possible to draw two inconsistent conclusions from the evidence, the jury's verdict will *not* be overturned.  *In Re Exxon Valdez*, 270 F.3d 1215, 1237 (9th Cir. 2001).  Here, drawing all reasonable inferences in SINCO's favor, the cumulative evidence presented at trial offers a multitude of different considerations and does not compel "only one" reasonable conclusion contrary to the jury's verdict.  For this and following reasons, Defendants' Motions are not well taken.

Defendants' Motions demand that the court reweigh the evidence and impermissibly make its own credibility determinations contrary to the objective evidence:

| **DEFENDANTS' MOTIONS:** | **TRIAL TESTIMONY:** |
|---|---|
| The parties' customers are a subset of the world's most sophisticated businesses, and the purchases at issue were for the supply of carefully-vetted, customized projects for millions of dollars' worth of parts. 6:4-6 | **Paul Carter** 68:22-69:244 [ECF 638 at 37.]<br>Q. Are you generally aware, as you sit here today, that Apple has done business with SINCO<br>Technologies PTE Limited at some point in time?<br>A: In my personal capacity from my business, I'm not aware, but they may be doing business with parts of Apple.<br>**Alison Chen** 7:9-12 [ECF 638 at 39.]<br>A. I'm testifying in the capacity of an individual.<br><span style="color:red">62:1-2 [Andara Decl. Exh. B]</span><br><span style="color:red">A. I'm not aware of this purchase order, and I don't have a way to really investigate all Google.</span><br>**Andy Lim** 9:04-9:13 [ECF 638 at 48.]<br>A. I'm testifying on -- based on my knowledge. |
| There can be no doubt that the purchasers here exercised a high degree of care and were knowledgeable as to who they were dealing with "[r]egardless of any trademark." 6:11-12 | **Alison Chen** 45:15-17  [ECF 638 at 44.]<br>Q. Ms. Chen, did you ever refer to XingKe Dongguan as SINCO, S-I-N-C-O?<br>A. I have not.<br><span style="color:red">65:18-23 [Andara Decl. App. E]</span><br><span style="color:red">Q.   And you reference SINCO twice in this communication of September 25, 2017. Who are you referring to?</span><br><span style="color:red">A. There was only Mark Liew from **SINCO** in this email. [See Trial Ex. 409.]</span><br><span style="color:red">67:7- 14</span><br><span style="color:red">Q. Who are you referring to when you say "SINCO" in that communication?</span><br><span style="color:red">A. There was only Mark Liew from **XingKe Dongguan**.</span><br><span style="color:red">Q. How did you come to associate SINCO with Mark Liew.</span><br><span style="color:red">A. I don't remember. [See Trial Ex. 410.]</span> |
| The little evidence that was offered concerning **Motorola** showed that it had stopped doing new business with SinCo SG by 2015 due to its high price markup. 10:14-16 | **Dr. Chee** TR 496:1-6. (Trial Exh. 350-"<span style="color:red">lenovo</span>") [ECF 639 at 96.]<br>Q. So that was historically your biggest client at SinCo Singapore; right?<br>A. Motorola Mobility, correct, *not Lenovo*.<br>Q. Right. So by 2015, before the sale to Jinlong, you had lost your historical biggest client?<br>A. I don't know about lost, but we were doing business with Motorola Mobility. It got sold to *Lenovo*. So I don't know if that considers as lost.<br>*See also* **Dr. Chee**  499:7-20. [ECF 639 at 98.]<br>*See also* **Mr. Nguyen** 1060:23-1061:17, 1064: 2-16, and 1155:22-1156:16. (Motorola ≠ Lenovo) |

Defendants characterize Andy Lim (Singapore employee); Alison Chen; and Paul Carter's

testimony as the equivalent to the companies they work for is an objectively false premise, that

was demonstrated before the Jury. None of these witnesses was noticed or presented as

Fed.R.Civ.P. 30 (b)(6) witnesses for their respective employers, as their counsel and testimony

clearly state repeatedly, nor can they reasonably be decisive as to all confusion with their

1  respective companies as demonstrated by their testimony. (Trial Exh. 49.) Defendants also ignore

2  that each company had dozens of business units that used suppliers, which was abundantly clear

3  in their attempt to redefine all Motorola business as a business unit that had been sold to Lenovo,

4  for which SINCO had not sought damages.  This Court should respectfully conclude that

5  substantial evidence exists sufficient to reasonably support the jury's Special Verdict.

6  **III.     PLAINTIFF'S TRIAL PRESENTATION WAS NOT SOLELY FOCUSED ON**
**"INITIAL INTEREST" CONFUSION – AND "LASTING LONG ENOUGH" IS**
7  **NOT A REQUISITE FOR LIKELIHOOD OF CONFUSION**

8          In one moment of lucidity, Defendants actually concede, "Yes, for a period, Defendants

9  were using the "SINCO" name, such as on business cards or in their email address because that

10  had been the name of the company for years."  (Mtn. 3:12-14.)  Defendants then deflect this

11  damning admission by claiming such evidence did not "open the door" to a customer

12  relationship.  (Mtn. p.3:16.) This alternative reality – at first conceding, but then deflecting –

13  ignores *the very case presented by Plaintiff and considered by the jury/trial approach taken by*

14  *Plaintiff:*  rogue employees using their SINCO employment status and business cards for

15  nefarious introductions, amongst other promotional activity, as directed by XingKe's "big boss"

16  Tjoa, and directing SINCO's American customers to a Chinese factory, XingKe, without

17  knowledge or authorization from SINCO in Singapore!  Such activity did not occur only once, or

18  at "initial interest," but amounted to a prolonged campaign spanning at least one year, if not much

19  longer from July 2016 to the Fall 2017.  Defendants mischaracterize SINCO's approach at trial

20  and cite only a single lower court case from the 7th Circuit, *Epic Sys. Corp. v. YourCareUniverse*,

21  244 F. Supp. 3d 878, 902-903 (W.D. Wis. 2017).

22          By citing this one case, Defendants extrapolate a broader holding that "to have actionable

23  initial interest confusion," there must be evidence that the trademark confusion would "last long

24  enough" to give defendant some competitive advantage.  (Mtn. p.4:8-12.)  Defendants imply that

25  XingKe's and the other individual defendants' use of the SINCO mark did not last "long enough

26  to have any influence on a purchasing decision."  *Id*.  From this, Defendants conclude that a

27  reasonable jury could have only reached but one conclusion:  no likelihood of confusion under

28  "initial interest" confusion.  This ignores the evidence, such as the testimony of Dr. Chee:

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park

A. And the first portion of what had actually happened was ***they started to actually tell the customers that they were us***, said that they were new owners of SINCO.

At times they made a clear distinction between what was SINCO DG and what was SINCO Technologies when it suited them. When it didn't suit their purpose, they would say SINCO in the generalized fashion to give the impression that they were the owners of SINCO.

Now, this was significant ***because it cut short their time to try to get to know the customers***. But in the first place, there is a clear confidentiality between us and the customers with regards to the projects that we did. So what kind of projects, the part names, who were the commodity managers that managed the specific programs, these are not ready information.
You can't turn -- you can't get this information readily.

So when they passed off as us essentially by ***using the generalized term "SINCO"*** and using our station employees to verify that they were us, mischievously they gained the trust of the customers who thinks that: Okay. If these are the known station technical employees in China and they are verifying that these guys are us, then it must be so. ***And that was how they got their foot through the door.***

***So this initial confusion was to get their foot through the door so they could begin discussions.*** And when it became a little bit more apparent, then they would tell the customers: Oh, actually, you don't need to deal with SINCO Singapore. I am the new entity. I am the new buyer and the new owner. It will be cheaper if you come through me.(Trial Transcript of Jonathan Chee 243:9-244:13 and 261:20-262:13.)

Q. You're talking about Apple and Intel and Google and Bose. How could they be misled?
A. Because they -- they were us. We already had an existing vendor code. We already had an existing vendor code. And our own employees told them that it's okay to deal with this new owner of SINCO.

***The analogy is you give the safe to your -- a trusted person to guard your house. So this wasn't like a robbery, so to speak, as an analogy. Somebody led them through the back door. The people that had keys to the house led the people through the door.***

That's why it's not about whether these clients were savvy or not. They are very savvy, of course. They are the top companies in the world, but there was no reason to doubt my existing employees when they say, "This is the new boss." That's the analogy here. The people who had keys to the house led the thieves through the door. (Trial Transcript of Jonathan Chee 321:15-322:8.)

It completely ignores Defendants admission that they gave these customers the SINCO business

card with the Plaintiff's trademark:



> Q. And did you ever travel to the United States with Mark Liew?
> A. Yes.
> Q. Was it his practice to also give his business card?
> A. *Yes*.
> Q. And did he give a business card that had any of these marks on it (indicating)?
> A. I -- I don't pay attention to the business card, but the business card say "SINCO Electronics (Dongguan)." (Trial Transcript of Mui Liang Tjoa 675:4-15.)

> Q. But -- and I think we've already covered this a couple times, but you did travel with Mark Liew to meet with Google in July of 2016?
> A. *I believe so.*
> Q. And you recall he gave his name card when he -- at the meeting with Google?
> A. *Yes, I think.*
> Q. And on that name card was the SINCO trademark?
> A. It says "SINCO Electronic (Dongguan)."
> Q. I understand the company name was on there, but you understand the trademark was also on there?
> A. *Whatever the logo they were using, he continued using. He used the same business card as long as he was with the company.* (Trial Transcript of Mui Liang Tjoa 799:15- 800:2 and Trial Exhibit 896.)

> Q. Do you see the SINCO trademark on this business card?
> A. *Yes.*
> Q. Oh, sorry. You're right. Correct, July 2016.
> A. *I believe this is a business card he had, so he should have used this business card.*(Trial Transcript of Mui Liang Tjoa 801:4-24 and Trial Exhibit 896.

> Q. And when you came over, did you meet with representatives from Bose, sir?
> A. Yes.
> Q. And did you not give them a business card with the word "SINCO" on it?



> A. *I always use the same name card for ten or more years, SINCO, yes.*(Trial Transcript of Cy Ng 826:22-827:3 and Trial Exhs. 895 and 896; see also, Trial Transcript of Mark Liew 860:12-861:18; [*Mark Liew testified he first used his competitors' trademark in the U.S. starting from July 2016*.].)

As referenced above Cy Ng testified that he used the SINCO trademark in the U.S. for the first

time in January 2017, with a customer that Defendants claimed was not confused as to source

prior to this trip, and at a time that Defendants admitted to knowledge of the SINCO U.S.

trademarks.  (Trial Transcript of Mui Liang Tjoa 674:13-17.)

ROPERS

MAJESKI

A Professional Corporation

Menlo Park

1    Putting aside for a moment that Plaintiff's trial approach was *not solely based on "initial*

2    *interest" confusion*, based on *dicta* in *Epic Sys. Corp*., a case where summary judgment was

3    granted, Defendants infer a much larger conclusion not recognized in the Ninth Circuit.  No Ninth

4    Circuit authority cites to or approves of the *dicta* in *Epic Sys. Corp*. that confusion must "last long

5    enough" to support a likelihood of confusion.

6    To the contrary, "lasting long enough" to influence a purchasing decision is not required

7    to find initial interest confusion in this Circuit.  "Initial interest confusion occurs when the

8    defendant uses the plaintiff's trademark 'in a manner calculated to capture initial consumer

9    attention, *even though no actual sale is finally completed as a result of the confusion*.'"

10    (*Interstellar Starship Servs., Ltd. v. Epix Inc.,* 304 F.3d 936, 941 (9th Cir. 2002) (weighing

11    internet trinity confusion, quoting *Brookfield Communications, Inc. v. West Coast Entm't Corp.*,

12    174 F.3d 1036, 1062 (9th Cir.1999), (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,

13    109 F.3d 1394, 1405 (9th Cir.1997) (internal quotation marks omitted) (italics added).)  If a rogue

14    company adopts as its domain name a protected trademark, for instance, and proceeds to sell

15    goods similar to those offered by the trademark owner, it necessarily "free rides" on the

16    trademark owner's goodwill.  (*Interstellar Starship Servs.,* 304 F.3d at 945, Trial Exhibit

17    133.) "We recognize a brand of confusion called 'initial interest' confusion, which permits a

18    finding of a likelihood of confusion although the consumer quickly becomes aware of the source's

19    actual identity and no purchase is made as a result of the confusion."  (*Interstellar Starship Servs.,*

20    *Ltd. v. Epix Inc.,* 184 F.3d 1107, 1110 (9th Cir. 1999) cert. denied, 528 U.S. 1155 (2000) citing to

21    *Brookfield, supra*, 174 F.3d at 1061–64; *Dr. Seuss Enters.*, 109 F.3d, *supra*, at 1405, and *Mobil*

22    *Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254, 257–58 (2d Cir.1987).)

23    Lasting "long enough" is not a factor, much less an objective one, in determining initial

24    interest confusion in this Circuit (e.g., *Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d

25    1002 (9th Cir. 2004)), nor is it for a majority of other Federal Circuits. (See, *Grotrian, Helfferich*

26    *Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975); *Checkpoint*

27    *Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 292-95 (3d Cir. 2001)

28    ("We join these circuits [citing *Brookfield Communications,* 174 F.3d at 1057, in holding that

ROPERS

MAJESKI

A Professional Corporation
Menlo Park

initial interest confusion is probative of a Lanham Act violation"]); noting that "Congress recognized the relevance of initial interest confusion and its effect on a company's goodwill when it amended the Lanham Act in 1962" *by deleting requirement that the defendant have deceived "purchasers as to the source of origin" of goods*); G*eneral Motors Corp. v. Keystone Automotive Inds., Inc.,* 453 F.3d 351, 355 (6th Cir. 2006) ("This Court has joined the vast majority of courts in extending the likelihood of confusion inquiry beyond only the point of sale"); *Australian Gold, Inc. v. Hatfield,* 436 F.3d 1228, 1238–39 (10th Cir. 2006) ("The federal courts, though not using the phrase "initial interest confusion," have acknowledged the potential for such confusion for decades"); *Custom Mfg. & Engineering, Inc. v. Midway Svcs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007) (confusion after the point is actionable).)  Defendants obtained a competitive advantage where there use of the trademark unlocked SINCO's existing business in the U.S. to Defendants, just as much as a stolen fob could be used to unlock a door so as unlawfully access to property.

Defendants' chief reliance on "initial interest" confusion "lasting long enough" is also counter to other authority within the 7th Circuit.  The 7th Circuit Court of Appeals has equated initial interest confusion to a "bait and switch scheme." In *Dorr–Oliver, Inc. v. Fluid Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996), the court stated, [T]he Lanham Act forbids a *competitor* from luring potential customers away from a producer by initially passing off its goods as those of the producer's, *even if confusion as to the source of the goods is dispelled by the time any sales are consummated*. (*Id.*; emp. added.)  This "bait and switch" of producers, also known as "initial interest" confusion, will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers.  (*Dorr–Oliver,* 94 F.3d at 382; see also *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir.2000) ("[Initial interest] confusion, which is actionable under the Lanham Act, occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase.")

In the final analysis, Defendants' singular cite to *Epic Sys. Corp.* is unpersuasive.  The case does *not* support a broader requirement that initial interest confusion must be "long lasting" in order to find a likelihood of confusion.  Such consideration is misplaced in the Ninth Circuit.

## IV.   ROTE PURPORTED BALANCING OF EACH SLEEKCRAFT FACTOR IS STRAINED

Nevertheless, with a narrow focus on "initial interest" confusion, Defendants then embark on a point-by-point superficial, rote discussion of all *Sleekcraft* factors to claim trademark infringement does not exist. (Mtn. pp.4-14).  Curiously, Defendants re-weigh select trial evidence – and task not permitted under Rule 50(b) – to claim their own assessment should void that of the jury's.  Such an exercise is argumentative.   More to the point, "[t]o evaluate the likelihood of confusion, including initial interest confusion, the so-called *Sleekcraft* factors provide *non-exhaustive guidance."*  (*Interstellar*, *supra,* 304 F.3d at 942 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346(9th Cir.1979) (italics added).)

The eight-factor test is not robotic but "pliant" – meaning "bending readily; flexible; supple; adaptable," from Dictionary.com – and the relative import of each factor is case specific." (*Interstellar, supra,* 304 F.3d at 942; *Brookfield, supra,* 174 F.3d at 1054.)  With this in mind, SINCO's trial presentation was, of course, not based solely on "initial interest" confusion, as Defendants would have this Court believe, but importantly focused broadly on a campaign of false designations of origin and continuous solicitations explicitly targeting SINCO's existing United States customers.  The evidence unambiguously demonstrated that Defendants used the SINCO trademark from July 2016 to January 2019 with pronounced bouts of expressed confusion from U.S. customers during this time ranging from Google (Andy Lim: "this will cause confusion" Alison Chen: "I am not confused [*sic*], Liew is SINCO") and other U.S. customers (Trial Exhs. 54, 59, 67-69, 419, and 429.)  Despite actual notice to stop (SINCO's State lawsuit was filed October 2016 and Tjoa admission of knowledge), and a feigned name change that coincided with the filing of multiple Trademark applications for the SINCO mark as late as January of 2017. (Trial Exhs. 93-95, 97, 99, 101-102, 104, 106-107, and 109.) XingKe's trademark application for the SINCO marks which all occurred after litigation was filed provide more than sufficient evidence of intent and notice among other factors.  Evidence at trial manifestly shows the



ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1    trademark being improperly displayed on the XingKe webpage as recent as January of 2019.

2    (Trial Exh. 133-11.)

3         Such trial presentation does not point to a single episode of "initial interest" confusion.

4    Rather than "initial interest," the jury fairly concluded that this pattern over a year's time

5    constitutes a prolonged and improper use of a mark by a foreign manufacturer who supplies

6    product to the mark's owner in the United States.

7         Such a fact pattern is also analogous to traditional trademark cases such as *Mallard Creek*

8    *Industries, Inc. v. Morgan*, 56 Cal.App.4th 426 (1997).  There, a trademark owner entered into an

9    arrangement to permit limited use of its mark by a manufacturer. The court, relying on Federal

10   authorities, addressed each *Sleekcraft* factor and weighed each differently on a sliding

11   scale.  (*Mallard Creek Industries*, *supra,* 56 Cal.App.4th at 435.)  Some factors were ignored,

12   others were deemed neutral. (*Ibid*.)  No single factor predominated.  The plaintiff in that case

13   produced baled wood-shavings and packaged its product with a distinctive name "Mallard Creek"

14   and logo "two ducks flying off from a marsh."  The plaintiff brought an action for trademark

15   infringement and unfair competition against its former distributor after learning its distributor had

16   continued to package and sell the same product using the company's name and logo and after the

17   trademark had already been registered.  *Despite finding no evidence of actual confusion*, the court

18   held that plaintiff established a prima facie case of trademark infringement and unfair

19   competition.  The court considered the company's logo a fanciful strong mark without evidence of

20   advertising or public awareness, that the names and logo used by plaintiff and defendant were

21   identical, that the products sold were identical, were marketed through the same channels and the

22   defendants' use of the company's name and logo created a substantial likelihood of

23   confusion.  (*Mallard Creek Industries*, 56 Cal.App.4th at 426, citing in part to *Ojala v.*

24   *Bohlin,* 178 Cal.App.2d 292 (1960).)  The same result is supported here, especially given the fact

25   that multiple examiners at the USPTO in rejecting Defendants' trademark applications for the

26   SINCO mark based on a likelihood of confusion. Admittedly, this evidence was not presented to

27   the Jury, but it is persuasive authority as to the application of the Defendants' use of the mark.

28

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

## A.   *Sleekcraft* Factor Evidence

**STRENGTH**. "SINCO" has conceptual strength because it is arbitrary or fanciful—it makes no description or suggestion of services it provides. "SINCO" has no meaning in English, but is derived from the Chinese characters "兴科."  As to commercial strength, SINCO has consistently used the "SINCO" name and the design mark "SiNCo," for over twenty years in the U.S. market. (Trial Exhs. 1-4 and 895/896.)  Because SINCO's mark is both conceptually and commercially strong, the Jury's finding of likelihood of confusion is supported.

**DEFENDANTS' USE/SIMILARITY/INTENT**.  Defendants admittedly used plaintiff's identical marks in the same lettering style, color, format or with a similar background design, hence the likelihood of confusion is increased. (*Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969).) The greater the similarity between the two marks at issue, the greater the likelihood of confusion. (*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir.2002). These factors, therefore, support the Jury's plausible finding of likelihood of confusion.

As Professor McCarthy observed, "[a] wrongful intent appears easy to infer where defendant knew of plaintiff's mark, had freedom to choose any mark and 'just happened' to choose a mark confusingly similar to plaintiff's mark." (McCarthy on Trademarks § 23:115; see also *Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir. 1948) ("This thought that a newcomer has an 'infinity' of other names to choose from without infringing upon a senior appropriation runs through the decisions like a leitmotif.").)  Here, the evidence shows that Defendants specifically chose the disputed marks at issue to directly target SINCO's specific U.S. customers and displace existing projects and related future business in order for XingKe to step into SINCO's shoes. Additionally, given that there was an ongoing suit involving the same parties, there is no real question that Defendants' decision to file over a dozen trademark applications with the PTO wherein it admitted to its infringing activity under penalty of perjury was deliberate. After the initial applications were rejected, Defendants repeatedly abandoned them and then re-filed applications on the same subject matter, to no avail.

ROPERS MAJESKI

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1     **ACTUAL CONFUSION/SOPHISTICATION**.  Defendants' late identified witnesses

2     Any Lim and Alison Chen were reasonably the least sophisticated and least credible witnesses

3     presented to the Jury, yet Defendants engage in mental gymnastics, willfully ignorant of the

4     evidence, to redefine their testimony and related evidence.  Furthermore, as referenced above,

5     SINCO provided evidence that Defendants continued to use the SINCO marks after notice and

6     feigned name change as to all the U.S. customers. Cy Ng as referenced above testified to using

7     his business card in the U.S. with Bose in January 2017, months after BOSE inquired if

8     Defendants' would continue to use the SINCO mark.  In some cases where the products are

9     identical and the marks are identical, the sophistication of buyers cannot be relied upon to prevent

10    confusion. (*McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979).) Here,

11    the marks are used and portrayed identically, as XingKe, Mr. Liew, and Mr. Ng used the SINCO

12    marks when trying to steal customers under the guise that XingKe was in fact SINCO.

13    The Ninth Circuit has recognized that actual confusion is hard to prove; difficulties in

14    gathering evidence of actual confusion make its absence generally "unnoteworthy." (*Eclipse*

15    *Associates Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118–19 (9th Cir.1990).)  However, evidence

16    of actual confusion, if found, bears on the inquiry and is "particularly potent" when a party can

17    prove it. (*Stone Creek,* 875 F.3d 426, 433). The factor of actual confusion can be "acknowledged,

18    [if there] is substantial circumstantial evidence of initial customer confusion." (*Interstellar Starship*

19    *Services, Ltd. v. Epix Inc.* 184 F.3d 1107, 1111(9th Cir. 1999).)  Thus, "this factor is weighed

20    heavily only when there is evidence of past confusion or, perhaps, when the particular

21    circumstances indicate such evidence should have been available." (*Id*. at 353.) Accordingly, when

22    considering the evidence and testimony, the Jury's finding of likelihood of confusion is amply,

23    andmore than supported. Especially where Defendants failed to apply a disclaimer as ordered by

24    this Court.

25    **IDENTICAL CUSTOMERS**.  Here, the electronics parts are sold to the identical customer

26    who SINCO worked with initially to design the parts and generally with the exact same customer

27    product manager as well as the same project name. The same sales methods are employed, which

28

is demonstrated by the Defendants using SINCO tools, SINCO marks in their email, business cards and the same PowerPoints and using identical web images from the SINCO website.

### B.    "Intent" Is Not Required For Infringement, But Nevertheless Its Existence Indicates Bad Faith

In discussing initial interest confusion, Defendants also claim their use was 'not with the intent to cause confusion.' Defendants argue "[t]he inquiry here is whether Defendants had a bad faith intent to confuse customers" – citing *Marketquest Grp., Inc. v. BIC Corp*., 862 F.3d 927, 937 (9th Cir. 2017).  (Mtn. p.11-12:26-1.)  Defendants also argue lack of "willfulness" at the end of the Motion in the context of Defendants' individual actions.  Mtn. p.30:24.  No matter from which section of their Motion, Defendants' position is a misreading of the law.  Intent to deceive is not required to prove a likelihood of confusion. (*Goto.com*, 202 F.3d at 1208.) The Jury found that Mr. Tjoa, Mr. Liew and Mr. Ng willfully infringed SINCO's trademarks based on ample evidence.

*First*, "intent" is of minimal importance since it can be hard to prove and "intent to confuse customers is not required for a finding of trademark infringement."  (*Brookfield, supra,* 174 F.3d at 1059 (citing *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1132 fn.12 (9th Cir. 1998) ("Absence of malice is no defense to trademark infringement.").)  A party claiming trademark infringement therefore need not prove intent to deceive since intent is not a necessary element of trademark infringement.  (*Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1219 (9th Cir. 1987) (holding that the absence of wrongful intent is not determinative).)  The case of *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992) stands for the proposition that a plaintiff can prevail without proving intent to deceive.

Yet, of note, where a plaintiff can in fact show intent, *he is likely to prevail because the courts then presume that the public will be deceived.*  (*Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) citing *Gallo,* 967 F.2d at 1293 (emp. added).)  With this in mind, Defendants miscite to *Marketquest.*  That authority examined classic fair use [2] of a descriptive

---

[2]    Applying the "classic fair use" defense, "[a] junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark." (*Marketquest Grp., Inc. v. BIC Corp*., 862 F.3d 927, 935 (9th Cir. 2017) citing *Cairns v. Franklin Mint Co*., 292 F.3d 1139, 1150 (9th Cir. 2002).) A defendant must show that its use is (1) other than as a trademark, (2) descriptive of the defendant's goods, and (3) in good faith. 15 U.S.C. § 1115(b)(4). Additionally, "the degree of customer confusion [is] a factor in evaluating fair use." (*Ibid*. citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 408 F.3d 596, 609 (9th Cir. 2005).)

ROPERS MAJESKI

A Professional Corporation
Menlo Park

ROPERS

MAJESKI

A Professional Corporation
Menlo Park

1   mark where "[a]n inference of bad faith does not arise from mere knowledge of a mark when the

2   use is otherwise objectively fair."  (*Marketquest Grp.,* 862 F.3d at 937.)  XingKe did not argue

3   classic "fair use" of a descriptive mark at trial – nor does it or can it do so now by way of its Rule

4   50(b) Motion.  XingKe does not claim "SINCO" is a descriptive or generic mark subject to fair

5   use.  Or that XingKe could properly reference the distinctive company name "fairly".  See, e.g.,

6   *New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 307-308 (9th Cir. 1992)

7   (nominative use of a mark lies outside the stricture of trademark law).  Rather, XingKe's use of

8   "SINCO" was a targeted operation to support business solicitations using an identical "fanciful"

9   mark [3] on identical goods – this to mislead U.S. customers into thinking XingKe in China was the

10  very same company as "SINCO" in Singapore.

11          *Secondly,* under these circumstances, an inference of bad faith, if not willfulness, exits

12  here.[4]  When "an alleged infringer knowingly [5] adopts a mark similar to another's, *courts will*

13  *presume an intent to deceive the public.***"**  (*Official Airline Guides,* 6 F.3d at 1394;

14  *Interstellar Starship Services, Ltd. v. Epix Inc*., 184 F.3d 1107, 1111 (9th Cir.1999) ("Adopting a

15  designation with knowledge of its trademark status permits a presumption of intent to deceive")

16  (bold added).)  And *placing an identical mark on identical goods creates a strong likelihood of*

17  *confusion, especially when the mark is fanciful.*  (*Stone Creek, Inc. v. Omnia Italian Design,*

18  *Inc.* 875 F.3d 426, 429 (9th Cir. 2017) (bold added).)  In "light of the virtual identity of marks, if

19  they were used with identical products or services, *likelihood of confusion would follow as a*

20  *matter of course."* (*Brookfield Communications, Inc.,*174 F.3d at 1056 (emp. added).)

21

22  _____

23  [3]   Fanciful marks comprise terms that have been invented for the sole purpose of functioning as a
    trademark or service mark. Such marks comprise words that are either unknown in the language
    (e.g., PEPSI, KODAK, and EXXON) or are completely out of common usage (e.g.,

24  FLIVVER).  (Trademark Manual of Examining Procedure (TMEP) §1209.01(a.).)
    [4]   In *Lindy Pen,* the Ninth Circuit took guidance from another jurisdictions, that willful

25  infringement equates with bad faith, citing *Reader's Digest Association, Inc., v. Conservative
    Digest, Inc.,* 821 F.2d 800, 807 (D.C. Cir. 1987); willfulness and bad faith require a connection

26  between a defendant's *awareness* and its actions at another's expense; *ALPO Petfoods, Inc. v.
    Ralson Purina Co*., 913 F.2d 958, 966 (D.C. Cir. 1990) (court reversed trial court's finding that

27  false advertising violation of Lanham Act was willful or in bad faith).  (*Lindy Pen Co. v. Bic Pen
    Corp*., 982 F.2d 1400, 1405, 1406 (9th Cir. 1993).)

28  [5] TR of Mui Liang Tjoa 674:13-17. Q. When did you first learn of these issued U.S. trademarks to
    SINCO? A. In 2017.  See also TR 721:7-3 and 746:4-747:16.)

1    XingKe's and the individual Defendants' use of an identical mark here on the same goods

2    *presumes an intent to deceive* – nothing within XingKe's Rule 50(b) Motion addresses this

3    presumption much less rebuts it.  Defendants' use of the "SINCO" mark demonstrates bad intent,

4    *if not bad faith intent*, which is evidence of a strong likelihood of confusion.  (*Stone Creek,* 875

5    F.3d at 429.)  Regardless of any finding of willfulness, it should be noted that a finding of

6    "willfulness" is not necessary for recovery of Defendants' ill-gotten profits.  Regardless of

7    whether there is or is not an intent to deceive (here, there is), the U.S. Supreme Court recently

8    ruled unanimously in April 23, 2020, in *Romag Fasteners, Inc. v. Fossil Group,* 590 U.S. __, 140

9    S.Ct. 1492 (2020), that to recover a trademark infringer's profits, the trademark owner need *not*

10   prove the defendant "willfully" infringed its trademark. [6]

11   **V.    LACHES IS NOT AT ISSUE IN THIS ACTION**

12   **A.    Plaintiff Filed Suit Well Within the Applicable Statute of Limitations**

13   Defendants correctly cite to authority indicating a suit must be filed within a relevant

14   statute of limitation time period to rebut the presumption of laches.  (Mtn. p.14:20.) However,

15   nowhere in their analysis do Defendants provide any plain or clear indication of exactly what that

16   limitation period is.  That period is four years.  (*Internet Specialties W., Inc. v. Milon-DiGiorgio*

17   *Enters., Inc.*, 559 F.3d 985, 990 n.2 (9th Cir. 2009).)  Under any measure of knowledge, Plaintiff

18   filed its suit within four years of known infringement.  The equitable defense of laches does not

19   _____

20   [6]   Section 35(a) of the federal Lanham Trademark Act, 15 U.S.C. §1117(a) allows a court to
      award a plaintiff the infringer's profits "subject to the principles of equity." Some courts read this
21   to mean profits were allowed only "where the infringement is willfully calculated to exploit the
      advantage of an established mark" or "where the defendant is attempting to gain the value of an
22   established name of another," as the US Court of Appeals for the Ninth Circuit ruled in *Lindy Pen
      Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405, 1406 (9th Cir. 1993).  Romag accused Fossil of
23   infringing its trademarks for snap fasteners used in handbags. A Connecticut federal jury found
      that Fossil infringed Romag's marks with "callous disregard" of Romag's rights, but not
24   willfully, and awarded Romag Fossil's profits. The US Court of Appeals for the Federal Circuit
      reversed the award because the Second Circuit (which includes Connecticut) required a finding of
25   willfulness for such an award – callous disregard not being enough. But in its opinion by Justice
      Neil Gorsuch, the Supreme Court noted that although various sections of the Lanham Act
26   expressly require some kind of mental state like intent, knowledge or willfulness for certain
      remedies, like monetary relief for trademark dilution, Section 35(a), allowing disgorgement of
27   profits does not, with regard to infringement claims.  Rather, the Court held, a court must only be
      guided by principles of equity when considering an award of profits – although it did note that a
28   trademark defendant's mental state is a "highly important consideration in determining whether
      an award of profits is appropriate."

4876-0435-0728.1

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

**ROPERS**
**MAJESKI**

A Professional Corporation
Menlo Park

1    apply.    The U.S. trademark infringement occurred in July 2016, and this action was filed on

2    September 22, 2017. (Trial Exhs. 24-25, 40 and 93-95, 97, 99, 101-102, 104, 106-107, and 109.)

3          Defendants misconstrue trial evidence to imply SINCO "rested on its rights" in excess of

4    four years by distorting a relationship between Mr. Bryan Lim of SINCO and its embedded

5    employees Liew and Ng, among others, at the Chinese factory – along with the "big bosses" Mr.

6    Xu Shu Gong and Mr. Goa BingYi also at the Chinese factory.  The factory and SINCO had an

7    early history of limited use of SINCO's name and logo by factory, (Trial Transcript of Dr. Chee

8    239:4-11, 240:6-11; 309:9-19; 310:2-12; 326:2-17) later evolving into purchase orders with

9    conditional terms addressing trademarks.  (Trial Exhs. 5, 14, 17-18, 19, 425-427, and 431.)

10   SINCO also concurrently retained on-site employees to monitor quality control.  (Trial Transcript

11   of Dr. Chee 313:21-314:5.)  Yet, despite all this diligence, Defendants conflate the efforts as

12   some sort of 'acquiescence' to infringement.  (See, e.g., Mtn. pp.15:25-27; SINCO employees at

13   the factory to monitor business activities would have been "on notice" by virtue of their "quality

14   control".)  No good deed – here, diligence – apparently goes unpunished.

15         As a threshold matter, with the exception of one episode regarding an attempted sale by

16   XingKe to Intel in the Fall 2013 (*infra*), all purported 'acquiescence' activity took place in China

17   well before Liew, Tjoa and Ng ever came to the United States in July 2016.  Defendants had

18   assured SINCO that the Intel incident would never happen again, very different than allowing

19   competition. (Trial Exhibit 54 ["taken steps to ensure it will not happen again."].)

20         This is important.  Activity in China from the early 2000s into 2016 will not support a

21   laches defense as to rights vested and enforced under U.S. law, where defendants had no known

22   U.S. activity until July 2016.[7]  "Central to trademark law is the territoriality principle – "under the

23   'territoriality principle,' use of a mark in another country generally does not serve to give the user

24   trademark rights in the United States." (*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.,* 894 F.

25   3d 1015, 1028 (9th Cir. 2018), citing *Grupo Gigante SA De CV v. Dallo & Co.,* Inc., 391 F.3d

26   

---

27   [7] Defendants claim direct sales to Intel started sometime in October 2013 (Mtn. 16:11) or
     November 5, 2013 (Mtn. 16:11, 23) and that SINCO and Mr. Brian Lim knew or should have
     known and did nothing to stop this activity.  These events, assuming in fact they occurred as

28   characterized, are within the four-year statute of limitation time period, October 2013 to
     September 2017, laches does not apply.

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1  1088,1092 (9th Cir. 2004).)  Prior use of a trademark in a foreign country does not entitle its

2  owner to claim exclusive trademark rights in the United States against one who, in good faith, has

3  adopted a like trademark of the same character prior to entry of the foreigner into the domestic

4  market.  (*Johnson & Johnson v. Diaz*, 339 F. Supp. 60, 63–64 (C.D.Cal.1971).)  *It is a basic tenet*

5  *of United States trademark law that foreign use of a mark creates no cognizable right to use that*

6  *mark within the United States*.  (*Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*,

7  754 F.2d 591, 599 (5th Cir.1985).)  This is known as the "territoriality principle," through which

8  "trademark rights exist in each country solely according to that country's statutory scheme."

9  (*Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568–69 (Fed.Cir.1990); see also *Aktieselskabet*

10  *AF 21. Nov. 2001 v. Fame Jeans, Inc*., 511 F.Supp.2d 1, 12 n. 5 (D.D.C.2007).)  As such, the

11  "'[p]riority of trademark rights in the United States depends solely upon priority of use in the

12  United States, not on priority of use anywhere in the world.'"  (*Grupo Gigante*, 391 F.3d at 1093

13  (quoting 3 McCarthy on Trademarks § 29:2 (4th ed.) (internal footnote omitted).)

14        Similar to the equitable defense of laches, third party use of similar marks outside the U.S.

15  cannot establish abandonment of Plaintiffs' rights in the U.S. as a matter of law.  The Lanham

16  Act is only concerned with the *marks used in the United States*.  (*E. Remy Martin & Co., S.A. v.*

17  *Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1531-32 (11th Cir.1985) (refusing to consider the

18  status and circumstances of trademarks in France in connection with domestic trademark-

19  infringement litigation).)  The relevant time period is when activity occurred in the U.S. from July

20  2016 to 2019. (Trial Exhibit 133.)  Once Liew, Ng, Tjoa and XingKe came to U.S. to promote a

21  competitive business using the SINCO mark in July 2016, SINCO immediately filed suit in State

22  court in October 2016, unaware of the trademark use until taking the deposition of Mr. Liew,

23  SINCO then expeditiously filed a Federal suit on September 22, 2017.  ECF 1. Laches runs "from

24  the time the plaintiff knew or should have known about its potential cause of action." (*Tillamook*

25  *Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir.

26  2006).)  SINCO filed suit within fourteen months of discovery, from July 2016 to September

27  2017. This satisfies the most analogous State statute of limitations in California or the four-year

28  statute of limitations for trademark infringement actions.  (*Internet Specialties W.*, 559 F.3d at

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

990 n.2; see also, e.g., *Grupo Gigante*, 391 F.3d at 1102 (four-year delay sufficient for laches defense); *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1193 (N.D. Cal. 2015) (same).)  Once Defendants came to the United States in mid-2016, they were sued by September 2017.

  **B.**   **Defendants Failed to Raise Any Factors Supporting Application of Laches in Their Earlier Oral Rule 50 (a) Motion**

  Defendants seek judgment on the equitable defense of laches. (Mtn. p.14-18 *in passim*.) However, except for scant mention of one factor (no. 4 – strength and value of the trademark rights asserted), the five (5) remaining factors required to support application of a laches defense, which Defendants raise and discuss *here* were *not* specifically addressed in their oral Rule 50 (a) Motion on November 12, 2021. These are: (1) Plaintiff's diligence in enforcing the mark (Mtn. 14:24-25 through 17: 1-14); (2) The harm to SinCo SG if relief is denied (Mtn. 18: 15-17); (3) Good faith ignorance by defendants (Mtn. p.18: 18-20); (5) Competition between parties (Mtn. p.18:21-23); (6) The extent of harm suffered by XingKe as a result of SinCo SG's delay. (Mtn. p.18: 24-26.) As such, Defendants are foreclosed from raising them here in this Rule 50 (b) Motion.

  As to factor (4) The strength and value of the trademark rights asserted (Mtn. p.18: 21-22), Defendants barely mentioned, much less analyzed, the "strength" and did not mention the "value" of the trademark at all previously in their Rule 50 (a) Motion: "If you look at the *Sleekcraft* factors, strength of the mark, the use of the SinCo mark across the number of non-SinCo Singapore entities within the SinCo group, none of which was pursuant to a license, impacts the strength of the mark." (Transcript of Proceedings, Friday November 12, 2021, 1469:11 to 1475:18). Defendants have waived their right to assert these foregoing factors here in their Rule 50 (b) Motion.

**VI.**   **DAMAGES ARE RATIONALLY AWARDED AND SUPPORTED BY SUBSTANTIAL EVIDENCE**

  Under the Lanham Act, the court, in its discretion, may award "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" for a "violation of any right of § 1112 the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) ..., or a willful violation under section 43(c)...." (15 U.S.C. § 1117(a);

- 20 -

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1    *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1111-1112 (9th Cir.2012).) Thus, a prevailing

2    plaintiff in Lanham Act litigation has the ability to pursue not only a recovery of its actual

3    damages (a legal remedy), but also an accounting of the defendant's profits (an equitable remedy)

4    or damages from willful infringement.  These should be awarded to Plaintiff SINCO as the

5    prevailing party.  (ECF 594, 595.)

6         **A.    Actual Notice Exists But Was Not Raised Under Rule 50 (a)**

7         XingKe claims in part that SINCO failed to demonstrate actual notice of its registration

8    and therefore cannot recover damages contrary to Tjoa's trial testimony and perjured Declaration

9    before the USPTO. (Trial Transcript 675:13-17 and 1431:18-1432:20.) First, this point was *not*

10   raised by Defendants' oral Rule 50(a) Motion therefore must be disregarded. (*Freund,* 347 F.3d at

11   761.)  The analysis ends here.

12         Secondly, and only out of caution, should the court continue (it respectfully should not),

13   the court should know that SINCO's 2006 trademark registration put XingKe and the other

14   Defendants on constructive notice of SINCO's claim to ownership of the SINCO mark in

15   2006. (15 U.S.C. § 1072; *Pinkette Clothing*, 894 F. 3d at 1020.)  Whether constructive or actual

16   notice, a registration ® symbol is not the only option for "notice".  *(Coach, Inc. v. Asia Pacific*

17   *Trading Co., Inc*., 676 F.Supp.2d 914, 924-925 (C.D. Cal 2009).)  For instance, a limited

18   licensing agreement was entered into between SINCO and XingKe dated January 2, 2012 that

19   alerted XingKe of SINCO's trademark and XingKe's permitted limited use.  (Trial Exh. 5. And

20   Tjoa testimony 712:12-713:10) Purchase Orders spanning years after this provided the same

21   actual notice. (Trial Exhs. 14, and 17-18.)  XingKe by October 2016 was on notice of SINCO's

22   suit to stop use of its mark by XingKe confederates in the U.S. as the State Complaint Defendants

23   were served had said trademarks attached as Exhibits C through F (identical to Trial Exh. 1-4), as

24   referenced therein.   When the USPTO rejected XingKe's January 2017 application for the

25   identical mark, they certainly were aware of the registration as cited by the examiners in multiple

26   rejections.  Under such cumulative circumstances, the sophistication of defendant and evidence

27   suggesting defendant was aware of the plaintiff's mark can suffice to establish actual notice of the

28

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1    registration.  (See, e.g., *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*, 934 F. Supp. 796,

2    812-813 (S.D. Tex. 1996).)

3          This issue of notice should *not* be considered via the Rule 50(b) Motion.  However, out of

4    caution, should the court consider it, when the weight of all evidence is correctly and objectively

5    balanced, the record unquestionably supports a verdict that XingKe had and has at all relevant

6    times appropriate, actual notice of SINCO's trademark interests. (Trial Transcript 1492:5-7.)

### B.    Damages Awarded Were Rationally Based on Segregation of Each Defendant's Respective Improper Conduct

8          Defendants take great pains to argue a purported lack of evidence to support a finding of

9    SINCO's "lost profit" damages, lack of evidence to support a finding of XingKe "earned profit"

10   damages (or disgorgement), and supposed improper duplication of awarding statutory and/or

11   excessive damages.  (Mtn. pp.25-32.)  When comparing the final jury instructions (ECF 554) to

12   the final form of the Special Verdict questions themselves (ECF 594), to which the Defense did

13   not object prior to submission the jury, Defendants' logic does not withstand scrutiny.  Each

14   award is specifically detailed as to each particular Defendant, with XingKe's award, for instance,

15   based on either SINCO's lost profits "and/or" XingKe's earned profits or both as attributed only

16   to XingKe's trademark infringement.  (ECF 594.)  Under the Lanham Act, a jury is permitted an

17   award for a combination of values for infringement, "either/or" or for "both".   (15 U.S.C. §

18   1117(a).)  A clean segregation between an award for "lost profits" or "earned profits" is not

19   apparent from the verdict form nor is it required under the Lanham Act.  Thus, Defendants'

20   impassioned arguments that the trial evidence does not support one or the other is without

21   foundation, since it is impossible to know at this point post-trial whether the jury's damage award

22   is based on "lost profits," "earned profits" or a combination of one or the other or both.

23         The same logic applies to the individual defendants Tjoa, Liew and Ng.  Given wide

24   discretion permitted for jury deliberations, and jury instructions that specifically ask for

25   individual consideration of counterfeit mark use and liability per individual, with itemized

26   statutory values outlined for penalized "use" or "willful use," it is highly probable the jury

27   considered the maximum award of $2,000,000.00 per individual defendant for willful use of a

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1  counterfeit mark (ECF 554, Instruction 50) and awarded that maximum amount against the

2  individual Tjoa and graciously discounted that possible maximum amount as to Liew and Ng.

3  ECF 594, p.3.   The individual awards are entirely consistent with the jury instructions reflecting

4  the law in the Ninth Circuit, are entirely consistent with the Special Verdict form itself and are

5  not duplicative of other damages (loss profits, earned profits) or obviously excessive based on the

6  trademark law and the economic evidence presented at trial.   The verdict respectfully should

7  stand based on the evidence showing the use of SINCO's mark on business cards and

8  presentations to U.S. customers by each of the individual Defendants'.

9           **C.    Damages Awarded are Supported by Substantial Evidence**

10         Defendants argue in two sections of their Motion – at pages 22-23 regarding plaintiff's

11  "lost profits" and at pages 25-26 regarding disgorgement of "defendants' profits" – claiming

12  SINCO has not demonstrated "causation" or "certainty" at trial sufficient to be awarded any

13  damages, whether SINCO's lost profits or disgorgement of Defendants' earned profits.  As with

14  "notice" (*supra*), "certainty" of damages was *not* argued by Defendants at their oral Rule 50(a)

15  Motion and must be disregarded now.  (*Freund,* 347 F.3d at 761.)

16         Even if Defendants' unsupported argument on "causation" is considered, Defendants

17  avoid a bigger point. Dr. Cox's regression model and testimonial analysis was reasonably based

18  on well-accepted scientific methodology of statistical extrapolation of prior sales data, using

19  SINCO's prior historic sales figures, trends from such sales and extrapolating trends from the

20  Singapore Economic Index. This modeling was never challenged on its technical grounds nor was

21  there any attempt to strike Dr. Cox's regression methodology as unreliable at trial.  (*Daubert v.*

22  *Merrell Dow Pharms*., 509 U.S. 579 (1993).) Unlike the plaintiff in *Lindy Pen*, as cited by

23  XingKe in its Motion, SINCO *did* in fact "furnish the court a reasonable estimate of its own

24  sales."  (See, Motion, p.24:11-12, citing to *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1408

25  (9th Cir. 1993).) Defendants' implication to the contrary is wrong.  (Trial Exhs. 7-12, as broken

26  out by each specific customer. *See* Defendants' Appendix A -ECF 633 at 63, and 78.)

27         Having presented as a qualified economist expert, as to Cox the question is not whether

28  the substance of Cox's evidence was "correct or even credible" but rather whether the jury is

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1    permitted to "agree with it," draw "reasonable inferences," and a "fair assessment" from it.

2    (*Skydive Ariz., Inc. v. Quattrocchi,* 673 F.3d 1105, 1113 (9th Cir.2012).) Under the circumstances

3    of this case, respectfully*, the jury is permitted to do exactly that*, regardless of any question of

4    "causation" (or certainty).  (E.g., *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 621 (9th Cir.1993)

5    (inferences based on extrapolation of limited data is appropriate and not considered "inexorable"

6    nor "fanciful").)

7                  **1.       Plaintiff's Economist Testimony is Based on Intellectual Rigor**

8            It bears repeating, "the purpose of section 1117 is to 'take all the economic incentive out

9    of trademark infringement.'" (*Polo Fashions, Inc. v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1135 (9th

10   Cir.1986) (citations omitted).)  Section 1117 demands neither empirical quantification nor expert

11   testimony to support a monetary award of actual damages; many sources can provide the requisite

12   information upon which a reasonable jury may calculate damages. (*Cf. Louis Vuitton S.A. v.

13   Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985) (upholding calculation of damages

14   based on statements made on a videotape and noting that "[r]ecovery under section 1117 is not

15   limited to cases in which the quantum of actual damages is demonstrated").)  In trademark

16   actions, the nature of the proof required to support a jury award depends on the circumstances of

17   the case and is "subject to the principles of equity."  (*Skydive Ariz.,* 673 F.3d at 1112, citing *DSPT

18   Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1223 (9th Cir.2010) (citations omitted).)  Requiring more

19   precision than can be attained, for example, especially where the impossibility of more precise

20   ascertainment was the fault of the wrongdoer, would be inequitable and is not required.  (*DSPT

21   Int'l,* 624 F.3d at 1223.)  "[A] defendant whose wrongful conduct has rendered difficult the

22   ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that

23   they cannot be measured with the same exactness and precision as would otherwise be possible."

24   (*Id*., at 1223, citing to *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co*., 273 U.S. 359, 379

25   (1927).)  As a result, in some circumstances, as here, absolute precision in the calculation of

26   damages is neither necessary nor possible. (*DSPT Int'l,* 624 F.3d at 1223.)

27           In reviewing a jury's award of actual damages for intentional infringement, the Ninth

28   Circuit "accept[s] 'crude' measures of damages based upon reasonable inferences so long as those

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1   inferences are neither 'inexorable ... [nor] fanciful.'" (*Skydive Ariz.,* 673 F.3d at 1112, citing

2   *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 621 (9th Cir.1993).) *This is because proof of actual*

3   *damage is often difficult.* (*Lindy Pen Co.,* 982 F.2d at 1407 (emp. added).)   Rather, the plaintiff

4   must have "a reasonable bases for the computation" even if lost profits cannot be calculated with

5   "absolute exactness." (*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.,* 923 F.Supp.2d 1245,

6   1254 (S.D. Cal. 2013), citing *McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 361 (9th

7   Cir.1996) (plaintiff must show existence of lost profits with "reasonable certainty" not

8   "speculation or guesswork").)

9       To support a jury's actual damages award, there need only be substantial evidence to

10   permit the jury to draw reasonable inferences and make a fair and reasonable assessment.

11   (*Skydive Ariz.,* 673 F.3d at 1112.) Further, in assessing whether a damages award is grossly

12   excessive, "[t]he fact that the jury may have agreed with [the plaintiff's expert] and rejected the

13   defendant's contentions does not render the award deficient or flawed.

14       Here, in evaluating the jury verdict, a district court assesses "any damages sustained by

15   the plaintiff" in the same manner as in tort damages:  the reasonably foreseeable harms caused by

16   the wrong.  (*Skydive Ariz.,* 673 F.3d at 1111-1112, citing *DSPT Int'l, Inc. v. Nahum*, 624 F.3d

17   1213, 1222 (9th Cir.2010); see also Restatement (Third) of Unfair Competition § 36(1) (1995).)

18   In reviewing an award of lost profits, *Skydive Arizona* emphasized that "we do not ask whether

19   the substance of the evidence presented to the jury was correct or even credible; we only ascertain

20   whether the award was based on reasonable inferences and fair assessments of the evidence in the

21   record."  (*Skydive Arizona*, 673 F.3d at 1113, citing again to *La Quinta Corp.,* 603 F.3d at 342.)

22       On this point, an expert's opinion must apply reliable methodology to reach a helpful

23   conclusion based on some expertise or specialized knowledge. (*Rambus Inc. v. Hynix*

24   *Semiconductor Inc.,* 254 F.R.D. 597, 606 (N.D.Cal.2008) (citing Fed.Rules Evid.Rule 702 in a

25   patent infringement case).)  For instance, "[t]rained experts commonly extrapolate from existing

26   data." (*G.E. Co. v. Joiner,* 522 U.S. 136, 146 (1997).)  Also, there should not be a great analytical

27   gap between the data and the opinion offered.  (*Id.*)  The court's gatekeeping authority ensures

28   that "an expert, whether basing testimony on professional studies or personal experience, employs

in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." (*Kumho Tire* Co*., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).)

By way of its Motions, XingKe and the individual Defendants do not argue any analytical gap or instability in Dr. Cox's methodology or extrapolations.  Nothing identified by Defendants by way of their Motion(s) regarding Dr. Cox's trial testimony indicates flimsiness or lack of rigor as compared to peers in the field of economics.  Dr. Cox's opinions were based on recognized principles of economics.  His methods were explained and could be tested – indeed, Mr. Kahrs tested Dr. Cox's opinions with his own version of a regression model.  (*Daubert*, 509 U.S. at 593–94.)  Upon cross-examination and upon admission of Dr. Cox's analysis, SINCO established a "reasonable probability" of the existence of a causal connection [8] between the infringement and a loss of revenue. (*Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 567 (1985).) Reasonable inferences of a causal nexus were established and presented by SINCO.

### 2.      Therefore, a Reasonable Basis for Computation of Damages Exists

Given the impossibility of precise or exacting measurements, however, the question remains whether the jury had sufficient tools for estimating actual damages.  (*DSPT Int'l,* 624 F.3d at 1223.)  Sufficient tools were provided the jury during this trial:  to wit, economist Dr. Cox extrapolated using a regression model, commonly recognized within his discipline and widely recognized amongst his peers, in offering evidence of SINCO's anticipated lost revenues corresponding to and commensurate with Defendants' infringing conduct.  No effort or mention

---

[8]   Proof of direct causation or absolute certainty are not mandated for proof of injury.  "Juries are allowed to act upon probable and inferential as well as direct and positive proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."  (*Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 564 (1931) (anti-trust violations) citing to *Allison v. Chandler*, 11 Mich. 542, 550-556 (1863).)  "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."  (*Story Parchment Co.,* 282 U.S. at 563, citing to *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co*., 273 U.S. 359, 379 (1927).)

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1  is made by Defendants to indicate use of such methodology violates Fed. Rules Evid. Rule 702 or

2  must be rejected under (*Daubert v. Merrell Dow Pharms*., 509 U.S. 579 (1993). ) In fact,

3  Defendants' own rebuttal economist Mr. Hank Kahrs again used a regression model of sorts when

4  shown his own slide by SINCO counsel – *a slide that he had prepared for the defense* – and one

5  based on a similar regression approach as Dr. Cox, albeit with dissimilar graphic lines (and

6  presumed values).   More to the point, Dr. Cox performed a standard economic analysis and

7  applied a recognized methodology to reach a "helpful" conclusion to the jury:  he quantified

8  SINCO's lost profits, comparing its historic sales *before Defendants' infringement* to its reduced

9  sales *after infringement*.   "An award of lost profits for an existing business is not speculative if

10  the business's track record supplies a basis for the award."  (*McClaran,* 97 F.3d at 356.)  Such a

11  method has also been commonly accepted as reliable by district courts of this Circuit.  (*See, e.g.,*

12  *Brighton Collectibles,* 923 F.Supp.2d at 1254)(*lost profits can be quantified with confidence by*

13  *comparing the plaintiff's actual sales before infringement to sales figures during the time*

14  *defendant improperly competed*, citing to *Ziegelheim v. Flohr*, 119 F. Supp. 324, 325, 329

15  (E.D.N.Y.1954) (there, 4 years of plaintiff's sales data showed loses when defendants copied a

16  Hebrew prayer book that was not readily available from a source other than plaintiff).) [9]

17        Dr. Cox's testimony is evidence now in the record.  There was no contemporaneous

18  objection or motion to strike his substantive presentation of the regression model at trial.   As

19  *Skydive Arizona* noted, "[q]uestions of evidentiary admissibility and credibility are properly

---

[9]   The Honorable Gonzalo P. Curiel, Southern District Judge in *Brighton Collectibles*, surveyed
numerous other cases (923 F.Supp.2d at 1254-1255) where similar evidence was accepted as
reliable, such as suggestions of a customer buying defendant's counterfeit product in place of and
instead of the plaintiff's product. (E.g., *Stevens Linen Assocs., Inc. v. Mastercraft Corp.,* 656 F.2d
11, 15 (2d Cir.1981) (remanding damages calculation to district court when plaintiff introduced
evidence it sent samples to 22 customers, who instead bought similar, cheaper design from
defendant because it was defendant's burden to show that its infringement did not cause every one
of these regular customers to switch to defendant); *Mfrs. Techs., Inc. v. Cams, Inc*., 728 F.Supp.
75, 80–81 (D.Conn.1989) ("very compelling" customer testimony); *Dolori Fabrics, Inc. v. The
Limited, Inc.,* 662 F.Supp. 1347, 1355 (S.D.N.Y.1987) (awarding lost profits of actual, shared
customer); *Key West Hand Print Fabrics, Inc. v. Serbin, Inc*., 269 F.Supp. 605, 613
(S.D.Fla.1966) (awarding lost profits when customer testified she cancelled large order because
defendant flooded market with cheap counterfeit), *aff'd* 381 F.2d 735 (5th Cir.1967) (*per curiam*);
see also *RSO Records, Inc. v. Peri*, 596 F.Supp. 849, 860 (S.D.N.Y.1984) (when defendants made
exact copies of stolen musical recordings and sold the records at the same price "[i]t would be
reasonable to assume that for every counterfeit copy of plaintiffs' copyrighted records and tapes
sold by defendants plaintiffs lost a corresponding sale,"..).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

challenged either before or during trial." (673 F.3d at 1113, citing to Fed.R.Civ.P. 16(c)(2)(D) and *Daubert*, 509 U.S. at 597.) "Failure to raise a *Daubert* challenge <u>at trial</u> causes a party to waive the right to raise objections to the substance of expert testimony post-trial. (*Ibid*., citing *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (Cir.1996) ("[T]he appropriate time to raise *Daubert* challenges is at trial. By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal.").) Cox was not subject to a *Daubert* objection or challenge at trial. His testimony was duly admitted.

Here, the jury was permitted if not encouraged to make reasonable inferences and a fair assessment of Dr. Cox's admitted testimony based on an uncontroversial regression model methodology. His expert testimony alone provides sufficient evidence to support the jury's verdict for money damages. (*Intel Corp.*, 6 F.3d at 621.)

### D.   <u>Damages Awarded Were Reasonably "Certain"</u>

Again, under Section 1117(a), a successful plaintiff can recover not only a defendant's ill-gotten profits, but also the plaintiff's actual damages. (15 U.S.C. §1117(a).) The Special Verdict also reflects this choice and option. (ECF 594.) Yet, Defendants are myopically focused solely on its "ill-gotten profits" as being vague, claiming uncertainty in the jury damage award. (Mtn. p.26:3-27:8.) Again, this position should *not* now be considered under Rule 50(b) since it was not first raised under Rule 50(a). (*Freund*, 347 F.3d at 761.) The analysis ends here.

Out of an abundance of caution, however, should the court assess further (respectfully it should not), Defendants again mischaracterize the jury award as being based solely on XingKe's "earned profits" as opposed to anything else, such as SINCO's "lost profits," and then attack the very strawman it falsely created – that because XingKe's earned profits (i.e., revenues, profit margins) are open to debate and can be tabulated a variety of different ways, it is supposedly "uncertain" as to how the jury arrived at a $11 million verdict against XingKe. (Mtn. 27:4-8.)

Defendants miss the forest for the trees. Under the Lanham Act, a jury is permitted an award for a combination of values for infringement, "either/or" or "both." (15 U.S.C. § 1117(a).) A clean segregation between an award for "lost profits" or "earned profits" is not apparent from the verdict form nor is it required under the Lanham Act. Frankly, the damage award against

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1   XingKe is more likely than not a reflection of SINCO's "lost profits" since Dr. Cox's regression

2   model and the bulk of this testimony focused almost exclusively on SINCO's lost profits, less so

3   on XingKe's "ill-gotten" earned profits.  (Trial Transcript 1158:15- 1245:4.) Without again

4   addressing the methodology and reliability of Dr. Cox's expert opinions (*supra*), had the jury

5   accepted his testimony, as it appears they did, an $11 million verdict against XingKe is not

6   "uncertain" where substantial evidence was presented at trial to indicate at least $37.5 million in

7   lost profits suffered by SINCO aligning with XingKe's proven infringing conduct.  For this

8   reason, the jury award is not uncertain.

9           **E.       Damages Awarded are Not Excessive**

10          Defendants claim "excessiveness" in two sections of their Motions, at page 27, lines 9-22

11  and again at page 32, line 9 to page 34, line 12.  However, in the first instance at page 27 they

12  literally do not articulate any cognizable legal basis as to why the damage award is deemed

13  "excessive."  At best, the argument gleaned is that "Defendants' equitable defenses bar any

14  finding of trademark infringement" and that "8% profit on XingKe's" earned profits is "unrelated

15  to [sales to] Swiftronic and Apple" and thus a "balance of the equities in this case" compels a

16  reduction in the jury award.  (Mtn. 27:17-22.)

17          The analysis here is misplaced for the very same reasons Defendants' "certainty" position

18  is misplaced (*supra*) – the jury award was likely based on SINCO's calculation "lost profits" from

19  Dr. Cox and not so much based on XingKe's "earned profits" (*supra*).  Assuming in all

20  probability that is so, the jury award is reasonably based on evidence in the record.  It is not

21  plainly result of "guesswork" and there is nothing "grossly excessive or monstrous" about such an

22  award where tens of millions of dollars in lost profit suffered by SINCO have been verified.

23  (*Hemmings*, 285 F.3d at 1191, citing to *Los Angeles Memorial Coliseum Com'n v. NFL*, 791 F.2d

24  1356, 1360 (9th Cir.1986).)  The award on this basis is not plainly excessive.

25          Next, from page 33 to 34, Defendants argue under SINCO must choose either actual

26  damages or statutory damages but not both, and therefore the jury award is excessive, citing

27  predominantly to *Gabbanelli Accordions & Imports, LLC v. Gabbanelli*, 575 F.3d 693, 698 (7th

28  Cir.) and, to a lesser extent, to an unreported case *Starbuzz Tobacco, Inc. v. Addison Specialty*

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

ROPERS MAJESKI

A Professional Corporation
Menlo Park

1    *Services*, 2015 WL 11251805 (S.D. Cal. 2015).  In both instances, since *only one party was*

2    *subject to suit*, these are authorities are not instructive.  Missing from Defendants' analysis is the

3    distinction between *XingKe the company* and *Tjoa, Liew and Ng the three individuals*, each being

4    held responsible for different actions – trademark infringement by the company, counterfeiting by

5    the individuals.  (ECF 594.)  "If there are separate violations, the fact that they are charged in the

6    same case does not preclude an award of compensatory damages for some of the violations, and

7    statutory damages for others as to which compensatory damages can't be ascertained or are too

8    slight to warrant the expense of determining but deterrence would be served by a money

9    judgment." (*Gabbanelli Accordions*, 575 F.3d at 698, citing *Nintendo of America, Inc. v. Dragon*

10   *Pacific Int'l*, 40 F.3d 1007, 1010–11 (9th Cir.1994).)  This is the case here.  Lost profits, which

11   are compensatory damages, and the statutory damages pertain to the different factual

12   circumstances, where XingKe was shown, in part, seeking a USPTO application for the "SINCO"

13   mark and continuing to advertise the mark on its website, whereas the individual Defendants were

14   shown to have solicited SINCO's American customers using unauthorized visits as employees,

15   using equally unauthorized business cards and marketing presentations misrepresenting who they

16   actually were.  This result is consistent with unreported authority, *Starbuzz*, where an election of

17   damages must typically be made as to any one party. (*Starbuzz Tobacco,*2015 WL 11251805 *3;

18   (there, Plaintiff elected as to one of the two Defendants to pursue statutory damages).)  Because

19   compensatory and statutory damages were awarded for different violations in this case, the

20   damage award cannot be deemed excessive nor "monstrous.  (*Hemmings,* 285 F.3d at 1191.)

21           Finally, Defendants do not argue the verdict was excessive based on the bias, passion, or

22   sympathy of the jury.  *Plumbers & Steamfitters Union, Local No. 598 v. Dillion*, 255 F.2d 820,

23   824 (9th Cir.1958).

24           **F.      Statutory Damages Awarded Against Individuals are Not Duplicative**

25           Defendants misrepresent the law, arguing statutory damages cannot be awarded against

26   each individual defendant.  (Mtn. p.33:13-15.)  They can be.

27           SINCO did not sue Defendants "jointly and severally" as "joint tortfeasors" for statutory

28   damages.  See again, Second Amended Complaint (ECF 23). This is important, since only a

1    single award for statutory damages within the statutory limits may be made for all infringements

2    involved in an action with respect to any one work, *except where multiple defendants are not*

3    *jointly liable.*  (*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc*., 658 F.3d 936, 947 (9th

4    Cir. 2011) citing to 18 C.J.S. Copyright § 127 (2011) (bold added).  "[W]here separate

5    infringements for which two or more defendants are **not** jointly liable are joined in the same

6    action, *separate awards of statutory damages would be appropriate*." *Louis Vuitton Malletier*,

7    658 F.3d at 946-947, citing 17 U.S.C. § 504, Notes of Committee on the Judiciary, H.R.Rep. No.

8    94–1476, 1976 U.S.C.C.A.N. 5659 (1976) (emphasis added).)

9         Of note, the *not reported* case cited by Defendants, *Coach, Inc. v. Celco Customs Services*

10   *Co.,* 2014 WL 12573411 *25 n.137 (C.D. Cal. 2014), is in accord.  There, neither the verdict

11   form nor the jury instruction included any language directing the jury to make only one single

12   award for ***joint*** infringement.  (*Coach,* 2014 WL 12573411 at *25 (emphasis added).)   The

13   Honorable Margret M. Morrow considered this to be error.  "In this case, defendants are jointly

14   and severally liable, and separate statutory damages awards are not appropriate." (2014 WL

15   12573411 at *25 n. 137.)

16        In contrast, in SINCO's case at bar against Tjoa, Liew and Ng, Jury Instruction No. 50

17   here (ECF 554) correctly indicates "*You must consider each individual defendant separately*"

18   since these defendants are not being sued jointly and severally.  (ECF 23.)  Therefore, separate

19   awards of statutory damages are entirely appropriate and not duplicative.  ( *Louis Vuitton*

20   *Malletier*, 658 F.3d at 946-947 (citations omitted).)

21        **G.      Statutory Damages Permitted For Counterfeit Marks**

22        Counterfeit marks are spurious, unauthorized use of marks on goods or services that are

23   identical or substantially indistinguishable from a registered mark which are likely to cause

24   confusion.  (18 U.S.C. § 2320(f)(1); see, e.g., *Arcona v. Farmacy Beauty*, 976 F.3d 1074, 1078

25   (9th Cir. 2020).)  However, when addressing counterfeiting and statutory damages, Defendants

26   argue a reasonable jury could not have found counterfeiting.  (Mtn. p.29:3.)

27        Citing to a Sixth Circuit case, Defendants characterize the individual defendants as

28   potential "franchisees" or "holdover franchisees" and argue their use of a SINCO mark was

ROPERS MAJESKI
A Professional Corporation
Menlo Park

4876-0435-0728.1

- 31 -

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

"genuine" and not counterfeit. (Mtn. p.29:4-20.) Further, citing to lower court cases from Pennsylvania and Maryland, Defendants allude to authorization by SINCO for Defendants "good faith" use of the SINCO mark – therefore no evidence of counterfeiting could be found by a jury. (Mtn. 29:21-30:17 ("one authorized by the parties' agreement," regarding a "revoked franchisee's continued use of former franchisor's trademark insufficient," is a "good faith" belief of "prior right to use" and "not be said to 'know' that the mark is counterfeit").)

These arguments, for what they are, improperly reweigh trial evidence and substitute the jury's determination for Defendants' own. This is improper under Rule 50(b). Further, no evidence at trial was introduced to demonstrate Liew, Ng or XingKe were franchisees or former franchisees. Technically, this point on franchising was not raised by Defendants' Rule 50(a) Motion and therefore should not be considered now. If the analysis continues (it shouldn't), trial evidence demonstrates just the opposite, that Liew and Ng were SINCO *employees* stationed at a Chinese factory for quality control purposes. XingKe was *a factory* manufacturing almost exclusively for SINCO. None of the Defendants had marketing responsibilities or franchise obligations in the United States. (Trial Transcript 233:15-20; 235:22-25; 245:23-246:10; 287:11-25; 289:5-8; 681:7-15; 955:4-956:8; and 957:21-958:13.) Since no evidence of franchising was introduced at trial, discussion of franchisee law from other Circuits as a defense to counterfeiting is inapplicable here.

Lastly, use of SINCO's mark by Defendants was not mistaken or in "good faith." Evidence at trial demonstrates when Liew applied for an American Visa to visit the United States for the first time in his life, for instance, he contacted SINCO – since SINCO was his employer – and lied to SINCO misrepresenting that he was taking a vacation to Disneyland. (Trial Transcript 288:8-17 and Trial Exhs. 24-25.) Yet, at the same time, he informed the United States State Department under oath that he was visiting Apple for work. (Trial Transcript 863:18-864:17.) Liew did so at Tjoa's bequest. Similarly, Ng signed a Non-Disclosure Agreement with SINCO requiring him to inform SINCO of any promotional activities involving SINCO products – but instead, Ng assisted Tjoa and XingKe with a presentation to Bose regarding SINCO products in December 2016 and doing so without alerting SINCO. Like Liew, Ng subsequently traveled to

ROPERS
MAJESKI
A Professional Corporation
Menlo Park

1   the United States for the first time in his life as a SINCO employee to solicit business from

2   XingKe from Bose in January 2017 without notifying SINCO.   XingKe itself, actively attempted

3   to usurp SINCO's registered trademark by applying for an identical mark before the USPTO in

4   January 2017 without alerting SINCO.   These are not the actions of "good faith" actors (or

5   "franchisees") but the actions of confederates and subterfuge.  Defendants knew in May of 2016

6   that they were competing with SINCO.

7         Sufficient trial evidence was submitted that can be reasonably interpreted by the jury that

8   Defendants were not acting in "good faith".  In the end, Defendants did not use a genuine mark

9   because they did not have authority from the mark's owner, SINCO, to promote that mark in the

10  United States.  (*Arcona*, 976 F.3d at 1078; 18 U.S.C. § 2320(f)(1).)

11  **VII.   THE JURY VERDICT IS FAIR TO THE DEFENSE SUPPORTED BY THE**
          **EVIDENCE – AN AMENDED JUDGMENT OR NEW TRIAL IS**
12        **UNWARRANTED**

13        Rule 59 allows the court to grant a new trial after a jury trial "for any reason for which a

14  new trial has heretofore been granted in an action at law in federal court." (Fed. R. Civ. P. 59(a).)

15  Although Rule 59 does not specify the grounds on which a court may order a new trial,

16  historically grounds include: "that the verdict is against the weight of the evidence, that the

17  damages are excessive, or that, for other reasons, the trial was not fair to the party moving."

18  (*Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007).)  The province of the jury will

19  only be invaded "if the verdict is contrary to the clear weight of the evidence, is based upon false

20  or perjurious evidence or to prevent a miscarriage of justice."  (*Molski*, 481 F.3d at 729.)

21        "When a motion for a new trial is based on insufficiency of the evidence, a 'stringent

22  standard applies' and a new trial may be granted 'only if the verdict is against the great weight of

23  the evidence or it is quite clear that the jury has reached a seriously erroneous result.'" (*MLM*

24  *Property, LLC v. Country Cas. Ins. Co*., 2010 WL1948609, at *2 (D. Or. 2010) (quoting *Digidyne*

25  *Corp. v. Data Gen. Corp*., 734 F.2d 1336, 1347 (9th Cir. 1984).) Substantial deference is

26  otherwise accorded to a jury's finding of the appropriate amount of damages. (*Los Angeles*

27  *Memorial Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir.1986), cert. denied, 484 U.S.

28  826 (1987).)  The jury's finding must be upheld unless the amount is grossly excessive or

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1    monstrous, clearly not supported by the evidence or based only on speculation or guesswork.

2    (*Los Angeles Memorial Coliseum*, 791 F.2d at 1360.)  As has been demonstrated at trial and by

3    way of this Opposition, SINCO's presentation of evidence was substantial, the jury verdict is not

4    "clearly" against the great weight of this evidence and was not grossly excessive or based on

5    speculation or guesswork.  No genuine basis for ordering a new trial exists.  Defendants' Rule 59

6    Motion should be denied. **10**  Where a district court has upheld a jury award in denying a motion

7    for a new trial, such a ruling is "virtually unassailable." (*Kode v. Carlson*, 596 F.3d 608, 612 (9th

8    Cir.2010).)  For the same reasons, Defendants' Rule 52(a) Motion should also be denied.

9    **VIII.   THE ABANDONMENT INSTRUCTION IS NOT ERRONEOUS**

10          Defendants claim the jury instruction addressing the equitable defense of abandonment is

11   in error.  *It is not.*  The Ninth Circuit jury instruction for abandonment, 15.22, specifically

12   acknowledges that no Ninth Circuit case establishes the standard of proof required to prove

13   abandonment as between "clear and convincing" and "preponderance" citing to *Electro Source,*

14   *LLC v. Brandess-Kalt-Aetna Group, Inc.,* 458 F.3d 931, 935 n.2 (9th Cir. 2006)(noting that

15   defendant "as the party asserting abandonment, is required to 'strictly prove' its claim …We do

16   not need to flesh out the contours of the 'strict proof' standard because our resolution of this

17   summary judgment appeal rests on the proper legal construction of § 1127") (collecting other

18   "strict proof" cases); *Prudential Ins. Co. v. Gibraltar Fin. Corp*., 694 F.2d 1150, 1156 (9th

19   Cir.1982) (characterizing abandonment as "in the nature of a forfeiture" which "must be strictly

20   proved"; see also *Grocery Outlet, Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir.2007)

21   (stating that because appellant waived its challenge to clear and convincing standard, the Ninth

22   Circuit "need not resolve the burden of proof issue").)  The instructions' comment section

23   continues, indicating scholars note that except for the Federal Circuit, "all" courts follow a clear

24   and convincing standard of proof of abandonment.  (Citing, 3 J. Thomas McCarthy, Trademarks

---

**10**   SINCO believes the actions by Defendants and their motives in this case are convoluted, are not simple nor can they be presented plainly separate and apart from a damage presentation. A partial new trial should not be ordered if it involves a tangled or complex fact situation that makes it unfair to determine damages apart from liability.  *See Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454-455 (3rd Cir. 2001); *McClain v. Owens-Corning Fiberglas Corp.* 139 F.3d 1124, 1128 (7th Cir. 1998); *Wharf v. Burlington Northern R.R. Co.* 60 F.3d 631, 638 (9th Cir. 1995) (no injustice resulting from retrial on damages only without reopening liability issues).

ROPERS
MAJESKI

A Professional Corporation
Menlo Park

1   and Unfair Competition § 17:12 (4th ed. 2015); see also Anthony L. Fletcher and David J. Kera,

2   Annual Review, 85 Trademark Rep. 607, 724-25 (1995).)  The "clear and convincing" jury

3   instruction standard for abandonment [11] was not erroneous.

4   **IX.   CONCLUSION**

5        Respectfully, Defendants' Fed.R.Civ.P. Rules 50(b) and 52(a) Motions, or in the

6   alternative, Defendants' Fed.R.Civ.P. Rule 59 Motion should each be denied in their entirety.  No

7   legal or factual basis has been adequately articulated to support modification or amendment of the

8   jury award or of the judgment.  In some cases, Defendants misrepresent the law.  In other cases,

9   they ignore key trial evidence.  In all respects, the Motions do not satisfy what respective

10   standards are required to alter or amend the results of the jury trial.

11

12   Dated: January 5, 2022                    Respectfully submitted,

13                                                           ROPERS MAJESKI PC

14

15                                                           By: */s/ Lael D. Andara*
16                                                                LAEL D. ANDARA
                                                                    ERNEST E. PRICE
17                                                                Attorneys for Plaintiff
                                                                    SINCO TECHNOLOGIES PTE LTD

---

[11]  Of note, as to the substance of trial evidence, similar to the equitable defense of laches, third party use of similar marks outside the United States cannot establish abandonment of Plaintiffs' rights in the United States.  The Lanham Act is only concerned with the marks used in the United States.  (*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1532 (11th Cir.1985) (undisputed that Defendant did not use his mark in the United States for approximately 6 years).  Plaintiff made out at least a prima facie case of abandonment).  Defendants insist on citing activity in Singapore as a basis for abandonment in the United States – it cannot be.

4876-0435-0728.1

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT
3:17CV5517

ROPERS
M A J E S K I

A Professional Corporation
Menlo Park